## UNITED STATES DISTRICT COURT FOR THE DISTRICT
## OF THE DISTRICT OF COLUMBIA

**BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS,**

                                        Case No.

                Plaintiff,

    v.

**DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR
and the
UNITED STATES DEPARTMENT OF
THE INTERIOR,**

                Defendants.

---

## PLAINTIFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S
## MOTION FOR PRELIMINARY INJUNCTION

The Board of Commissioners of Cherokee County, Kansas ("Cherokee County")

respectfully moves for a preliminary injunction in this action challenging the Secretary of

the Interior's violations of law that have allowed the fast-paced construction of a large

Indian casino resort without any environmental review of its effects on the surrounding

human environment. 1/ Cherokee County's complaint is an action for declaratory and

injunctive relief brought under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, the Declaratory Judgment Act (""DJA"), 28 U.S.C. §§ 2201 and 2202, the

---

1/      This same date Cherokee County filed its complaint in this action.  Due to the urgency of this
matter, Cherokee County has also filed this date a motion to expedite consideration of this Motion for
Preliminary Injunction

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Indian

Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*

  The planned casino development follows from the Secretary's decisions to

acquire trust lands and make conveyances of land for the benefit of the Quapaw Tribe of

Oklahoma, decisions that were taken without public notice and without regard to

governing statutes, regulations and policy. As a result of that decision, the casino

development is now under hurried construction, with over half of its development

footprint in Cherokee County. The construction and operations of the planned casino will

impose on Cherokee County myriad environmental impacts that threaten irreparable

injury to Cherokee County but that the Secretary failed to consider, as he is required to do,

before making his decisions.

  Cherokee County now moves for a preliminary injunction so that the Quapaw

casino development can be subjected to the environmental review required by the

National Environmental Policy Act ("NEPA") and the decisional process required by

NEPA and other federal regulations. Cherokee County therefore requests that the Court

enjoin the Secretary from proceeding with any further land acquisitions related to the

development. In addition, Cherokee County seeks an injunction against the Secretary, as

legal owner of the relevant real property, and all those acting in concert with him from

conducting any further construction activity on the property and from operation of the

casino until the Secretary has complied with applicable law by, among other things,

completing an environmental assessment and, if necessary, an environmental impact

statement as required by NEPA, as required by NEPA.

For these reasons, and for the grounds set forth in the accompanying

Memorandum in Support of Preliminary Injunction, Cherokee County respectfully

requests the Court grant a preliminary injunction.


Dated:  February 25, 2008

                                    Respectfully submitted,


                                    Jonathan L. Abram, D.C. Bar No. 389896
                                    jlabram@hhlaw.com
                                    Audrey E. Moog, D.C. Bar No. 468600
                                    amoog@hhlaw.com
                                    HOGAN & HARTSON L.L.P.
                                    555 Thirteenth Street, NW
                                    Washington, DC  20004–1109
                                    (202) 637-5600 (Telephone)
                                    (202) 659-5910 (Facsimile)

C. Dean McGrath, Jr., D.C. Bar No. 453574       David R. Cooper
dmcgrath@manatt.com                             dcooper@fisherpatterson.com
June DeHart, D.C. Bar No. 362871                FISHER, PATTERSON, SAYLOR &
jdehart@manatt.com                              SMITH, LLP
MANATT, PHELPS & PHILLIPS, LLP                  3550 SW 5th Street
700 Twelfth St. NW                              Topeka, KS 66601
Suite 1100                                      (785) 232-7761 (Telephone)
Washington, DC 20005                            (785) 232-6604 (Facsimile)
(202) 585-6500
(202) 585-6600

                                                *Counsel for Board of Commissioners of
                                                Cherokee County*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF THE DISTRICT OF COLUMBIA**

**BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS,**

                                        Case No.

                  Plaintiff,

      v.

**DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR
and the
UNITED STATES DEPARTMENT OF
THE INTERIOR,**

                  Defendants.

---

**PLAINTIFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S
MEMORANDUM IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**INTRODUCTION**

In this action, the Board of Commissioners of Cherokee County, Kansas

("Cherokee County") challenges the Secretary of the Interior's violations of law that have

allowed the fast-paced construction of a large Indian casino resort without any

environmental review of its effects on the surrounding human environment.  The planned

casino development follows from the Secretary's decision to take certain lands into trust

and to convey other interests in land for the benefit of the Quapaw Tribe of Oklahoma,

decisions that were taken without public notice and without regard to governing statutes,

regulations, and policy.  As a result of the Secretary's decisions, the casino development is now under hurried construction.  Over half the development footprint lies in Cherokee County.  In addition, the planned casino will impose on Cherokee County myriad environmental impacts that threaten irreparable injury to Cherokee County but that the Secretary failed to consider, as he is required to do, before taking lands into trust for the Quapaw.  After many months of trying to persuade the Secretary of the Interior to take action to correct its unlawful trust acquisitions, Cherokee County brings this action as a last resort.

Cherokee County now moves for a preliminary injunction so that the defendants' decisions and pending decisions to permit and enable the Quapaw casino development can be subjected to the environmental review required by the National Environmental Policy Act ("NEPA") and the decisional process required by other federal regulations and department policy.  Without an injunction, the casino development will continue unchecked and its significant environmental effects will be an unreviewed, unmitigated fait accompli.  Cherokee County therefore requests that the Court enjoin the Secretary from proceeding with any further land acquisitions related to the development.  In addition, Cherokee County seeks an injunction against the Secretary, as legal owner of the relevant real property, and all those acting in concert with him from conducting any further construction activity on the property and from operation of the casino  until the Secretary has complied with applicable law by, among other things, completing an environmental assessment and, if necessary, an environmental impact statement as required by NEPA.  Until that has occurred, neither the United States as legal owner nor

the Quapaw as beneficial owner acting in concert with the United States, can be

permitted to proceed with construction or operation of the Quapaw casino development.

## STATEMENT OF FACTS

In May 2007, the Quapaw Tribe of Oklahoma announced plans for a large casino

development in the tri-state corner of Oklahoma, Kansas and Missouri. See W. Kennedy,

"Tribe Announces Plans for Resort Casino," *Joplin Globe*, May 15, 2007 (attached as Ex.

1(A) ("Tribe Announces Plans"); Declaration of Rod Edmondson ¶ 7 (attached as Ex. 1)

("Edmondson Decl."). The planned casino development will lie partly in Ottawa County,

Oklahoma, where the casino and hotel structure will be located, and partly in Cherokee

County, where the development's access road and customer parking will be built. *See*

Ex.1(A) "Tribe Announces Plans" at 1. Some two million people per year are expected,

and even without the required environmental assessment, it is clear that much of the

traffic and other environmental impacts will be felt in Cherokee County, in which every

single casino customer will drive and park on his way to the casino just over the border.

*See* Ex. 1, Edmondson Decl.¶¶ 7, 10, 19-23. As a result, Cherokee County will bear the

brunt of the casino's direct and indirect environmental impacts.

### A.    The Quapaw Casino Development

Although no public announcement was made prior to May 2007, Quapaw officials

stated at that time that "the tribe ha[d] been working on the project since 1990." Ex. 1(A),

"Tribe Announces Plans" at 1. "The [ ] project will consist of a casino/hotel complex,

infrastructure and other amenities on approximately 85 acres in Oklahoma, surface

vehicle parking and an access driveway on approximately 63 acres in Kansas, and an

extension of the access driveway on approximately 30 acres in Missouri." C. Artman

Letter to Sen. P. Roberts dated Dec. 20, 2007 at 1 (attached as Ex. 1(C)). The entire 63

acres of parking area and access roadway in Kansas is located in Cherokee County. Ex. 1, Edmondson Decl. ¶ 10. The Quapaw call the casino development the Downstream Casino Resort. *See* Ex. 1(A) at 1.

The 40-acre Oklahoma parcel on which the Quapaw are building the casino-hotel structure is usually referred to as the Meh-No-Bah Allotment, named for the original Indian allottee of the parcel. Ex. 1(C), Artman Letter to Sen. P. Roberts dated Dec. 20, 2007 at 1; M. Downing Letter to J. Nelson dated Oct. 25, 2007 at 1-2 (attached as Ex. 1(B)). The Meh-No-Bah Allotment is located in an undeveloped area with no existing roads prior to the start of construction. Ex. 1, Edmondson Decl. ¶ 11. In order to bring casino resort customers to the development, the Quapaw plan to build a road to connect the development to Route 166 in Cherokee County and in nearby Missouri. *Id.*; *see also* Quapaw Casino Development Plan (attached as Ex. 1(E)). The access road will bring traffic from the interstate highway in Missouri into Cherokee County, Kansas, and then into the casino parking area, also located in Cherokee County, from which customers would make their way into the casino resort. Ex. 1, Edmondson Decl. ¶¶ 10-11; Ex. 1(E).

On or about May 14, 2007, the Quapaw Tribe held a press conference at which it announced its final plans for constructing a large-scale $200 million casino resort to operate 24 hours a day, seven days a week and 365 days a year, and to attract two million annual visitors. Ex. 1(A), "Tribe Announces Plan" at 1. The Quapaw held a public groundbreaking ceremony on July 31, 2007. R. McKinney, "Area Officials Celebrate Quapaw Tribe's Planned $200 Million Casino, Hotel," *Joplin Globe*, July 31, 2007, at 1 (attached to Ex. 2(A). Current construction includes a casino, a hotel, restaurants, shopping areas and approximately 9,000-square-foot of meeting space. *Id.* According to

the Quapaw, the 12-story hotel will be visible for three miles in each direction from the interstate. Ex. 1(A), "Tribe Announces Plans" at 1. The Quapaw also plan a second phase of development that includes a conference center, spa and salon, and have unspecified plans for further development. *Id.* at 2 .

The current phase of the Quapaw casino resort development includes a large parking area designed to hold over 2200 cars, located in Cherokee County, Kansas. *See* Ex. 1, Edmondson Decl. ¶¶ 10, 12. As planned, the Quapaw development contains no other parking area to support its casino resort development except for the parking area in Cherokee County. *Id.* ¶ 10.

The casino is scheduled to open July 4, 2008, with more than 70,000 square feet of casino floor space, and more than 2,000 slot machines, 30 table games and 15 poker tables. *See* Ex. 1(A), "Tribe Announces Plans" at 1; Ex. 2(B), R. McKinney, "Work on Schedule," *Joplin Globe*, Dec. 17, 2007 ("Work on Schedule"). The Downstream Casino Resort is expected initially to employ approximately 1,200 people. Ex. 2(B),"Work on Schedule" at 1 During construction, between 150 to 300 construction workers are working on the site each day. *Id.*, According to press reports, the concrete foundation for the 177,000 square-foot casino building had been poured by December and the steel frame of the casino structure was completed and steel work was underway on the 12-story hotel portion of the structure. *Id.*  2/ All of this is being done without any environmental assessment whatsoever, much less the environmental impact statement that would ordinarily be required before the federal government takes lands into trust and otherwise permits such an extensive development.

---

2/      The Quapaw maintain a website for the project at http://downstream-dashboard.com, on which a number of photographs of the current development can be viewed. Other areas of the website are password-secured and not available to the public.

### B.    Defendant's Land Acquisitions for the Quapaw Casino Resort

In order to accumulate land interests in the Meh-No-Bah allotment to build its casino resort, the Quapaw asked the Secretary to acquire by taking into trust certain fractional interests in the parcel on which the casino is to be located, and to convey certain restricted fractional interests to the tribe.

In a series of transactions between May and July 2007, the Secretary acquired a five-sixths interest in the Meh-No-Bah allotment in trust for the tribe. *See* Ex. 1(C), Artman Letter dated Dec. 20, 2007;  C. Ward Letter dated Aug. 6, 2007 at 6-7 (attached as Ex. 2(C) (detailing transactions).  The Secretary also conveyed title in the remaining one-sixth interest in the Meh-No-Bah allotment from the estate of an individual Indian holding title under restrictions against alienation to the tribe under restrictions against alienation. *See* Ex. 1(C), C. Artman Letter dated Dec. 20, 2007;  Ex. 2(C), C. Ward Letter dated Aug. 6, 2007 at 6-7.  All these Secretarial actions took place pursuant to the Indian Land Consolidation Act, 25 U.S.C. § 2201 *et seq. See* Ex. 1(C), C. Artman Letter dated Dec. 20, 2007; Ex. 2(C), C. Ward Letter dated Aug. 6, 2007 at 6-7; W. Nordwall Letter dated Aug. 6, 2007 at 1-2 (attached as Ex. 2(D).

The Indian Land Consolidation Act ("ICLA"), 25 U.S.C. § 2201 *et seq.*, was enacted to address the problem of fractionated interests on allotment lands.  ICLA authorizes DOI, *inter alia*, to acquire fractional interests in land in trust for the benefit of tribes.  Although ILCA expressly provides that the general statute authorizing the Secretary to acquire land in trust for Indians, 25 U.S.C. § 465, applies to the Act, *see* 25 U.S.C. § 2202, the Secretary acquired the five-sixths interests in the Meh-No-Bah allotment without applying the governing trust acquisition regulations codified in 25

C.F.R. Part 151.  *See* Ex. 1(C), C. Artman Letter dated Dec. 20, 2007; Ex. 2(D), W.

Nordwall Letter dated Aug. 6, 2007 at 1-2.

Part 151 the applicable federal regulations expressly provides that "these

regulations set for the authorities, policy, and procedures governing *the acquisition of*

*land by the United States in trust status for individual Indians and tribes.*"  25 C.F.R

§ 151.1 (emphasis added).  Therefore, the trust acquisition of the five-sixths interest in

the parcel was subject to regulations requiring the Secretary to consider specific criteria

and a specific process for trust acquisitions.  Section 151.10 expressly requires that "the

Secretary will consider [the specified] criteria in evaluating requests for the acquisition of

land in trust status," including among other requirements, the "purposes for which the

lands will be used" and "the extent to which the applicant has provided information that

allows the Secretary to comply with [the BIA's] National Environmental Policy Act

Revised Implementing Procedures . . . ."  25 C.F.R. § 151.10(c),(h).  Part 151 expressly

applies to the trust acquisition of fractional land interests.  25 C.F.R. § 151.7.

The Secretary has not promulgated any other regulations that specifically govern

trust acquisitions or land conveyances under ILCA.  At present, the Department carries

out ILCA transactions through its Indian Land Consolidation Program ("ILLP") in the

Bureau of Indian Affairs ("BIA").  *See* M. White Decl. ¶¶ 2-3 (attached as Ex. 3).  Prior

to approving trust acquisitions or land conveyances under ILCA, the ILCP requires the

acquiring tribe to certify that it does <u>not</u> intend to change the use of the land to be

acquired.  *Id.* ¶ 6.  According to the director of the ILCP, ILCA has not previously been

used to acquire lands for gaming.  *Id.* ¶ 4.  Nevertheless, the Department has since

acknowledged that "[t]he BIA did not complete either an environmental assessment (EA)

or environmental impact statement (EIS) for this project because it determined that one is not required for the ILCA transactions." Ex. 1(C), C. Artman Letter dated Dec. 20, 2007 at 1.

After acquiring the one-sixth interest under restrictions against alienation in the Meh-No-Bah allotment, the Quapaw submitted an application to the Eastern Oklahoma Regional Director of the BIA pursuant to Part 151 to have that one-sixth interest taken into trust. *Id.* at 1. On December 20, 2007, Assistant Secretary Artman indicated that as to this additional interest, BIA did intend to "comply with NEPA requirements for the pending acquisition of the [one-sixth] interest in the Meh-No-Bah allotment." *Id.* Within days, the Quapaw withdrew its application to have the one-sixth interest taken into trust. *See* J. DeHart Decl. ¶ 17 (attached as Ex. 4). As matters stand, the Secretary has acknowledged that taking lands into trust for gaming requires compliance with NEPA, but it has conveyed all the interests in the Meh-No-Bah allotment, either in trust or with restrictions against alienation, to the Quapaw without conducting any environmental review of the tribe's casino development under NEPA. *Id.* ¶ 12. "The bottom line is that the Tribe now owns 100 percent of the Meh-No-Bah allotment and BIA records reflect that it is held in trust for the Tribe." Ex. 2(D), W. Nordwall Letter dated Aug. 6, 2007 at 2 (providing "a summary of the acquisition of the Meh-No-Bah Quapaw allotment, [ ] on which [Nordwall] advised the Quapaw Tribe").

Acquisitions of land in trust for gaming purposes are subject to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"). Under IGRA, tribes may only operate gaming on "Indian lands," which consist of (1) "lands within the limits of any Indian reservation" and (2) "lands title to which is . . . held in trust by the United States

for the benefit of any Indian tribe or . . . held by any Indian tribe . . . subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4). IGRA also imposes a broad prohibition against gaming on land taken into trust after October 17, 1988 (the date of enactment), unless certain narrow exceptions apply. 25 U.S.C. § 2719.

To carry out its obligations under IGRA, the Department has developed and published specific policies. In accordance with official DOI policy, all gaming-related trust acquisition applications must be referred to the Office of Indian Gaming in the Assistant Secretary for Indian Affairs' Office of Policy and Economic Development in Washington, D.C. *See* Checklist for Gaming-Related Acquisitions at 1 (attached as Ex. 2(E) ("Gaming Acquisition Policy"). No trust acquisitions for purposes of gaming may take place until the Office of Indian Gaming has approved the acquisition. *Id.* Here, the acquisitions and conveyances for the Quapaw took place entirely under the ILCP and the BIA did not refer the trust applications to the Office of Indian Gaming for approval even though it was "common knowledge" that the Quapaw were building a casino development, Ex. 3, M. White Decl. ¶ 8, and even though the Quapaw held a well-reported press conference on May 15, 2007, describing the location, size, scope, and timing of their development and stating that the tribe has been working on the project since 1990. *See* Ex. 1(A), "Tribe Announces Plans" at 1.

The procedure followed by defendants in connection with ILCA acquisitions requires that the tribe acquiring fractional interests must first certify that the tribe will not change the manner in which the land will be used. Ex. 3, M. White Decl. ¶ 6. In this case, it is not yet known whether the Tribe made any misrepresentation about its intended

use of the property when it sought ILCA acquisitions for the Casino site. But there is no doubt that the Tribe had been working on plans for the Downstream Casino since 1990. *See* Ex. 1(A), "Tribe Announces Plans" at 1. The tribe certainly had substantially complete development plans – including architectural and engineering plans, construction contracts, and financing arrangements – by the time of the first of the Meh-No-Bah trust acquisition in May 2007 in order to advance the project so significantly in less than a year. It is presently unknown whether the tribe misrepresented its intentions in its certification to the ILCP, or the ILCP contravened Department policy by failing to require a tribal certification or by failing to refer an acquisition for gaming purposes to the Office of Gaming Policy.

The Quapaw casino development includes some 60 acres of surface parking in Cherokee County, on land the Quapaw own in fee. In or around 2007, the Quapaw informed Kansas state agencies that it intended to apply to have its land on which the casino parking lot was built taken into trust by the United States, which would remove that property from the County tax rolls. Ex. 1, Edmondson Decl. ¶ 28. .

C.     **Injury to Cherokee County Caused by Defendant's Actions**

Cherokee County will be irreparably injured by the Quapaw casino development and the defendant's failure to review the project under NEPA prior to taking land into trust for and conveying interests in land to the Quapaw.

The County has a small, declining population of approximately 21,000 living in its 590 square miles (on average, 39 people per square mile), with a per capita annual income of approximately $14,710. *Id.* ¶ 5. Under state law, the County is responsible for the cost of police services and the cost of fire and other public safety services in unincorporated areas, and for maintaining County roads. *Id.* ¶ 16.

The Quapaw development already has caused damage to Cherokee County roads. Presently, construction contractors for the Quapaw development are using State Line Road, a Cherokee County road, to bring heavy equipment and materials onto the construction site. *Id.* ¶ 18. Part of the construction has involved cutting the existing "chip and seal" hard surface road to extend a sewer line from the project site into Missouri. *Id.* Construction traffic already has interfered with use of the County road and shortened its expected life. *Id.* 3/

As planned by the Quapaw, all casino traffic will travel through Cherokee County on County roads, and all or virtually all casino customers will park in Cherokee County. *Id.* ¶ 15. With over two million annual visitors expected at the Quapaw casino, all of whom will drive on Cherokee County roads and park in Cherokee County, it is certain that casino traffic will have a significant, adverse and continuing impact on County roads. *Id.* ¶ 19. The dramatic increase in traffic will have a significant impact on the cost of maintaining the roads and on traffic safety, as the expected traffic volume will far exceed the traffic volume for which the county roads were designed to bear. *Id.*

Based on the experience of another Kansas jurisdiction with a smaller Indian casino, Cherokee County expects the casino traffic to cause a significant increase in automobile accidents and law enforcement service calls in the vicinity of the development. *Id.* ¶ 20. Even leaving aside the impact on Cherokee County residents, the increase in vehicle accidents and dramatic increase in the County's transient population will require increased police service calls – a burden the County has estimated will

---

3/     Construction work on the parking lot and road in Cherokee County also has destroyed critical wildlife habitat in the county. The habitat was destroyed without the permit required by Kansas law. Ex. 1, Edmondson Decl. ¶ 14 & Ex. 1(D) at 6-7 (J. Larson, Kansas Department of Wildlife and Parks e-mail dated Dec. 27, 2007).

require five new law enforcement personnel to patrol the roads and respond to traffic accidents and fatalities. *Id.* ¶¶ 19-23. The County also will need to fund a new public safety substation in the vicinity of the casino to provide adequate fire and ambulance services after the casino development opens for business. *Id.* ¶ 23. All of these impacts will be felt in and by Cherokee County as a direct result of the Quapaw casino development, yet none have been considered by the Secretary as required by NEPA and other federal law.

Other environmental impacts exist as well. Starting shortly after the Civil War, Cherokee County and surrounding counties in Kansas, Missouri and Oklahoma – including Ottawa County where the Quapaw casino development is centered – were the site of over a century of intensive coal, lead, and zinc mining. *Id.* ¶ 24. Cherokee County and other parts of what is known as the Tri-State mining district have been left scarred by this history. *Id.* Today, the U.S. Environmental Protection Agency broadly monitors this region and continues to engage in reclamation efforts. *Id.* To this day, communities in the Tri-State mining district continue to be vulnerable to danger from lead, zinc, cadmium, and other mining-related contaminants in soil and waters. *Id.* ¶ 25. Without an environmental study, it is unknown whether construction and surface disturbance for the Quapaw casino development will cause or lead to exposure of contaminants in soils or surface or groundwater in Cherokee County or in other nearby areas.

### D.    Suspected Violations of the Clean Water Act

We are hampered in our ability to determine the scope of the environmental threat, of course, for the very reason that brings us to this Court – there has been no environmental analysis done by the Secretary. Nevertheless, just based on site review and information currently available, it appears that the tribe is in violation of various

requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* In connection with the

casino development, the Quapaw is (1) dredging and/or filling waters of the United States

without a Clean Water Act Section 404 permit or Section 401 certification and (2)

violating various terms of the Kansas Stormwater Runoff from Construction Activities

General Permit. These violations, summarized briefly below and discussed in detail in

Exhibit 2(F), Notice of Violation to Quapaw Casino Development Authority, constitute

violations of the CWA and its regulations and are grounds for an enforcement action. *See*

40 C.F.R. § 122.41(a). *See also* Ex. 2(G) (Letter to Army Corps of Engineers concerning

CWA violations).

The discharge of dredged and fill material to waters of the United States is

prohibited unless the discharge is in compliance with Section 404(a) of the Clean Water

Act, 33 U.S.C. § 1344(a). 4/ A discharger must obtain coverage under a Section 404

permit prior to discharging dredged and fill material into Waters of the United States. 33

U.S.C. § 1311(a). The Quapaw has not obtained a Section 404 permit. Ex. 2(F), Notice

Letter at 10.

The Quapaw casino development construction is currently discharging fill and/or

dredged materials, including rock, sand, and dirt – "pollutants" within the meaning of

Section 502(6) of the CWA, 33 U.S.C. 1362(6) – and disposing them into a tributary of

the Spring River. *Id.* at 9. The discharge and disposal of the fill and/or dredged material

---

4/       "When a stream is dredged, filled, or put into a culvert, it loses its capacity to perform vital
ecological services. Upon dredging and filling, a stream's capacity to trap excess sediment and prevent it
from disrupting downstream uses is impaired. The same is true of the capability of a stream to store and
transform excess organic matter. This stream alteration also has the tendency to reduce the amount of
direct contact the water has with the streambed and diminish the nutrient removal capacity of the stream.
Overall, dredge and fill material significantly disrupts the ecosystem of a stream. Thus,, the Clean Water
Act strictly regulates activity associated with dredging and filling." Ex. 2(F), Notice Letter at 9.

into a tributary of the Spring River at the Site constitutes the "discharge of a pollutant" within the meaning of Section 501 (12) of the CWA. 33 U.S.C. § 1362(12).

In addition to the Quapaw's failure to obtain a Section 404 permit, it also is obligated to obtain a Section 401 certification from the Kansas Department of Health and the Environment and the U.S. Environmental Protection Agency certifying that discharges from the site will comply with the state's and federal water quality standards. 33 U.S.C. § 1341. The Quapaw has failed to obtain these certifications. *See id.* at 10.

The Quapaw obtained both a Kansas State permit and an EPA permit relating to stormwater runoff connected to its construction activities. However, review of the permits compared to the actual project scale demonstrated that the information on which the permits were granted was false or, at least, is no longer accurate. *See id.* at 6-8. For example, the Kansas permit is based on information and analysis of stormwater discharge over approximately a 40-acre project site. *Id.* at 7. In fact, the portion of the project site in Kansas is significantly larger. *Id.* As a result, stormwater characteristics for roughly half of the site have not been analyzed. *Id.* Under Kansas regulations, a permit based on inaccurate information is invalid. *Id.* at 7-8. The EPA permit is similarly based on inaccurate information and therefore invalid under that agency's regulations. *Id.* at 8. A site inspection by a prominent international environmental firm also revealed that that activities on the construction site are violating the color and turbidity standards at Kansas Administrative Regulation 28-16-28e subdivision (b)(8) in streams draining the northern and northwesterly borders of the Site. *Id.* at 6-7. Violation of state water quality standards also violates the Clean Water Act. *Id.* at 2.

In a proper environmental assessment of the Quapaw development, potential violations and the substantive requirements of other federal environmental laws, like the Clean Water Act, would be explored and addressed.

**E.    Cherokee County's Efforts To Remediate Its Injury Without Resort To Litigation**

Cherokee County has tried without success to persuade the Secretary to take action to correct his violations of law since at least July 2007.  Beginning in July 2007, significant efforts were made to apprise DOI officials of the Quapaw development situation and to learn whether the Tribe and the DOI had complied with governing statutes, regulations and department policy.  *See* Ex. 4, DeHart Decl. ¶¶ 2-10.  Those efforts led to a series of meetings and telephone conferences with the Assistant Secretary for Indian Lands, Carl Artman, who recognized that the trust acquisitions for the Quapaw casino had not proceeded in accordance with department policy and that no NEPA review had been done.  *Id.* ¶¶ 11-12.  Through December 2007 and January 2008, it appeared that the Secretary would undertake NEPA compliance, in connection with the Quapaw's then-pending trust application seeking to have the United States take the one-sixth interest held under restrictions against alienation into trust.  *See id.* ¶¶ 12-16.  After learning on January 31, 2008, that the Quapaw had withdrawn the trust application and that the Secretary would not take action to review the project pursuant to NEPA, *see id.* ¶ 17, Cherokee County determined that litigation was its only remaining course of action.

To be clear, Cherokee County is not opposed to casino development *per se*; it is opposed to casino development that threatens it and its citizens with a significant uncompensated burden without any review by responsible officials.  Indeed, as defendants are aware, Cherokee County is likely to become the location for one of the

four State Lottery-owned gaming facilities authorized by the 2007 Kansas Expanded Lottery Act. Pursuant to this Act, Cherokee County held an election in which county residents voted in favor of locating a Kansas Lottery casino in the county. Ex. 1, Edmondson Decl. ¶ 32. Following public hearings, the County approved a resolution endorsing the management application of Kansas Penn Gaming, an affiliate of Penn National Gaming, Inc. *Id.* ¶ 33.

Cherokee County's process shows the right way to approach gaming development, and why the Quapaw site must be subjected to further study. In contrast to the Quapaw casino resort development, every step in the Cherokee County process was conducted in public and with full participation of the people of Cherokee County, who stand to receive 2% of gaming revenue from the Kansas Lottery casino – revenue that will compensate for additional public service burdens. *See id.* ¶¶ 32-35. Furthermore, under agreement between the County and Kansas Penn Gaming, Kansas Penn Gaming will also provide additional direct reimbursement to the County for the infrastructural and public safety costs incurred due to the Kansas Lottery casino, *see id.* ¶ 36, and will remain fully responsible for complying with Kansas environmental laws and standards and with any applicable federal environmental laws. The Kansas Expanded Lottery Act is currently the subject of a state constitutional challenge and is under review by the Kansas Supreme Court. *See id.* ¶ 35. It is uncertain whether Kansas Lottery casino located in Cherokee County will come to pass. *Id.*

Without an injunction and the required review by responsible officials, the potential environmental and other impacts of the Quapaw development will go unreviewed, and there will be no vehicle for assuring reasonable steps are taken to

mitigate them or otherwise address the additional costs of police and other services
associated with the development.

## ARGUMENT

A preliminary injunction is appropriate in this case because (1) Plaintiffs are
likely to succeed on the merits; (2) Plaintiffs will face irreparable harm in the absence of
injunctive relief; (3) the issuance of an injunction will not substantially harm the
defendants; and (4) the public interest favors granting such relief. *See Mova Pharm.
Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citation omitted). These four
factors are not considered in isolation from one another, and no one factor is necessarily
dispositive. Rather, "the factors must be viewed as a continuum, with more of one factor
compensating for less of another." *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20,
27 (D.D.C. 1997).

**I.        Cherokee County Is Likely To Succeed On Its Claims That
            Defendant's Failure To Comply With IGRA And NEPA Were
            Arbitrary And Capricious And Contrary To Law**

The APA provides that a court "shall . . . hold unlawful and set aside agency
action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiff is
likely to succeed on its APA claims because it is clear that defendants violated IGRA,
NEPA, and DOI regulations and policies by allowing the tribe to circumvent IGRA and
by entirely failing to assess the significant environmental impacts of the tribe's casino
development under NEPA. There can be no question that defendant's actions violated
IGRA and the Department's gaming-related land acquisition policies and were arbitrary
and capricious and contrary to law. Nor is there any question that defendant's actions
that permit a project entailing months of building activity, the construction of large

buildings and parking areas, permanent and temporary disturbance of soils and

watercourses, and the eventual operation of a casino facility designed to attract thousands

of visitors per day, 24 hours a day, 365 days a year, will "significantly effect[ ] the

quality of the human environment" in and around the project.  42 U.S.C. § 4332(2)(C).

**A.**    **Defendant Violated IGRA And Its Gaming-Related Land Acquistion**
       **Policies By Allowing The Trust Acquisitions To Proceed Solely Under**
       **ILCA**

Under IGRA, Indian gaming may occur only on "Indian lands."  *See* 25 U.S.C.

§ 2701.  For tribes, like the Quapaw, which do not have a reservation, "Indian lands" are

"any lands title to which is either held in trust by the United States for the benefit of any

Indian tribe or individual or held by any Indian tribe or individual subject to restriction by

the United States against alienation and over which an Indian tribe exercises

governmental power."  25 U.S.C. § 2703(4)(B).  Section 20 of IGRA further provides

that "gaming . . . shall not be conducted on *lands acquired by the Secretary in trust for*

*the benefit of an Indian tribe* after October 17, 1998" unless certain exceptions apply.  25

U.S.C. § 2719(a) (emphasis added).  Because IGRA places stringent statutory

requirements on Indian gaming if it would occur on post-October 1988 land acquisitions,

the Department has promulgated specific procedural steps that must be followed with

respect to land acquisitions that are gaming-related.  The Secretary's policy, reflecting his

interpretation of a statute under his authority, is due considerable deference.  *See, e.g.,*

*Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002).

The key requirements of the policy are contained in the Department's "Checklist

for Gaming Acquisitions, Gaming-Related Acquisitions, and IGRA Section 20

Determinations," Office of Indian Gaming Management (March 2005) (Exhibit 2(E),

"Gaming Acquisition Policy").  Under this policy, "*[a]ll* requests for the acquisition of

land for gaming must be transmitted to [Office of Indian Gaming Management] regardless of whether the land is located on, contiguous to, or off the applicant's reservation." Ex. 2(E), Gaming Acquisition Policy at 1. This directive expressly applies to "*trust-to-trust, restricted-to-restricted/trust, and fee-to-trust land acquisitions.*" *Id.* Thus, the Secretary has adopted a policy that required <u>all</u> of the Quapaw's Meh-No-Bah acquisitions to follow the procedures outlined in the Gaming Acquisition Policy, including the transactions for the five-sixths interests that were acquired in trust *and* the one-sixth interest that was acquired by the tribe under restrictions against alienation. *See id.* The policy further provides that "[t]he authority to approve or disapprove land acquisitions for gaming and gaming-related purposes is vested with the Assistant Secretary-Indian Affairs (AS-IA)[.]" *Id.*

The Secretary's Gaming Acquisition Policy also requires that BIA follow the acquisition regulations of 25 C.F.R. Part 151. *Id.* (BIA Regional Director must provide "a complete file . . . which clearly indicates compliance with 25 C.F.R. Part 151"). It mandates that regional offices of the BIA transmit complete acquisition "packages" to the Office of Gaming Management in Washington for approval before acquiring lands into trust for gaming-related purposes. *Id.* The acquisition package "must contain a complete file of information and documents which clearly indicates [BIA's] compliance with *25 C.F.R. Part 151, IGRA, the National Environmental Policy Act (NEPA)* and other applicable Federal laws, regulations and Executive Orders." *Id.* (emphasis added).

In this case, the BIA was required to follow the Gaming Acquisition Policy in order to take into trust, or transfer title to the tribe under restrictions against alienation, the interests in the Meh-No-Bah allotment on which the Quapaw are constructing the

gaming/hotel structure. It failed to do so, instead processing the transactions through the ILCP. Thus, the Secretary permitted the acquisition of the Meh-No-Bah interests to occur without complying with 25 C.F.R. Part 151, without conducting an inquiry under IGRA to determine if the acquisition fell within 25 U.S.C. § 2719's exceptions on the prohibition on gaming in post-1988 land acquisitions, without complying with NEPA, and without obtaining the approval of the Secretary or his delegee, the Assistant Secretary-Indian Affairs.

As acknowledged by the Director of the Indian Land Consolidation Program, ILCA has not previously been used as a method to acquire land for gaming. Ex. 3, White Decl. ¶ 4. According to the ILCP Director, when the ILCP acquires an interest in land for a tribe, ILCP obtains a certification from the tribe that the tribe will not change the manner in which the land is being used. *Id.* ¶ 6. With no planned change in land use, no substantial risk arises of environmental or other impacts of the decision to take land into trust. Here, it is unclear whether the Quapaw made such a certification for the Meh-No-Bah trust acquisitions or whether such certification accurately disclosed that the tribe intended to change the nature of the land use by building a large gaming facility. It is clear, however, the Department went forward despite "common knowledge" that the Quapaw was building a very large casino. Ex. 3, White Decl. ¶ 8 ; *see also* Ex. 1(A), "Tribe Announces Plans" at 1; Ex. 2(C), S. Ward Letter to NIGC dated Aug. 6, 2007 at 6-7 (detailing the dates and other information concerning the ILCA transactions in May and July 2007). Clearly, the Secretary was on notice before the July 2007 acquisitions that the tribe intended a radical change in land use, and that the ILCP was being used to circumvent IGRA and Department's Gaming Acquisition Policy.

It is a basic tenet of administrative law that agencies must follow their established policies and procedures. *See, e.g., Morton v. Ruiz*, 415 U.S. 199, 232 (1974); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (vacating agency decision where "the FAA's abandonment of its own established procedure and its lack of reasoned analysis on the record constitute[d] arbitrary and capricious agency action in violation of the law."). The Secretary's failure to do so here – a direct cause of the Secretary's failure to comply with NEPA – was arbitrary and capricious and renders the Secretary's decisions and the Quapaw's acquisitions invalid.

**B.    Interior Defendants' Failure to Conduct Any Environmental Review In Connection With Its Trust Decisions Violated NEPA.**

**1.    Environmental Review Pursuant to NEPA Was Required.**

The Secretary of the Interior ("Secretary") must comply with the National Environmental Policy Act ("NEPA"), which requires that every Federal agency take a "hard look" at the environmental consequences of its actions. *Balt. Gas & Electric Co. v. Nat'l Res. Defense Council, Inc.,* 462 U.S. 87, 97 (1983)). Specifically, Section 102 of the Act provides:

> The Congress authorizes and directs that, to the maximum extent possible: . . . (2) *all agencies* of the Federal Government *shall –*
>
>> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a *detailed statement* of the responsible official on –
>>> (i) the *environmental impact* of the proposed action,
>>> (ii) any *adverse environmental effects* which cannot be avoided should the proposal be implemented,
>>> (iii) *alternatives* to the proposed action,
>>> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 (emphasis added).  The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA, which, as the Department recognizes, "are binding on all Federal agencies, address the procedural requirements of NEPA and the proper methods for the administration of the NEPA process."  Ex. 2(E), Gaming Acquisition Policy at 9.

NEPA review is triggered by "major federal action," including "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area[,] . . . actions approved by permit or other regulatory decision, [and] federal and federally assisted activities."  40 C.F.R. § 1508.18(b)(4).  NEPA prohibits federal agencies from ignoring connected and/or interrelated actions to avoid application of NEPA or to avoid a more detailed assessment of environmental effects.  40 C.F.R. § 1508.25(a).  The NEPA review process must be completed "without delay."  40 C.F.R. § 1500.5.

There are two levels of environmental review under NEPA, an Environmental Assessment ("EA") and Environmental Impact Statement ("EIS").  The EA process is used when the agency must determine whether a federal action or federal project would significantly affect the environment.  40 C.F.R. § 1508.27.  If the EA ultimately concludes that the action or project would not significantly effect the environment, the agency issues a Finding of No Significant Impact ("FONSI") and the NEPA review is complete.  If the EA concludes that the action or project would significantly effect the environment, the agency must prepare an EIS in accordance with the requisite process.

40 C.F.R. § 1502. If it appears likely that an EIS will be required, the agency may directly proceed with an EIS without first preparing an EA. According to the Department, "[p]roposals for large and/or controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts." Ex. 2(E), Gaming Acquisition Policy at 10.

Taking land into trust for the Tribe is a federal action requiring compliance with NEPA. As this Court noted in another case involving NEPA review of an Indian casino project, "[i]t seems self-evident that a massive complex devoted entirely to around-the-clock commercial gambling and complementary diversions for a host of transient visitors is a unique species of 'development' bearing little resemblance to [other types of commercial development]." *Citizens Exposing Truth About Casinos v. Norton*, 2004 WL 523811, at *8 (D.D.C. Apr. 23, 2004), *aff'd*, 492 F.3d 460 (D.C. Cir. 2007) ("*CETAC*") (enjoining trust acquisition, finding casino EA inadequate and remanding to agency to address deficiencies). Indeed, the Department of the Interior regularly prepares Environmental Assessments and Environmental Impact Statements in connection with trust acquisitions or other Indian-gaming related federal actions to address how a planned casino project (including its thousands of new employees, daily visitors, and changes in physical development and natural resource use) will affect the environment. For example, the Bureau of Indian Affairs recently issued a Draft EIS in connection with a trust acquisition for the Confederated Tribes of the Warm Springs Reservation of Oregon's

proposal to develop a resort and casino in the City of Cascade Locks, Hood River County,

Oregon. *See* http://www.gorgecasinoeis.com/index.html. 5/

In recent years, there have been a number of legal disputes about the adequacy of

environmental reviews of Indian casino projects. *See, e.g., Mich. Gambling Opposition v.*

*Norton*, 477 F. Supp. 2d 1, 9-20 (D.D.C. 2007) ("*MichGO*"); *CETAC*, 2004 WL 523811,

at *5-9 (D.D.C. Apr. 23, 2004)("*CETAC*"); *TOMAC v. Norton*, 240 F. Supp. 2d 45, 52-53

(D.D.C. 2003); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 165-70 (D.D.C. 2002),

*aff'd*, 348 F.3d 1020 (D.C. Cir. 2003).  In those, the issue was the adequacy of the

Government's NEPA review.  What makes this case unusual is the Secretary's complete

failure to conduct *any* environmental review whatsoever.

Typically, environmental review of planned Indian casino projects involves

detailed analysis of various environmental effects, including the traffic, public safety and

law enforcement effects that Cherokee County is or will be injured by, and other

socioeconomic impacts. *See, e.g., CETAC*, 2004 WL 5238116, at *7 ("EA . . . replete

with discussion of . . . traffic, noise, cultural resources, socioeconomic conditions" among

others; "the project will exponentially increase traffic" with 10,600 to 13,000 vehicle

trips per day); *TOMAC*, 240 F. Supp. 2d at 51-52 (discussing direct and indirect impacts

on traffic); Cascade Locks Draft EIS, Chapter 4 at 88-89, 133-40 (assessing the impacts

on police, fire and ambulance service needs under the proposed alternative; assessing

traffic and transportation impacts of the proposed action, including impacts due to

construction) (available at http://www.gorgecasinoeis.com/draft_eis.html).  Casino

environmental reviews also typically addresses issues relating to substantive federal

---

5/    The National Indian Gaming Commission also frequently conducts NEPA reviews of Indian casino-related federal actions that fall within its domain. *See, e.g.*, www.gratoneis.com (website for NIGC's current NEPA review of a Sonoma County, California tribal casino project).

environmental laws like the Clean Air Act and the Clean Water Act. *See, e.g., MichGo*, 477 F. Supp. 2d at 11-12 (discussing Clean Air Act and air pollution impacts); Cascade Locks Draft EIS, Chapter 4 at 27-30 (assessing direct and indirect impacts of proposed project on water quality). Here, a prominent international environmental consultant has identified potentially significant issues that implicate the Clean Water Act. As set forth in detail in the Notice Cherokee County sent the Quapaw on February 22, 2008, the Quapaw project appears to be in violation of several provisions of the Clean Water Act. *See* Ex. 2(F), Notice Letter at 6-10. Among other violations, construction activities are unlawfully polluting a Spring River tributary with discharged dredge or fill materials. *Id.* at 9.

When the Department has failed to conduct an adequate environmental review in connection with a federal action that would enable the development of an Indian casino, courts have issued preliminary injunctions to force NEPA compliance. That was the case in *TOMAC*, in which BIA was initially enjoined from taking 79 acres into trust so an Indian tribe could construct and operate a casino until BIA had considered the impact of growth-induced development on the environment. 240 F. Supp. 2d at 52-53. Similarly, in *CETAC*, the district court enjoined the Secretary and "remanded for further elaboration of the Environmental Assessment on the particular[ ] [issues] noted [by the court] or, in the alternative, for preparation of an Environmental Impact Statement." *CETAC*, 2004 WL 5238116, at *10. The same result should obtain here, where the Secretary has entirely failed to assess the environmental impacts of its decisions respecting the Meh-No-Bah parcel.

2.    **The Secretary's Failure To Follow The Land Acquisition Regulations, 25 C.F.R. Part 151, Was Arbitrary And Capricious And Contrary To Law.**

Defendant failed to consider their NEPA obligations because they permitted the land acquisitions to proceed under the Indian Land Consolidation Act without following the procedures set forth in the land acquisition regulations, 25 C.F.R. Part 151. *See* Ex. 1(C), C. Artman Letter dated Dec. 20, 2007 to Sen. P. Roberts. "The BIA did not complete either an environmental assessment (EA) or an environmental impact statement (EIS) because it determined that one is not required for the ILCA acquisitions." *Id.* ILCA, however, contains no exemption from NEPA or other federal environmental laws, nor does it contain an exemption from the regulations at 25 C.F.R. Part 151.

ILCA was enacted in order to address the problem of fractionated land interests on allotment lands. ICLA authorizes DOI, *inter alia*, to acquire fractional interests in land in trust for the benefit of tribes. Although ILCA provides for funding trust acquisitions of fractional interests, it does not provide a specific procedure for such transactions. On the contrary, ILCA expressly provides that the general statute authorizing the Secretary to acquire land in trust for Indians, 25 U.S.C. § 465, applies to the Act. 25 U.S.C. § 2202. Trust land acquisitions under Section 465 are governed by regulations promulgated by the Secretary and codified in 25 C.F.R. Part 151, which expressly includes acquisition of fractional interests. *See* 25 C.F.R. § 151.7.

Defendants' acquisition of the five-sixths interest in the Meh-No-Bah allotment for the Quapaw in 2007 falls within 25 C.F.R. Part 151. Under this part, "an individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary[,]" providing the required information.

25 C.F.R. § 151.9.  The Quapaw acquisitions were subject to 25 C.F.R. § 151.10.  6/

Section 151.10 expressly requires that "the Secretary will consider [the specified] criteria

in evaluating requests for the acquisition of land in trust status[,]" including among other

requirements, the "*purposes for which the lands will be used*" and "*[t]he extent to which

the applicant has provided information that allows the Secretary to comply with [the

BIA's] National Environmental Policy Act Revised Implementing Procedures*[.]"  25

C.F.R. 151.10 (c), (h) (emphasis added).  It is the policy of the Department that "[n]o

acquisition of land in trust status, including a transfer of land already held in trust or

restricted status, shall be valid unless the acquisition is approved by the Secretary.  25

C.F.R. § 151.3 (emphasis added).

 The Secretary's land acquisition regulations also require that the Secretary

provide public notice of his intention to acquire land into trust for an Indian or Tribe by

placing a notice in the Federal Register or "in a newspaper of general circulation serving

the affected area" prior to transferring title.  25 C.F.R. 151.12(b).  Critically, the

Secretary failed to provide *any* public notice of the Meh-No-Bah acquisitions, depriving

plaintiff and other affected parties from seeking judicial review prior to the transfer of

title.

 In taking into trust the Meh-No-Bah interests, the Secretary did not follow the

procedure under Part 151 or consider any of the criteria under Section 151.10 in

acquiring land in trust for the Quapaw casino development.  "It is well settled that an

agency is legally bound to respect its own regulations, and commits procedural error if it

---

6/ Section 151.10 relates to "on-reservation" acquisitions.  Although the Quapaw Tribe does not have
a reservation, its trust acquisitions fall within the on-reservation regulation under the definition of
"reservation" in 25 C.F.R. 151.2(f) because the Meh-No-Bah allotment is within the tribe's former
reservation in Oklahoma.

fails to abide them." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (citing *Service v. Dulles*, 354 U.S. 363 (1957)). *See also Cntr. for Auto Safety v. Dole*, 828 F.2d 799, 808 (D.C. Cir. 1987) ("a court will require an agency to adhere to its own regulations 'even when the administrative action under review is discretionary in nature'"); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 13 (D.D.C. 2004) (granting plaintiff's motion for summary judgment where agency failed to follow its own regulatory procedures; "[a]lthough . . . the courts may not compel an agency to employ 'extra procedural devices,' this Court shall compel an agency to follow the procedures set forth in its own regulations."). Defendants' failure to conduct the required trust acquisition procedures, including compliance with NEPA, in connection with taking the five-sixths interest in the Meh-No-Bah Allotment into trust was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law.

   3.    **Even If The Department's Trust Acquisitions Were Not Subject To Part 151, They Were Still Subject to The Department's NEPA Policies**

      a.    **BIA's NEPA Published Policies Plainly Were Violated**

   Even if it were proper to acquire trust lands under ILCA without complying with Part 151, the Secretary violated the Administrative Procedure Act by failing to comply with the Department's and BIA's NEPA policies (as well as NEPA itself) in connection with the Meh-No-Bah acquisitions.

   The Department's NEPA policies are set out in Part 516 of the Department Manual. 7/ As stated at 516 DM 1.2: "It is the policy of the Department:

            ***
               B.    To the fullest practicable extent, to encourage

---

7/    The Department Manual is available on the Department's website at
http://elips.doi.gov/app_home/index.cfm?fuseaction=home

public involvement in the development of Departmental plans and
programs through State, local, and tribal partnerships and
cooperative agreements at the beginning of the NEPA process, and
to provide timely information to the public to better assist in
understanding such plans and programs affecting environmental
quality in accordance with the CEQ Regulations;

      C.     To interpret and administer, to the fullest extent
possible, the policies, regulations, and public laws of the United
States administered by the Department in accordance with the
requirements of Sections 101 and 102 of NEPA;

      ***

      E.     To consult, coordinate, and cooperate with other
Federal agencies and, particularly, State, local, Alaska Native
Corporations, and Indian tribal governments in the development
and implementation of the Department's plans and programs
affecting environmental quality and, in turn, to give consideration
to those activities that succeed in best addressing State and local
concerns[.]

Furthermore, with respect to externally initiated proposals such as tribal land
acquisition, it is Department policy that "[o]fficials responsible for the development or
conduct of loan, grant, contract, lease, license, permit, or other externally initiated
activities shall require applicants, to the extent necessary and practicable, to provide
environmental information, analyses, and reports as an integral part of their applications."
516 DM 1.4(C). Each agency within the Department has promulgated its own NEPA
policies. The BIA's NEPA policy, titled "Managing the NEPA Process-Bureau of Indian
Affairs" is published in the Department Manual as Chapter 10 of Part 516.

The BIA's NEPA policy clearly provides that NEPA compliance is required when
BIA action is required on an application by a tribe:

Guidance to Applicants and Tribal Governments.
      A.     Relationship with Applicants and Tribal
Governments.
            (1)     Guidance to Applicants.
                 (a)     *An "applicant" is an entity*
*which proposes to undertake any activity which will at*
*some point require BIA action.* These may include tribal

governments, private entities, state and local governments or other Federal agencies. *BIA compliance with NEPA is Congressionally mandated. Compliance is initiated when a BIA action is necessary in order to implement a proposal.*
**\*\*\***

      (d)     Since much of the applicant's planning may take place outside the BIA system, it is the applicant's responsibility to prepare a milestone chart for BIA use at the earliest possible stage in order to coordinate the efforts of both parties. Early communication with the responsible BIA office will expedite determination of the appropriate type of NEPA documentation required. Other matters such as the scope, depth and sources of data for an environmental document will also be expedited and will help lead to a more efficient and more timely NEPA compliance process.

      (2)     Guidance to Tribal Governments.
      (a)     Tribal governments may be applicants, and/or be affected by a proposed action of BIA or another Federal agency. Tribal governments affected by a proposed action shall be consulted during the preparation of environmental documents . . . *Notwithstanding the above, the BIA retains sole responsibility and discretion in all NEPA compliance matters.*
      (b)     Any proposed tribal actions that do not require BIA or other Federal approval, funding or "actions" are not subject to the NEPA process.

516 DM 10.3 (emphasis added).

In accordance with this policy, compliance with NEPA is required when a tribe seeks BIA's action on trust land acquisitions. 8/ As discussed above, although it failed to do so here, BIA typically recognizes that trust land acquisitions for gaming purposes call for environmental review under NEPA. BIA also conducts NEPA review on trust acquisitions for other, non-gaming purposes. *See, e.g.*, Notice of Intent to Prepare an

---

8/     There is a class of mandatory trust acquisitions which is exempt from NEPA. *See, e.g.*, *Sault Ste. Marie Tribe of Lake Superior Chippewa Indian v. United States*, 78 F. Supp. 2d 699, 703 (W.D. Mich. 1999). If Congress has directed the Secretary to acquire trust lands for a particular tribe, and the Secretary reasonably deems Congress's directive to be mandatory, rather than discretionary, the Secretary need not comply with NEPA. *See id.* That did not occur here.

Environmental Impact Statement for the White River Amphitheater, Muckleshoot Indian Reservation, King County, WA, 63 Fed. Reg. 35939-03 (July 1, 1998) (EIS to be prepared in connection with proposed trust acquisition for construction of amphitheater).

Agencies must follow their established policies and procedures. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (providing that "[b]efore the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures."); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (vacating agency decision where "the FAA's abandonment of its own established procedure and its lack of reasoned analysis on the record constitute[d] arbitrary and capricious agency action in violation of the law.").  Defendant's failure to follow its own NEPA policies in its decision-making process for the Meh-No-Bah acquisitions constitutes a violation of the APA.

> **b.    The Meh-No-Bah Acquisitions Did Not Qualify For Categorical Exemption Under BIA's NEPA Policies**

The only way for the defendant to lawfully avoid preparing an EA or EIS would be if the trust acquisitions fell with those types of federal actions that are entitled to a categorical exclusion from NEPA's requirements.  The Council on Environmental Quality ("CEQ") in its regulations implementing NEPA has defined a categorical exclusion as:

> [A] category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required . . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant effect.

40 C.F.R. § 1508.4. The Meh-No-Bah trust acquisitions cannot qualify for a categorical exclusion. 9

The BIA's categorical exclusions are set forth in the Departmental Manual. The Manual lists various categories and types of categorical exclusions, none of which appear to cover acquisition of land in trust for gaming or other development purpose. Even assuming the eligibility of routine ILCA transfers-of-title acquisitions for categorical exclusions, the use of ILCA to take land into trust for the Tribe to construct a major casino resort would not qualify for any categorical exclusion.

The BIA's most relevant categorical exclusion is one for "[a]pprovals or grants of conveyances and other transfers of interests in land *where no change in land use is planned*." 516 DM 10.5(I) (emphasis added). 10/ Thus, while there may well be many ILCA acquisitions that would qualify for a categorical exclusion from review under NEPA, the Meh-No-Bah acquisitions do not qualify for exclusion because they clearly involved land conveyances where a very dramatic change in land use was planned.

BIA's NEPA Policy also provides:

> In addition to the actions listed in the Department's categorical exclusions in Appendix 1 of 516 DM 2, many of which the BIA also performs, the following BIA actions are hereby designated as categorical exclusions unless the action qualifies as an exception under Appendix 2 of 516 DM 2. *These activities are single, independent actions not associated with a larger, existing or proposed, complex or facility. If cases occur that involve larger*

---

9    That is not to say that some routine ILCA transactions could not qualify for categorical exclusion under NEPA. In all likelihood, many ILCA transactions solely take place to consolidate land interests in tribes and reduce fractionated land ownership patterns. That clearly is not the case here where the ILCA acquisitions took place for the purpose of building a large casino development.

10/    BIA's categorical exclusions also include one titled "Administrative Actions and Other Activities Relating to Trust Resources." 516 DM 10.5(D). BIA explains that this category includes BIA's "[m]anagement of trust funds (collection and distribution), budget, finance, estate planning, wills and appraisals." *Id.* This categorical exclusion plainly does not apply to acquisitions of lands into trust.

> *complexes or facilities, an EA or supplement should be*
> *accomplished.*

516 DM 10.5. 11/ Thus. even if one of BIA's categorical exclusions applied to a single

ILCA acquisition, it would not apply here where the acquisitions, whether considered

singly or jointly, are clearly part of "a larger . . . proposed [ ] complex or facility." *Id.*

Nor would a categorical exclusion be appropriate under the Department's NEPA Policy.

It provides that a categorical exclusion may not employed to avoid environmental review

if, *inter alia*, the individual action may "have a direct relationship to other actions with

individually insignificant but cumulatively significant environmental effects." 516 DM 1,

App. 2. Courts review agency decisions to categorically exclude an action from NEPA to

determine whether the decision satisfies the requirements for the categorical exclusion or,

alternatively, whether the action was arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with the law. *See, e.g., West v. Sec'y of the Dep't of Transp.,*

206 F.3d 920, 924 (9th Cir. 2000). Here, even if defendant did not know of the tribe's

intentions in May 2007 (or had been misled up to that time) when the first acquisitions of

Meh-No-Bah interests took place, he cannot credibly claim ignorance of this fact after he

continued to take Meh-No-Bah land interests into trust after the tribe held a press

conference on May 15, 2007, detailing its plans to build a casino resort right on top of the

parcel. Because the defendant plainly knew or should have known of the intended

purpose for the Meh-No-Bah acquisitions prior to the later acquisitions in July 2007,

---

11/     The Department also has identified a list of categorically excluded actions, such as "policies and directives of an administrative, financial, legal, technical or procedural nature" and "activities which are educational, informational, advisory, or consultative," 516 DM 1, App. 1. None bear any relevance to the Meh-no-Bah acquisitions.

defendant could not employ BIA's categorical exclusion for land conveyances to evade NEPA review without violating the APA. 12/

For all these reasons, defendant's complete failure to conduct any environmental review under NEPA cannot survive even deferential review.

C.    **Preliminary and Permanent Injunction is the Proper Remedy for Defendant's Violations Of Law**

As shown above, the Secretary has violated federal law by taking land into trust for the Tribe and conveying interests in land to the tribe under restrictions against alienation under ILCA without complying with IGRA, NEPA, and other environmental laws. "The proper [judicial] remedy for substantial procedural violations of NEPA . . . is an injunction." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988). *See also Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034 (D. Mont. 2006) (district court suspended Bureau of Land Management leases and ordered the shutdown of a pipeline pending BLM's compliance with NEPA). The *Montana Wilderness* court determined that its

> equitable powers are broad, and it is within the court's authority to fashion a remedy that fits the particular facts of the case before it. Moreover, a district court has the power to fashion a remedy that ensures full compliance with the law. In this case there are two options with respect to the leases. One is to permanently suspend the leases until the NEPA process is complete. The other more drastic option is to void the leases . . . .

---

12/    Likewise, CEQ's NEPA regulations expressly require federal agencies to consider whether the cumulative impact of a series of actions will require the preparation of an environmental impact statement or an environmental assessment.  CEQ has defined cumulative impact to cover exactly the kind of structured transaction at issue here:

> 'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  40 C.F.R. § 1508.7.

*Mont. Wilderness,* 408 F. Supp. 2d at 1034 (citing *Kettle Range Conservation Group v.*

*U.S. Bureau of Land Mgmt.,* 150 F.3d 1083 (9th Cir. 1998)). The court decided to

suspend the leases and to shutdown the pipeline.

Indeed, in the past the Government has advocated that the courts vacate and

remand trust decisions in order to enable the Department to reconsider *ab initio* a

decision to take land into trust for a tribe. *See Dep't of Interior v. South Dakota,* 519 U.S.

919, 922 (1996) ("the Government asks this Court [to grant certiorari, vacate and remand

decision of the Eighth Circuit and] do so with 'instructions that [the district court's

decision] also be vacated and that the matter, in turn, be remanded to the Secretary of the

Interior for reconsideration and issuance of a new administrative decision"); Notice,

Dep't of the Interior, Bureau of Indian Affairs, Land Status: Lower Brule Sioux Tribe, 62

Fed. Reg. 26,551, 26,552 (May 14, 1997) (stating that court's remand of trust acquisition

"operates to take the land out of trust" for tribe).

Moreover, an injunction requiring the Secretary to reconsider or reopen his trust

decisions on the Meh-No-Bah Allotment in order to comply with the law is in line with

the Secretary's inherent authority to reconsider his decisions. *See, e.g., Belville Mining*

*Co. v. United States.,* 999 F.2d 989, 997 (6th Cir.1993). For example, in *King v. Norton,*

a decision dealing with an amendment to the Chippewa's tribal constitution, the court

found that the "Agency [BIA] did not act beyond the scope of its authority when it

reconsidered and reversed its earlier decision [approving the sufficiency of petition

signatures to call an election to amend the constitution of the Saginaw Chippewa Indian

Tribe of Michigan]." 160 F. Supp. 2d 755, 762 (E.D. Mich. 2001). Furthermore,

"detrimental reliance by a party will not prevent an agency's reconsideration of a

decision if the initial decision is in fact erroneous." *Id.* at 761 (quoting *Belville,* 999 F. 2d at 999).

For these reasons, Cherokee County has established substantial likelihood of success in on its ultimate claim for a permanent injunction pending compliance with NEPA and other federal law.

## II.    Plaintiff Will Be Irreparably Harmed In the Absence of an Immediate Preliminary Injunction

Cherokee County will be irreparably harmed if an injunction is not issued.  The Cherokee County portion of the development constitutes over 50% of the entire footprint of the current construction as depicted on the Quapaw map.  *See* Ex. 1(E), Quapaw Casino Development Map.  Once the casino opens, all or virtually all of the expected two million annual casino customers will travel on Cherokee County to enter and leave the casino and will park in Cherokee County.  Ex. 1, Edmondson Decl. ¶¶ 15, 19.  The direct, indirect, and cumulative adverse impacts of the Quapaw casino development are not known because of the Secretary's failure to conduct an environmental review pursuant to NEPA.  However, it is clear that Cherokee County inevitably will be irreparably injured by certain obvious impacts of the project.

Once the casino opens, Cherokee County will experience a dramatic increase in traffic from the casino that will have a significant impact on the cost of maintaining the roads and on traffic safety, as the expected traffic volume will far exceed the traffic volume for which the county roads were designed to bear.  *Id.* ¶¶ 19-23.  Cherokee County will bear the burden of these costs.  *Id.* ¶ 16.  Even now, construction contractors for the Quapaw development are using State Line Road, a Cherokee County road, to bring heavy equipment and materials onto the construction site.  *Id.* ¶ 18.  The Quapaw's

contractors have already cut the existing "chip and seal" hard surface road to extend a sewer line from the project site into Missouri. *Id.* Construction traffic has shortened the expected life of the road, which will require resurfacing. *Id.* And that is just the beginning.

The heavy use of county roads for casino access will cause significant public safety costs that the County will bear. *Id.* ¶¶ 19-23. Casino traffic will necessarily lead to an increased need for police to patrol the roads and respond to traffic accidents and other law enforcement service calls. *Id.* ¶¶ 20-23. Cherokee County will incur additional public safety costs to provide necessary fire and ambulance services in the area near the casino after the casino opens for business, including the cost to fund five (5) new or additional law enforcement personnel and a new public safety sub-station near the Quapaw casino parking area in order to provide adequate public safety infrastructure and services after the Quapaw casino begins operations. *Id.* ¶ 23.

Irrreparable harm is established when the injury is "imminent," meaning "actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). While the exact scope of Cherokee County's injuries may not presently be quantified, there is nothing theoretical about the existence of present damage from construction activity and imminent injury from the traffic and public safety-related costs that will be imposed by the opening and operation of the Quapaw's $200 million dollar casino development. Furthermore, Cherokee County's injuries must be remedied now, by a preliminary injunction, because there is no adequate "compensatory or other corrective relief" that will be available at the conclusion of this litigation. *Id.* Once the casino development is fully constructed and operating, the County's claims against the United

States will likely be considered moot, and the County will have no remedy against the

Tribe, which enjoys sovereign immunity.  Now is the time to enjoin the construction and

operation of the casino development so that the opportunity for an adequate remedy may

be preserved.

**III.     The Balance Of Harms Weighs In Favor Of Preliminary Relief**

Granting the preliminary injunction will not harm the government's legitimate

interests.  Defendants cannot contend that they will be burdened by a preliminary

injunction pending final disposition of this action because defendants have no legitimate

interest in engaging in action that is contrary to law.  *See Surdyk's Liquor, Inc. v. MGM*

*Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1028 (D. Minn. 2000) (holding that a defendant

may not claim that an injunction, which merely prohibits defendant from engaging in

illegal behavior, is burdensome); *Berne Corp v. Gov't of the V.I.*, 120 F. Supp. 2d 528,

537 (D. V.I. 2000) (granting preliminary injunction and holding that the "public interest

weighs in favor of enjoining the government from violating federal law") (citation

omitted).  Nor can defendants claim to be harmed by an injunction that requires them to

carry out their lawful obligations under NEPA.

The Secretary may argue that the tribe has already begin construction and so an

injunction would impair tribal interests by imposing costs associated with construction

delay.  But as the *Montana Wilderness* court noted, "[a] third party's financial damages

from an injunction generally do not outweigh potential harm to the environment."

*Montana Wilderness*, 408 F. Supp. 2d at 1034 (citing *Nat'l Parks & Conservation Ass'n v.*

*Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001)).  Other courts have voided leases because of

failure to comply with NEPA and have even barred the Secretary from considering the

fact that the leases have been made and financial investments made by the lessees.  *See,*

*e.g., N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988). Likewise, any harm the Quapaw would claim to experience from any delay or impact on their development pending defendants' compliance with the law cannot outweigh the other preliminary injunction factors. NEPA compliance is a necessary component of the federal action from which the tribe seeks to benefit. Delay occasioned mid-stream of development does not outweigh Cherokee County's likelihood of success and irreparable injury, and the public interest, just because it occurs after construction has begun rather than prior to commencement, as it properly should have.

## IV. The Public Interest Favors the Requested Relief.

The public interest plainly favors granting an injunction here. The public has an unmistakable interest in seeing that laws faithfully are executed by public officials. *See, e.g., Mova Pharm. Corp.*, 140 F.3d at 1066 (upholding preliminary injunction when district court concluded that the public's interest in the "faithful application of the laws" tipped public interest prong in favor of requested preliminary injunction); *O'Donnell Constr. Co. v. D.C.*, 963 F.2d 420, 429 (D.C. Cir. 1992). "[T]here is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993).

This factor particularly weighs in favor of relief here because "a public interest expressed by Congress was frustrated by" the Secretary's approval of the Quapaw land acquisitions "with likely environmental consequences, without NEPA compliance." *Id.* Thus, "the public interest would be served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA, by complying with NEPA's requirements." *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998).

## CONCLUSION

For these reasons, plaintiff requests that the Court issue the requested preliminary injunction and require the Secretary to comply with federal environmental and other laws applicable to the planned development.

Dated:  February 25, 2008

Respectfully submitted,

Jonathan L. Abram, D.C. Bar No. 389896
jabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

C. Dean McGrath, Jr., D.C. Bar No. 453574
dmcgrath@manatt.com
June DeHart, D.C. Bar No. 362871
jdehart@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
700 Twelfth St. NW
Suite 1100
Washington, DC 20005
(202) 585-6500
(202) 585-6600

David R. Cooper
dcooper@fisherpatterson.com
FISHER, PATTERSON, SAYLOR &
SMITH, LLP
3550 SW 5th Street
Topeka, KS 66601
(785) 232-7761 (Telephone)
(785) 232-6604 (Facsimile)

*Counsel for Board of Commissioners of Cherokee County*

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiff Board of Commissioners of Cherokee

County, Kansas, hereby certifies that copies the foregoing Motion for Preliminary

Injunction, Memorandum in Support of Motion for Preliminary Injunction, attached

declarations and exhibits, and Proposed Order were served by hand delivery and by

certified overnight mail on this 25th day of February, 2008, on the following counsel for

defendants:

> David Bernhardt
> Solictor of the Department of the Interior
> Department of the Interior
> 1849 C Street, N.W.
> Washington DC 20240
>
> Michael B. Mukasey
> U.S. Attorney General
> Department of Justice, Room B-103
> 950 Pennsylvania Avenue, NW
> Washington, D.C.  20530-0001
>
> Jeffrey A. Taylor
> U.S. Attorney for the District of Columbia
> 555 4th Street, NW
> Washington, DC 20530

> Audrey E. Moog

**EXHIBIT 1**

Declaration of Rod Edmondson, Commissioner of
Cherokee County, Kansas

UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF THE DISTRICT OF COLUMBIA

BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS,

Case No.

Plaintiff,

v.

DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR
and the
UNITED STATES DEPARTMENT OF
THE INTERIOR,

Defendants.

---

DECLARATION OF ROD EDMONDSON,
COMMISSIONER OF CHEROKEE COUNTY, KANSAS

I, Rod Edmondson, declare as follows:

1.      I am one of three County Commissioners duly elected by the people of

Cherokee County, Kansas.  I was elected in November, 2004 for a term of four (4) years.

Together with my fellow commissioners, Patrick Collins and Charles Napier, we

constitute the Board of Commissioners for Cherokee County and carry out the duties and

exercise the powers of Cherokee County.  I make this declaration based on my personal

knowledge and on information known to the Board of Commissioners of Cherokee

County. If called upon to testify, I could and would testify competently to the matters set forth herein.

2.    Under Kansas law, a County's powers derive generally from K.S.A. 19-101, which establishes the organized counties in Kansas as bodies corporate and politic empowered: (a) to sue and be sued; (b) to purchase and hold real and personal property for the use of the county, (c) to sell and convey any real or personal property estate owned by the county, and make such order respecting the same as may be deemed conducive to the interest of the inhabitants; (d) to make all contracts and do all other acts in relation to the property and concerns of the county, necessary to the exercise of its corporate or administrative powers; (e) to exercise the powers of home rule to determine their local affairs and government authorized under the provisions of K.S.A. 19-101a; and (f) to exercise such other and further powers as may be especially conferred by law. The powers of a county as a body politic and corporate are required by to be exercised by a board of county commissioners. K.S.A. 19-103.

3.    The duties of the Board of County Commissioners include, *inter alia*: (a) the apportionment and ordering the levying of taxes, K.S.A. 19-212 (including the levying and apportionment of taxes imposed by other taxing entities within the county such as school districts, cities, fire districts, and others); (b) an obligation to levy a county tax sufficient to defray all county charges and expenses incurred the year; K.S.A. 19-241; (c) the approval of a budget submitted by the sheriff for the financing of the operation of the sheriff's office. K.S.A. 19-805(c); and (d) the maintenance and repair of county roads, K.S.A. 68-502.

4.      Cherokee County is Kansas' most southeastern county, bordering both Missouri and Oklahoma. Cherokee County is bordered on the south by Ottawa County, Oklahoma and on the east by Jasper and Newton Counties, Missouri.

5.      According to United States Census Bureau statistics, Cherokee County has a small and declining population of approximately 21,000 residents in its 590 square miles (approximately 39 persons per square mile), with a per capita income of approximately $14,710. In the 2000 Census, Cherokee County had only 8,875 households.

6.      At a meeting of the Board of Commissioners of Cherokee County held on January 21, 2008, the Board voted in favor, by a vote of 3 to 0, to bring the above-captioned lawsuit. The County's goal in the suit is to ensure that the federal defendants reopen the decisions to take land into trust for the Quapaw Tribe and make other land conveyances to the tribe in order to conduct an environmental review of the significant direct, indirect, and cumulative environmental impacts of the Quapaw's casino development, including the construction stage and the later operation of a 24-hour-a-day, 365-day-a-year casino resort, on local communities including Cherokee County. As described below, Cherokee County has already been harmed by the environmental effects of the Quapaw project and will suffer further, irreparable harm as construction continues and after the casino is in operation.

7.      On or about May 15, 2007, the Board of Commissioners learned of the Quapaw's intention to build a casino resort from an article in a local newspaper, the Joplin *Globe.* The article concerned the public announcement by the Quapaw of its plans to develop a $200 million casino resort in northeast Oklahoma and attract two million

visitors per year. Quapaw Tribal Chairman John Berrey announced the tribe had been working on the project since 1990, and that it was "purely coincidental" that the project was unfolding at the same time that the Kansas Legislature had authorized construction of a $225 million casino in neighboring Southeast Kansas. J.R. Matthews, Vice Chairman of the Tribe's Business Committee, stated that the tribe had acquired more than 235 acres in Oklahoma, Kansas and Missouri around the Tri-State Monument where the States' borders meet to build the resort. The tribe stated that the opening date for the casino was scheduled for July 4, 2008. The tribe also announced plans for a 12-floor luxury hotel with 240 rooms to open 90 days after the casino. (See Joplin *Globe*, "Tribe Announces Plans for Casino," May 15, 2007, attached as Exhibit A).

8.    The Board of Commissioners learned from this and other published reports that the Quapaw's casino resort project currently under construction will include: (a) surface parking for 2,200 cars plus a dedicated employee parking lot; (b) additional surface parking for buses and recreational vehicles with utility hook-ups; (c) 70,000 square feet of gaming floor, including 2,000 slot machines, 30 table games, 15-table poker room, and a high limit gaming area; (d) a 12 story hotel; (e) multiple restaurants; and (f) 9,000 square feet of meeting space.

9.    The portion of the Quapaw development on which the casino building is reportedly being constructed is on 40 acres of land described as the SE1/4 of the NW1/2, Section 17, Township 29 north, Range 25 east in Ottawa County, Oklahoma. (See Letter from BIA Regional Director dated Oct. 25, 2007, attached as Exhibit B.) This tract of land is in the far northeast corner of Oklahoma, located north of Interstate 44 and

immediately south of the Kansas/Oklahoma border. It is also known as the Meh-No-Bah allotment.

10.    However, over 50% of the entire footprint of the current Quapaw casino development is located within Cherokee County, including all or virtually all of the development's customer parking areas. Surface parking and the access roadway for the Quapaw development will occupy approximately 63 acres in Cherokee County, Kansas. (See Dept. of Interior Letter to Senator Roberts dated Dec. 20, 2007, attached as Exhibit C.)

11.    The site of the Quapaw development is essentially landlocked. Vehicle access to the property requires exiting Interstate 44 in Missouri at the Route 166 junction, traversing a few hundred feet to State Line Road in Cherokee County, Kansas and, then, south and west to the construction site. Presently, the only access to the site is via unpaved county roads in Cherokee County. Regardless of any path taken by the tribe in constructing an entry through tribally owned land in Missouri and Kansas, the entrance to the project will necessarily cross a county road in Cherokee County, Kansas.

12.    The 2,200 vehicle parking lot in Cherokee County was graded by mid-December 2007 and concrete was poured by mid-January 2008.

13.    Quapaw Chairman John Berrey informed the Cherokee County Commission, on November 26, 2007, that construction trucks were using State Line Road, a County Road in Cherokee County, to access the property.

14.    During the construction of the parking lot and the construction road to the construction site, the tribe or its contractors destroyed critical wildlife habitat in Cherokee County, Kansas. The habitat was destroyed without the permit required by Kansas law.

(See J. Larson, Kansas Department of Wildlife and Parks e-mail dated Dec. 27, 2007; attached as Exhibit D, at pages 6-7.)

15.    The access for the project is intended to turn from U.S. Highway 166 onto a new access road crossing State Line Road, to the parking area in Cherokee County, Kansas. (See Quapaw Casino Development Plan, attached as Exhibit E.)  Thus, all Quapaw casino traffic will travel through Cherokee County on county roads, and all or virtually all casino customers will park in Cherokee County.

16.    Under Kansas law, Cherokee County bears the burden of maintaining in good repair all county roads, and for the cost of Sheriff's Department facilities and personnel, and the funding for emergency medical services in unincorporated areas.

17.    The Quapaw have indicated to the Board that it intends to widen and resurface portions of State Line Road.  It has not, however, provided any specific description of the work it indicated it wanted to perform or any analysis supporting any specific plans.  Nor has it made any formal commitment to perform any road improvements.

18.    Presently, construction contractors for the Quapaw development are using State Line Road, a Cherokee County road, to bring heavy equipment and materials onto the construction site.  Part of the construction has involved cutting the existing "chip and seal" hard surface road to extend a sewer line from the project site into Missouri. Construction traffic has burdened the road and shortened its expected life and the road will require resurfacing.

19.    With over two million annual visitors expected at the Quapaw casino, all of whom will drive on Cherokee County roads and park in Cherokee County, it is certain

that casino traffic will have a significant effect on Cherokee County roads. The dramatic increase in traffic in all likelihood will have a significant impact on the cost of maintaining the roads and on traffic safety, as the expected traffic volume will far exceed the traffic volume for which the county roads were designed to bear.

20.    The Board is aware of anecdotal evidence that suggests that increased traffic to and from the casino site will significantly burden Cherokee County's public safety infrastructure. For example, the development of a smaller but similar casino by the Prairie Band of Pottawatomie Tribe of north of Topeka, Kansas saw a significant increase in automobile accidents at the access road to the casino from U.S. Highway 75. A number of years later, state funding enabled the Kansas Department of Transportation to build an overpass to address the safety problem presented by traffic turning across a major highway.

21.    The heavy use of county roads for casino access also will cause significant public safety costs that the County will bear. With two million annual visitors to the Quapaw casino, the southeast corner of the County in the vicinity of the Quapaw development will experience a daily transient population far in excess of the local population. As a result, casino traffic will necessarily lead to a significantly increased need for police to patrol the roads and respond to traffic accidents. In addition, there will be a substantial increase in the number of law enforcement service calls to respond to complaints connected to the transient casino population.

22.    In addition to law enforcement-related costs, the County will incur increased costs to provide necessary fire and ambulance services after the casino development opens for business.

23.    Based on presently known information, the Board estimates that it will need to fund five (5) new or additional law enforcement personnel and a new public safety sub-station located within approximately one (1) mile of the Quapaw casino parking area in Cherokee County in order to provide adequate public safety infrastructure and services after the Quapaw casino begins operations.

24.    Starting shortly after the Civil War, Cherokee County and surrounding counties in Kansas, Missouri and Oklahoma – including Ottawa County where the Quapaw casino development is centered – were the site of over a century of intensive coal, lead and zinc mining.  Cherokee County and other parts of the Tri-State mining district have been left scarred by this history.  Today, the U.S. Environmental Protection Agency broadly monitors this region and continues to engage in reclamation efforts.

25.    To this day, communities in the Tri-State mining district continue to be vulnerable to danger from lead, zinc, cadmium and other mining-related contaminants in soil and waters.  Without an environmental study, it is unknown whether construction and surface disturbance for the Quapaw casino development will cause or lead to exposure of contaminants in soils or surface or groundwater in Cherokee County or in other nearby areas.

26.    Based upon the analysis of environmental consultants, the Board has grounds to believe that the Quapaw are in violation of numerous provisions of the federal Clean Water Act.

27.    On November 26, 2007, Quapaw Chairman Berrey appeared before the Board of County Commissioners, voicing non-specific plans to develop commercial and retail property in Cherokee County, Kansas appurtenant to the casino project.  However,

the Quapaw have not shared any firm plans or commitments to develop commercial enterprises within Cherokee County that might generate some tax revenue in the County.

28.    The Quapaw casino development will not generate tax receipts in Cherokee County. There are presently no commercial outlets in the immediate area other than a single "gentlemen's club" on Route 166/400. Thus, Cherokee County will not see increased sales tax revenue from Quapaw casino customers to offset the cost burden imposed by the development. Further, it has been discovered through open records requests to Kansas State agencies that the Quapaw intend to acquire the Kansas real estate into trust, thereby removing such property from the county tax rolls.

29.    The environmental impacts discussed in this declaration represent the immediate and presently known and forecast impacts on Cherokee County. A proper environmental review pursuant to the National Environmental Policy Act is necessary both to address these impacts and to consider other potential direct, indirect and cumulative impacts imposed by the Quapaw casino development.

30.    The Board of Commissioners has brought its concerns to the defendants over the course of many months of correspondence, meetings and telephone conferences, but defendants have failed to take any action to properly review the environmental impacts of the Quapaw casino development. (See Board of Commissioners' letter to C. Artman dated Oct. 18, 2007, attached as Exhibit H; Dept. of Interior Letter to Gov. Sebelius dated Feb. 1, 2008, attached as Exhibit I). These contacts are described in greater detail in the Declaration of June DeHart.

31.    There is a possibility that a separate casino resort will be developed in Cherokee County. During the 2007 legislative session, the "Kansas Expanded Lottery

Act" (the "Act") was enacted, authorizing the Kansas Lottery to operate one lottery gaming facility in each of four gaming zones across Kansas. One of the gaming zones is the Southeast Zone, comprised of Crawford and Cherokee Counties. Under the Act, the Kansas Lottery Commission "may approve management contracts with one or more prospective lottery gaming facility managers to manage, or construct and manage, on behalf of the State of Kansas and subject to the operational control of the Kansas lottery, a lottery gaming facility or lottery gaming enterprise [in the gaming zones] where the commission determines the operation of such facility would promote tourism and economic development." SB 66, § 3(d). To approve a management contract, the Lottery Commission must determine that the proposed "lottery gaming facility managers" will invest at least $225 million in infrastructure, including ancillary products and services like restaurants, hotels, motels, museums, or entertainment facilities. SB 66, §§ 1(a) and 3(g)(2).

32.    Pursuant to the Act, Cherokee County called an election on the question of "Shall the Kansas lottery be authorized to operate a lottery gaming facility in Cherokee County?" The election was duly noticed, conducted, and the votes counted and canvassed in the manner provided under Kansas law. The voters of the County overwhelmingly voted in favor of the development and operation of a Lottery Gaming Facility in Cherokee County.

33.    Thereafter, the County called a public hearing on July 2, 2007 ("Public Hearing") to receive information and testimony in support of prospective Managers regarding their qualifications, proposed sites for the Lottery Gaming Facility, and their specific development plans for a Lottery Gaming Facility or Lottery Gaming Enterprise.

Kansas Penn Gaming, LLC was the only party to present a statement of qualifications and to present information and testimony at the Public Hearing.

34.    After duly considering all information and testimony provided in advance of and at the Public Hearing, the County determined that Kansas Penn Gaming, LLC possessed the qualifications and financial resources to construct and operate a Lottery Gaming Facility or Lottery Gaming Enterprise in Cherokee County, Kansas. On July 23, 2007, the Board of Commissioners approved a resolution for endorsement for Kansas Penn Gaming, and thereafter, on or about December 6, 2007, Kansas Penn Gaming, LLC submitted its application to the Kansas Lottery Commissioner to be selected as the "lottery gaming facility manager" in the southeast gaming zone, which comprises both Cherokee and Crawford Counties.

35.    It is not certain that the Cherokee County-based gaming facility will come to pass. The Kansas Expanded Lottery Act is currently subject to a state constitutional challenge now pending before the Kansas Supreme Court. If, however, the Kansas Penn Gaming project goes forward and the casino is opened, Cherokee County will benefit in several ways. Cherokee County will receive 2% of net revenues from the facility. The County will also receive substantial property and sales taxes in connection with the facility.

36.    The entire process for approval of a gaming facility in Cherokee County has occurred through a transparent, public process which provided (1) for a veto of gaming by the voters in Cherokee County and (2) for public comment as to the application and endorsement of Kansas Penn Gaming as a Manager. In addition, Cherokee County was able to negotiate an agreement with Kansas Penn Gaming, LLC

which required Penn Gaming to fund the construction of adequate infrastructure to serve

the Penn Gaming project in Cherokee County, including roadways, utilities, and public

safety and emergency service facilities. In contrast, the Quapaw project has not included

any planning for addressing the additional burden the project will place on Cherokee

County either in terms of increased traffic or increased public safety and first responder

requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _15th_ day of _February_, 2008.

Rod Edmondson

**EXHIBIT 1(A)**

Wally Kennedy, "Tribe Announces Plans For Resort Casino,"
*Joplin Globe*, May 15, 2007

**THE JOPLIN GLOBE**

It's your world. *We deliver it.*

# Tribe announces plans for resort casino

— By Wally Kennedy

wkennedy@joplinglobe.com

In gambling, it's all about the numbers.

For the Quapaw Tribe of Oklahoma, the gamble is whether a $200 million resort casino at the Three-States Monument will attract 2 million visitors a year.

John Berrey, chairman of the tribe, said he is confident that the gamble will be profitable and will pump millions of dollars into the regional economy.

"Our resort will be unlike anything in the region," he said. "It will be a destination resort that attracts tourist dollars from outside of the region.

"We are extremely excited about bringing a resort of this quality and scale to the Tri-State region, and we think everyone else will be pleased with it, too. We look forward to being a good corporate citizen in the surrounding communities and making this a tourism success story for the entire region."

The tribe on Monday unveiled its plan for the casino during a news conference at the Three-States Monument, six miles west of Joplin at the Highway 166 exit from Interstate 44. The monument is at the junction of the boundaries of Oklahoma, Kansas and Missouri.

Berrey said the tribe has been working on the project since 1990, and that it is "purely coincidental" that the project is unfolding at the same time that the Kansas Legislature has authorized construction of a $225 million casino in Southeast Kansas. The land for the proposed Kansas casino is a stone's throw from where the tribe will build its casino. Voters in Cherokee County, Kan., will decide June 5 whether to authorize the state-owned casino.

The tribe has acquired more than 235 acres in all three states around the monument to build the resort, said JR Mathews, vice chairman of the tribe's business committee.

Mathews said the casino will be built on 85 acres in Oklahoma. Some of that land, he said, belonged to his family. The tribe has acquired 120 acres in Kansas and 30 acres in Missouri.

Mathews said the tribe's existing casino, near Miami, Okla., will continue to operate. He said it will continue to serve a local market.

Construction of the casino has started. It is to open July 4, 2008. A 14-floor luxury hotel with 240 rooms is to open 90 days later. The tribe said the hotel will be visible for three miles in each direction from the interstate.

Berrey said planning is under way on the infrastructure needed to support such a large operation. The tribe, he said, has met with city officials in Joplin to talk about sewer and water service. New roads will be developed, and the tribe hopes that a new exit will be constructed to take motorists directly from the interstate to the casino. "We want to build partnerships so that all parties will benefit," Berrey said. "We will help them build infrastructure so that they can help us meet our needs."

With the field-stone monument as a backdrop, Berrey said the Downstream Casino Resort initially will employ about 1,200 people, and that annual payroll will be about $42 million. The resort will purchase an estimated $30 million a year in goods and services from area vendors.

The tribe is calling its project the Downstream Casino Resort because the original name of the Quapaw Tribe — O-Gah-Pah — means "the downstream people" as they were named by related tribes centuries ago.

Berrey said the casino will provide valuable revenue to state and local governments, and that unlike sites operated by national gambling corporations, the money will not leave the area. "We will keep the money here," he said.

Observing the news conference was Dale Oglesby, mayor of Galena, Kan., one of several towns that could benefit from the casinos.

"It's amazing," he said. "There's so much happening it's hard to stay up with it. One way or another, we will have a casino, possibly two. One thing is certain: This area is going to change, and there is nothing that can stop the events that have started."

The first phase of the project includes restaurants, shopping centers and a 10,000-square-foot meeting center. The second phase will include a conference center, spa and salon.

"This is something the Quapaws have wanted to do for a long time," Berrey said, "because we knew the three-states property was ideal for an upscale resort, and it would be huge for the region's economy."

The following are among the partners in the project.

n G. Michael "Mickey" Brown, of Sea Girt, N.J., is the casino project manager. He was involved in the development of the Foxwoods Resort Casino in Mashantucket, Conn., said to be the world's largest and most successful casino, and the Seneca Niagara Casino in Niagara Falls, N.Y.

n JCJ Architects, of Hartford, Conn., will design the resort. The company designed Foxwoods in Connecticut, the Seneca Niagara Spa Hotel & Casino, and the Blue Lake (Calif.) Casino.

n Manhattan Construction Co., of Tulsa, Okla., will be the contractor. Manhattan was established in 1896 in the Oklahoma Territory, before statehood, and has managed construction of numerous casinos, including the Isle of Capri and Harrah's in Louisiana.

n The development partner and financial adviser is Elm Tree Partners LLC, of Henderson, Nev.

n Bank of America and Merrill Lynch have been retained by the tribe to raise development construction funding.

Copyright © 1999-2006 cnhi, inc.

Photos



Globe/Roger Nomer John Berrey, chairman of the Quapaw Tribe of Oklahoma, and a group make the casino announcement Monday in front of the Tri-State Corner Monument near the site where Missouri, Oklahoma and Kansas meet. The tribe is planning to construct a $200 million resort casino at the site.

**EXHIBIT 1(B)**

Mary L. Downing, Regional Director, Real Estate Services,
Bureau of Indian Affairs, Letter of October 25, 2007, to
Jeffrey Nelson, National Indian Gaming Commission



# United States Department of the Interior
## BUREAU OF INDIAN AFFAIRS
### Eastern Oklahoma Regional Office
P.O. Box 8002
Muskogee, OK 74402-8002

IN REPLY REFER TO:

Real Estate Services

OCT 2 5 2007

Mr. Jeffrey Nelson
National Indian Gaming Commission
1441 L Street NW, Suite 9100
Washington, DC 20005

Dear Mr. Nelson:

This correspondence is in response to the request for a determination whether a tract known as the "Meh-No-Bah Allotment" is within the former reservation of the Quapaw Tribe of Oklahoma as defined by the Secretary in Title 25, United States Code (25 U.S.C.), Section 2719 (a)(2)(A)(i.) The legal description of the tract is the SE¼NW¼ of Section 17, Township 29 North, Range 25 East of the Indian Meridian, Ottawa County, Oklahoma, containing 40 acres.

It is the Bureau's position that the land cited is within the former historic boundaries of the Tribe. This position is based on the following historical facts. Soon after the purchase of Louisiana by the United States, the Quapaws were living in southern Arkansas, Oklahoma and Louisiana. By Treaty dated August 24, 1818 (7 Stat. 176), the Quapaw Tribe (Tribe) entered into its first treaty with the United States and ceded the majority of this land with the exception of approximately 1,225,000 acres on the south side of the Arkansas River between Little Rock and Arkansas Post. The Treaty of November 15, 1824 (7 Stat. 232) provided for the cession of the tract reserved to the Tribe in the 1818 Treaty and the Tribe agreed to relocate on the Red River in northern Louisiana and settle among the Caddo Tribe. Flooding of these lands made the Tribe's new location uninhabitable and forced the Tribe to return to its old location in Arkansas.

In order to provide a permanent home for the Tribe, the United States agreed by the Treaty of May 13, 1833 (7 Stat. 424) to convey by patent 150 sections of lands west of the state line of Missouri and between the lands of the Tribes of the Senecas and Shawnees in northeastern Indian Territory, in what is now northeastern Ottawa County, Oklahoma. The lands were located between the Neosho River and the Missouri line, north of the Seneca and Shawnee lands, and extended one-half mile north of the Kansas line. By the Treaty of February 23, 1867 (15 Stat. 513) the Tribe ceded to the United States that portion of lands lying in the state of Kansas, being a strip of land on the north line of the Tribal treaty lands about one half mile in width and containing about 12 sections of land in all.

The Quapaw National Council approved an Act on March 23, 1893, which was ratified and confirmed by the United States by the Act of March 2, 1895 (28 Stat. 907) for the allotments to the members of the Quapaw Tribe for the lands identified in the Treaty of 1833, in what is now northeastern Ottawa County, Oklahoma. The "Meh-No-Bah Allotment" was one of the allotments made pursuant to this Act.

In addition, pursuant to the terms of the *Indian Land Consolidation Act*, as amended by the *American Indian Probate Reform Act*, 25 U.S.C. § 2201, the Secretary of the Interior approved the Quapaw Tribe of Oklahoma Land Consolidation Plan. The plan permits the Tribe to acquire, sell or exchange lands within this area without special legislation for the purpose of consolidating Tribal land holdings in this area. The Bureau of Indian Affairs, Eastern Oklahoma Regional Office, has entered into a compact with the Tribe authorized by the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450, et seq., to provide Federal Government services to the Indians residing in the former treaty lands. The lands designated in the treaties between the United States and the Tribe have been referred to from time to time as "treaty lands" rather than "reservation lands". The treaty lands of the Tribe were conveyed by the United States by Patent pursuant to the Treaty of 1833 and subsequently allotted by the United States to Tribal members subject to restrictions against alienation.

The Bureau concludes that the former treaty lands of the Quapaw Tribe of Oklahoma are tantamount to "former reservation lands" and the "Men-No-Bah Allotment" meets the requirement of 25 U.S.C. § 2719 (a)(2)(A)(i) since this tract is part of the lands identified in the Treaty of May 13, 1833, which is the former treaty lands of the Tribe.

Copies of the Treaties of May 13, 1833, March 2, 1895 and a map identifying the former treaty area are enclosed. Should you have any questions, please contact Ms. Annette Jenkins, Realty Officer, Eastern Oklahoma Regional Office, Division of Real Estate Services, at (918) 781-4658.

Respectfully,

Regional Director

Acting

Enclosures

**EXHIBIT 1(C)**

Carl J. Artman, Assistant Secretary – Indian Affairs,
U. S. Department of the Interior, December 20, 2007, letter
to The Honorable Pat Roberts, U. S. Senator



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



DEC 2 0 2007

The Honorable Pat Roberts
United States Senate
Washington, D.C. 200510

Dear Senator Roberts:

Thank you for your letter of October 24, 2007, requesting our review of an October 18, 2007, letter from the Board of County Commissioners of Cherokee County, Kansas (Board). In that letter, the Board asks several questions regarding the proposed Downstream Casino and Hotel to be operated by the Quapaw Indian Tribe of Oklahoma (Tribe).

The proposed project will consist of a casino/hotel complex, infrastructure and other amenities on approximately 85 acres in Oklahoma, surface vehicle parking and an access driveway on approximately 63 acres in Kansas, and an extension of the access driveway on approximately 30 acres in Missouri.

The Board's first question is whether the land on which the gaming establishment will be located has been taken into trust for the Tribe. The gaming establishment will be located on the Meh-No-Bah allotment. The land has been acquired in trust through the Indian Land Consolidation Act (ILCA), except for an undivided 1/6 interest which is the subject of a trust application pending before the Eastern Oklahoma Regional Director of the Bureau of Indian Affairs (BIA) under 25 CFR Part 151.

The Board's second question relates to the application of the Indian Gaming Regulatory Act (IGRA) to the parcel on which the gaming establishment will be located, along with whether IGRA also impacts the non-gaming parcels in Kansas and Missouri. The BIA has informed the National Indian Gaming Commission (NIGC) that the gaming establishment will be located within the former reservation of the Quapaw Tribe in Oklahoma (copy enclosed). We are not aware of an NIGC opinion on whether the gaming parcel in Oklahoma qualifies as "Indian lands" under IGRA. It is our position that IGRA does not require the proposed parking lot in Kansas to be taken into trust as no gaming activities will be conducted thereon.

The Board's third question relates to compliance with the requirements of the National Environmental Policy Act (NEPA). The BIA did not complete either an environmental assessment (EA) or an environmental impact statement (EIS) for this project because it determined that one is not required for the ILCA acquisitions. However, the BIA will comply with NEPA requirements for the pending acquisition of the 1/6 interest in the Meh-No-Bah allotment.

The Board's last question is whether the Tribe has entered into a management contract for this casino. Our understanding is that the Tribe intends to manage the gaming establishment itself rather than retain a management company.

We hope that this letter addresses the Board's concerns. Thank you for your interest in this important issue.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

Enclosure

OCT 2 5 2007

Real Estate Services

Mr. Jeffrey Nelson
National Indian Gaming Commission
1441 L Street NW, Suite 9100
Washington, DC 20005

Dear Mr. Nelson:

This correspondence is in response to the request for a determination whether a tract known as the "Meh-No-Bah Allotment" is within the former reservation of the Quapaw Tribe of Oklahoma as defined by the Secretary in Title 25, United States Code (25 U.S.C.), Section 2719 (a)(2)(A)(i.) The legal description of the tract is the SE¼NW¼ of Section 17, Township 29 North, Range 25 East of the Indian Meridian, Ottawa County, Oklahoma, containing 40 acres.

It is the Bureau's position that the land cited is within the former historic boundaries of the Tribe. This position is based on the following historical facts. Soon after the purchase of Louisiana by the United States, the Quapaws were living in southern Arkansas, Oklahoma and Louisiana. By Treaty dated August 24, 1818 (7 Stat. 176), the Quapaw Tribe (Tribe) entered into its first treaty with the United States and ceded the majority of this land with the exception of approximately 1,225,000 acres on the south side of the Arkansas River between Little Rock and Arkansas Post. The Treaty of November 15, 1824 (7 Stat. 232) provided for the cession of the tract reserved to the Tribe in the 1818 Treaty and the Tribe agreed to relocate on the Red River in northern Louisiana and settle among the Caddo Tribe. Flooding of these lands made the Tribe's new location uninhabitable and forced the Tribe to return to its old location in Arkansas.

In order to provide a permanent home for the Tribe, the United States agreed by the Treaty of May 13, 1833 (7 Stat. 424) to convey by patent 150 sections of lands west of the state line of Missouri and between the lands of the Tribes of the Senecas and Shawnees in northeastern Indian Territory, in what is now northeastern Ottawa County, Oklahoma. The lands were located between the Neosho River and the Missouri line, north of the Seneca and Shawnee lands, and extended one-half mile north of the Kansas line. By the Treaty of February 23, 1867 (15 Stat. 513) the Tribe ceded to the United States that portion of lands lying in the state of Kansas, being a strip of land on the north line of the Tribal treaty lands about one half mile in width and containing about 12 sections of land in all.

The Quapaw National Council approved an Act on March 23, 1893, which was ratified and confirmed by the United States by the Act of March 2, 1895 (28 Stat. 907) for the allotments to the members of the Quapaw Tribe for the lands identified in the Treaty of 1833, in what is now northeastern Ottawa County, Oklahoma. The "Meh-No-Bah Allotment" was one of the allotments made pursuant to this Act.

In addition, pursuant to the terms of the *Indian Land Consolidation Act*, as amended by the *American Indian Probate Reform Act*, 25 U.S.C. § 2201, the Secretary of the Interior approved the Quapaw Tribe of Oklahoma Land Consolidation Plan. The plan permits the Tribe to acquire, sell or exchange lands within this area without special legislation for the purpose of consolidating Tribal land holdings in this area. The Bureau of Indian Affairs, Eastern Oklahoma Regional Office, has entered into a compact with the Tribe authorized by the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450, et seq., to provide Federal Government services to the Indians residing in the former treaty lands. The lands designated in the treaties between the United States and the Tribe have been referred to from time to time as "treaty lands" rather than "reservation lands". The treaty lands of the Tribe were conveyed by the United States by Patent pursuant to the Treaty of 1833 and subsequently allotted by the United States to Tribal members subject to restrictions against alienation.

The Bureau concludes that the former treaty lands of the Quapaw Tribe of Oklahoma are tantamount to "former reservation lands" and the "Men-No-Bah Allotment" meets the requirement of 25 U.S.C. § 2719 (a)(2)(A)(i) since this tract is part of the lands identified in the Treaty of May 13, 1833, which is the former treaty lands of the Tribe.

Copies of the Treaties of May 13, 1833, March 2, 1895 and a map identifying the former treaty area are enclosed. Should you have any questions, please contact Ms. Annette Jenkins, Realty Officer, Eastern Oklahoma Regional Office, Division of Real Estate Services, at (918) 781-4658.

Respectfully,

(Sgd.) Mary L. Downing

Acting Regional Director

Enclosures

File, Chrony, RD
AJenkins 10/16/07 – retype 10/22/07 – retype 10/23/07, 10/15/07
G:Annette\Ltr Meh-No-Bah-Quapaw

**EXHIBIT 1(D)**

Cindy Livingston, Director, Administrative Services Division,
Kansas Department of Wildlife and Parks, December 27, 2007,
letter to David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P.

RECEIVED DEC 2 0 2007



Kathleen Sebelius, Governor
J. Michael Hayden, Secretary

**DEPARTMENT OF WILDLIFE AND PARKS**

www.kdwp.state.ks.us

December 27, 2007

David R. Cooper
Fisher, Patterson, Sayler & Smith, L.L.P.
PO Box 949
Topeka, KS 66601-0949

Dear Mr. Cooper:

Thank you for your request concerning correspondence on the Quapaw Tribe of Oklahoma's site in Cherokee County as maintained by the Kansas Department of Wildlife & Parks. This information is included with this correspondence.

We are regulated in our actions in supplying information by a series of state laws which comprise a consumer protection act for the state of Kansas. The laws simply say that we can not provide lists if they will be used to sell to individuals on that list. <u>Kansas state law provides that "No person shall knowingly sell, give or receive, for the purpose of selling or offering for sale any property or service to persons listed therein, any list of names and addressed contained in or derived from public records ...".</u> These restrictions also apply to your use or allowed use of this information.

Thank you for your inquiry.

Sincerely,

Cindy Livingston, Director
Administrative Services Division

Enclosure (7)

Cc: Open records file

PRATT OPERATIONS OFFICE
512 SE 25th Ave., Pratt, KS 67124-8174
(620) 672-5911 • Fax: (620) 672-6020

**EXHIBIT 1(E)**

James Larson, Aquatic Ecologist, Environmental Services Section,
Kansas Department of Wildlife and Parks July 31, 2007,
letter, and e-mail string with Charles K. Ahn and Chris Jackson,
Blackshare Environmental Solutions



# KANSAS

DEPARTMENT OF WILDLIFE AND PARKS                    KATHLEEN SEBELIUS, GOVERNOR

07/31/07

Charles K. Ahn                                          Track:  20070384
Blackshare Environmental Solutions                              Cherokee County
5601 NW 72nd Ste 312                                    Ref:    D6.1000
Oklahoma City OK  73132

RE: Quapaw Tribe Proposed Resort Casino and Hotel

Dear Mr. Ahn:

The project was reviewed for potential impacts on crucial wildlife habitats, current state-listed threatened and endangered wildlife species, and public recreation areas for which this agency has some administrative authority.

Based upon aerial photography, the proposed facilities to be installed in Cherokee county may impair critical habitat for the state-listed dark-sided salamander, which has been found nearby. Specifically, we are concerned that forested patches among cropland on the proposed site may indicate sites of intermittent wetlands. Such wetlands can be critical habitat for amphibian reproduction, even those not considered to be within the jurisdiction of the COE. Intermittent wetlands are also valuable for a variety of other native fauna (including several on the Kansas SINC list).

Details of Cherokee county T&E and SINC species can be found online at
http://www.kdwp.state.ks.us/news/other_services/threatened_and_endangered_species.

In order to evaluate whether this species, or its critical habitat, occurs at the proposed site we require a habitat evaluation. This can be done either by a qualified biologist (we can provide a list of qualified consultants) or by a KDWP employee. Assessments by the KDWP may take between 1 and 2 months to schedule.

I also note that your initial letter indicated some site assessment has already been completed. That assessment may contain enough information for us to evaluate the site for this critical habitat.

Feel free to respond to this letter via email (jamesl@wp.state.ks.us) or phone.

Sincerely,

James Larson, Aquatic Ecologist
Environmental Services Section

Pratt Operations Office
512 SE 25th Ave., Pratt, KS 67124-8174



James Larson <kdwp.env.rev@gmail.com>

# Quapaw Tribe Casino and Hotel
6 messages

James Larson <jamesl@wp.state.ks.us>                    Wed, Nov 28, 2007 at 2:40 PM
To: cahn@blackshare-env.com

KDWP Track No:  20070384      CO:  CK      Ref Code:  D6.1000

Dear Charles Ahn:

Sorry about the miscommunication last week, I apparently screwed up
the email address on my previous message.

On July 13th of this year KDWP received a letter from you regarding
a proposed casino location.  A parking lot for that casino will be
built in the SE corner of Cherokee County, KS, Section 13-35S-25E.  On
July 31st, 2007, I sent a reply indicating we have threatened and
endangered species concerns at that location.  On a subsequent visit
for another, unrelated casino project within the same section of land,
I noticed that construction on this project had already begun.

In order to be in compliance with the Kansas Nongame and Endangered
Species Conservation Act, a habitat evaluation of the habitat which
has been disturbed, as well as any that will be disturbed, must be
conducted.  KDWP provides such evaluations free of charge, or we can
provide a list of approved consultants (attached).  If critical
designated habitat is present, then a separate action permit from our
office will be needed.  Typically these permits are required before
construction can begin, and we may require construction cease until
this issue is resolved (depending on a variety of factors).

In my initial letter (attached) I incorrectly identified one
species of concern as the 'dark-sided' salamander:  This species was
re-named the Longtail salamander (Eurycea longicauda).  In addition,
Dr. Joe Collins of JTC Enterprises has identified critical habitat for
the Eastern Newt (Notophthalmus viridescens), Spring Peeper
(Pseudacris crucifer), Broadhead Skink (Eumeces laticeps), and
Redbelly Snake (Storeria occipitomaculata) as occurring in adjacent
habitat to the project site.  Based on aerial photography, it appears
similar habitat exists on the project site.  Loss of critical habitat
must be mitigated.  Mitigation options include the creation of new
habitat, preservation and enhancement of existing habitat, or a fee to
a third party acting to preserve & create new habitat.  At this time,
I am unaware of a third-party organization creating habitat for these
species in SE Kansas.

In our phone conversations on November 21st, you indicated that you
had never received our previous letter.  Please note in the future
that we respond to _all_ requests, and if you have not received our
response, do please contact us to follow-up.  We typically respond

within 30 days.

Please let me know as soon as possible once you've spoken to your client how you would like to proceed.

Thanks!
James


--
James Larson
Kansas Department of Wildlife and Parks
512 SE 25th Ave
Pratt, KS 67124-8174
W 620.672.0795
C 620.450.8311

**2 attachments**

 **20070384.jhl.doc**
378K

 **CONSULTANT LIST.pdf**
10K

---

**Charles K. Ahn <CAhn@blackshare-env.com>**          **Wed, Nov 28, 2007 at 4:05 PM**
To: "Larson, James" <jamesl@wp.state.ks.us>

James:

I appreciate your explanations regarding the KDWP jurisdiction over these types of projects.  Per our conversation, please fax/e-mail a copy of the original response letter so I can let the client know. As we've discussed, we will probably advise our client to meet you (and us) at the project location in order to arrive at a feasible mitigation protocol (if warranted) for the state-listed species of concern.

Regards,

Charles K. Ahn


5601 Northwest 72nd Street, Suite 312
Oklahoma City, OK 73132
405.603.2500 Office
405.470.0084 Fax
405.226.9883 Cell
CAhn@Blackshare-env.com

[Quoted text hidden]

---

**James Larson <jamesl@wp.state.ks.us>**          **Thu, Nov 29, 2007 at 8:04 AM**
To: "Charles K. Ahn" <CAhn@blackshare-env.com>

Charles,

Is there not an attachment with our original response on the previous

email?  I've included it again here.

**James**
[Quoted text hidden]

--

[Quoted text hidden]

📄 **20070384.jhl.doc**
378K

---

**Charles K. Ahn <CAhn@blackshare-env.com>**                    **Thu, Nov 29, 2007 at 3:47 PM**
To: "Larson, James" <jamesl@wp.state.ks.us>
Cc: "Chris T. Jackson" <CJackson@blackshare-env.com>

James:

I guess your letter has an automatic update on the date.  Is this the same letter which you had sent back in July/August of this year?  Just for our recordkeeping purposes, could you let us know the date of the letter?

Also, do you have a preference on when you would like to meet us on site next week?  I think we are pretty open all week.  Please advise.

Regards,

Charles K. Ahn

5601 Northwest 72nd Street, Suite 312
Oklahoma City, OK  73132
405.603.2500 Office
405.470.0084 Fax
405.226.9883 Cell
CAhn@Blackshare-env.com

-----Original Message-----
From: kdwp.env.rev@gmail.com [mailto:kdwp.env.rev@gmail.com] On Behalf Of James Larson
Sent: Thursday, November 29, 2007 8:05 AM
To: Charles K. Ahn

[Quoted text hidden]

---

**James Larson <jamesl@wp.state.ks.us>**                    **Mon, Dec 10, 2007 at 9:25 AM**
To: Chris Jackson <cjackson@blackshare-env.com>
Cc: Charles Ahn <cahn@blackshare-env.com>, Tim Kent <timlkent@hotmail.com>

KDWP Track No: 20070384    CO: CK    Ref Code: D6.1000

Chris,

Based on our meeting last Friday (Dec 7th) and subsequent look at the existing habitat, I do not believe critical habitat with be

affected for the Eastern Newt or Spring Peeper. Moderate quality
habitat (R-Value = 5.0; scale 1-10) for the Broadhead skink was
identified as likely to be impacted by the construction of a road.
Once a definite acreage that will be destroyed has been established,
we can calculate the number of habitat units that will be lost (acres
x R-value). That loss of habitat will need to be mitigated. As
mentioned previously, mitigation may include habitat creation or
preservation and enhancement (no in-lieu fee option appears to exist
for Broadhead Skink at this time). We talked about the possibility of
re-planting an old road with oak-hickory saplings, or planting trees
in an abandoned pasture E of the project.

Let me know when you come up with a specific acreage.

[Quoted text hidden]

---

**James Larson <jamesl@wp.state.ks.us>**                    **Thu, Dec 27, 2007 at 9:27 AM**
To: Chris Jackson <cjackson@blackshare-env.com>
Cc: Charles Ahn <cahn@blackshare-env.com>, Tim Kent <timlkent@hotmail.com>

KDWP Track No: 20070384      CO: CK      Ref Code: D6.1000

Chris,

Sorry for the delay getting back to you on this, between ice storms
and Christmas, I got kinda busy.

After looking over the maps again, I agree that the road appears to
be affecting approximately 1 acre of critical habitat for the
Broadhead Skink (the other habitat you mentioned does not qualify as
Broadhead Skink habitat). The quality (R-value) for that habitat is 5
(scale 1-10), so a total of 5 habitat units (HU) will be affected.
Based upon the aerial photography I have, there also appears to be an
isolated patch of woodlands that were previously destroyed in the
pasture to the W of this strip of habitat. I don't recall
specifically discussing this habitat in terms of Broadhead Skink
during our meeting, but since it appears identical to the Skink
habitat elsewhere on-site using aerials, it should be included as
impacted habitat. According to aerial photography, this patch of
woodlands is approximately 1.3 acres in size (based on nearby habitat,
we'll call this as having an R-value of 5), resulting in an additional
6.5 HU.

These 11.5 HU will need to be mitigated. As we discussed,
mitigation options include habitat creation or preservation and
enhancement. Habitat creation for the broadhead skink will involve
establishing a woodland. The number of habitat units gained can be
calculated by comparing the present R-value of a habitat with maximum
possible R-value while taking into account the time it will take to
become established.

For example, establishing woodlands on ground with no intrinsic value
to wildlife (i.e., along the abandoned roadway) will generate 7.5 HU
per acre planted. Given the 11.5 HU that need to be mitigated,

approximately 1.53 acres would need to be planted to mitigate in this way.  The pasture/odd area to the E of the project site ( the second habitat mentioned in the previous email) is not Broadhead Skink habitat, but could be enhanced to become broadhead skink habitat through additional tree plantings.  The existing habitat there has an R-value of 6.0 (as "odd area", not as woodlands), and therefore for each acre in which plantings are made, 4 HU of mitigative gain are possible.

 Let us know how you would like to mitigate these impacts to broadhead skink as soon as possible.

Thanks
James
--
James Larson
Kansas Department of Wildlife and Parks
512 SE 25th Ave
Pratt, KS  67124-8174
W 620.672.0795
C 620.450.8311


[Quoted text hidden]

Gmail - Quapaw Casino Project                    http://mail.google.com/mail/?ui=2&ik=8e66dcb768&view=pt&q=ch..

 **Gmail**                        James Larson <kdwp.env.rev@gmail.com>

# Quapaw Casino Project

cjackson83@cox.net <cjackson83@cox.net>                Tue, Dec 11, 2007 at 10:30 AM
To: "Larson, James" <jamesl@wp.state.ks.us>

Mr. Larson,

I apologize for the late reply. The ice storm has been hitting OKC pretty hard and our capabilities are
still limited. Our main server is down so I am utilizing my personal e-mail address.

I have attached a map indicating that approximately 2.6 acres of critical habitat have been impacted.
I believe a conservative estimate would put impact to the highest rated habitat at one (1) acre and
the lower rated habitat at two (2) acres.

Please let us know if you agree with the estimated acreage of impact and we can begin to move
forward. I understand it may take some time to evaluate the habitat ratings and put together a
mitigation plan. Just keep us in the loop and we will gladly adhere to guidelines you set forth.
Thanks again for your assistance on this matter and it was a pleasure to meet with you last week.

Regards,

Chris Jackson
Blackshare Environmental Solutions
405-603-2500

Soil_Map.pdf
564K

**EXHIBIT 1(F)**

Quapaw Casino Development Map







Quapaw Resort Casino & Hotel
Phase I - Hotel Tower & Gaming Facility
Will Rogers Tpke / Interstate 44
Miami, Oklahoma

CSK-CE101

**EXHIBIT 1(G)**

David R. Cooper, Fisher, Patterson, Sayler, & Smith,
October 18, 2007, letter to Carl J. Artman, Assistant Secretary,
Indian Affairs, Department of the Interior

**FISHER, PATTERSON, SAYLER & SMITH, L.L.P.**
LAWYERS

DAVID R. COOPER, ATTORNEY
E-Mail dcooper@fisherpatterson.com
Telephone (785) 232-7761

3550 SW 5ᵗʰ Street, P.O. Box 949
Topeka, Kansas 66601-0949
Fax (785) 232-6604

October 18, 2007

Carl J. Artman
Assistant Secretary, Indian Affairs
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

        RE:     Inquiries as to Quapaw Tribe of Oklahoma, Downstream Casino and Hotel

Dear Secretary Artman:

I write on behalf of the Board of County Commissioners of Cherokee County, Kansas (BOCC). At the direction of the BOCC, I inquire regarding the Quapaw Tribe's Downstream Casino and Hotel presently under construction.

According to published reports, the Tribe acquired 85 acres in Oklahoma, upon which it would build the casino, along with 120 acres in Kansas and 30 acres in Missouri. (Joplin Globe, July 31, 2007, October 16, 2007.) It is reported the project will include a casino with 30 table games, 2,100 slot machines and 15 poker tables; a 226-room, 12-story hotel with luxury suites; and various restaurants. The Tribe recently announced that 2,400 yards of concrete were poured from mid-August through the first week of October and that completion of the project is expected in July 2008. Tribal Chairman John Berrey has been quoted saying the parking lot of its Downstream Casino Resort would be on property owned by the tribe in Cherokee County, Kansas.

Though the construction of the project seems to be proceeding apace, there have been no public announcements that the project has received the necessary approvals by the appropriate federal agencies.

The first question to be addressed is whether the Secretary of the Interior has taken land into trust to be used for the casino. If so, when and under what authority (e.g. Indian Land Consolidation Act)? Further, did the tribe disclose the intended use for the land as a casino when placing the land into trust?

A related question arises under the Indian Gaming Regulatory Act ("IGRA"). Has the land used for the casino been determined to be "Indian lands" as required by IGRA? We are aware that

---

Carl J. Artman
Assistant Secretary, Indian Affairs
October 18, 2007
Page 2

the National Indian Gaming Commission ("NIGC") wrote the Tribe and asked the Tribe to provide information demonstrating that the tribal gaming would be conducted on "Indian lands." Has the Tribe responded? If so, has a decision been made? Must the planned parking lot, in Cherokee County, Kansas, be "Indian lands?" If so, has such land been taken into trust?

The project implicates the National Environmental Policy Act ("NEPA") and other environmental laws. The land transfers involved with the casino project are subject to NEPA. We are not aware of any environmental assessment associated with the project. Was an environmental assessment done? Has there been an environmental impact statement? If so, what were the results?

Has the Tribe entered into a management contract for the casino? If so, with whom, and has the contract been approved by the NIGC? If not, does the Tribe have the requisite experience to manage a casino of this magnitude? Will the Tribe run into the same management difficulties it experienced with its Miami, Oklahoma, casino?

Thank you in advance for your assistance in resolving the issues identified above. Please contact me at 785-232-7761 or dcooper@fisherpatterson.com regarding any questions or comments you may have.

Sincerely,

David R. Cooper

DRC:drc

cc:    Phil Hogen - Chairman, National Indian Gaming Commission
       Rod Edmondson -Chairman, Cherokee County Board of County Commissioners

**EXHIBIT 1(H)**

Carl J. Artman, Assistant Secretary, Indian Affairs,
Department of the Interior, February 1, 2006, letter to
Kansas Governor Kathleen Sebelius



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



FEB 0 1 2008

The Honorable Kathleen Sebelius
Governor of Kansas
Topeka, Kansas  66612-1590

Dear Governor Sebelius:

Thank you for your letter of December 19, 2007, to Secretary Kempthorne requesting our review of an October 18, 2007, letter from the Board of County Commissioners of Cherokee County, Kansas (Board). In that letter, the Board asks several questions regarding the proposed Downstream Casino and Hotel to be operated by the Quapaw Indian Tribe of Oklahoma. The Secretary has asked me to respond to your request.

The proposed project will consist of a casino/hotel complex, infrastructure and other amenities on approximately 85 acres in Oklahoma, surface vehicle parking and an access driveway on approximately 63 acres in Kansas, and an extension of the access driveway on approximately 30 acres in Missouri.

The Board's first question is whether the land on which the gaming establishment will be located has been taken into trust for the Tribe. The gaming establishment will be located on the Meh-No-Bah allotment. The land has been acquired in trust and restricted fee through the Indian Land Consolidation Act (ILCA).

The Board's second question relates to the application of the Indian Gaming Regulatory Act (IGRA) to the parcel on which the gaming establishment will be located, along with whether IGRA also impacts the non-gaming parcels in Kansas and Missouri. The BIA has informed the National Indian Gaming Commission (NIGC) that the gaming establishment will be located within the former reservation of the Quapaw Tribe in Oklahoma (copy enclosed). We are not aware of an NIGC opinion on whether the gaming parcel in Oklahoma qualifies as "Indian lands" under IGRA. It is our position that IGRA does not require the proposed parking lot in Kansas to be taken into trust as no gaming activities will be conducted thereon.

The Board's third question relates to compliance with the requirements of the National Environmental Policy Act (NEPA). The BIA is currently undergoing a review of environmental compliance matters as they relate to the Meh-No-Bah allotment.

The Board's last question is whether the Tribe has entered into a management contract for this casino. Our understanding is that the Tribe intends to manage the gaming establishment itself rather than retain a management company.

We hope that this letter addresses the Board's concerns. Thank you for your interest in this important issue.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

OCT 2 5 2007

Real Estate Services

Mr. Jeffrey Nelson
National Indian Gaming Commission
1441 L Street NW, Suite 9100
Washington, DC 20005

Dear Mr. Nelson:

This correspondence is in response to the request for a determination whether a tract known as the "Meh-No-Bah Allotment" is within the former reservation of the Quapaw Tribe of Oklahoma as defined by the Secretary in Title 25, United States Code (25 U.S.C.), Section 2719 (a)(2)(A)(i.) The legal description of the tract is the SE¼NW¼ of Section 17, Township 29 North, Range 25 East of the Indian Meridian, Ottawa County, Oklahoma, containing 40 acres.

It is the Bureau's position that the land cited is within the former historic boundaries of the Tribe. This position is based on the following historical facts. Soon after the purchase of Louisiana by the United States, the Quapaws were living in southern Arkansas, Oklahoma and Louisiana. By Treaty dated August 24, 1818 (7 Stat. 176), the Quapaw Tribe (Tribe) entered into its first treaty with the United States and ceded the majority of this land with the exception of approximately 1,225,000 acres on the south side of the Arkansas River between Little Rock and Arkansas Post. The Treaty of November 15, 1824 (7 Stat. 232) provided for the cession of the tract reserved to the Tribe in the 1818 Treaty and the Tribe agreed to relocate on the Red River in northern Louisiana and settle among the Caddo Tribe. Flooding of these lands made the Tribe's new location uninhabitable and forced the Tribe to return to its old location in Arkansas.

In order to provide a permanent home for the Tribe, the United States agreed by the Treaty of May 13, 1833 (7 Stat. 424) to convey by patent 150 sections of lands west of the state line of Missouri and between the lands of the Tribes of the Senecas and Shawnees in northeastern Indian Territory, in what is now northeastern Ottawa County, Oklahoma. The lands were located between the Neosho River and the Missouri line, north of the Seneca and Shawnee lands, and extended one-half mile north of the Kansas line. By the Treaty of February 23, 1867 (15 Stat. 513) the Tribe ceded to the United States that portion of lands lying in the state of Kansas, being a strip of land on the north line of the Tribal treaty lands about one half mile in width and containing about 12 sections of land in all.

The Quapaw National Council approved an Act on March 23, 1893, which was ratified and confirmed by the United States by the Act of March 2, 1895 (28 Stat. 907) for the allotments to the members of the Quapaw Tribe for the lands identified in the Treaty of 1833, in what is now northeastern Ottawa County, Oklahoma. The "Meh-No-Bah Allotment" was one of the allotments made pursuant to this Act.

In addition, pursuant to the terms of the *Indian Land Consolidation Act*, as amended by the *American Indian Probate Reform Act*, 25 U.S.C. § 2201, the Secretary of the Interior approved the Quapaw Tribe of Oklahoma Land Consolidation Plan. The plan permits the Tribe to acquire, sell or exchange lands within this area without special legislation for the purpose of consolidating Tribal land holdings in this area. The Bureau of Indian Affairs, Eastern Oklahoma Regional Office, has entered into a compact with the Tribe authorized by the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450, et seq., to provide Federal Government services to the Indians residing in the former treaty lands. The lands designated in the treaties between the United States and the Tribe have been referred to from time to time as "treaty lands" rather than "reservation lands". The treaty lands of the Tribe were conveyed by the United States by Patent pursuant to the Treaty of 1833 and subsequently allotted by the United States to Tribal members subject to restrictions against alienation.

The Bureau concludes that the former treaty lands of the Quapaw Tribe of Oklahoma are tantamount to "former reservation lands" and the "Men-No-Bah Allotment" meets the requirement of 25 U.S.C. § 2719 (a)(2)(A)(i) since this tract is part of the lands identified in the Treaty of May 13, 1833, which is the former treaty lands of the Tribe.

Copies of the Treaties of May 13, 1833, March 2, 1895 and a map identifying the former treaty area are enclosed. Should you have any questions, please contact Ms. Annette Jenkins, Realty Officer, Eastern Oklahoma Regional Office, Division of Real Estate Services, at (918) 781-4658.

Respectfully,

(Sgd.) Mary L. Downing

Acting Regional Director

Enclosures

File, Chrony, RD
AJenkins 10/16/07 — retype 10/22/07 — retype 10/23/07, 10/15/07
G:Annette\Ltr Meh-No-Bah-Quapaw

**EXHIBIT 2**

Declaration of Audrey E. Moog, Hogan & Hartson LLP

UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF THE DISTRICT OF COLUMBIA

**BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS,**

Case No.

Plaintiff,

v.

**DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR
and the
UNITED STATES DEPARTMENT OF
THE INTERIOR,**

Defendants.

---

## DECLARATION OF AUDREY E. MOOG

I, Audrey E. Moog, declare as follows:

1.     I am an attorney with Hogan & Hartson LLP, duly licensed to practice law in the District of Columbia and the State of New York. The matters set forth herein are true as of my own personal knowledge, and if called to do so, I could and would competently testify to these matters under oath.

2.     Attached hereto as Exhibit 2(A) is a true and correct copy of the article entitled "Area Officials Celebrate Quapaw Tribe's Planned $200 Million Casino, Hotel," by Roger McKinney, published on July 31, 2007, in the *Joplin (MO) Globe*, and obtained from the *Joplin Globe* website, http://joplinglobe.com.

3.      Attached hereto as Exhibit 2(B) is a true and correct copy of the article entitled "Work On Schedule," by Roger McKinney, published on December 17, 2007, in the *Joplin (MO) Globe*, and obtained from the *Joplin Globe* website, http://joplinglobe.com.

4.      Attached hereto as Exhibit 2(C) is a true and correct copy of the letter by Stephen R. Ward, Conner & Winters, LLP to the National Indian Gaming Commission dated August 6, 2007 (without attachments).

5.      Attached hereto as Exhibit 2(D) is a true and correct copy of the letter by Wayne C. Nordwall to Chairman John L. Berrey, Quapaw Tribe of Oklahoma (O-Gah-Pah) dated August 6, 2007.

6.      Attached hereto as Exhibit 2(E) is a true and correct copy of the Department of the Interior Office of Indian Gaming Management policy titled "Checklist for Gaming Acquisitions, Gaming-Related Acquisitions and IGRA Section 20 Determinations" dated March 2005.

7.      Attached hereto as Exhibit 2(F) is a true and correct copy of the Board of Commissioners of Cherokee County's Notice of Intent to Sue for Violations of the Clean Water Act to the Quapaw Tribe dated February 22, 2008.

8.      Attached hereto as Exhibit 2(G) is a true and correct copy of the letter by David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P., on behalf of the Board of Commissioners of Cherokee County, Kansas, to the Army Corps of Engineers dated February 22, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th day of February, 2008, in Washington, D.C.

Audrey E. Moog

**EXHIBIT 2(A)**

Roger McKinney, "Area Officials Celebrate Quapaw Tribe's
Planned $200 Million Casino, Hotel," *Joplin Globe*, July 31, 007



# Area officials celebrate Quapaw Tribe's planned $200 million casino, hotel

— By Roger McKinney
rmckinney@joplinglobe.com
Area dignitaries on Tuesday praised the Quapaw Tribe of Oklahoma's plans for a $200 million casino and hotel as an investment that could boost the economy of the entire area.
Downstream Casino Resort's planned opening is set for July 4, 2008, with the casino opening first and the hotel opening about three months later. A ceremonial groundbreaking was put on Tuesday at the construction site on 80 acres where Oklahoma, Missouri and Kansas meet, just off exit 1 from Interstate 44.
Also part of the event was the announcement of a partnership between the tribe and Loma Linda Country Club for use of the club's golf course by Downstream customers.
John Berrey, chairman of the tribe's business committee, told reporters that future projects could result in a total investment of $800 million.
"While the project is in Oklahoma, it is only eight miles from downtown Joplin and just three miles from the city limit of Joplin," said Debbie Linnes, chairwoman of the Joplin Area Chamber of Commerce board and president of St. John's Regional Medical Center. "It is, for all intents, a part of the economy of the city and the entire region. This project will have a great economic impact for the Joplin region."
Linnes said the development would provide entertainment and meeting venues, and boost the area's service industry.
Berrey reinforced that idea.
"What we want from this is a better life for everybody in the area," Berrey said. He said the tribe wants to be a partner with the communities surrounding the casino.
"This is not just about the Quapaw Tribe, even though it's a big day for us," he said. "It's about Joplin and Baxter and Galena and Miami, Loma Linda. It's Carthage. It's about those people, those services, those relationships we're going to build. We're going to grow together. To us, that's the most important part about today."
Berrey said the tribe has a tentative agreement with Bobby Landis, owner of Loma Linda, for use of the country club's 36-hole golf course.
"What we plan to provide is a monthly fee plus a round fee so our golfers can have the experience of playing over at his golf course," Berrey said. "We also talked to him about helping him with some upgrading of his facility."
"What we're discussing is them becoming members of Loma Linda," Landis said. "There's been some discussions about improvements to the golf course."
Landis said an agreement is ready to be signed. Neither Landis nor Berrey revealed any financial details about the deal.
Landis said the hotel and casino would result in a large amount of development along I-44.
"What will happen on exit 1 is a complete transition from woodland to an extension of Joplin," Landis said.
Joplin Mayor Jon Tupper said city officials have been meeting with tribal officials about the potential for cooperation.
"Economically, it's going to be tremendous for our whole area," Tupper said.
Dale Oglesby, mayor of Galena, Kan., agreed.
"I think all three states are going to benefit from the development," Oglesby said. "We're all in this together."
Plans call for a 12-story hotel with 226 rooms. A hot-air balloon on Tuesday took participants to the 200-foot height of the planned hotel tower.
"At the top of our (hotel) tower we're going to have a high-roller lounge, and really nice suites with a balcony," Berrey said.

**EXHIBIT 2(B)**

Roger McKinney, "Work on Schedule," *Joplin Globe*,
December 17, 2007



# Work on schedule

— By Roger McKinney
rmckinney@joplinglobe.com

Sean Harrison said he is amazed when he visits the construction site for Downstream Casino Resort by the amount of progress that has been made since work began.

Harrison is a spokesman for the Quapaw Tribe of Oklahoma, which is building the hotel and casino where Oklahoma, Kansas and Missouri meet off Exit 1 to Interstate 44.

One of the cranes at the site is visible over the treetops to motorists on the Interstate. Harrison said construction is on schedule for opening the casino in late July or early August, with the 12-story hotel set to open in October. The price tag on the project is $200 million.

"It will be the tallest building this side of Tulsa, Springfield, Kansas City and Northwest Arkansas," Harrison said of the hotel.

The construction site was busy recently, with 165 workers in what will become the casino and hotel. Harrison said the steel work has been completed on the casino, and it is to be enclosed by the end of the month. The foundation was poured on the adjoining hotel tower, and steel work is set to begin.

Marilyn Rogers, a member of the tribe's business committee and construction site liaison, said more than 300 construction workers would be on the site when the hotel construction gets into full swing.

Harrison said meetings have been taking place in temporary buildings set up for the construction project. Wall coverings for the hotel were being chosen.

"There are millions of details," he said. "Everybody feels very comfortable that it's on schedule."

The information technology for the casino and hotel represents an $18 million investment by the tribe, Harrison said.

He said a single card would allow visitors to order room service in the hotel, play a slot machine, pay for a meal in the restaurant and do a number of other things.

Inside what will become the casino, Harrison and Rogers pointed out the locations of the casino floor, the restaurants and the back area where employee offices will be located. The area of the casino building is 177,000 square feet, with a 70,000-square-foot casino floor. It will have 2,000 slot machines, 30 table games and 15 poker tables.

Harrison said the sports bar will have a "monster" TV.

Plans for the hotel include 219 guest rooms and seven luxury suites; a spa with a sauna, workout room and massage; and retail shopping on the ground floor.

Hotel guests also will have access to Loma Linda Country Club's golf course through an agreement between the tribe and the club.

The tribe projects having more than 2 million annual visitors. Projections call for 1,200 full-time employees, with a $35 million base annual payroll plus $9 million in employee benefits.

Rogers said the tribe has been planning for the casino and hotel for more than five years.

"We were planning on a big casino for years," she said. "It's progressed faster than anyone ever thought."

Rogers said the tribe's property has 55 acres in Oklahoma, on which the casino and hotel are being built; 100 acres in Kansas, where the parking lot will be constructed; and 37.5 acres in Missouri, which will include the resort entrance.

Officials in Cherokee County, Kan., through an attorney the County Commission has hired to handle gambling issues, have asked tribal officials about designation of the casino property as American Indian land and about environmental assessments. Penn National Gaming, under an agreement with the county, is to reimburse the county for its expenses for the attorney. Penn National plans to build a state-owned casino and hotel a short distance from the planned tribal casino and hotel, with opening scheduled for 2010.

Rogers said she is confident the issues with Cherokee County will be resolved amicably.

"In my opinion, there are no issues," she said. "I've covered everything."

Harrison said the project manager is G. Michael Brown and Associates of Sea Girt, N.J., led by G. Michael "Mickey" Brown. Brown is a former gambling regulator who went into casino management.

Brown resigned in June 1997 as chief executive officer of the Foxwoods Resort Casino, which the June 21, 1997, New York Times described as "a gambling mecca in eastern Connecticut that claims to be the world's most profitable casino." The paper said the casino is owned by the Mashantucket Pequot tribe.

"Mr. Brown was a major architect of the Pequots' success, negotiating the deal with the state that allowed them to open the casino and then serving as its chief executive officer for five years," the Times reported in the story about Brown's resignation from the position.

"This place is going to rival anything he's ever seen," Harrison said.

Contractor

Manhattan Construction Co., of Tulsa, Okla., is the lead contractor on the tribal construction project.

Copyright © 1999-2006 cnhi, inc.

Photos



Globe/T. Rob Brown Employees with Manhattan Construction, based in Tulsa, go over floor plans for the Downstream Casino Resort, which is being built by the Quapaw Tribe of Oklahoma. The casino is on schedule to open in July or August, with the hotel to follow in October.

**EXHIBIT 2(C)**

Stephen R. Ward, Conner & Winters, LLP, August 6, 2007,
letter to National Indian Gaming Commission
(without attachments)

# CONNER & WINTERS

ATTORNEYS & COUNSELORS AT LAW



**Stephen R. Ward**

Conner & Winters, LLP
4000 One Williams Center
Tulsa, Oklahoma 74172-0148
918-586-5711

Direct 918-586-8978
Fax 918-586-8698
*sward@cwlaw.com*

August 6, 2007

National Indian Gaming Commission
1441 "L" Street, N.W., Suite 9100
Washington, D.C. 20005
Attention: Jo-Ann Shyloski, Associate General Counsel

Re:    Downstream Casino Resort

Ladies and Gentlemen:

The National Indian Gaming Commission (the "NIGC") has, by a letter dated August 2, 2007, requested that the Quapaw Tribe of Oklahoma (O-Gah-Pah) (the "Tribe") provide information pertaining the lands on which the Tribe is developing a new gaming enterprise and resort, to be known as the "Downstream Casino Resort." This letter is intended to provide the NIGC with a background concerning the site of the project, as well as an analysis and documentation relating to the requirements, set forth in the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701 *et seq.* (the "IGRA"), for conducting gaming on Indian lands.

The Downstream Casino Resort is being developed by the Downstream Authority of the Quapaw Tribe of Oklahoma (O-Gah-Pah) (the "Authority"), an unincorporated arm of the Tribe wholly owned by the Tribe. The project will be built on several tracts of land consisting of some 200 acres in the northeastern corner of Oklahoma, the southeastern corner of Kansas, and the southwestern corner of Missouri. Land within the project site is held subject to fee, restricted, and trust titles—all either held by the Tribe or by the United States in trust for the Tribe. Some access roads, parking lots, and administrative and support facilities will be built on fee lands owned by the Tribe. However, the casino itself will be built—and all Class II and Class III gaming operations will be conducted—on lands the title to which is held either by the Tribe subject to restrictions by the United States against its alienation or in trust for the benefit of the Tribe. The portion of the Downstream Casino Resort in which gaming is to be conducted will be referred to hereinafter as the "Downstream Casino."

## Summary

As set forth herein, the Tribe satisfies the foundational requirements as an Indian tribe for conducting gaming lawfully on Indian lands, including that (a) the Tribe is a federally recognized Indian nation that actively exercises sovereignty and governance, (b) the Tribe has a federally approved gaming ordinance in effect pursuant to the IGRA, and (c) the Tribe has a valid tribal-state compact in force relating to certain Class III games. These matters are

National Indian Gaming Commission
August 6, 2007
Page 2

generally addressed in parts I and II below.

In addition, the Tribe will conduct Class II and Class III gaming solely on a tract of land for which title to an undivided 100% interest presently is held either by the Tribe subject to restrictions by the United States against alienation or by the United States in trust for the benefit of the Tribe. Specifically, the Downstream Casino site (a) is land within, at least, the Tribe's "former reservation" within the State of Oklahoma, (b) is land the title to which has since allotment been held either by individual Indians or the Tribe subject to restrictions by the United States against alienation or by the United States in trust for the Tribe, (c) is land subject to the Tribe's jurisdiction, and (d) is land over which the Tribe has exercised jurisdiction and governmental powers sufficient to satisfy the requirements of law. These matters are addressed in parts III through VIII of this letter.

## I. Sovereignty and Federal Recognition

The IGRA requires that gaming be conducted by an "Indian tribe," and the statute defines that term to mean "any Indian tribe, band, nation, or other organized group or community of Indians" which (i) "is recognized as eligible by the Secretary [of the Interior] for the special programs and services provided by the United States to Indians because of their status as Indians" and (ii) "is recognized as possessing the powers of self-government." 25 U.S.C. § 2703(5). The Tribe satisfies both of these elements of the statutory definition.

The Tribe is a sovereign American Indian nation that has been recognized as such for centuries by other sovereign governments, including the governments of Spain and France, and, then, the United States. The Tribe began government-to-government relations with the United States no later than with the negotiation and conclusion of the Treaty of August 24, 1818, at St. Louis, Missouri (Kappler, 1904, vol. 2, p. 160, 7 Stat. 176). The Tribe has a culture and a language, and, in addition, it has an organized functioning government that exercises sovereignty, including governance through the promulgation of written laws, which are codified in the *Quapaw Code* and in the *Quapaw Code of Tribal Regulations*.

In addition, the Quapaw Tribe is formally recognized by the United States. *See* 72 Fed. Reg. 13,648, 13,650 (Mar. 22, 2007) (annual listing of recognized tribes); *see also* 25 U.S.C. § 479a-1 (requiring listing of recognized tribes). As a federally recognized Indian tribe, the Tribe is eligible to receive—and it receives—funding and services from the Bureau of Indian Affairs (the "BIA") by virtue of its status as an Indian nation. In addition, the Tribe is a self-governance tribe for purposes of Public Law 93-638, the "Indian Self-Determination and Education Assistance Act," 25 U.S.C. §§ 450 *et seq.*, and it administers a number of programs pursuant to annual funding agreements entered into under 25 U.S.C. § 458cc and other applicable law.

National Indian Gaming Commission
August 6, 2007
Page 3

## II.  Tribal Regulation and Conduct of Gaming

The Tribe conducts and regulates gaming pursuant to a gaming ordinance, *see* Quapaw Code tit. 17, §§ 1 *et seq.*, originally adopted on October 16, 2004, *see* Bus. Comm. Res. No. 101604-C, and amended on January 31 and February 14, 2005, *see* Bus. Comm. Res. Nos. 013105-A and 021405-A.  The Tribe's gaming ordinance was approved by the Chairman of the NIGC by letter dated February 3, 2005.  In addition, the Tribe has adopted administrative regulations relating to gaming, including regulations implementing the tribal-state gaming compact between the Tribe and the State of Oklahoma, which are contained in Title 17 of the *Quapaw Code of Tribal Regulations*.  Primary regulation of gaming by the Tribe is vested in a Tribal Gaming Agency, *see* Quapaw Code tit. 17, § 10, the actions and decisions of which are subject to review by a Tribal Gaming Commission, *see id.* tit. 17, § 9.

The Tribe conducts Class III gaming pursuant to a tribal-state gaming compact (the "Compact") in full force and effect with the State of Oklahoma, and which has been approved by the Secretary of the Interior.  The Compact—which is in a standard form adopted by the Oklahoma Legislature for all tribes—permits certain Class III gaming on tribal lands.  *See* Okla. Stat. tit. 3A, § 281.  The Compact was adopted by the Quapaw Tribal Business Committee on November 23, 2004, *see* Bus. Comm. Res. No. 112304-A, and it was subsequently approved by the Secretary of the Interior, through a designated representative, pursuant to a letter dated January 12, 2005.[1]

The Compact authorizes the Tribe to operate certain covered Class III games at locations and facilities in addition to the single location at which the Tribe currently operates gaming, provided that such additional gaming facilities are on "Indian lands" for purposes of the IGRA, and provided other requirements are met.  Under the Compact the

"Tribe may establish and operate enterprises and facilities that operate covered games only on its Indian lands as defined by IGRA.  The Tribe shall notify the [State Compliance Agency] of the operation of any new facility following the effective date of this Compact.  Nothing herein shall be construed as expanding or otherwise altering the term 'Indian lands', as that term is defined in the IGRA, nor shall anything herein be construed as altering the federal process governing the tribal acquisition of 'Indian lands' for gaming purposes."

(Compact Pt. 5(L), at 10.)  The Compact thus requires that the Tribe must notify the appropriate agencies of the state concerning the operation of a new casino, and such a new facility must comply with the licensing and revenue provisions set forth in the Compact.

---

[1]       The Compact became effective as of the date of its publication in the *Federal Register*, February 8, 2005.  *See* 70 Fed. Reg. 6725 (Feb. 8, 2005).  The Compact is, by its terms, in full force and effect until January 1, 2020, with automatic renewals for successive 15-year terms unless the Tribe or the State request renegotiation.  (Compact Pt. 15(B), at 26.)

National Indian Gaming Commission
August 6, 2007
Page 4

### III.  Location and Description of Downstream Casino Site

The Downstream Casino is to be built on a tract of land allotted to a Tribal member, Meh-No-Bah Rabbit (Allottee No. 178/194) in 1895.  For this reason, the tract is known as the "Meh-No-Bah Allotment."  The legal description of the tract is as follows:

SE¼, NW¼, Section 17, Township 29 North, Range 25 East of the Indian Meridian, Ottawa County, Oklahoma, consisting of 40 acres, more or less.

(Exs. 6 & 7.)  The Meh-No-Bah Allotment is located in the far northeastern corner of the portion of the Tribe's last reservation within Oklahoma. (Ex. 7 at 2;  Ex. 11(B) & (C) (legal description and map of reservation);  Ex. 11(B);  Ex. 12(D)-(F).)  Although the project site encompasses several tracts of land held by or for the Tribe subject to fee, restricted, and trust title, the Downstream Casino—the only location on the site at which gaming is to be conducted—will be located solely on the Meh-No-Bah Allotment. (Exs. 12(F) & (G).)

In 1834, the Quapaw Tribe was removed from its homeland in Arkansas and adjacent states to the present-day States of Oklahoma and Kansas pursuant the Treaty of May 13, 1833 (Kappler, 1904, vol. 2, p. 395, 7 Stat. 424).  The treaty established a permanent reservation for the Tribe consisting of 150 sections of land to be held by the Tribe "and their descendants so long as they shall exist as a nation or continue to reside thereon." Treaty of 1833 art. II.  As originally established, most of the Tribe's 1833 reservation was located within the far northeastern corner of the present-day State of Oklahoma, with a smaller portion located within the far southeastern corner of the State of Kansas.[2] (Ex. 12(A) & (B).)

By an enactment of the Quapaw National Council on March 23, 1893, the Quapaw Tribe self-allotted the land within the portion of its original 1833 reservation located in present-day Oklahoma.  The allotment was carried out in two primary phases, namely, first, with the allotment of 200-acre tracts in the fall of 1893 (the "First Allotment"), and then with the allotment of surplus or additional 40-acre tracts in the spring of 1894 (the "Second Allotment").  Subsequently, Congress ratified the Tribe's allotment determinations through the Act of Mar. 2,

---

[2]        The portion of the original Quapaw Reservation within Kansas, as created, consisted of approximately 12 sections of land, and was approximately one-half mile in width from north to south;  this area of the reservation came to be known as the "Quapaw Strip" or the "Kansas Strip."  Pursuant to the Treaty of February 23, 1867 (Kappler, 1904, vol. 2, p. 961, 515 Stat. 513), the Tribe sold approximately 7,600 acres of land within the "Quapaw Strip" to the United States, and also sold approximately 18,522 acres in the western part of the reservation to the Peoria Tribe.  The Meh-No-Bah Allotment was and is located within another area of the 1833 reservation not included in or affected by these land sales.

National Indian Gaming Commission
August 6, 2007
Page 5

1895, 28 Stat. 907, known as the "Quapaw Allotment Act."[3]

## IV. Title History of Meh-No-Bah Allotment

The tract of land on which the Downstream Casino is to be built was allotted to Meh-No-Bah in the Second Allotment, and title in it was thereafter held by individual Indians subject to restricted title. Beginning in April 2007, the United States acquired title to an undivided five-sixths interest in the tract in trust for the Tribe. Title to the remaining undivided one-sixth restricted interest was acquired by the Tribe in July 2007 subject to restrictions by the United States against its alienation. As a result, title to an undivided 100% percent interest in the tract is currently held either by the Tribe subject to restricted Indian title or by the United States in trust for the Tribe.

Following is a summary of the chain of title from allotment to the present.

A.    *One Hundred Percent Restricted Interest from Allotment to Undivided One-Half (50%) Restricted Interests Held Individually by Odestine McWatters and Matilda Beaver:* According to land title records of the BIA, the original allottee, Meh-No-Bah, died on February 5, 1905. BIA records reflect that Meh-No-Bah's interest in the parcel passed to her niece, Ta-Meh Quapaw, and her nephew, Alexander Lewis. By 1957, the tract had passed to their heirs, Odestine Alberdine Hampton McWatters and Matilda Stand Beaver, each of whom held title to an undivided one-half (50%) interest in the tract subject to restrictions by the United States against its alienation. (Ex. 6.)

B.    *Undivided One-Half (50%) Restricted Interest from Odestine McWatters to the Tribe:* The BIA's land records for the tract reflect that, following her death in 1997, the undivided one-half (50%) restricted interest of Odestine McWatters passed to two members of the Quapaw Tribe, Yannah F. McWatters Stephenson and George R. McWatters, Jr. (Ex. 6.) In April 2007, both Ms. Stephenson and Mr. McWatters applied to the BIA to convey their restricted interests in the tract to the Tribe pursuant to the Indian Land Consolidation Act, 25 U.S.C. §§ 2201 *et seq.* (the "ILCA"). Subsequently, title to both of these restricted interests in the tract was conveyed to the United States in trust for the benefit of the Tribe through the Tribe's program for the acquisition of fractional interests and pursuant to 25 U.S.C. § 2212(a)(1). (Exs. 1, 2 & 9(A).) Therefore, following the completion of these two conveyances, title to a one-half (50%) undivided interest in the tract was held by the United States in trust for the benefit of the Tribe.

C.    *Undivided One-Half (50%) Restricted Interest from Matilda Beaver to Undivided One-Sixth Restricted Interests Held by Three Grandchildren:* Official records reflect that Matilda Beaver died on July 30, 1959. Ms. Beaver left a BIA will that expressly devised her

---

[3]    The Quapaw Allotment Act originally placed restrictions on the sale of Quapaw lands for 25 years, although Congress subsequently has continued these restrictions on remaining Quapaw lands.

National Indian Gaming Commission
August 6, 2007
Page 6

restricted estate to her three grandchildren—Billy Lewis Urquhart, a/k/a Billy Louis Urquhart, Jan Colbert Killough, and Bobbie Rae Starr, a/k/a Bobbie Rae Killough—in equal proportions of "one-third each," with a life estate in her only daughter, Ida Louise McQuillin Killough. (Ex. 7, at 24.) Thus, under her BIA will each of Ms. Beaver's grandchildren were to receive an undivided one-sixth interest in the tract, subject to a life estate in their mother.[4]

Ms. Beaver was a member of the Peoria Tribe of Oklahoma, federal supervision over which was terminated effective August 2, 1959, just days after her death. *See* Act of August 2, 1956, 70 Stat. 937. The so-called "Peoria Termination Act" expressly ended the federal trust relationship relating to the Peoria Tribe, and removed restrictions by the United States against alienation of Peoria tribal members' lands as of the effective date. *See id.* 70 Stat. 937 §§ 2 & 3(a). However, subsequent to Ms. Beaver's death the BIA determined that since she died *before* the effective date of the Peoria Termination Act her restricted estate remained subject to federal trust supervision.[5]  (Ex. 7, at 21.)

The undivided one-sixth restricted interests in the tract devised to each of Ms. Beaver's grandchildren were conveyed to the Tribe as follows:

   *1.     Undivided One-Sixth Restricted Interest from Jan Colbert Killough to the Tribe:* Mr. Killough applied to the BIA to convey his undivided one-sixth interest in the tract to the Tribe pursuant to the ILCA. The BIA verified that Mr. Killough's interest continued to be a restricted interest. Subsequently, on May 18, 2007, Mr. Killough's undivided one-sixth restricted interest in the tract was conveyed to the United States in trust for the benefit of the Tribe pursuant to 25 U.S.C. § 2212(a)(1).[6]  (Ex. 3.)

---

[4]     Official records reflect that Ms. Beaver's daughter, Ida Louise McQuillin Killough, who held a life estate in the one-sixth interests Ms. Beaver bequeathed to her grandchildren, died on February 13, 1997.

[5]     The BIA advises that Ms. Beaver's restricted interest in the parcel appears to have remained for many years in an inactive trust status (sometimes referred to within the agency as a "dry" trust). Nevertheless, before approving the conveyances to the Tribe the BIA confirmed that the interests in the Meh-No-Bah Allotment that Ms. Beaver bequeathed to her three grandchildren remained *restricted* interests. In addition, available records reflect that no official determination was ever made by the BIA ending the restricted status of these interests.

[6]     A "Transcript of Ownership" for the tract issued by the BIA in 2006 reflected that Mr. Killough, Ms. Starr/Killough, and Mr. Urquhart, were not Indians. In response to the Tribe's request to acquire Ms. Beaver's interest in the tract through her heirs, the BIA conducted an extensive review of the title history and of associated records, and confirmed that Mr. Killough, Ms. Killough-Starr, and Mr. Urquhart each are or were of Indian heritage and that their interests in the tract are restricted interests. Apparently the erroneous notation in the records resulted

National Indian Gaming Commission
August 6, 2007
Page 7

2.    *Undivided One-Sixth Interest from Bobbie Rae Starr, a/k/a Bobbie Rae Killough, to the Tribe:* Ms. Starr/Killough applied to the BIA to convey her undivided one-sixth interest in the tract to the Tribe pursuant to the ILCA. The BIA verified that Ms. Killough/Starr's interest continued to be a restricted interest. Subsequently, on July 6, 2007, Ms. Killough/Starr's undivided one-sixth restricted interest in the tract was conveyed in trust to the United States for the benefit of the Tribe pursuant to 25 U.S.C. § 2212(a)(1). (Ex. 4.)

3.    *Undivided One-Sixth Interest from Estate of Billy Louis Urquhart, a/k/a Billy Lewis Urquhart, to the Tribe:* Official records reflect that one of Ms. Beaver's heirs, Mr. Urquhart, died on October 24, 1959, at age 21, just some three months after Ms. Beaver's death. Mr. Urquhart died without any known heirs, and his restricted estate was never probated. The Tribe obtained a conveyance of the undivided one-sixth restricted interest in the tract originally intended for Mr. Urquhart pursuant to 25 U.S.C. § 2204(a)(2).

Under § 2204(a)(2), a tribal government that owns at least a one-half (50%) undivided interest in a tract of land may acquire the interests of the minority undivided restricted owners. *See id.* Such a conveyance is required to be made upon the request of the Tribe, and the consent of the minority interest owner involved is not prerequisite for such a conveyance.[7] Further, this statute does not require the identification of missing owners or the conclusion of a probate of interests of deceased owners before a conveyance is made. Upon application of the Tribe under this statute, the BIA confirmed that Mr. Urquhart's interest in the tract continued to be a restricted interest. On July 10, 2007, the BIA conveyed Mr. Urquhart's undivided one-sixth interest in the tract to the Tribe, with the title to be held by the Tribe subject to restrictions by the United States against its alienation. (Ex. 5.)

D.    *Summary of Continuous Trust Status from Original Allottee to the Tribe:* Following the conveyance to the Tribe of the restricted interests of Ms. Stephenson and Mr. McWatters—totaling an undivided one-half (50%) interest in the tract—and the restricted interests of Mr. Killough, Ms. Starr/Killough, and the estate of Mr. Urquhart—amounting to the remaining undivided one-half (50%) interest in the parcel—the Tribe became the restricted owner and beneficial owner of an undivided 100% interest in the Meh-No-Bah Allotment. These interests had remained in a federal trust status since allotment.

All of the interests in the Meh-No-Bah Allotment were acquired by the Tribe pursuant to

---

from the lack of a completion of a probate of their grandmother's restricted estate, the lack of a probate of Mr. Urquhart's estate, and other circumstances.

Since the conveyances to the Tribe occurred relatively recently, the BIA has advised that an updated Title Status Report is not yet available.

[7]    Both Mr. Killough and Ms. Starr/Killough consented in writing to the conveyance of Mr. Urquhart's restricted interest to the Tribe, although such consent was not required under the ILCA.

National Indian Gaming Commission
August 6, 2007
Page 8

the ILCA, which permits tribes to acquire undivided fractional restricted interests in Indian lands in order to make such lands unusable. *See* 25 U.S.C. § 2216(a). The statute expressly provides that title to land acquired by a Tribe under the ILCA "shall be taken into trust by the United States for that . . . Indian Tribe." *Id.* § 2209. The ILCA places no restrictions on the use of restricted lands a tribe acquires. Further, since conveyances of restricted lands to a tribe under the ILCA are not "fee-to-trust" conveyances, the requirements of 25 C.F.R. Part 151 are not applicable. (Ex. 9(B).)

In summary, an undivided five-sixth interest in the tract—including the interests of Ms. Stephenson, Mr. McWatters, Mr. Killough, and Ms. Starr/Killough—was conveyed directly from restricted owners to the United States in trust for the benefit of the Tribe. The remaining undivided one-sixth interest in the tract was conveyed directly from the estate of a restricted owner—the estate of Mr. Urquhart—to the Tribe in restricted title. None of these interests in the parcel were fee interests before they were conveyed into trust for the Tribe or to the Tribe in restricted status. As a result, all of the interests in the Meh-No-Bah Allotment have been held in a federal trust status—they have been held either by restricted owners or by the United States in trust for the Tribe—continuously since allotment.

## V. Satisfaction of Title Requirements for "Indian Lands" Under the IGRA

For purposes of the IGRA, "Indian lands" are (i) "all lands within the limits of any Indian reservation" and (ii) "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." As formulated in the NIGC's regulations, "Indian lands" include:

"(a) Land within the limits of an Indian reservation; *or*
(b) Land over which an Indian tribe exercises governmental power *and* that is either
(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation."

*See* 25 C.F.R. § 502.12 (2006) (emphasis added). In other words, lands eligible for gaming pursuant to the IGRA must either be within an existing Indian reservation *or* they must be lands over which an Indian tribe exercises "governmental power" *and* that are held through one of two types of Indian land title—title held by the United States in trust for a tribe or an individual, or title held by a tribe or an individual subject to restrictions by the United States against its alienation.

The question of whether the Quapaw Tribe's 1833 reservation in Oklahoma is a present-day reservation has never been addressed by Congress or in the courts. In general, the

National Indian Gaming Commission
August 6, 2007
Page 9

question of whether a tribe's reservation has been disestablished requires a statement of clear congressional intent to do so.[8] Although no such clear intent is present with respect to the Quapaw Tribe's 1833 reservation, and although the Tribe does not concede that its reservation has been disestablished, this is a complex issue that the NIGC need not address concerning the tract of land at issue.

If a tribe has a recognized present-day reservation, then it may conduct gaming on fee lands within the reservation. But the IGRA and the NIGC's regulations make plain that any tribe may conduct gaming on land the title to which is held in restricted status and on land held in trust by the United States for the benefit of the tribe, so long as the other requirements in the statute are satisfied. *See* 25 U.S.C. § 2703(b)(1) and (2); 25 C.F.R. § 502.12 (2006). In this case, title to an undivided 100% percent of the Meh-No-Bah Allotment is held either in trust for the Tribe or by the Tribe subject to restrictions against alienation. As a result, the title requirements in 25 U.S.C. § 2703(b)(1) and (2) are satisfied, and the Meh-No-Bah Allotment satisfies the definition for "Indian lands."

## VI. Satisfaction of Requirements for Tribal Jurisdiction and Exercise of Governmental Power

When a tribe does not have a present-day reservation, the IGRA requires the tribe to establish, in addition to the title requirement of § 2703, that it exercises "governmental power" over any land that it intends to use for gaming. The NIGC has determined that tribal jurisdiction is a threshold requirement for the exercise of such power.

The United States Supreme Court has held that an Indian reservation is "Indian country," *see, e.g., Williams v. United States*, 327 U.S. 711, 713, 66 S. Ct. 778, 779 (1946); *Donnelly v. United States*, 228 U.S. 243, 33 S. Ct. 449, 457-58 (1913), and Congress has defined the term "Indian country" as encompassing broader territory than a "reservation," *see* 18 U.S.C. § 1151. The Supreme Court has specifically recognized that tribal governments in Oklahoma have jurisdiction over their "Indian country," regardless of whether such land "consists of a formal or informal reservation, allotted lands, or dependent Indian communities." *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 128, 113 S. Ct. 1985, 1993 (1993). The Tribe thus has a recognized right to exert jurisdiction over the Indian country within its original reservation boundaries—namely, the land to which title is held by the United States in trust on behalf of the Tribe, and also the restricted land held by the Tribe and individual Indians subject to restrictions

---

[8]    *See, e.g., Solem v. Bartlett*, 465 U.S. 463, 470-71, 104 S. Ct. 1161, 1166 (1984) (noting Congress must "clearly evince an intent to change boundaries" before the Court will find that diminishment or disestablishment has occurred); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S. Ct. 1361, 1363 (1977) (noting in determining intent to disestablish a reservation courts are to follow "the general rule that doubtful expressions are to be resolved in favor of [Indian Tribes] who are the wards of the nation, dependent upon its protection and good faith") (quoting *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S. Ct. 121, 122 (1930)).

National Indian Gaming Commission
August 6, 2007
Page 10

by the United States against its alienation. For these reasons, the Tribe has legally recognized and presumed jurisdiction over its "Indian country," which consists of the trust and restricted Indian lands within its original reservation boundaries, and which includes the Meh-No-Bah Allotment.

The archives of the Tribe, the United States, and the BIA reflect that the Tribe has and continues to exercise governance over the trust and restricted Indian lands within its original reservation boundaries. In recent years, the Tribe has enacted ordinances that expressly establish its jurisdiction over the lands within the Tribe's Indian country. These include the Tribe's general jurisdictional statute, which provides that the "jurisdiction of the government of the Quapaw Tribe shall extend over all of the lands and territories of the Quapaw Reservation." Quapaw Code tit. 1, § 4(b).[9] The Tribe has also enacted a land use planning and zoning ordinance to address land use planning within the boundaries of the Tribe's 1833 reservation. *See* Quapaw Code tit. 23, §§ 1 *et seq.* In particular, the Tribe has zoned the site of the Downstream Casino Resort for commercial, recreational, and industrial uses—the last category of which expressly allows uses for "indoor entertainment and amusement facilities." *See id.* § 4 (official land use map attached as exhibit 9) & § 18.2 (definition of industrial zoning).

In addition, the Tribe has directly exercised its governmental powers over the Meh-No-Bah Allotment. The Tribe (i) built a road on the Meh-No-Bah Allotment to provide construction access to the tract, (ii) placed numerous signs around the perimeter of the parcel providing public notice that the land is within the Tribe's jurisdiction and control, (iii) constructed a fence around the perimeter of the tract to actually control access, and (iv) has taken other actions reflecting the direct exercise of governmental jurisdiction and control over the tract.[10]  (Ex. 8.)  The Tribe has therefore engaged in specific acts of governance on the Meh-No-Bah Allotment that are virtually identical to the types of "concrete manifestations of

---

[9]    The Quapaw Tribe has enacted other statutes and ordinances that exercise its sovereignty over its Indian country in areas including:  (a) regulation of corporations, Quapaw Code tit. 10, §§ 101 *et seq.*;  (b) regulation of the environment, *id.* tit. 15, §§ 1-A *et seq.* (environmental code, environmental protection commission, solid waste code, toxic and hazardous substance code, and water quality code);  (c) gaming regulation, *id.* tit. 17, §§ 1 *et seq.*;  (d) liquor regulation and control, *id.* tit. 20, §§ 101 *et seq.*;  (e) taxation and revenue, *id.* tit. 30, §§ 1 *et seq.*;  and (f) tobacco taxation, *id.* tit. 30, § 201 *et seq.*
In addition, the Tribe has tribal-state compacts in force with the State of Oklahoma in the areas of gaming, tobacco taxation, gasoline taxation, and motor vehicle licensing that further make clear the Tribe actually exercises its jurisdiction over it Indian country.

[10]    The Tribe has commissioned two surveys of the tract, including a commercial survey (Ex. 12(G)) and a cadastral survey conducted by the United States Bureau of Land Management (which is underway as of the date of this letter), it has had the surface of the tract graded for construction, and it has other and similar actions as a government relating to development of the property.

National Indian Gaming Commission
August 6, 2007
Page 11

governmental authority" that the NIGC has deemed sufficient for purposes of the IGRA in other cases. *See, e.g.,* Memorandum from Penny J. Coleman, Acting General Counsel, NIGC, to Philip N. Hogen, Chairman, NIGC, re "Kiowa Indian Tribe of Oklahoma—Gaming Site" (Nov. 15, 2005).

## VII.  Satisfaction of the Section 20 Exception for Trust Lands Acquired After October 17, 1988, If Applicable

Under the IGRA, lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, are not eligible for use for gaming unless

"(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; or
(2) the Indian tribe has no reservation on October 17, 1988, and—
(A) such lands are located in Oklahoma and—
(i) are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary, or
(ii) are contiguous to other land held in trust or restricted status by the United States for the Indian Tribe in Oklahoma; . . . ."

25 U.S.C. § 2719(a).  As noted, title to an undivided five-sixths interest in the Meh-No-Bah Allotment was acquired by the Secretary in trust for the benefit of the Tribe between April and July 2007.  Title to the remaining undivided one-sixth interest in the tract was conveyed to the Tribe subject to restrictions against its alienation in July 2007.  But since the Meh-No-Bah Allotment has remained in a trust status since allotment—either as land the title to which was held by individual Indians or the Tribe subject to restrictions by the United States against its alienation or as land held in trust by the United States for the benefit of the Tribe—the general prohibition against gaming on parcels acquired post-IGRA does not apply in this situation.

The conveyance of the Meh-No-Bah Allotment to the United States in trust for the Tribe and to the Tribe subject to restrictions by the United States against alienation involved a direct conveyance of restricted land to a trust status.  All of the interests in the tract acquired by the Tribe had been held by Indians subject to restrictions by the United States against alienation since allotment—and since before October 17, 1988, the deadline in the IGRA after which newly acquired trust lands were to be subject to additional requirements.  Where a tribe acquires restricted land directly in trust, and where the chain of federal trust management and supervision over the land is unbroken, the NIGC has concluded that such property has "remained in trust" and thus is not subject to the requirements in IGRA related to parcels acquired in trust after the statutory deadline.  *See* Memorandum from Penny J. Coleman, Acting General Counsel, NIGC, to Philip N. Hogen, Chairman, NIGC, regarding "Kiowa Indian Tribe of Oklahoma—Gaming Site" (Nov. 15, 2005).

In addition, the Tribal interest in the Meh-No-Bah Allotment would be eligible for use for Indian gaming under IGRA, even if the requirements in § 2719(a) were to apply.  The

National Indian Gaming Commission
August 6, 2007
Page 12

Meh-No-Bah Allotment is land either (a) located within the Tribe's present-day reservation or, if the Tribe's reservation is no longer an existing reservation, it is (b) located within the boundaries of the Quapaw Tribe's former reservation in Oklahoma, as discussed elsewhere in this opinion.[11] In addition, the Tribal interest in the Meh-No-Bah Allotment is contiguous to other land held in trust or restricted status for the Quapaw Tribe. The tract located immediately to the north of the Meh-No-Bah Allotment is the Meh-Het-Tah-Spada Allotment, in which the Tribe is the owner of an undivided interest that is the majority interest in the parcel. Adjacent to the Meh-No-Bah Allotment on the east is the Lottson Allotment, in which the Tribe holds, or is the beneficial title holder, of a majority interest held as a combination of trust and restricted land.

In conclusion, the Meh-No-Bah Allotment consists entirely of undivided interests title to which is held either by the United States for the benefit of the Tribe, or by the Tribe subject to restrictions against its alienation. The tract is within at least the Tribe's "former reservation" within the State of Oklahoma. The tract is within the Tribe's Indian country, and therefore the Tribe has presumed jurisdiction over it. Finally, the Tribe it has exercised its governmental powers and jurisdiction over the tract in concrete way. For the reasons stated herein, the Meh-No-Bah Allotment satisfies the requirements for "Indian lands" for purposes of the IGRA.

The above is intended to respond to the NIGC's request for the Tribe's analysis as to why the planned site of the Downstream Casino qualifies as "Indian lands" for purposes of 25 U.S.C. §§ 2703(4) and 2719. I am enclosing an appendix of exhibits that addresses the NIGC's request for copies of the trust and restricted deeds to the gaming site and maps or plats of the site showing the location of the Downstream Casino. The Tribe and I will look forward to

---

[11]    The Tribe's original reservation in Oklahoma is, at a minimum, a "former reservation" for purposes of 25 U.S.C. § 2719(a)(2)(A). This conclusion is confirmed in part by the regulations relating to Indian land acquisitions, which provide that the term "Indian reservation"

"means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final determination that a reservation has been disestablished or diminished, Indian reservation means that area of land constituting the former reservation of the tribe as defined by the Secretary."

25 C.F.R. § 151.2(f) (italics omitted).

National Indian Gaming Commission
August 6, 2007
Page 13

addressing any of your questions and comments about this matter.

Sincerely,

Stephen R. Ward

SRW/nsf

cc:     Quapaw Tribal Business Committee

        John L. Berrey, Chairman, Tribal Business Committee
        Barbara Kyser Collier, Director, Tribal Gaming Agency

Enclosures

**EXHIBIT 2(D)**

Wayne C. Nordwall August 6, 2007, letter  to
Chairman John L. Berrey, Quapaw Tribe of Oklahoma
(O-Gah-Pah)

August 6, 2007

Wayne C. Nordwall
25210 N. 42nd Drive
Glendale, Arizona 85310

John L. Berrey, Chairman
Quapaw Tribe of Oklahoma (O-Gah-Pah)
P.O. Box 765
Quapaw, Oklahoma 74363-0765

      Re:    Meh-No-Bah Allotment

Dear Chairman Berry:

      This is a summary of the acquisition of the Meh-No-Bah Quapaw allotment, #178/194, on which I advised the Quapaw Tribe of Oklahoma. The Quapaw Tribe received $1,000,000 pursuant to P.L. 108-108 to pursue its land consolidation program. Using these funds, the Tribe acquired roughly two-thirds of the allotment pursuant to the fractional interest acquisition program authorized by the Indian Land Consolidation Act (ILCA), specifically, 25 U.S.C. § 2212. Under this authority once the land is acquired, the statute provides that the Secretary (meaning the Secretary of the Interior) "shall immediately hold interests acquired under this chapter in trust" for the tribe that exercises jurisdiction over the acquired interests. Accordingly, as soon as the Secretary acquired the interests in the Meh-No-Bah allotment on behalf of the Quapaw Tribe, the Bureau of Indian Affairs (BIA) changed its title records to reflect that they are now held in trust for the Quapaw Tribe. The remaining one-third interest had to be acquired through a slightly different procedure.

      Section 2212(a)(1) provides that the Secretary may acquire fractional interests "with the consent of the owner, or from an heir during probate." In this case, the remaining one-third interest appeared to be held by two putative heirs. Both were willing to sell their interests in the allotment. However, until an actual probate is commenced and the heirs determined, no sale could be consummated. The BIA's probate program is behind by several thousand probates and it was impossible to ascertain when the probate of the one-third interest in the Meh-No-Bah allotment might take place. In order to finish the acquisition of the property, the Tribe chose to use other Tribal funds for the acquisition and to use the Tribe's authority to acquire land under another section of ILCA.

      Section § 2204(a) gives tribes the authority to acquire all of the interests in a piece of property if the tribe secures the consent of at least 50 percent of the interest holders. A

tribe's ownership interests are included in calculating the 50 percent consent requirement. In this case, the Quapaw Tribe owned two-thirds of the property. The Tribe, therefore, exercised its right under § 2204(a) to acquire the remaining one-third interest. The BIA has transferred the remaining one-third interest to the Quapaw Tribe. The purchase price was paid to the BIA and it was deposited into an estate account. Once the probate is completed, the money will then be paid to the heirs. The bottom line is that the Tribe now owns 100 percent of the Meh-No-Bah allotment and BIA records reflect that it is held in trust for the Tribe.

Based upon the BIA's records relating to the Meh-No-Bah allotment that I have reviewed, it appears that this land has been in restricted status since allotment. This was the basis on which the BIA was able to effectuate these conveyances under ILCA. If the land were not in restricted or trust status, the land would have had to be acquired pursuant to section 2202 of ILCA and the process to convert fee land to trust status initiated pursuant to 25 CFR Part 151. While historically there was a distinction between restricted title and trust title, today there is no real distinction between restricted land and trust land. See, for example, section 2703(4)(B) *Definitions* in the Indian Gaming Regulatory Act. This section provides that, among other things, "Indian lands" means—

"any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."

From the information I have about these conveyances, they were made properly and in accordance with the applicable provisions of ILCA.

Please let me know if you have any questions regarding this matter.

Sincerely,

Wayne C. Nordwall

Wayne C. Nordwall

WCN/

cc:    Quapaw Tribal Business Committee
       Stephen R. Ward, General Counsel, Quapaw Tribe

2

**EXHIBIT 2(E)**

Checklist for Gaming and Gaming Related Acquisitions

# CHECKLIST
# FOR GAMING ACQUISITIONS
# GAMING-RELATED
# ACQUISITIONS and IGRA
# SECTION 20
# DETERMINATIONS

Office of Indian Gaming Management
1849 C Street NW, MS-4600 MIB
Washington, DC  20240
(202) 219-4066
(202) 273-3153 fax

March 2005

# Table of Contents

PART 1 - LAND ACQUISITION - 25 CFR PART 151

    I.   151.3 Land acquisition policy ................................................................... Page 2
    II.   151.4 Acquisitions in trust of lands owned in fee by an Indian ................. Page 2
    III.   151.5 Trust acquisitions in Oklahoma under Section 5 of the IRA ........... Page 2
    IV.   151.6 Exchanges ............................................................................... Page 2
    V.   151.7 Acquisitions of fractional interests ............................................ Page 2
    VI.   151.8 Tribal consent for non-member acquisitions ............................. Page 2
    VII.   151.9 Request for approval of acquisitions ......................................... Page 3
    VIII.   151.10 On-reservation acquisitions .................................................. Page 3
        B.   151.10(a) ............................................................................... Page 3
        C.   151.10(b) ............................................................................... Page 3
        D.   151.10(c) ............................................................................... Page 3
        E.   151.10(d) ............................................................................... Page 4
        F.   151.10(e) ............................................................................... Page 4
        G.   151.10(f) ............................................................................... Page 4
        H.   151.10(g) ............................................................................... Page 4
        I.   151.10(h) ............................................................................... Page 4
    IX.   151.11 Off reservation acquisitions .................................................. Page 5
    X.   151.12 Action on requests ............................................................... Page 5
    XI.   151.13 Title Examination ................................................................. Page 5
    XII.   151.14 Formalization of acceptance .................................................. Page 5

PART 2 - INDIAN GAMING REGULATORY ACT - 25 U.S.C. § 2719, SECTION 20

    I.   Section 20(a), 25 U.S.C. § 2719(a) .................................................... Page 6
        A.   Section 20(a)(1) ..................................................................... Page 6
        B.   Section 20 (a)(2)(A) ............................................................... Page 6
        C.   Section 20 (a)(2)(B) ............................................................... Page 6
    II.   Section 20(b)(1), 25 U.S.C. § 2719(b)(1). ........................................... Page 7
        A.   Section 20 (b)(1)(B) ............................................................... Page 7
        B.   Section 20(b)(1)(A) ............................................................... Page 7
    III.   Guidance for preparing NEPA documents ........................................... Page 9
        Checklist of Environmental Issues for NEPA Review .......................... Page 11
    IV.   Preparation of Section 20 documentation by Region ............................. Page 12

## CHECKLIST FOR GAMING and GAMING-RELATED ACQUISITIONS

The Office of Indian Gaming Management (OIGM) is responsible for Indian gaming functions and activities remaining with, or delegated to, the Secretary under the Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. §§ 2701-2721. The OIGM is also responsible for the review of recommendations from Regional Offices regarding requests for the acquisition of land into trust for gaming and gaming-related purposes. This function includes acquisitions either for a new gaming facility, for the expansion of a present gaming facility, or for projects that are essential to the operation of a gaming facility, such as parking lots or the construction of a waste water treatment facility serving the gaming establishment. The following criteria should be used to determine whether the acquisition is gaming-related: (1) if the land and the improvements on the land are going to be used exclusively to support the gaming facility, the acquisition is gaming-related; (2) if the land and the improvements on the land are not used exclusively to support the gaming facility but the gaming facility cannot operate without it, the acquisition is gaming-related; and (3) if the land and the improvements are not used exclusively for the gaming facility and are not essential to its operation, but the gaming facility is merely sharing in infrastructure improvements, the acquisition is not gaming-related.

In order to assist you in preparing a complete land acquisition package for review and final action, the OIGM has prepared this checklist for your use. The checklist is designed to address the factors found in Title 25, Code of Federal Regulations (CFR), Part 151, the requirements of Section 20 of IGRA, and the environmental laws which most likely would be applicable. We also have included information on certain procedural steps that should be followed to assure that a complete file of the tribe's application, information, and supporting documentation is properly submitted to the Central Office. These procedural steps are:

A.  All requests for the acquisition of land for gaming must be transmitted to OIGM regardless of whether the l and i s located o n, c ontiguous to, o r o ff t he applicant's reservation. This directive applies to trust-to-trust, restricted-to- restricted/trust, and fee-to-trust land acquisitions. The authority to approve or disapprove land acquisitions for gaming and gaming-related purposes is vested with the Assistant Secretary - Indian Affairs (AS-IA); however, the authority to accept title in trust for BIA is vested with the Regional Director.

B.  The acquisition package submitted to Central Office, OIGM must contain a complete file of information and documents which clearly indicates compliance with 25 CFR Part 151, IGRA, the National Environmental Policy Act (NEPA) and other applicable Federal laws, regulations, and Executive Orders. The Regional Office's transmittal memorandum must contain Proposed Findings of Fact and Conclusions relative to 25 CFR Part 151, Section 20 of IGRA, and NEPA, and any other information deemed appropriate by the Regional Director. Further, it must contain the Regional Director's recommendations for approval or disapproval of the acquisition. For ease in cross-referencing to specific findings or conclusions, the acquisition package should be organized with an index, and all exhibits should be tabbed and numbered. The initial request or application received from the tribe should be kept intact and tabbed as one exhibit. For example, responses to the B IA's r equest for input/comments should be kept intact and tabbed as a single exhibit, e.g. the 30-day n otices t o s tates, county, city, etc. All of these documents can be under one tab with each full document manually numbered for ease in citation and location. No additions or deletions should be made to the tribe's application package. Any additional information obtained by BIA offices to supplement or clarify the tribe's application should be maintained separately and should be identified in a manner that will enable the reader to readily make a d etermination as t o which o ffice obtained or prepared the additional information.

C.  The Regional Director must independently analyze the factors, and make independent findings and recommendations even when the Tribe submitting the application has contracted the realty services program under Title I of the Indian Self-Determination and Education Assistance Act (ISDEA), or has entered into a self-governance compact pursuant to Title IV of the ISDEA.

D.  When the acquisition is subject to Section 20 (b)(1)(A) of IGRA, 25 U.S.C. Sec. 2719(b)(1)(A), which requires consultation, a two-part Secretarial determination, and the concurrence of the Governor of the State, the Regional Director must recite separate proposed factual findings to support a determination by the Secretary that the gaming establishment o n newly acquired lands is in the best interest of the tribe and its members and is not detrimental to the surrounding community. The specific factors and consideration for the Section 20 analysis are identified in Part 2 of this Checklist.

E.  When the Regional Director believes that the acquisition satisfies one of the Section 20 exemptions other than (b)(1)(A), the transmittal memorandum from the Regional Director must so indicate and must include an analysis establishing that such an exemption exists, and include supporting documentation, i.e., an appropriate Solicitor's Office legal opinion, in the acquisition file.

F.  The completed acquisition package must be reviewed by the appropriate Regional or Field Solicitor to ensure that all legal requirements have been adequately addressed.

G.  The Regional Director's Memorandum must contain a statement certifying that the documents submitted for the acquisition are copies of the original documents.

## PART 1 - LAND ACQUISITION - 25 CFR PART 151

### I.  151.3 Land acquisition policy

☐  A.  The Regional Director's Proposed Findings of Fact and Conclusions must include a statement and statutory citation to the specific act(s) of Congress authorizing the trust acquisition, e.g., Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465.

Additionally, the Regional Director's Proposed Findings of Fact and Conclusions must include a discussion of applicable provisions in the tribe's governing documents authorizing the tribe to take the requested action.

☐  B.  The Regional Director must include a statement that indicates which circumstances listed in 25 CFR § 151.3(a) support the request for the trust acquisition.

### II.  151.4 Acquisitions in trust of lands owned in fee by an Indian

☐  A.  The trust acquisition package must include a discussion of the ownership status of the property, a legal land survey or other document that provides an accurate description of the property to be acquired, and a plat or map to show the distance and/or proximity of the property to the reservation, the reservation boundaries, or to trust lands, whichever is applicable (see also Part 1, Section VII, Paragraph A of this Checklist).

☐  B.  The acquisition package must include a copy of the resolution of the appropriate governing body of the tribe authorizing the trust acquisition request and must include a copy or excerpt of the tribe's governing document, if any, which identifies the scope of authority for the tribe's actions. The resolution should include a request to take the land into trust, the exact legal description of the property, the location, the intended purpose, and a citation to the applicable portion of the tribe's governing document which permits the governing body to make the request. The legal description of the property must be identical throughout the acquisition package. Any discrepancies in the legal description should be noted and fully explained.

☐  C.  The Regional Director must provide an assurance that the information provided pursuant to 25 CFR § 151.4 was reviewed and found to be sufficient. The Regional Director's assurance must include a brief summary of the tribe's history, organization, and governing practices to illustrate the tribe's operating standards. Legal issues must be reviewed by the appropriate Regional or Field Solicitor. A copy of the Solicitor's opinion or response must be included as part of the package.

### III.  151.5 Trust acquisitions in Oklahoma under Section 5 of the Indian Reorganization Act

☐  A.  When 25 CFR § 151.5 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

### IV.  151.6 Exchanges

☐  A.  When 25 CFR § 151.6 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist, in addition to information required in 25 CFR Part 152, if applicable.

### V.  151.7 Acquisitions of fractional interests

☐  A.  When 25 CFR § 151.7 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

## VI. 151.8 Tribal consent for non-member acquisitions

☐   A.   When 25 CFR § 151.8 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

☐   B.   A copy of any written documentation, such as a letter or resolution, executed by the tribe proposing to acquire land on a reservation other than its own, to the tribe having jurisdiction over such reservation must be included as part of the package. This documentation should identify the property proposed for trust acquisition and the parties involved in the transaction.

☐   C.   The acquisition package must also include a copy of the written consent of the tribe having jurisdiction over such reservation for the proposed acquisition. This documentation should also identify the property and the parties involved in the transaction.

## VII. 151.9 Request for approval of acquisitions

☐   A.   The information required under 25 CFR Part 151 should be organized to provide a complete picture of the tribe's request. The Tribes should be encouraged to submit their requests in a manner which will facilitate the analysis of the request. At the onset of a request, the tribe should be instructed on the nature of the required submissions which support the request. Documents received from the tribe should be kept intact. NO ADDITIONS OR DELETIONS SHOULD BE MADE TO THE TRIBE'S APPLICATION PACKAGE. ANY ADDITIONAL INFORMATION OBTAINED BY BIA OFFICES TO SUPPLEMENT OR CLARIFY THE TRIBE'S APPLICATION SHOULD BE MAINTAINED SEPARATELY AND IDENTIFIED IN A MANNER THAT WILL ENABLE THE READER TO READILY MAKE A DETERMINATION AS TO WHICH OFFICE OBTAINED OR PREPARED THE ADDITIONAL INFORMATION. Although there is no particular application format required, the organization of information should follow the following logical sequence: (1) The identification of the parties; (2) a citation of the statutory authority which authorizes the acquisition; (3) a statement justifying the need for the additional land [151.10(b)]; (4) a full and complete explanation of the intended purpose for the land [151.10(c)]; (5) a physical description of the location of the land; (6) present and past uses of the land; (7) proof of present ownership, or a description of those circumstances which will lead to tribal ownership; (8) a legal description supported by a survey or other document; (9) an indication of the location and proximity to the tribe's reservation, the reservation boundaries or to trust lands; (10) a plat/map indicating such location and proximity of the land to the reservation; and (11) the tribal resolution. The tribal resolution must include the information listed in Part 1, Section II, Paragraph B of this Checklist.

## VIII. 151.10 On-reservation acquisitions

☐   A.   The notification process will be conducted by letter inviting the state and local governments having regulatory jurisdiction over the land to be acquired to provide written comments on potential impacts (regulatory jurisdiction, real property taxes, and special assessments). The notification letters should include information on the location of the proposed gaming facility, the scope of gaming proposed, and other pertinent information which will assist the consulted officials should they wish to comment on the proposed acquisition.

☐   B.   151.10(a):   The Regional Director must determine that there is statutory authority for the acquisition. A brief summary of the specific statute or act(s) of Congress should be provided along with an independent, factual analysis of the application of such statutory authority to the tribe's request. (See Part 1, Section I of this Checklist).

☐   C.   151.10(b): The Regional Director must conclude that the tribe has sufficiently justified the need for the additional land. The Regional Director's conclusion should be based on a factual finding which may be supported by independent information, or by information and evidence provided by the tribe. The tribe may justify its request by establishing that existing tribal land is inadequate for gaming because of size, location, and market conditions. In support of this contention the tribe may have developed feasibility or market study, or a business plan which the Regional Director should independently review to determine whether it supports the tribe's assertions.

☐ D. 151.10(c): The Regional Director must conclude that the tribe has adequately described the intended purposes for the land.

E. 151.10(d) NOT APPLICABLE

☐ F. 151.10(e): The Regional Director must make a conclusive statement regarding the impact on the State and any political subdivisions expected to result from removing the land from the tax rolls. The Regional Director will come to a conclusion on the basis of information received from the state and local governments having regulatory jurisdiction over the land to be acquired, and other independent information. At the expiration of the required 30-day comment period for State and local governments, the appropriate BIA official will prepare a record that indicates the contacts made and the responses received, and that includes any other additional comments or information. The record will also include any objections made by the contacted governmental entities. The Regional Director must consider any and all objections, and must provide an analysis of the merits of specific objections. The Regional Director will include any information on the outcome of any objection referred to the tribe. Copies of the record on the 30-day notification process shall be included in the submission to the Central Office.

☐ G. 151.10(f): The Regional Director must include, in the same manner as described in Part 1, Section VIII, paragraph F of this Checklist, a conclusion regarding any jurisdictional problems and potential land use conflicts. The Regional Director's conclusion should be based on information received as a result of the BIA notification, on information obtained independently, or on information known about the jurisdictional issues inherent in the status of Indian lands. If jurisdictional problems or conflicts in land use have been identified, existing agreements between the tribe and local jurisdictions resolving these issues should be included in the acquisition package.

☐ H. 151.10(g): The Regional Director must include an independent assessment of the impact on the BIA should the land be acquired in trust. The Regional Director should consider the type of services required for the land, if any; the availability of staff to carry out the additional responsibilities; and such other considerations which may be relevant in making this

assessment. In the assessment of the impact, an analysis is required of the intended and future uses of the property, and a statement should be written based on the analysis indicating the extent to which the BIA Agency and Regional offices will be impacted by the proposed trust acquisition. A fully documented assessment is needed to assess how the added responsibilities (i.e. leases, rentals, easements, emergencies, environmental concerns, roads, traffic, etc.) will affect the present BIA staff. To state merely that the BIA's only duty to the property will be routine or administrative is insufficient. If the applicant tribe has contracted the realty services program under Title I of the ISDEA, or has entered into a self-governance compact under Title IV of the ISDEA, the Regional Office should provide an analysis of the tribe's role in the supervision/administration of the land.

☐ I. 151.10(g): The acquisition package must include a pre-acquisition environmental site assessment, no matter whether the proposed acquisition is discretionary or non-discretionary, as required by 602 DM 2. This Department Manual release requires the assessments to be conducted or supervised by qualified individuals, as determined by the Bureau, and provides that assessments will generally be considered adequate for one year prior to the date of acquisition, with documented exceptions for real property located in adverse climatic or geographical areas.

With respect to discretionary acquisitions, the Regional Director must also comply with the requirements of NEPA and its implementing regulations. NEPA is codified at 42 U.S.C. §§ 4321-4347. The NEPA regulations promulgated by the Council on Environmental Quality (CEQ) are published at 40 CFR Parts 1500-1508. In addition, the Regional Director must comply with Departmental NEPA requirements in 516 DM 1-6, as well as the BIA-specific NEPA requirements in 516 DM 6, Appendix 4. The Bureau's NEPA Handbook is published in 30 BIAM Supplement 1. The *Checklist of Environmental Issues for NEPA Review of Proposed Gaming-Related Actions* reproduced in Part 2 of this Checklist must be included with NEPA documents which are being submitted to the AS-IA for review. A more detailed description of the pertinent NEPA requirements is provided in Part 2, Section III of this Checklist.

## IX.  151.11 Off reservation acquisitions

☐  A.  When 25 CFR 151.11 applies, the acquisition package must include all the information required under Part I, Section VIII, of this Checklist.

☐  B.  The greater the distance the acquired land is from the tribe's reservation will require that the Regional Director's analysis more fully justify the anticipated benefits to the tribe. The information obtained under Part 2, Section II(B) (best interests factors) of this Checklist may be considered, if the application requires submission of this information pursuant to Section 20 of the IGRA, in analyzing the tribe's application to determine if the acquisition sufficiently satisfies the anticipated benefit to the tribe. As the distance from the reservation increases, the greater the justification will have to be to support the additional benefits to the tribe.

☐  C.  The Regional Director must review the tribe's comprehensive economic development plan required under 25 CFR § 151.11(c), which specifies the anticipated financial benefits associated with the acquisition.

## X.  151.12 Action on requests

☐  A.  The AS-IA will use the information provided by the tribe, Superintendent, and Regional Director to make a decision on the request. Therefore, the Regional Director must ensure that the acquisition package is complete in all respects to allow for a timely and informed decision. The package must include all documents, exhibits, and information relied on or provided in support of the proposed acquisition. Should the AS-IA decide to approve the tribe's application to acquire the land in trust for gaming, the Central Office will publish the required *Federal Register* notice.

## XI.  151.13 Title Examination

☐  A.  The acquisition package must include an *Abstract of Title* or *Commitment for Title Insurance Policy* covering the property to be acquired. The title evidence must be examined by the appropriate Regional or Field Solicitor who must prepare a preliminary title opinion to identify any liens, encumbrances or other legal infirmities which may exist. The accuracy of all legal descriptions must be verified and must match the legal descriptions of the property contained in other documents within the acquisition package prior to submission to the appropriate Regional or Field Solicitor. Copies of correspondence or documented contacts between the Regional Office and the Solicitor's Office must be included as part of the acquisition package. A draft of the instrument of conveyance must be prepared and provided to the Solicitor to ensure compliance with all legal requirements.

After an Abstract of Title has been submitted by the tribe for the title evidence, an appraisal of the property by the BIA is required. The appraisal is used to alert the appropriate Regional or Field Solicitor of the value of the property in the event that office does not have authority to examine title evidence on property exceeding the value of $100,000. The Department of Justice is authorized to examine an Abstract of Title on the property valued at $100,000 or more.

## XII.  151.14 Formalization of acceptance

☐  A.  The Regional Director will be notified in writing of the AS-IA's approval of the acquisition request and authorized to proceed with the formal acceptance of the land in trust subject to satisfactory completion of all title requirements, and following expiration of the 30-day period after publication of the *Federal Register* notice required under 25 CFR § 151.12. A copy of the final title opinion by the appropriate Regional or Field Solicitor, and a copy of the approved and recorded conveyance instrument must be provided to OIGM for inclusion as part of the file.

☐  B.  The appropriate Regional or Field Solicitor's approval of the draft conveyance document must be obtained before a final instrument of conveyance is prepared and signed. A copy of the draft conveyance instrument should be included as part of the acquisition package.

☐  C.  The approved instrument of conveyance must be recorded in the appropriate BIA title office. When fee property is approved for trust, the approved instrument of conveyance to trust should also be recorded in the appropriate county office.

**PART 2 - INDIAN GAMING REGULATORY ACT - 25 U.S.C. § 2719, SECTION 20**

Section 20 of IGRA, 25 U.S.C. § 2719, governs the use of land acquired in trust when the intended use of the land is for gaming. Section 20 of IGRA prohibits gaming on lands acquired in trust after October 17, 1988, with certain exceptions.

The first section of this Part describes the exceptions to the gaming prohibition on lands acquired in trust after October 17, 1988. The second section of this Part describes the instances when the general prohibition on gaming on newly acquired lands will not apply to lands acquired in trust after October 17, 1988. The third section of this Part describes the responsibility of the BIA Regional Office regarding compliance with the requirements of NEPA. The fourth section of this part describes the preparation of the Section 20 documentation by the Regional Office for transmittal to Central Office.

All applications for the trust acquisition of land intended for gaming must be processed with Section 20 considerations in mind. Typically, the acquisition will be for the construction and operation of a gaming facility. There will be projects however, which on first impression may not readily appear to be intended for gaming. For instance, if a tribe intends to expand an existing gaming facility through the addition of a hotel with additional gaming space thereon, the acquisition should be deemed to be for gaming. However, if a tribe intends to expand parking facilities for an existing gaming establishment, the acquisition should not be deemed to be for gaming because there is no gaming conducted in the parking lot. Although an acquisition for the expansion of parking facilities would not be subject to the two-part determination in 25 U.S.C. § 2719(b)(1)(A), the acquisition is still subject to approval by the AS-IA, as stated in PART ONE, above because it is gaming-related. A tribe's contention that gaming on newly acquired lands is not prohibited because one or more exceptions apply will require a conclusive factual and legal finding that the particular exception does apply to the trust acquisition.

**I. Section 20(a), 25 U.S.C. § 2719(a)**

This section of IGRA prohibits gaming on land acquired by the Secretary in trust for an Indian tribe after October 17, 1988, UNLESS one of the following exceptions apply:

☐   **A.   Section 20(a)(1): The land to be acquired qualifies as either:**

☐   land that is located within the boundaries of the tribe's reservation as the reservation existed on October 17, 1988, OR

☐   land that is contiguous to the boundaries of the tribe's reservation as the reservation existed on October 17, 1988. Include documentation establishing that the land is contiguous and the appropriate Field or Regional Solicitor's concurrence with this determination.

☐   **B.   Section 20 (a)(2)(A): The tribe had no reservation on October 17, 1988, AND the land is located in Oklahoma, AND:**

☐   the land to be acquired is within the boundaries of the Indian tribe's former reservation as defined by the Secretary, (2)(A)(i). Include an Office of the Solicitor's opinion that the land is within the tribe's former reservation, OR

☐   the land to be acquired is contiguous to other land held in trust or restricted status by the United States for the Indian tribe in Oklahoma, (2)(A)(ii). Include documentation establishing that the land is contiguous and the appropriate Field or Regional Solicitor's concurrence with this determination.

When the application indicates that the proposed acquisition of land in Oklahoma is located in the Indian tribe's "former reservation," the Regional Director must provide a legal opinion from the Office of the Solicitor that the land qualifies as "former reservation lands" and should be treated as such for the purposes of IGRA.

When the application indicates that the proposed acquisition is contiguous to other trust land, or to land held in restricted status by the United States for the Oklahoma tribe, the acquisition package must include documentation of the trust or restricted status of the land which is contiguous to the proposed acquisition. A plat or map showing the contiguous status of the respective parcels of land should be included in the acquisition package. The Regional Director's findings should include all legal descriptions of the lands (lengthy descriptions can be noted as attachments, exhibits, etc.), references to significant dates such as the acquisition date and approval date of trust status. Any and all facts, historical and present, which will establish the finding that the proposed acquisition is contiguous should be discussed and included in the Regional Director's findings. The appropriate Regional or Field Solicitor's concurrence that the land is contiguous must be included.

☐   **C.   Section 20 (a)(2)(B): The tribe had no reservation on October 17, 1988, AND the**

land is located in a State other than Oklahoma AND:

☐ such land is within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

When the application indicates that the proposed acquisition is located within the Indian tribe's "last recognized reservation," the Regional Director must provide documentation that the proposed acquisition is in the tribe's last recognized reservation. The Regional Director's analysis of this issue must include documented information relating to the history of the tribe to show that the tribe is presently located in the state in which the land proposed for trust acquisition is located. A legal opinion from the Office of the Solicitor addressing this issue must be included.

II. Section 20(b)(1), 25 U.S.C. § 2719(b)(1)

This section provides that the general prohibition on gaming on newly acquired lands will not apply under several circumstances. Because the circumstances numbered (b)(1)(B) are not frequently presented, they are discussed before (b)(1)(A).

☐ A. Section 20 (b)(1)(B): Gaming can be conducted on newly acquired land if the land(s) are taken in trust as part of:

☐ a settlement of a land claim, (b)(1)(B)(i); OR

☐ the initial reservation of a newly acknowledged Indian tribe given Federal recognition under the Federal acknowledgment process, (b)(1)(B)(ii); OR

☐ the restoration of lands for an Indian tribe restored to Federal recognition, (b)(1)(B)(iii).

When the application indicates that the proposed acquisition falls within one of these exceptions, the Regional Director must provide documentation that the particular exception is applicable to the case. Copies of the enabling acts or legislation such as the settlement act, the restoration act, the reservation plan, the final determination of federal recognition and other documentary evidence relating to the tribe's history and existence must be included as part of the acquisition package. A legal opinion from the Office of the Solicitor concluding that the proposed acquisition comes within one of the above exceptions must be included.

☐ B. Section 20(b)(1)(A): Gaming can be conducted on newly acquired land if the Secretary:

☐ Consults with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, and

☐ Issues a two-part determination: that the gaming establishment on newly acquired lands (1) will be in the best interest of the Indian tribe and its members, and, (2) will not be detrimental to the surrounding community, and

☐ Obtains the concurrence of the Governor of the State in which the gaming activity is to be conducted in the Secretary's two-part determination.

The BIA has been delegated responsibility to conduct the consultation on behalf of the Secretary. The consultation process must be completed by the Regional Director at the Regional Office level. Consultation will be conducted by letter inviting the applicant tribe and appropriate state (including the Governor), local and other nearby tribal officials to comment on the proposed acquisition by addressing questions/issues relating to the two-part determination. The consultation letter should include pertinent information regarding the proposed trust acquisition for gaming including information on the location of the proposed gaming facility, the scope of gaming proposed and other information which will assist the consulted officials to comment on the proposed acquisition. A consultation letter should always be sent to the Governor of the State in which the gaming activity is to be located.

☐ Appropriate state and local officials include the governor of the state in which the land is located and state and appropriate officials of units of local governments located within ten (10) miles of the site of the proposed gaming establishment.

☐ Nearby tribal officials include the tribal governing bodies of all tribes with Indian lands located within 50 miles of the site of the proposed trust acquisition.

The Regional Director may decide that broader consultation is required, or that another method of consultation is necessary in addition to the consultation conducted by letter. When an additional method is used, the Regional Director must fully describe the process and the outcome or results, and provide verification of the use of the process. For example, if public hearings or meetings were held copies of the hearing transcripts, minutes or videotapes must be

provided as part of the file. Newspaper articles or other written verification of the public's response to the proposed acquisition should also be included to illustrate public sentiment. Sample letters are attached for your information. Note that two letters are used - one for the applicant tribe (13 factors); and one for the appropriate State, and local officials, including officials of other nearby Indian tribes (6 factors). It is recommended that the letters be adjusted to reflect the facts of the transaction being processed. Also, it is very important that this process be differentiated from the Part 151 notification process which requires the 30-day notice for determination of taxation, special assessments, services, zoning, etc. (151.10(e)).

The Regional Director should provide a minimum of 30 days for the consulted officials to comment and respond to the consultation letter. In determining the proper length of the consultation period, the Regional Director should take into consideration the number of parties contacted, the scope and magnitude of the proposed gaming project, the preliminary indications of public sentiment, support, opposition, the potential impact on other gaming operations and such other factors which likely will be issues of concern to the consulted parties. Additional time may be granted upon written request; however, the request should provide a good reason for the additional time.

☐    The consultation letters to the applicant tribe and to the appropriate state, local and nearby tribal officials must request specific information useful in making the two-part determination. The responses provided, whether they oppose or support the proposed acquisition, should be supported by factual data and documentary information justifying the position taken. To assist the Secretary in determining whether the gaming establishment on newly acquired land will be in the best interest of the tribe and its members, the applicant tribe should be requested to address items such as the following:

1.   Projections of income statements, balance sheets, fixed assets accounting, and cash flow statements for the gaming entity and the tribe prepared in accordance with Generally Accepted Accounting Principles and National Indian Gaming Commission standards. There should be sufficient detail in expenses and assumptions to allow evaluation of the accuracy and reasonableness of the projections. Projections should cover at least the term of any financing or management agreement, but not less than three years.

2.   Projected tribal employment, job training, and career development, including the basis for projecting an increase in tribal employment considering the off-reservation location of the facility, and the impact on the tribe if tribal members leave to take jobs off-reservation.

3.   Projected benefits to the tribe from tourism and basis for the projection.

4.   Projected benefits to the tribe and its members from the proposed uses of the increased tribal income.

5.   Projected benefits to the relationship between the tribe and the surrounding community.

6.   Possible adverse impacts on the tribe and plans for dealing with those impacts.

7.   Any other information which may provide a basis for a Secretarial determination that the gaming establishment is in the best interest of the tribe and its members, including copies of any consulting agreements, financial agreements, and other agreements relative to the purchase, acquisition, construction, or financing of the proposed gaming facility, or the acquisition of the land where the facility will be located.

☐    To assist the Secretary in determining whether the gaming establishment on newly acquired land will not be detrimental to the surrounding community, the officials consulted and the applicant tribe should be requested to address items such as the following:

1.   Evidence of environmental impacts and plans for mitigating adverse impacts.

2.   Reasonably anticipated impact on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community.

3.   Impact on the economic development, income, and employment of the surrounding community.

4.   Costs of impacts to the surrounding community and sources of revenue to accommodate them.

5.   Proposed programs, if any, for compulsive gamblers and the source of funding.

6.  Any other information which may provide a basis for a Secretarial determination that the gaming establishment is not detrimental to the surrounding community.

Consulted officials should be advised that the fact that an official does not have extensive information or documented proof on the items listed above should not prevent the consulted official from addressing the items to the extent possible.

Because the impacts of a gaming facility established on newly acquired land will be difficult to quantify in concrete or tangible terms, the officials consulted should also be invited to address such additional concerns or factors which they believe more fully demonstrate the actual or potential impact of the proposed gaming facility. The consulted officials should not be limited to the listed items.

## III.  Guidance for preparing NEPA documents for proposed gaming-related actions

The following information provides general guidelines for compliance with NEPA in cases involving gaming-related Federal actions. The Regional Director must comply with the requirements of NEPA when making recommendations pursuant to the two-part determination in Section 20(b)(1)(A) of the IGRA, even when this determination is made for lands already held in trust for an Indian tribe.

NEPA is codified in 42 U.S.C. §§ 4321-4347. Section 102 of NEPA, 42 U.S.C. § 4332, requires all Federal Agencies to include in every recommendation or report on proposals for major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on: (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

In 1978, the Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 40 CFR Parts 1500-1508. These regulations, which are binding on all Federal agencies, address the procedural requirements of NEPA and the proper methods for the administration of the NEPA process. Further guidance on NEPA compliance can be found in Department of the Interior Manual, Part 516. Departmental Manual 516 DM 6, Appendix 4 (augmented by a *Federal Register* Notice

of July 7, 1995) addresses BIA's NEPA policy and procedures. The BIA's NEPA Handbook is published in 30 BIAM Supplement 1.

The law and regulations defining the parameters of NEPA are well-defined and explicit. The implementing regulations for NEPA require the use of an interdisciplinary approach, consultation with all interested parties, and a speedy commencement of the process (40 CFR § 1501.2). The NEPA regulations also require that the paperwork be concisely written (40 CFR § 1500.4), that the entire process be completed without delay (40 CFR § 1500.5), and that consideration of NEPA occur early in the planning process (40 CFR §§ 1501.1 and 1501.2). NEPA documents must be supported by evidence which is adequate to show that the agency in question has made sufficient environmental analyses (40 CFR § 1500.2(b)). The lead agency may, if it wishes, set specified page limits and time limits for NEPA documents (40 CFR § 1501.8); the BIA has so far not chosen to set such limits.

Under the NEPA process there are several levels of analysis that may be applied to a particular Federal action. The level which will eventually be chosen for the analysis is generally dependent upon whether or not an undertaking could significantly affect the environment. The basic levels are: a categorical exclusion determination (CX), an environmental assessment (EA), and an environmental impact statement (EIS).

☐   A Federal action may be categorically excluded from a detailed environmental analysis if it meets certain criteria, criteria which a Federal agency has previously determined would have no significant environmental impact. A number of agencies, including the BIA, have developed lists of actions which are normally categorically excluded from environmental evaluation under the NEPA regulations. See 516 DM 6 Appendix 4.

☐   The next level of analysis, the EA, is used to determine whether or not a Federal action would significantly affect the environment (for the definition of "significantly" see 40 CFR § 1508.27). If it would not, the agency can then issue a Finding of No Significant Impact (FONSI). The EA is described in 40 CFR § 1508.9. An EA usually contains the following information: the need for the proposed action; the alternatives to the proposed action (always including the no-action alternative); the environmental impacts of the proposed action and the alternatives; and a listing of the agencies and persons consulted.

☐   If the EA determines that the environmental consequences of a proposed Federal undertaking

may be significant, an EIS is prepared. The EIS, the most comprehensive level of analysis, is described in 40 CFR § 1502. Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts. The EIS should discuss the purpose of, and need for, the action; the alternatives; the affected environment; the environmental consequences of the proposed action; mitigation measures; lists of preparers, agencies, organizations and persons to whom the statement is sent; an index; and an appendix (if any). It is also a good practice to include in a NEPA document a large-scale map with a legend, showing the proposed site in detail. A smaller-scale map with a legend, showing the site in relation to the surrounding features and areas is also a desirable feature of a NEPA document.

Following is a *Checklist of Environmental Issues for NEPA Review of Proposed Gaming-related Actions.* The Regional Director must include this *Checklist* with NEPA documents which are being submitted to the AS-IA for review. Diskette copies of the *Checklist* are available from the OIGM upon request.

## IV. Preparation of Section 20 documentation by Region

**This section describes the duties of the BIA Region Office after completion of the Section 20 requirements for the proposed acquisition:**

☐ Upon completion of the consultation process, (i.e. receipt of responses, expiration of allowed response time), the Regional Director will review and prepare a summary of the comments and responses received from the consulted officials. When a response raises an issue with actual or potential negative implications which may affect a favorable two-part determination, the Regional Director will analyze the issue and determine what action may be appropriate. The Regional Director should request the applicant tribe to make an effort to resolve the issue. The tribe should be given 30 days to resolve the issue. Additional time may be granted upon written request; however, the requester must justify the need for the additional time. The Regional Director should also advise the tribe that failure or reluctance to respond will result in the Regional Director making conclusive findings on the issue without input from the tribe.

☐ Upon completion of all actions or activities relating to the proposed acquisition, including an independent analysis of all the information and factual evidence provided by the tribe and the parties consulted, the Regional Director must prepare Proposed Findings of Fact addressing the two-part determination and the items of information relating to such a determination. The proposed findings made and conclusions reached must be supported by the facts, supporting exhibits or other documentation.

The Regional Director's Proposed Findings of Fact should include an analysis by program officers (i.e. social services, law enforcement, finance, environmental and tribal operations), to ensure that aspects of those program areas have been adequately addressed by the tribe's application. For example, suppose that the tribe had indicated that in furtherance of its relationship with the surrounding community, the tribe and the local governments will enter into mutual-aid or crossdeputization agreements to facilitate better police services. Clearly, the law enforcement staff would provide a valuable analysis of the agreements and the merits of the proposal.

The Regional Director's Proposed Findings of Fact should also include an analysis of all agreements relied on to arrive at conclusions on the two part determination. For example, if the management agreement is the document used to figure projections of income to the tribe, the Regional Director's Proposed Findings of Fact must include an analysis and conclusion regarding the validity of the finding.

To assure that all important documents and issues are received and adequately reviewed and considered, the acquisition package should be organized in such a manner to allow easy access for review. The information and exhibits should be tabbed and indexed for easy reference. For purposes of organization, the Regional Director's factual findings relative to the two-part determination should be placed under the topical heading identified for each of the two-parts. For example, the "Best Interest of the Tribe" category should serve as a topical heading, and be followed by facts, findings and conclusions on each factor listed under that category.

# OFFICE OF INDIAN GAMING MANAGEMENT
*Checklist of Environmental Issues for NEPA Review of Proposed Gaming-related Actions*

Title of NEPA Document: _____ Regional Office: _____

NEPA Document Number: _____ Case File Number: _____ Date: _____

Print Name & Title of Lead Area Preparer/Reviewer: 

| Common Environmental Issues | Addressed in Document? | | Significant Impact?♣ | | Signature of BIA Field Specialist | Date |
|---|---|---|---|---|---|---|
| | Page(s) | No | Yes | No | | |
| Air Quality (40 CFR 50-85, 29 CFR 1910.134(d), etc.)♥ | | | | | | |
| Archaeological, Historical & Cultural (36 CFR 800)♥ | | | | | | |
| Biota & Threatened & Endangered Species (50 CFR)♥ | | | | | | |
| Coastal Zone Issues (15 CFR 930)  (♥ if applicable) | | | | | | |
| Construction, Demolition, Landscaping & Reclamation | | | | | | |
| Crime Potential, Protection and Prevention | | | | | | |
| Current, Past and Future Cumulative Impacts ♣ ♥ | | | | | | |
| Demographic Trends (♥ if alterations will be notable) | | | | | | |
| Energy (electrical, fuel, etc.) Resource Use & Changes ♥ | | | | | | |
| Fire Potential, Protection and Prevention | | | | | | |
| Floodplain, River, Lake, Wetland & Riparian Areas ♥ | | | | | | |
| Forests, Forestry Resources and Logging | | | | | | |
| Geology, Seismic and Mining (♥ if a hazard is present) | | | | | | |
| Hazardous Substances and Wastes (40 CFR 260-373)♥ | | | | | | |
| Health and Safety: OSHA (29 CFR 1900-1999), etc. | | | | | | |
| Indian Religious Issues (AIRFA: 25 CFR 211.7, etc.)♥ | | | | | | |
| Land-use Plans (40 CFR 1508.18(b) and 25 CFR 151) | | | | | | |
| Noise (29 CFR 1910.95 & 1926.52, 40 CFR 205, etc.) | | | | | | |
| Non-hazardous Wastes (solid, liquid or confined gas)♥ | | | | | | |
| Paleontological Resources | | | | | | |
| Prime and Unique Farm Lands (7 CFR 658.3-5)♥ | | | | | | |
| Protected, Sensitive and Special-management Areas ♥ | | | | | | |
| Rangelands, Range Resources and Range Activities | | | | | | |
| Recreational/Subsistence Hunting, Fishing & Gathering | | | | | | |
| Releases (40 CFR 112-117, 40 CFR 300-373, etc.)♥ | | | | | | |
| Socioeconomic Issues (tribe & other affected parties)♥ | | | | | | |
| Stormwater Discharges (40 CFR 122.26)♥ | | | | | | |
| Utilities Issues and Changes | | | | | | |
| Vehicular and Pedestrian Traffic Issues and Changes ♥ | | | | | | |
| Visual Resources (light pollution, views, aesthetics, etc.) | | | | | | |
| Wastewater Treatment & Disposal (40 CFR 122-129)♥ | | | | | | |
| Water Quality (surface, ground and drinking water)♥ | | | | | | |
| Water Quantities Needed and/or Affected ♥ | | | | | | |
| Other (specify) | | | | | | |
| Other (specify) | | | | | | |

♥ Indicates those issues, at a minimum, which must be addressed in all EAs and EISes. Other issues must be addressed if they would be affected.

♣ "Significance" is defined in 40 CFR 1508.27. An EA or an EIS must show an assessment of the degree of significance of any expected impact – individual, cumulative, direct, indirect, beneficial, adverse, present, reasonably-foreseeable-future, residual and/or synergistic -- of the proposed action. See 42 USC 7609; 40 CFR 1501.2(a and b), 1502.16, and 1508.8; and 516 DM 5.3(B). "Cumulative impact" is defined in 40 CFR 1508.7.

# BOND & COMPANY INCORPORATED

919 Prince Street • Alexandria, VA 22314 • bondandco@aol.com
Phone (703) 684-6098 - Fax (703) 684-7138

## FAX TRANSMITTAL

DATE: _Jan. 25 '06_

TO: _June DeHart_

FAX: _2 - 585 - 6600_

FROM:    ☐ Rich Bond            ☐ Andrew DeMerse

            ☒ Andy Madden      ☐ Other

Number of Pages (including cover): _15_

MESSAGE: _____

_See Pages 5, 6, 7_

Please contact _____ at (703) 684-6098 if a problem receiving this fax occurs.

**EXHIBIT 2(F)**

Notice to Quapaw Casino Development Authority, et al.
of Intent to Sue for Violations of the Clean Water Act, by
David R. Cooper, Representing Cherokee County, Kansas

# FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
## LAWYERS

DAVID R. COOPER, ATTORNEY
E-Mail dcooper@fisherpatterson.com
Telephone (785) 232-7761

3550 SW 5th Street, P.O. Box 949
Topeka, Kansas 66601-0949
Fax (785) 232-6604

February 22, 2008

Downstream Development Authority
of the Quapaw Tribe of Oklahoma (O-
Gah-Pah)
a/k/a Quapaw Casino Development
Authority
12049 SE 110th St.
Galena, Kansas 66739

Stephen R. Ward
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, Oklahoma 74172-0148

Mr. Tim Kent
Quapaw Tribe of Oklahoma
P.O. Box 765
Quawpaw, Oklahoma 74303

Dirk Kempthorne
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Mr. John Berrey
Tribal Business Committee Chairman
Quapaw Tribe of Oklahoma (O-Gah-
Pah)
5681 S 630 Rd.
Quapaw, Oklahoma 74354

<u>VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

**Re:    Notice of Intent to Sue for Violations of the Clean Water Act**

Dear Quapaw Casino Development Authority and Messrs. Kent, Berrey and Ward, and
Sec. Kempthorne:

On behalf of Cherokee County, Kansas, I am writing this letter in regard to
violations of the Federal Water Pollution Control Act (the "Clean Water Act" or
"CWA"), 33 U.S.C. §§ 1251 *et seq.* committed by Downstream Development Authority
of the Quapaw Tribe of Oklahoma (O-Gah-Pah), also known as the Quapaw Casino
Development Authority ("QCDA") and its agents or assignees. This letter constitutes a
Notice of Violation and Intent to File Suit ("Notice Letter") against QCDA under section
505 of the Clean Water Act, 33 U.S.C. § 1365.

February 22, 2008
Page 2

     I understand QCDA to be the owner and/or operator of an approximately 81-acre construction project that spreads over parts of the states of Kansas, Missouri and Oklahoma. *See* Photos 1 through 4 (attached). The project concerns what the QCDA has announced as the Downstream Casino Resort development. QCDA has described this development as including a Casino intended to be open 24-hours a day and to include: 70,000 square feet of casino floor with 2,000 slot machines, 30 table games, and a high limit gaming area; a 12-story hotel with 225 rooms, and surface parking for 2,200 cars and additional parking space for buses and RVs. The Casino itself is being erected in Oklahoma, the parking areas are principally in Kansas, and the intended public access to the parking areas and Casino is from Missouri. I understand the nominal address of the construction site (the "Site") to be 12049 SE 110th St., Galena, Kansas. The violations alleged in this letter are occurring as a result of the extensive and rapid construction on the Site that QCDA has announced it intends to complete so as to open the "Casino Resort" in July 2008.

     Cherokee County's contentions in this letter are based on information from expert sources and are made on information and belief. QCDA is in violation of various requirements of the CWA. Specifically, QCDA is violating various terms of the Kansas Stormwater Runoff from Construction Activities General Permit and the EPA General Construction Permit, violating the prohibition against discharges without a permit, and discharging dredged and/or fill material to waters of the United States without a Clean Water Act Section 404 permit or Section 401 certification. These violations constitute grounds for an enforcement action. *See* 40 C.F.R. § 122.41(a).

     Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date upon which Cherokee County mails this Notice Letter. These provisions of law authorize civil penalties for each separate violation of the Clean Water Act occurring between May 30, 2002 and March 15, 2004 of up to $27,500 per day per violation and civil penalties of up to $32,500 per day per violation for all CWA violations after March 15, 2004. In addition to civil penalties, Cherokee County will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. §§ 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees.

     Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires a citizen to give notice of the alleged violations and his or her intent to sue sixty (60) days prior to the initiation of a civil action under Section 505(a) of the CWA, 33 U.S.C. § 1365(a). You are formally placed on notice that following sixty (60) days from the date of this Notice Letter, Cherokee County intends to file suit in federal court against QCDA and against any other persons identified by Cherokee County as being responsible for the violations described in this Notice Letter.

February 22, 2008
Page 3

Under Section 505 of the CWA, "any citizen may commence a civil action on his own behalf" against any "any person" that is "alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a) and (a)(1). The CWA gives the federal courts the authority to enforce such a standard or limitation, or order with respect to such standard and limitation, and to apply appropriate civil penalties under 33 U.S.C. § 1319(d) and litigation costs under 33 U.S.C. § 1365(d).

## I.    Factual Background

### A.    About Cherokee County, Kansas

The Site is located in Cherokee County, Kansas. As the regional government responsible for achieving multiple objectives, including maintaining a high quality of life for its residents, one of Cherokee County's primary goals is stewardship of the environment. Cherokee County's interest in protecting the environment extends beyond its borders, as much of the wildlife that inhabits the County resides in the broader region as well.

### B.    Facts about the Site

The Site is located approximately five miles southwest of Joplin, Missouri. The boundaries of the existing construction activities and planned development at the Site are located in portions of Cherokee County, Kansas, Ottawa County, Oklahoma, and Newton County, Missouri. This Notice Letter concerns violations located in Kansas and Oklahoma, but does not imply that similar violations are not present in the Missouri portion of the Site.

The Site and surrounding area is located within the Spring River watershed, which includes portions of southeastern Kansas, southwestern Missouri, and northeastern Oklahoma. Tributaries of the Spring River located in the immediate vicinity of the Site include an unnamed tributary flowing to the north/northwest of the site located within Kansas and an unnamed tributary of Fivemile Creek flowing to the south/southwest of the site located within Oklahoma.

The unnamed tributary of the Spring River in Kansas extends from its apparent point of origination (based on review of an official USGS topographical map) approximately 1/2 mile north of the site along Highway 166/100 to its point of discharge to the Spring River located approximately five miles to the west of the site. The unnamed tributary of Fivemile Creek located to the south/southwest of the site extends from its apparent point of origination (based on review of the USGS topographical map) to its point of discharge to Fivemile Creek located approximately one mile to the southwest of the site. Fivemile Creek extends from this point approximately four miles to the west where it discharges to the Spring River.

February 22, 2008
Page 4

In general, the natural topography of the northern and northwestern portions of the site located in Kansas is gently sloped to the northwest. The natural topography of the southern portion of the site located within Oklahoma is moderately sloped to the south, with the slope increasing as one travels southward. Additionally, several pronounced valleys are apparent on the Oklahoma portion of the site.

Based on the observed topography, drainage from the northern portions of the site, located in Kansas and Missouri, flows to the north/northwest along natural drainages that discharge to a tributary of the Spring River located approximately 1/3-mile northwest of the site. Drainage from the southern portions of the site, located in Oklahoma, and the eastern portions of the site, located in Kansas and Missouri, flows to the south/southwest along natural drainages that discharge to the unnamed tributary of Fivemile Creek located less than 1/4 mile south of the site. These contentions are consistent with information presented by QCDA in its two NOIs.

The Spring River is a "water of the United States" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), 40 C.F.R. § 232.2 and 33 C.F.R. Part 328; *see also* http://www.kdheks.gov/tmdl/download/2008_303d_List.pdf (indicating that the Spring River and certain tributaries are regulated under Section 303 of the CWA and are impaired by various pollutants); http://www.kdheks.gov/tmdl/download/ spring_metals.pdf. Fivemile Creek is tributary to the Spring River.

## II.    Statutory Background: The Clean Water Act

In 1972, Congress amended the Federal Water Pollution Control Act of 1948 to remedy the historically unchecked degradation of the Nation's waters. Congress set forth the Act's primary objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[1] The introductory sections of the CWA establish ambitious goals of eliminating discharge of pollutants into navigable waters by 1985, and an interim goal of achieving fishable and swimmable conditions, wherever possible, by 1983. 33 U.S.C. § 1251(a)(1)-(2). From the beginning, courts have recognized that the CWA is a tough law—"strong medicine."[2] Because of the serious threats imposed by stormwater runoff, Congress amended the Clean Water Act in 1987 to require storm water permitting regulations.[3]

The Clean Water Act delegates to the U.S. Environmental Protection Agency ("EPA") Administrator the responsibility to administer the CWA and to regulate the

---

[1]  33 U.S.C. §1251(a); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).

[2]  *Texas Mun. Power Agency v. US EPA*, 836 F.2d 1482, 1488 (5th Cir. 1988) ("The CWA is strong medicine. . . . Congress explicitly recognized that reduction of the amount of effluents—not merely their dilution or dispersion—is the goal of the CWA."); *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 317 (1981) (stating that the modern CWA is a "'total restructuring' and 'complete rewriting' of the existing water pollution legislation considered in that case"); *see also US EPA v. State Water Res. Control Bd.*, 426 U.S. 200, 202-05 (1976).

[3]  *See* 33 U.S.C. § 1342.

---

February 22, 2008
Page 5

discharge of pollutants into navigable waters of the United States. The CWA delegates to the Secretary of the Army, acting through the Chief of Engineers, the responsibility to regulate discharges of dredged and fill material into waters of the United States. 33 U.S.C. § 1344(a). The EPA Administrator and the Secretary of the Army, acting through the Corps of Engineers, therefore share administrative and regulatory authority under the Clean Water Act.

The Clean Water Act specifically prohibits the discharge of any pollutant by any person except in compliance with enumerated sections of the CWA. 33 U.S.C. § 1311(a). As such, discharge of pollutants to waters of the United States is allowed only pursuant to an NPDES permit issued by the EPA or by an EPA-delegated State-permitting authority. *Id.* Section 301(a) prohibits all discharges of pollutants, including contaminated stormwater, that are not authorized by a NPDES permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

All permits issued by Kansas and the U.S. EPA must comply with the Clean Water Act and the regulations implementing the CWA. 40 C.F.R. §§ 122.4(a) & 123.25(a). The Clean Water Act also requires that Kansas ensure compliance with water quality standards in NPDES permits. *See* 33 U.S.C. § 1313(a). Water quality standards are comprised of the designated uses of the water body, e.g., water contact recreation or municipal drinking water, and the State water quality criteria that must be met to maintain the designated use. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.3(i). Water quality criteria may be expressed numerically or with narrative descriptions of the required quality of water to support the designated use. 40 C.F.R. § 131.3(b).

In Kansas, water quality standards are established by the Kansas Department of Health and Environment and are codified in the Kansas Administrative Regulations. Certain water quality standards apply to all surface waters within Kansas.[4] In Oklahoma,

---

[4] Kansas Administrative Regulation 28-16-28e subdivisions (a) and (b) provide, with emphasis added:

Surface water quality criteria.

(a) [...]

(b) General criteria for surface waters. The following criteria shall apply to all surface waters, regardless of classification.
(1) Surface waters shall be free, at all times, from the harmful effects of substances that originate from artificial sources of pollution and that produce any public health hazard, nuisance condition, or impairment of a designated use.
(2) Hazardous materials derived from artificial sources, including toxic substances, radioactive isotopes, and infectious microorganisms derived directly or indirectly from point or nonpoint sources, shall not occur in surface waters at concentrations or in combinations that jeopardize the public health or the survival or well-being of live- stock, domestic animals, terrestrial wildlife, or aquatic or semiaquatic life.
(3) Surface waters shall be free of all discarded solid materials, including trash, garbage, rubbish, offal, grass clippings, discarded building or construction materials, car bodies, tires, wire, and other unwanted or discarded materials. The placement of stone and concrete rubble for bank stabilization shall be acceptable to the department, if all other required permits are obtained before placement.
(4) Surface waters shall be free of floating debris, scum, foam, froth, and other floating materials

---

February 22, 2008
Page 6

the Oklahoma Water Resources Board promulgates water quality standards and the Oklahoma Department of Environmental Quality implements the state's water pollution control program.

### III.     Violations of the Kansas Stormwater Runoff from Construction Activities General Permit, the EPA General Construction Permit, and Section 301's Prohibition Against Discharging Pollutants Without a Permit for Activities Not Covered By Either General Permit

On July 23, 2007, QCDA was granted coverage under the Kansas Stormwater Runoff from Construction Activities General Permit[5] (the "Kansas Permit") by the Kansas Department of Health and Environment ("KDHE") based on representations it made in a Notice of Intent ("NOI") filed on May 22, 2007.[6] It also appears the QCDA obtained coverage under the U.S. EPA Construction General Permit ("EPA Permit") and was assigned Permit No. OKR150001 and Project Tracking No. OKR15AL41. Subsequent to beginning construction, QCDA has violated various provisions of each Permit.

Part 3 of the Kansas Permit specifically prohibits "construction activities that may discharge stormwater runoff that violates the Kansas Surface Water Quality Standards." As referenced in Footnote 4, there are several water quality standards applicable to the regulated waters on and proximate to the Site. Of these standards, it is most immediately apparent from site reconnaissance that activities on the Site are violating the color and turbidity standards provided in Kansas Administrative Regulation 28-16-28e subdivision

---

directly or indirectly attributable to artificial sources of pollution.

(5) Oil and grease from artificial sources shall not cause any visible film or sheen to form upon the surface of the water or upon submerged substrate or adjoining shorelines, nor shall these materials cause a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines.

(6) Surface waters shall be free of deposits of sludge or fine solids attributable to artificial sources of pollution.

(7) Taste-producing and odor-producing substances of artificial origin shall not occur in surface waters at concentrations that interfere with the production of potable water by conventional water treatment processes, that impart an unpalatable flavor to edible aquatic or semiaquatic life or terrestrial wildlife, or that result in noticeable odors in the vicinity of surface waters.

**(8) The natural appearance of surface waters shall not be altered by the addition of color-producing or turbidity-producing substances of artificial origin.**

(9) In stream segments where background concentrations of naturally occurring substances, including chlorides and sulfates, exceed the water quality criteria listed in table 1a of the ``Kansas surface water quality standards: tables of numeric criteria,'' as adopted by reference in subsection (d) of this regulation, at ambient flow, the existing water quality shall be maintained, and the newly established numeric criteria shall be the back- ground concentration, as defined in K.A.R. 28-16- 28b(e). Background concentrations shall be established using the methods outlined in the ``Kansas implementation procedures: surface water quality standards,'' as defined in K.A.R. 28-16-28b(gg), and available upon request from the department.

[5] The Permit is available at http://www.kdheks.gov/stormwater/download/General_Permit.pdf.

[6] KDHE assigned the following tracking numbers to QCDA's coverage under the Kansas Permit: Kansas Permit No. S-NE28-00004 and Federal Permit No. KSR104442.

---

February 22, 2008
Page 7

(b)(8) in streams draining the northern and northwesterly borders of the Site. Cherokee County intends to pursue further water quality testing to determine the full scope of water quality violations in each stream flowing from the Site, but this Notice Letter suffices to put QCDA on notice of the illegal activities that are causing these violations.

Information available to the County indicates that QCDA's construction activities are in violation of the Kansas Permit's requirements governing the use of Best Management Practices. These deficiencies include:

- No velocity dissipation devices are in evidence as required by Part 7 of the Kansas Permit.
- Control measures have not been properly selected or maintained as required by Part 7 of the Kansas Permit. For example, although silt fencing is visible along the northern and western borders of the site, none is visible along the southern border. At one location along the northwestern border, the silt fencing appears to have been compromised. In addition, the silt fencing appears to be inadequate for a construction site of this size and for the steep slopes visible in the northern portion of the site. See, *e.g.*, U.S. EPA Stormwater Pollution Prevention Plan (SWPPP) guidance for construction sites, 2007.
- The Kansas NOI indicates that the "Detention Pond" will be used as a sedimentation basin. However, as QCDA's aerial photos show, the Detention Pond had not been completed by the end of 2007 and therefore could not be used for sedimentation, in violation of Part 7 of Kansas Permit. Instead, it appears that a pre-existing pond has been used as a *de facto* sedimentation pond. Furthermore, this pond is located outside the silt fencing at the boundary of the construction activities, thereby inhibiting the potential beneficial effect of the pond. Discoloration of this pond, evidently due to sediment, is plainly visible in photographs.
- As noted above, the southern boundary of the site appears to lack silt fencing, which is an additional violation of Part 7 of the Kansas Permit if that area of the Site comes under the rules for a common drainage of less than 10 acres.

In addition to violations of the Kansas Permit's BMP provisions, in the Kansas NOI, QCDA represented the area to be disturbed by the development to be 40 acres. However, review of a site plan produced by the QCDA's architects shows this area to be grossly in error. Rather than 40 acres, the area of the development is more than twice that size. The Kansas Permit imposes an ongoing responsibility to notify the State of Kansas should conditions vary from those represented at the time of filing the NOI. QCDA has violated the Permit by not informing the State of changed circumstances many months after becoming aware that the represented versus actual scale of the construction activities were divergent.

---

February 22, 2008
Page 8

*As importantly, because the additional acreage was not included in the NOI, activities in these locations are discharging pollutants without a permit, in violation of the CWA.* 33 U.S.C. § 1311(a).

In the Kansas NOI, QCDA's consultants Wendel Duchscherer Architects & Engineers analyzed storm water discharges for the site under two scenarios: existing conditions and proposed conditions. The analysis of stormwater discharge under existing conditions accounts for roughly half the site. As a result, stormwater characteristics for roughly half of the site have not been analyzed. Again, the Kansas Permit imposes an ongoing responsibility to notify the State of Kansas should conditions vary from those represented at the time of filing the NOI. Kansas Permit, Part 7.1. QCDA has violated the Kansas Permit by not informing the State of changed circumstances many months after becoming aware that the represented versus actual scale of the construction activities were divergent.

QCDA appears to also be disturbing earth outside of the northwest boundaries of the project area represented in the NOI at a scale of greater than one-acre of disturbance. The stormwater analysis provided in the NOI failed to include these areas, and as such, these activities are resulting in a discharge of pollutants without a permit, in violation of the CWA. 33 U.S.C. § 1311(a).

As Cherokee County continues to gather information about the Site, Sender does not waive the right to raise other violations of the CWA including violation of water quality standards applicable specifically to the Spring River and its tributaries, violations that may be inherent in QCDA's Stormwater Pollution Prevention Plan, and the failure of QCDA to make proper inspections under the Permit. Additionally, because the representations made by QCDA in its application for coverage under the Permit have varied considerably, Cherokee County intends to ask the State of Kansas to implement a separate, individual discharge permit for the Site.

In addition to the violations of the Kansas Permit discussed above, QCDA is also in violation of the EPA Permit. First, with respect to the NOI submitted to gain coverage under the EPA Permit, QCDA has understated the scale of the project and the associated disturbance of earth. The EPA Permit specifically proscribes such underestimates, and in such cases, provides no coverage: "Discharges are not authorized if your NOI is incomplete or inaccurate or if you were never eligible for permit coverage." Part 2, EPA Permit. To the extent that QCDA has understated the scale or nature of its project, it is in violation of this component and other components in the EPA Permit.

As with the Kansas Permit, QCDA may also be out of compliance with SWPPP requirements (Part 3, EPA Permit) and performance of the required inspections (Part 3.10, EPA Permit), and updating of the SWPPP (Part 3.11, EPA Permit).

February 22, 2008
Page 9

IV.    **Violations of Clean Water Act Sections 401, 404 and 505**

The discharge of dredged and fill material to waters of the United States of the United States is prohibited unless the discharge is in compliance with Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a). The CWA delegates to the Army Corps of Engineers and to the EPA joint authority to implement and manage the permits for discharges of dredged and fill material into waters of the United States. A discharger must obtain coverage under a Section 404 permit prior to discharging dredged or fill material into waters of the United States. 33 U.S.C. § 1311(a). QCDA has not obtained a Section 404 permit.

The fill and/or dredged materials currently being discharged and disposed of into a tributary of the Spring River includes rock, sand and dirt, and are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. 1362(6). The discharge and disposal of the fill and/or dredged material into a tributary of the Spring River at the Site constitutes the "discharge of a pollutant" within the meaning of Section 501 (12) of the CWA. 33 U.S.C. § 1362(12).

QCDA indicated in its Kansas NOI that the project would not "include dredge or fill of a potential jurisdictional water body or wetlands."[7] Based on review of the NOI and supporting submittals, site reconnaissance, and review of recent aerial and ground photos, the Site impacts or threatens to impact the line or grade of at least one local stream on the north side of the site. See, *e.g.*, Photo 4. The potential impacts are evident from review of photographs obtained from the QCDA website and observations made during site reconnaissance. An aerial photo from 2006 in the County's possession shows a portion of the unnamed drainageway located to the north of the site that conveys water to the Spring River. Photo 3. Aerial photos obtained from QCDA show extensive earthwork in this area in 2007. Photos 1 and 2. In one photo, the unnamed drainageway is visible in the lower left corner, extending from the foot of the soil pile created by earthwork activity. Photo 4. This is the same stream that was observed conveying significant quantities of water on February 11, 2008. *See* Photos 5-8. Thus, earthwork activities at the Site have filled waters that fall under the jurisdiction of the Corps, mandating coverage under a CWA Section 404 permit.

When a stream is dredged, filled, or put into a culvert, it loses its capacity to perform vital ecological services. Upon dredging and filling, a stream's capacity to trap excess sediment and prevent it from disrupting downstream uses is impaired. The same is true of the capability of a stream to store and transform excess organic matter. This stream alteration also has the tendency to reduce the amount of direct contact the water has with the streambed and diminish the nutrient removal capacity of the stream. Overall, dredge and fill material significantly disrupts the ecosystem of a stream. Thus, the Clean Water Act strictly regulates activity associated with dredging and filling.

---

[7] In Section C (Existing Conditions/Use) of the NOI, QCDA also indicated the proposed project to would not "impact the line or grade of a stream."

February 22, 2008
Page 10

In addition to QCDA's failure to obtain a Section 404 permit, QCDA is obligated to also obtain a Section 401 certification from KDHE and the U.S. EPA certifying that discharges from the Site will comply with the state's and federal water quality standards. 33 U.S.C. § 1341. QCDA has failed to obtain these certifications.

It is important to note that even if at one point QCDA believed that the project would not involve dredging and/or filling of a regulated water body, QCDA was and is continually obligated to notify the U.S. EPA, KDHE, and the Army Corps of Engineers when it becomes aware that such activities will occur. 33 U.S.C. § 1341(a)(3)

## V.    CONCLUSION

Upon expiration of the 60-day notice period, Cherokee County intends to file a citizen enforcement action in federal court pursuant to Section 505(a) of the Clean Water Act for the above violations. In addition to the violations set forth above, this notice covers all violations of the CWA by QCDA evidenced by information that becomes available to Cherokee County after the date of this Notice Letter.

The name, address and telephone number of each person giving notice pursuant to this Notice Letter are:

> Cherokee County, Kansas
> Board of County Commissioners of the County of Cherokee, Kansas
> 100 West Maple, PO Box 14
> Columbus, KS 66725
>
> c/o David R. Cooper
> Fisher, Patterson, Sayler & Smith, LLP
> 3550 SW 5th Street
> PO Box 949
> Topeka, KS 66601-0949
> Phone 785.232.7761

Please address all communications to legal counsel representing Cherokee County. Cherokee County is represented in this matter by:

> David R. Cooper
> Fisher, Patterson, Sayler & Smith, LLP
> 3550 SW 5th Street
> PO Box 949
> Topeka, KS 66601-0949
> Phone 785.232.7761

February 22, 2008
Page 11

      Although Cherokee County is always interested in avoiding unnecessary litigation, Cherokee County does not intend to delay the filing of a complaint in federal court if the foregoing violations are not remedied in a timely manner.

                            Sincerely,


                            David R. Cooper
                            Attorney for Cherokee County, Kansas

drc
Enclosures

cc:

| | |
|---|---|
| Michael B. Mukasey<br>Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530-0001 | Roderick L. Bremby, Secretary<br>Kansas Department of Health and Environment<br>Curtis State Office Building<br>1000 SW Jackson<br>Topeka, KS 66612 |
| Stephen L. Johnson, Administrator<br>U.S. Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Mail Code: 1101A<br>Washington, D.C. 20460 | Downstream Development Authority of the Quapaw Tribe of Oklahoma<br>12049 SE 110th Street<br>Galena, KS 66739 |
| John B. Askew, Regional Administrator<br>U.S. Environmental Protection Agency, Region 7<br>EPA Region 7 Main Office<br>901 N. 5th Street<br>Kansas City, KS 66101 | John Berrey, Tribal Business Committee Chairman<br>Downstream Development Authority of the Quapaw Tribe of Oklahoma<br>Quapaw Tribe of Oklahoma<br>PO Box 765<br>Quapaw, OK 74303<br><br>(Physical Address of Tribal Complex)<br>5681 S 630 Rd.<br>Quapaw,OK 74354 |
| | Stephen R. Ward<br>CONNER & WINTERS, LLP<br>4000 One Williams Center<br>Tulsa, Oklahoma  74172-0148<br>Attorney for Quapaw Tribe of Oklahoma |
| Richard Greene, Regional Administrator<br>U.S. Environmental Protection Agency, Region 6<br>EPA Region 6 Main Office<br>1445 Ross Avenue, Suite 1200<br>Dallas, Texas 75202 | Mr. Steve Thompson, Executive Director<br>Oklahoma Department of Environmental Quality<br>P.O. Box 1677<br>Oklahoma City, OK 73101-1677 |



Photo 1: View of the construction site and surrounding area on December 1, 2007 looking north.

| Title: | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | Date: As noted on photograph description |
|---|---|---|
| Site: | Tri-States Area (Kansas, Missouri, and Oklahoma) | |



Photo 2: View of the casino construction site and surrounding area on December 1, 2007 looking southeast.

| Title: | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | Date: As noted on photograph description |
|---|---|---|
| Site: | Tri-States Area (Kansas, Missouri, and Oklahoma) | |



# Photo 3



Photo 4:  View of the construction site and surrounding area on December 19, 2007 looking southeast.

| **Title:** | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | **Date: As noted on photograph description** |
| --- | --- | --- |
| **Site:** | Tri-States Area (Kansas, Missouri, and Oklahoma) | |



**Photo 5:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses Prairie Road looking southwest.



**Photo 6:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site south of Prairie Road looking southwest.

| Title: | Site Photographs | Date: February 11, 2008 |
|---|---|---|
| Site: | Oklahoma Casino<br>Tri-States Area (Kansas, Missouri, and Oklahoma) | |



**Photo 7:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses 110th Street looking east.



**Photo 8:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses 110th Street looking west.

| Title: | Site Photographs | Date: February 11, 2008 | |
|---|---|---|---|
| Site: | Oklahoma Casino<br>Tri-States Area (Kansas, Missouri, and Oklahoma) | | |

**EXHIBIT 2(G)**

David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P.,
February 22, 2008, letter on behalf of the Commissioner
of Cherokee County, Kansas, to Army Corps of Engineers

# FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
## LAWYERS

DAVID R. COOPER, ATTORNEY
E-Mail dcooper@fisherpatterson.com
Telephone (785) 232-7761

3550 SW 5th Street, P.O. Box 949
Topeka, Kansas 66601-0949
Fax (785) 232-6604

February 22, 2008

Col. Anthony Funkhouser
Tulsa District Commander
U.S. Army Corps of Engineers
1645 S 101 E Ave.
Tulsa, Oklahoma 74128-4609

Col. Roger Wilson
Kansas City District Commander
U.S. Army Corps of Engineers
601 E. 12th Street
Kansas City, Missouri 64106

<u>VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

**Re:    Urgent Request for Clean Water Act Section 404 Evaluation of
Activities at 80-Acre Construction Site in Galena, Kansas**

Dear Col. Funkhouser and Col. Wilson:

On behalf of Cherokee County, Kansas, I write to ask you to address urgent concerns arising from a large site under construction in the vicinity of Galena, Kansas. The construction site at issue spans parts of the states of Kansas, Missouri and Oklahoma. (See attached Photos 1 and 2)   It is the intended site of what the Downstream Development Authority of the Quapaw Tribe of Oklahoma (O-Gah-Pah), a/k/a the Quapaw Casino Development Authority (QCDA) has announced as its Downstream Casino Resort development. QCDA has described this development as including 70,000 square feet of casino floor, a 12-story hotel, surface parking for 2,200 cars, and additional parking space for buses and RVs.  An address associated with the construction site is 12049 SE 110th St., Galena, Kansas, 66739.

The violations alleged in this letter are occurring as a result of the extensive, aggressive grading and rapid construction that QCDA has declared that it intends to complete by July 2008.   Disturbance of earth on a large scale in connection with the grading and construction activity is causing discoloration and increased turbidity of streams coming off the property flowing into the Spring River.  As a steward of our waters under the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 *et seq.,* the Army Corps of Engineers (the "Corps") should immediately bring the activities at this construction site under its jurisdiction through the legal authority found at CWA Section 404.

February 22, 2008
Page 2

Based on an analysis obtained by Cherokee County from expert sources, the construction site presents violations of various requirements of the CWA including failure to obtain a CWA Section 404 permit and accompanying CWA Section 401 certification. Specifically, there has been discharge of dredged or fill materials into waters that are tributary to the Spring River, a jurisdictional water body. These discharges are despoiling a natural part of Cherokee County's environment that the County has worked hard to improve and protect over the past several years. While Cherokee County has concurrently sent a 60-day notice of intent to sue QCDA under the CWA's citizen suit provision in the belief that QCDA is responsible for these violations, it is the County's desire that the Corps immediately address the impacts to the environment perpetrated at the construction site.

As the regional government responsible for maintaining a high quality of life for its residents, one of Cherokee County's primary goals is stewardship of the environment. The County is informed that the construction has destroyed critical wildlife habitat without a required permit and that mitigation measures have not been taken to reduce impacts on the County's sensitive amphibian population.

The County is now concerned that the scale of the project and associated construction activities have been misrepresented not only to the County but possibly also to the Corps. Thus, an immediate inspection of the ongoing construction site by the Corps is necessary.

*The County believes that oversight from the Corps through an individual Section 404 permit is critical to ensuring that activities at the construction site do not further degrade the environment.* Moreover, the Corps should confer with the Kansas Department of Health and Environment to ensure that water quality is not further eroded. If the owner or operator purports to complying with one of the Corps' nationwide permits, then violations of the nationwide permit general conditions would appear to include adverse effects from impoundments (condition #8), improper management of water flows (condition #9), improper usage of heavy equipment (condition #11), and improper soil erosion and sediment controls (condition #12). This is not necessarily an exclusive list.

When the County became aware of the adverse impact of the grading activities at the construction site on the environment, the County made inquiries and was surprised to learn that the QCDA does not appear to have obtained coverage under a Section 404 permit. Based on our review of aerial photos, site reconnaissance, and the QCDA's application for coverage under the Kansas Stormwater Runoff from Construction Activities General Permit, the County concludes that earthwork activities at the Site has filled waters that fall under the jurisdiction of the Corps. An aerial photo from 1996 in the County's possession shows a portion of the unnamed stream located to the north of the site that conveys water to the Spring River. (See attached Photo 3) Aerial photos obtained from QCDA show extensive earthwork in this area in 2007. In one photo, the unnamed drainageway is visible in the lower left corner, extending from the foot of the soil pile created by earthwork activity. (See attached Photo 4) This is the same stream

February 22, 2008
Page 3

that was observed conveying significant quantities of water on February 11, 2008. (See attached Photos 5-8)

It is important to note that even if at one point the owner or operator might have believed that the project would not involve the discharge of dredged and/or fill materials, those responsible for the construction site have a continuing obligation to notify the U.S. EPA, KDHE, and the Corps when such activities will occur. 33 U.S.C. § 1341(a)(3).

Given the scale of ongoing earthwork and other construction activities and its impact on regulated waters, Cherokee County believes that regulation of the site under an individual permit is not only proper but required. In addition, as construction activities are well under way, authorizing coverage under a nationwide permit at this time would amount to a *post-hoc* determination that the activities on the site have minimal environmental impact. Coverage under a nationwide permit would also be contrary to Section 404(b)(1) Guidelines, including Part 230.10 in particular.

Cherokee County thanks the Corps for investigating this matter in a timely manner. Please inform me if there are any additional manners in which the County would need to exhaust its remedies with the Corps prior to seeking relief in court should that step become necessary. In the County's opinion, given the ongoing activities at the Site, the failure to conduct a Section 404 review at this time would rise to the level of an arbitrary and capricious action and abuse of discretion, in violation of Section 706(2) of the Administrative Procedures Act, 5 U.S.C. § 706(2).

After you have reviewed this letter and its contents, please let me know how the County can be of assistance to your investigation.

Sincerely,

David R. Cooper
Attorney for Cherokee County, Kansas

drc
Enclosures



Photo 1: View of the construction site and surrounding area on December 1, 2007 looking north.

| Title: | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | Date: As noted on photograph description |
|---|---|---|
| Site: | Tri-States Area (Kansas, Missouri, and Oklahoma) | |



Photo 2:  View of the casino construction site and surrounding area on December 1, 2007 looking southeast.

| Title: | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | Date: **As noted on photograph description** |

| Site: | Tri-States Area (Kansas, Missouri, and Oklahoma) |



# Photo 3



Photo 4: View of the construction site and surrounding area on December 19, 2007 looking southeast.

| **Title:** | Site Photographs – as obtained from the QCDA website, on February 13 and 14, 2008: http://downstream-dashboard.com/photos | **Date: As noted on photograph description** |
| **Site:** | Tri-States Area (Kansas, Missouri, and Oklahoma) | |



**Photo 5:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses Prairie Road looking southwest.



**Photo 6:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site south of Prairie Road looking southwest.

| **Title:** | Site Photographs | **Date: February 11, 2008** |
|---|---|---|
| **Site:** | Oklahoma Casino<br>Tri-States Area (Kansas, Missouri, and Oklahoma) | |



**Photo 7:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses 110th Street looking east.



**Photo 8:** View of an unnamed tributary of the Spring River located to the north/northwest of the casino construction site as it crosses 110th Street looking west.

| Title: | Site Photographs | Date: February 11, 2008 |
|---|---|---|
| Site: | Oklahoma Casino Tri-States Area (Kansas, Missouri, and Oklahoma) | |

**EXHIBIT 3**

Declaration of Michael D. White

## UNITED STATES DISTRICT COURT FOR THE DISTRICT
## OF THE DISTRICT OF COLUMBIA

**BOARD OF COMMISSIONERS OF**
**CHEROKEE COUNTY, KANSAS,**

                                      Case No.

              Plaintiff,

     v.

**DIRK KEMPTHORNE, in his official**
**capacity as the SECRETARY OF THE**
**INTERIOR**
**and the**
**UNITED STATES DEPARTMENT OF**
**THE INTERIOR,**

              Defendants.

---

I, Michael David White, hereby declare as follows:

1.     I am an attorney with the law firm of Manatt, Phelps & Phillips, LLP ("Manatt"), duly licensed to practice before all of the courts of the Commonwealth of Virginia and the District of Columbia. The matters set forth in this declaration are true of my own personal knowledge, and if called to do so, I could and would competently testify to these matters under oath.

2.     On August 23, 2007, I contacted Robert Jaeger, Director of the Department of Interior, Bureau of Indian Affairs Indian Land Consolidation Program (the "ILCP" or "Program") by telephone at (715) 682-0310. During our conversation, we discussed the acquisition of land under the Indian Land Consolidation Act ("ILCA") and his involvement with it.

3.      Jaeger stated that in 2004, the American Indian Probate Reform Act ("AIPRA") made the ILCP permanent. The Program allows individuals to voluntarily convey to the Secretary of Interior for the benefit of a Tribe fractionated interests in land. The Secretary takes title to the land for the benefit of the Tribe. Jaeger stated that all acquisitions under the Program have been of trust or restricted land.

4.      Jaeger stated that he has "never" had a request to take land into trust for gaming purposes.

5.      Jaeger stated that there are no AIPRA regulations. Thus far, he has been operating off of "policy statements" issued by his superiors.

6.      With respect to National Environmental Policy Act ("NEPA") issues, Jaeger stated that the tribe has the responsibility for preparing any environmental assessment. NEPA issues are handled by the local Bureau of Indian Affairs office. When the ILCP acquires an interest in land for a tribe, it obtains a certification from the tribe that the tribe will not change the manner in which the land is being used and thus, an environmental assessment would not be required.

7.      Jaeger stated that $1,000,000 was appropriated for the Quapaw's land acquisition program in the 2004 federal budget bill to acquire land. Once this money has been spent, the Quapaw's program will end. Moreover, Quapaw lands do not have as many fractionated interests as other tribes.

8.      On August 27, 2007, I again contacted Robert Jaeger by telephone. During our discussion, he said that none of the land the Quapaw obtained under trust thorugh the ILCP was acquired for gaming purposes "as far as I know," although it was "common knowledge" that the tribe was building a casino.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 21 day of February, 2008 at Washington, District of Columbia.

_____
MICHAEL D. WHITE

**EXHIBIT 4**

Declaration of June DeHart

UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF THE DISTRICT OF COLUMBIA

**BOARD OF COMMISSIONERS OF**
**CHEROKEE COUNTY, KANSAS,**

Case No.

Plaintiff,

v.

**DIRK KEMPTHORNE, in his official**
**capacity as the SECRETARY OF THE**
**INTERIOR**
**and the**
**UNITED STATES DEPARTMENT OF**
**THE INTERIOR,**

Defendants.

_____

### DECLARATION OF JUNE DEHART

I, June L. DeHart, hereby declare as follows:

1.    I am an attorney with the law firm of Manatt, Phelps & Phillips, LLP ("Manatt").  I am duly licensed to practice before all of the courts of the District of Columbia and the State of Mississippi, and the matters set forth in this declaration are true of my own personal knowledge, and if called to do so, I could and would competently testify to these matters under oath.

2.    Between July 2007 and January 2008, I initiated and/or participated in numerous meetings and telephone conversations with officials of the Department of the Interior and the National Indian Gaming Commission regarding the casino development undertaken by the Quapaw Tribe of Oklahoma and its effects in and on Cherokee County, Kansas.  The following paragraphs detail some of these meetings and  conversations.

3.      On July 30, 2007, I contacted George Skibine, Director, Indian Gaming Staff, Bureau of Indian Affairs ("BIA"), Department of Interior ("DOI"), by email about the proposed Quapaw casino. We spoke by telephone on August 1, and Skibine stated that he knew very little about the proposed Quapaw casino but would obtain information about it.

4.      In an email on August 2, 2007, Skibine advised that the Quapaw casino land had been acquired in trust after 1988. He said that on August 2, the NIGC had sent a letter to the tribe asking for information to help it determine whether the proposed casino is on "Indian lands" as defined in IGRA.

5.      In an email with Skibine on August 3, I shared with Skibine information that the Quapaw land was apparently taken into trust under the Indian Land Consolidation Act ("ILCA") and inquired about the process for such ILCA acquisitions. Skibine suggested that we contact the BIA Regional office in Muskogee, Oklahoma to get a copy of the ILCA application(s) as he was not aware of the process. He noted that no application had been sent to or reviewed in the Office of Indian Gaming in Washington, DC.

6.      On August 6, 2007, Skibine suggested speaking with JoAnn Shyloski, Associate General Counsel at NIGC, who has responsibility for Oklahoma gaming matters. In an August 9, 2007 telephone conversation, Ms. Shyloski confirmed that a letter had been sent to the tribe requesting information as to the status of the lands for the proposed casino. She suggested filing a request under the Freedom of Information Act to get a copy of the letter.

7.      On August 8, I spoke with Nancy Pierskalla of the Indian Gaming staff, BIA, Interior, who stated that she knew little about the Quapaw's proposed casino but learned from the Regional office that the Quapaw lands for the casino were acquired under ILCA. She stated that the tribe would have to submit an application to take the land into trust under ILCA and if the land was to be used for another purpose such as gaming then the tribe would have to get approval to game from the Office of Indian Gaming. She stated that ILCA does not exempt the tribe from the requirements of IGRA.

8.    On August 9, I spoke with Mary Downing, in the BIA Regional office. She stated that her office was not aware of the proposed casino until they were alerted to it by Skibine and saw news articles referring to it. She was not aware of the ILCA procedures, was not certain as to what land was acquired, and suggested contacting Robin Jaeger in the ILCA office. She confirmed that the Tribe had no trust land in Kansas or Missouri.

9.    On September 12, 2007, C. Dean McGrath, Jr., an attorney with Manatt, Phelps & Phillips, and I met with David Bernhardt, Solicitor for the Department of the Interior. We discussed the NIGC's request for information concerning whether the site qualifies as "Indian lands" under IGRA, the process by which the Department took land into trust for the Quapaw Tribe under ILCA and whether the process complied with NEPA. Bernhardt stated that he understood the concern about taking land into trust under ILCA in order to build a major casino resort while avoiding both NEPA and IGRA review. He advised that these are issues the Department has not previously addressed. He stated that the Department would examine the interrelationship between ILCA, the Indian Gaming Regulatory Act ("IGRA") and NEPA and get back to us in the next couple of weeks. In the following weeks, we participated in further meetings with staff of the Solicitor's Office.

10.    On October 22, 2007, I spoke with Skibine. He reviewed the information he had regarding the acquisition of the Quapaw land under ILCA. He stated that under the process in which the tribe acquired the casino development land, the tribe's development eluded review under NEPA and eluded DOI's internal requirement to approve gaming acquisitions at the Office of Indian Gaming in Washington. He stated that the big question is NEPA and there is an issue as to how the ILCA program is implemented.

11.    On or about November 16, 2007 we contacted the office of Carl Artman, Assistant Secretary for Indian Affairs to request a meeting. On December 7, 2007, David Cooper, Counsel for the Cherokee County Commission; Carl Sottosanti, Deputy General Counsel for Penn National Gaming; Dean McGrath, and I met with Assistant Secretary Artman, and members of his staff. David Cooper stated that Cherokee County was concerned that land

3

had been taken into trust for gaming purposes outside of the Indian Gaming Regulatory Act ("IGRA") process, and that the Department of Interior ("DOI") had failed to undertake any environmental review during that process, particularly in light of the fact that the Tribe had acquired the land to construct a multimillion dollar tribal casino.   Artman solicited our input on how the Department should proceed.

12.     On December 19, 2007, David Cooper, Carl Sottosanti, Dean McGrath, and I met with Michael Bogart, Counselor to the Secretary of the Interior; Carl Artman; and Jim Cason, Assistant Secretary for Policy, Management and Budget, U.S. Department of the Interior to discuss the Quapaw Tribe's proposed Downstream Casino.   Cooper restated Cherokee County's concern that the Quapaw tribe was currently constructing a multimillion dollar casino project on land taken into trust by the Department under ILCA without having conducted the environmental review required by NEPA.   Artman stated that the Department of Interior had not conducted any environmental assessment prior to taking the land into trust under ILCA, as required by NEPA.  He also stated that contrary to Departmental policy, the trust land acquisitions were not reviewed in the Department's Office of Indian Gaming.  Artman stated that the Department was concerned about the process by which the land was taken into trust for the Quapaw casino, as well as the lack of the requisite review by the Department and that the Department may have been misled.   He stated that he intended to send a letter to the Quapaw Tribe on January 2 expressing his concerns and putting the Tribe on notice to "stay action." He stated that the Department would quickly examine the potential legal remedies and would act to ensure that the requirements of NEPA are met.  He stated that the Tribe had an application pending to take a 1/6 undivided interest in the Meh No Bah allotment into trust for the casino site and that the Department would require NEPA review as part of that process.

13.     On January 4, 2008, I spoke to Carl Artman by telephone. Artman stated that he had not sent the promised letter to the Quapaw Tribe, but he intended to send the letter the following week.   I spoke with him again on January 10, 2008.  He stated that he expected to send his letter to the Quapaw the following Monday.  Artman added that "knowing John Berry,"

4

the Quapaw Tribe would not stop construction absent a temporary restraining order commanding them to do so.

14.    On January 15, 2008, I contacted Carl Artman by phone to discuss the status of his letter to the Quapaw Tribe.  Artman stated that the letter had not gone out.

15.    On January 18, 2008, I spoke with Carl Artman by telephone to determine the status of his letter to the Quapaw Tribe.  Artman stated that he was still reviewing the matter but noted the matter may need to be resolved through litigation and Cherokee County may want to sue.  He stated that he was concerned that "something was missed" and wanted to take remedial action.

16.    On January 23, 2008, David Cooper, Carl Sottosanti, Dean McGrath and I spoke with Carl Artman in a telephone conference to discuss the status of Artman's letter to the Quapaw Tribe.  Artman stated that he is still "trying to get the facts," including what, if any, environmental work had been done.

17.    On January 31, 2008, David Cooper, Carl Sottosanti, Dean McGrath and I again spoke with Carl Artman by telephone.  Artman stated that the Quapaw's trust application on the 1/6 undivided interest of restricted fee land had been withdrawn.  He advised that no categorical exclusion had been done when the when the 5/6 interests were taken into trust.  He indicated that a letter would not be sent to the Quapaw, as he had earlier intended.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of February, 2008 at Washington, District of Columbia.


Dated:  February 25, 2008

_June L. DeHart_
June L. DeHart

## UNITED STATES DISTRICT COURT FOR THE DISTRICT
## OF THE DISTRICT OF COLUMBIA

**BOARD OF COMMISSIONERS OF**
**CHEROKEE COUNTY, KANSAS,**

                                    Case No.

                Plaintiff,

    v.

**DIRK KEMPTHORNE, in his official**
**capacity as the SECRETARY OF THE**
**INTERIOR**
**and the**
**UNITED STATES DEPARTMENT OF**
**THE INTERIOR,**

                Defendants.

---

## <u>ORDER</u>

Upon consideration of Plaintiffs' Motion for a Preliminary Injunction, the Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, and the attached declarations and exhibits filed in support thereof, and the opposition thereto, as well as the entire record herein, it is hereby

ORDERED, that Plaintiffs' motion be, and it hereby is, GRANTED; and

It is further ORDERED, that defendants Dirk Kempthorne and Department of the Interior, and their agents, representatives, and employees be, and are enjoined from proceeding with any further land acquisitions related to the Qaupaw Tribe of Oklahoma Downstream Casino Resort development, pending further order of the Court.

It is further ORDERED that the Secretary of the Interior, as legal owner of the relevant

real property, and all those acting in concert with him, are enjoined from conducting any further

construction activity on the property and from operation of the casino until further order of the

Court or until the Secretary has complied with applicable law by, among other things,

completing an environmental assessment and, if necessary, an environmental impact statement as

required by NEPA.

SO ORDERED this ___ day of _____, _____.


_____
UNITED STATES DISTRICT JUDGE

Copies to:

Jonathan L. Abram
Audrey E. Moog
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109

David R. Cooper
FISHER, PATTERSON, SAYLOR &
    SMITH, LLP
3550 SW 5th Street
700 Twelfth St. NW
Topeka, KS 66601

C. Dean McGrath, Jr.
June DeHart
MANATT, PHELPS & PHILLIPS, LLP
700 Twelfth St. NW
Suite 1100      )
Washington, DC 20005

United States Attorney for the District of Columbia
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20001

Office of the Attorney General
U.S. Department of Justice
10th & Constitution Avenue, N.W.
Room B 327
Washington, D.C. 20530

David Bernhardt
Solicitor of the Department of the Interior
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

# TABLE OF CONTENTS
## FOR
## APPENDIX OF EXHIBITS

Exhibit 1.    Declaration of Rod Edmondson, Commissioner of
Cherokee County, Kansas

    1(A)    Wally Kennedy, "Tribe Announces Plans For Resort Casino,"
*Joplin Globe*, May 15, 2007

    1(B)    Mary L. Downing, Regional Director, Real Estate Services,
Bureau of Indian Affairs, Letter of October 25, 2007, to Jeffrey
Nelson, National Indian Gaming Commission

    1(C)    Carl J. Artman, Assistant Secretary – Indian Affairs,
U. S. Department of the Interior, December 20, 2007, letter
to The Honorable Pat Roberts, U. S. Senator

    1(D)    Cindy Livingston, Director, Administrative Services Division,
Kansas Department of Wildlife and Parks, December 27, 2007,
letter to David R. Cooper, Fisher, Patterson, Sayler & Smith,
L.L.P.

    1(E)    James Larson, Aquatic Ecologist, Environmental Services
Section, Kansas Department of Wildlife and Parks July 31, 2007
letter, and e-mail string with Charles K. Ahn and Chris Jackson,
Blackshare Environmental Solutions

    1(F)    Quapaw Casino Development Map

    1(G)    David R. Cooper, Fisher, Patterson, Sayler, & Smith, October 18,
2007, letter to Carl J. Artman, Assistant Secretary, Indian
Affairs, Department of the Interior

    1(H)    Carl J. Artman, Assistant Secretary, Indian Affairs, Department
of the Interior, February 1, 2006, letter to Kansas Governor
Kathleen Sebelius

Exhibit 2.    Declaration of Audrey E. Moog, Hogan & Hartson LLP

      2(A)    Roger McKinney, "Area Officials Celebrate Quapaw Tribe's Planned $200 Million Casino, Hotel," *Joplin Globe*, July 31, 2007

      2(B)    Roger McKinney, "Work on Schedule," *Joplin Globe*, December 17, 2007

      2(C)    Stephen R. Ward, Conner & Winters, LLP, August 6, 2007, letter to National Indian Gaming Commission (without attachments)

      2(D)    Wayne C. Nordwall August 6, 2007, letter  to Chairman John L. Berrey, Quapaw Tribe of Oklahoma (O-Gah-Pah)

      2(E)    Checklist for Gaming and Gaming Related Acquisitions

      2(F)    Notice to Quapaw Casino Development Authority, et al. of Intent to Sue for Violations of the Clean Water Act, by David R. Cooper, Representing Cherokee County, Kansas

      2(G)    David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P., February 22, 2008, letter on behalf of the Commissioner of Cherokee County, Kansas, to Army Corps of Engineers

Exhibit 3.    Declaration of Michael White

Exhibit 4.    Declaration of June DeHart