/UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF THE DISTRICT OF COLUMBIA

BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS,

        Case No.  1:08-cv-00317-RWR
        Judge Richard W. Roberts

        Plaintiff,

v.

DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR
and
the UNITED STATES DEPARTMENT
OF THE INTERIOR,

        Defendants.

---

**PLAINTIFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S
REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

      Defendants offer a host of arguments in opposition to plaintiff's motion for preliminary injunction 1/ – including that we were both too late and too early in filing suit – but it concedes that it did absolutely no environmental review and that it has not done the analysis required by federal law before allowing gaming to proceed on Indian lands. Contrary to defendants' assertions, they are the proper parties because the obligation to conduct NEPA and other reviews is theirs as the responsible federal officials, and the

---

1/    The United States' Opposition to Plaintiff's Motion For Preliminary Injunction (D.E. 10) is referred to herein as "Defendants' Opposition" or "Opposition" and cited as "Opp. at __." Exhibits to the Opposition are cited as "Opp. Ex. __." Plaintiff Board of Commissioners of Cherokee County's Memorandum in Support of Motion for Preliminary Injunction is referred to herein as its opening brief and cited as "Pl. Mem. at __."   Exhibits to plaintiff's opening brief are cited as "Pl. Mem. Ex. __."

Court has both jurisdiction and authority to grant the requested relief.  In sum, defendants have failed to refute Cherokee County's showing that all four preliminary injunction factors weigh in favor of granting the requested injunction.

In this action, Cherokee County challenges the Secretary of the Interior's decisions to take certain lands into trust and to convey other interests in land for the benefit of the Quapaw Tribe of Oklahoma – decisions that were taken without public notice and without regard to governing statutes, regulations, and policy, and that have allowed the Quapaw Tribe of Oklahoma to engage in fast-paced construction of a large Indian casino resort without the required environmental review of its effects on the surrounding human environment.  Over half of the development footprint for the new Quapaw casino project lies in Cherokee County, and the planned casino will impose on Cherokee County significant environmental impacts that threaten irreparable injury to Cherokee County but that the Secretary failed to consider, as he is required to do, before taking lands into trust for the Quapaw.  Cherokee County has moved for a preliminary injunction so that the defendants' decisions and pending decisions to permit and enable the Quapaw casino development can be subjected to the environmental review required by the National Environmental Policy Act ("NEPA") and the decisional process required by other federal regulations and department policy before it is absolutely too late.

In its opening brief, Cherokee County showed that defendants violated the Indian Gaming Regulatory Act ("IGRA") and their Gaming Acquisition Policy, NEPA and NEPA's implementing regulations, the Department's own land acquisition procedures found in 25 C.F.R. Part 151, and the Department of the Interior and Bureau of Indian Affairs' NEPA implementing guidelines.  *See* Pl. Mem. at 17-36.

In opposition, defendants barely dispute their violation of NEPA and DOI's regulations and NEPA-related policies. Defendants apparently concede, as they must, that NEPA applied to the Meh-No-Bah acquisitions and that they entirely failed to comply with NEPA. Instead, defendants' position is apparently that they may disregard the law and their obligations there under without any legal consequence so long as they complete their land conveyances in secret and preclude any complaint from occurring prior to their transfer of title. For support, they cite the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, but their own cases show that the QTA does not apply here because our claims do not call into question the federal government's title to the lands at issue. Our claim is therefore redressable, not moot. And our IGRA claim is ripe, since no one disputes that absent an injunction gaming will commence in a matter of a few months. Finally, defendants have made no serious attempt to dispute the significant irreparable harm facing Cherokee County if the planned very substantial gaming development is allowed to proceed without any consideration at all of its potential adverse impacts on the human and natural environment in our County.

**I.    Cherokee County Has Demonstrated its Likelihood of Success on the Merits.**

**A.    Defendants Are The Proper Parties.**

Defendants argue first that they are not the proper party to enjoin, but they provide no authority in support of this assertion. Cherokee County's complaint and motion largely are grounded on violations of NEPA, a statute that commands the compliance of federal agencies. The defendants are exactly the right parties because they

are the ones who violated the law. The only authority cited by defendants relates to Indian tribes' immunity from suit and power of taxation, 2/ and so is simply irrelevant.

Cherokee County seeks in this action to have the defendants' trust acquisitions for the Quapaw declared invalid until such time that defendants comply with their legal obligations in connection with the trust acquisitions. Thus, Cherokee County's request for preliminary injunctive relief seeks to enjoin defendants from permitting further construction of the Quapaw casino development and operation of the casino to maintain the status quo and prevent further harm to Cherokee County during this litigation. Defendants mischaracterize the issue by asserting that the United States has no regulatory role over the Tribe's construction activities. *See* Opp. at 5-6. The issue is whether construction can proceed or a casino can be operated where the construction and operation is occurring as a result of unlawful action by the defendants in violation of NEPA and gaming-related statutes.

Defendants offer *no* authority for their assertion that their trust acquisition actions "do[ ] not endow the United States with the authority to halt the lawful activities of the Tribe on that land." Opp. at 6. None of the cases cited by defendants involve an action by or against the Department of the Interior or the Secretary, and none stand for the proposition that the Secretary – or this Court – lacks power to enforce or comply with the law simply because a tribe's activities would be affected. Even though, as a general principle, tribes enjoy the right to self-government, tribes are dependent sovereigns

---

2/   Defendants cite *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) (concerning tribal immunity from action seeking to recover state taxes); *National Labor Relations Board v. Pueblo of San Juan*, 276 F.3d 1186, 1192-93 (10th Cir. 2002) (addressing tribe's immunity from provision of federal labor law); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982) (addressing tribe's power to impose severance tax non-Indian mineral lessees); and *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152-53 (1980) (addressing tribal immunity from state taxes). *See* Opp. at 5, 6.

subject to the plenary power of Congress and the regulatory oversight of the Department of the Interior. *See Oliphant v. Suquamish Tribe*, 435 U.S. 191, 208-09 (1978) ("Indian tribes hold and occupy [Indian lands] with the assent of the United States and under their authority") (quotation and citation omitted; decision superseded by statute). Defendants acknowledge this limitation on tribal sovereignty by describing the Quapaw as "*quasi-sovereign.*" Opp. at 6. As a general matter of trust law, defendants, as delegee of the United States, owner of the Meh-No-Bah interests, maintain the power over trust property that trustees generally have. *See* Restatement (Third) of Trusts § 85(1)(a) (2007).

Even setting aside the United States' general regulatory authority over tribal construction activities, it has an indispensable role in Indian trust land acquisitions that must be done in compliance with federal law. As a matter of federal law, the defendants' acquisition process must include an environmental review of the Quapaw's planned use of the acquired lands under NEPA – a federal obligation that the defendants nowhere dispute. And as a matter of federal law, the defendants must conduct required reviews before undertaking land acquisitions for the purpose of Indian gaming under IGRA, *see e.g.* 25 U.S.C. § 2719 and Pl. Ex. 2(6) (Gaming Acquisition Policy). The defendants violated these requirements, and an injunction should therefore issue against continued construction and operation of the planned casino pending compliance with NEPA and federal gaming laws. There is nothing surprising in that, nor in the impact of the injunction on the construction companies and Tribe that are acting in concert with the United States in connection with use of these lands for gaming. Fed. R. Civ. P. 65(d).

### B.      The Quiet Title Act Does Not Bar This Action.

Defendants next assert that the Quiet Title Act, 28 U.S.C. § 2409a, bars this action because the remedy sought "would nullify the Secretary's decision to acquire the allotment in trust or restricted fee for the Tribe." Opp. at 7. Defendants are wrong, however, and their own cases make that clear. It is true that the QTA bars actions that would divest the United States of title. But this action would do no such thing. If the Court grants Cherokee County's relief and invalidates the trust transaction at issue, the United States' title to the Meh-No-Bah interests will remain the same – with title in the United States. 3/

The Quiet Title Act waives the United States' sovereign immunity for actions to quiet title involving property held by the United States but maintains it with respect to challenges to the United States' title to trust or restricted Indian lands. 28 U.S.C. § 2409a(a). And it is surely so that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the *United States' title* to real property." *Block v. N. D. ex rel. Bd. Of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983) (emphasis added). But the Act does not apply where, as here, there is no challenge to the ownership interests of the United States. That is clear from the Supreme Court's holding

---

3/      And even if it were correct, defendants' QTA argument would not apply to the application currently pending. The most intriguing aspect of defendants' Opposition is their footnote revealing that "the Quapaw Tribe currently has one application pending to have land taken into trust under the Indian Land Consolidation Act[,]" which the Secretary has offered to hold in abeyance during the pendency of this litigation. *See* Opp. at 2 n.1. The attached exhibit 3, the Declaration of Majel Russell, Deputy Assistant Secretary-Indian Affairs, describes the pending application as a "forced sale" under 25 U.S.C. § 2204(a) for minority interests in the Me-Het-Tah-Spada Allotment. Opp. Ex. 3 ¶ 3. Cherokee County understands that the Me-Het-Tah-Spada Allotment is within Ottawa County, Oklahoma, and bridges the area between the Quapaw's planned casino parking area (in Cherokee County) and the casino-hotel structure, providing customer access to the casino. Notably, neither the Opposition nor the Declaration state whether the defendants intend to comply with NEPA in connection with the pending application or whether their NEPA analysis of the pending application would (as is required) take into account the cumulative effects of the pending acquisition with the prior acquisitions to consider the environmental effects of the Quapaw casino development as a whole.

6

in *Block* and from the many cases since.  Under "the plain language of the statute, for the QTA to apply to an action: "'(1) the United States must claim an interest [other than a security interest or water rights] in the property at issue, and (2) there must be a disputed title to real property.  If either condition is absent, the [QTA] [by its] terms does not apply[.]'"  *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 2007 WL 1200473, at *6 (W.D.N.Y. Apr. 20, 2007) (quoting *Leisnoi, Inc. v. United States,* 170 F.3d 1188, 1191 (9th Cir. 1999).

     Courts determining the applicability of the Act to actions arising under other statutes recognize that the central question is whether "the plaintiff's suit could impact the *United States'* title" to the land at issue.  *Neighbors For Rational Dev., Inc. v. Norton*, 379 F.3d 956, 965 (10th Cir. 2004) (emphasis added) ("*Neighbors*"); *see also Comanche Nation, Okla. v. United States*, 393 F. Supp. 2d 1196, 1207 (W.D. Okla. 2005).  Indeed, defendants principally rely on *Neighbors* in support of their argument that the QTA bars Cherokee County's action here, *see* Opp. at 7-8, but if anything *Neighbors* shows just the opposite.  In *Neighbors*, the plaintiffs challenged the Secretary's trust acquisition of lands that had been held by individual Indians as tenants in common.  379 F.3d at 958-59.  As here, the plaintiffs asserted APA claims grounded on violations of the land acquisition regulations in 25 C.F.R. Part 151 and of NEPA.  *Id.* at 959.  But the distinction that makes every difference is that in *Neighbors*, a ruling in favor of the plaintiffs would have *divested the United States of title*.  *See id.* at 958 (holding "to the extent Neighbors' requested relief would divest the United States of title to the property the [QTA] precludes Neighbors' suit").  *See Citizens Against Casino Gambling*, 2007 WL 1200473, at *6 ("In short, the QTA applied to the dispute in *Neighbors* not because the property

7

had Indian land status, but because the lawsuit could result in divestiture of title to real property in which the United States claimed an interest").

Defendants also rely on *State of Florida, Dep't of Business Regulation v. U.S. Dep't of Interior*, 768 F.2d 1248, 1248-55 (11th Cir. 1985), but there again the plaintiffs challenged the title of the United States. The land at issue was purchased in fee by the Seminole, which thereafter succeeded in having the Secretary take the land into trust. *Id.* Thus, a decision in favor of Florida would have divested the United States of title to the property. *Id.* at 1254 ("Here, the appellants seek an order divesting the United States of its title to land held for the benefit of an Indian tribe."). Likewise, in *Shivwits Band of Paiute Indians v. Utah.*, 185 F. Supp. 2d 1245, 1247-48 (D. Utah 2002), the QTA barred a claim in which the challenged trust acquisition of lands initially held by the tribe in fee, if successful, would have divested the United States of title. 4/

Neither *Neighbors* nor *Florida* governs here because we do not challenge the title of the United States to lands that it owns. Where the United States' title to or interest in Indian lands would not be divested by granting the requested relief, the QTA does not apply. *See, e.g., Comanche Nation*, 393 F. Supp. 2d at 1207 (granting preliminary injunction barring publication in Federal Register of notice of approval of gaming compact) 5/; *Citizens Against Casino Gambling*, 2007 WL 1200473, at *6. The same reasoning has been applied in cases involving boundary disputes concerning Indian lands. For example, in *Pueblo of Sandia v. Babbitt*, this Court determined that a boundary

---

4/       Defendants' citation to *Shawnee Trail Conservancy v. U.S. Dep't of Agriculture*, 222 F.3d 383, 386-88 (7th Cir. 2000) is inapposite because the plaintiffs' claim styled as a constitutional claim clearly sought to divest the United States of certain real property interests.

5/       The *Comanche Nation* court did not cite the *Neighbors* decision issued by the Tenth Circuit the prior year, but the *Neighbors* decision was cited and discussed in briefing by the parties. *See* Plaintiff's Opposition Brief to Defendants' Motion to Dismiss at 16-17, D.E.44, *Comanche Nation v. United States*, 5:05-cv-00328 (W.D. Okla.).

8

dispute between the Pueblo and the U.S. Forest Service was not subject to the QTA because "the Pueblo does not seek title to the disputed claim area; *title would remain in the United States government*." 1996 WL 80867, at *4 (D.D.C. Dec. 10, 1996) (emphasis added). Likewise, in *Pueblo of Taos v. Andrus*, the Court held that the QTA did not apply in a similar dispute because "title to both parcels of land involved rests with the United States[.]" 475 F. Supp. 359, 364-65 (D.D.C. 1979). The *Neighbors* court distinguished *Pueblo of Taos* on that very basis, noting that "decisions for the plaintiff [in *Pueblo of Taos*] would not have divested the United States of title to the property." *Neighbors*, 379 F.3d at 964.

In this case, the United States' legal title to the Meh-No-Bah interests is not in doubt. Before the defendants' unlawful actions, the United States held legal title to the Meh-No-Bah interests, in trust for certain individual Indians. After the defendants' unlawful actions, the United States still holds the same legal title, now in trust for the Tribe. And if Cherokee County's requested relief is granted, the United States would still continue to hold the same legal title to the lands in question. 6/ For that reason, the QTA is no bar to this Court's review of defendants' violations of NEPA and federal gaming law, or to the requested preliminary injunction. 7/

---

6/    The same is true as to the one-sixth interest held under restrictions against alienation. As pointed out by the defendants, restricted Indian lands are functionally equivalent to trust lands. *See* Opp. at 4 n.4. Notably, before and after the acquisitions at issue, the Quapaw maintained and continue to maintain governmental jurisdiction over the lands, and thus the tribe's sovereign interest would not be injured by the requested relief.

7/    Moreover, APA claims challenging the agency's decision to *acquire* Indian lands should be regarded as falling outside the Quiet Title Act. In *South Dakota v. U.S. Dep't of Interior,* the Eighth Circuit observed that "[w]e doubt whether the Quiet Title Act precludes APA review of agency action by which the United States *acquires* title [for the beneficial use of an Indian tribe]." 69 F.3d 878 (8th Cir. 1995), *cert. granted, judgment vacated, case remanded with instructions to vacate District Court judgment and remand to Secretary for reconsideration,* 519 U.S. 919 (1996) (APA review of the Secretary's decision to take land into trust). The Eighth Circuit did not reach the question because it had determined that 25 U.S.C. § 465 was an unconstitutional delegation of power. 69 F.3d at 881, n.1.

### C. Cherokee County's NEPA Claims Are Neither Moot for being Filed too Late Nor Unripe for Being Filed too Early.

Defendants claim that Cherokee County's claims are moot because they were filed too late, after transfer of title, and also that they are not yet ripe because they were filed too early, before gaming has begun. Neither is correct.

**Mootness**. According to the defendants, "Plaintiff's NEPA claims are moot because the federal actions that triggered NEPA compliance . . . have already been completed." Opp at 9. Nothing can be done, say the defendants, because the QTA bars this action and therefore, defendants' action "cannot be reversed." Opp. at 9. And they offer an extended quotation from *Neighbors* holding that the issue of the Secretary's re-examination of the trust acquisition was moot where "[r]equiring the Secretary to re-examine its trust acquisition decision would not provide [plaintiff] with any meaningful relief" because the court had "no power to divest the United States of the property[.]" *Neighbors*, 379 F.3D at 965 (quoted at length in Opp. at 9-10). To be sure, if the QTA actually applied, there would be an issue of redressibility, the aspect of mootness addressed in defendants cited authorities. *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 357 F. Supp. 2d 225, 230 (D.D.C. 2004), *aff'd on other grounds*, 460 F.3d 13 (D.C. Cir. 2006); *see also Karst v. Envtl. Educ. & Prot., Inc. v. U.S. Envtl. Prot. Agency*, 403 F. Supp. 2d 74, 82 (D.D.C. 2005), *aff'd*, 475 F.3d 1291 (D.C. Cir. 2007).

But as shown above, the QTA does not bar this action or the relief sought because neither calls into question the United States' title to the lands in question. The United States' legal title to the Meh-No-Bah allotment would remain the same regardless of whether Cherokee County's requested relief were granted. Thus, defendants' argument that the NEPA claims are moot is wrong.

And their reliance on *Neighbors* is wrong for another reason as well, for there the federal defendants had already done a NEPA review, and the Tenth Circuit declined to require another:

> We do not think this request for relief is precluded by the Quiet Title Act.  Furthermore, considering various development proposals after the trust acquisition would not be simply an exercise in futility.  We, nevertheless, *conclude this request for relief is moot because the Secretary complied with [NEPA] when approving a lease of the [ ] property*.  We do not think it would be wise to require the Secretary to plow the same ground twice . . . . Neighbors never argues the completed environmental assessment does not adequately consider the environmental impacts and alternatives to development of the property.  Thus, we conclude Neighbors' request for an injunction barring development of the property until a [NEPA] analysis is complete is moot.

*Id.* at 965-66 (emphasis added).

Not so here, where everyone appears to agree that no NEPA review has ever been conducted on the planned development.  In this case, defendants conducted no environmental review under NEPA of the Quapaw casino development, in clear violation of (1) the NEPA statute and its implementing regulations; (2) Department of Interior's and Bureau of Indian Affairs' own NEPA implementing guidelines; (3) the requirements, including NEPA compliance, of the Department's trust acquisition regulations in 25 C.F.R. Part 151; and (4) the Department's published policy concerning land acquisitions for purposes of Indian gaming and IGRA.  *See* Pl. Mem. at 17-36.  The suggestion that it is too late to comply with the law because the defendants' acquisitions have taken place is no defense because the QTA does not preclude relief and because the defendants have plainly violated federal law.

**Ripeness.**  Defendants also assert that Cherokee County's first claim comes too early and so is not yet ripe because "land acquisition and transfer does not implicate

11

IGRA," Opp. at 10, and because no gaming is yet occurring. *Id.* Defendants are incorrect in their premise and in their conclusion.

First, the premise. Although IGRA does not contain its own land acquisition provisions, it is plainly wrong for defendants to claim that "IGRA has nothing to do with land acquisition or transfer." Opp at 10. Section 20 of IGRA, codified at 25 U.S.C. § 2719, contains a broad prohibition against gaming on lands acquired in trust by the Secretary after 1988, along with certain specific exceptions to that prohibition. Because of Section 20's requirements concerning gaming on post-1988 trust acquisitions, the Secretary has developed and published specific policies to ensure that gaming can only occur on post-1988 trust acquisitions if the acquisitions fall within Section 20's exceptions. *See* Pl. Mem. Ex. 2(6) (Gaming Acquisition Policy). In view of the express command of Section 20, as well as the Secretary's Gaming Acquisition Policy, IGRA plainly has quite a lot "to do with land acquisition or transfer." Opp. at 10. *See* Pl. Mem. at 18-21.

And next, the conclusion. Defendants argue that Cherokee County's claim is not yet ripe because the casino has not yet opened for business. They refer to IGRA's "scheme of civil and criminal actions that may be used to prevent and punish Indian gaming" that violates IGRA, and assert that "there can be no violation" before gaming takes place. Opp at 10-11. These assertions confuse the National Indian Gaming Commission's ("NIGC") regulatory authority over gaming violations with the Secretary's authority – and duty – to ensure that any gaming on Indian trust lands acquired after 1988 conform to Congress' command in Section 20 of the Act. *Compare* 25 U.S.C. § 2719

with 25 U.S.C. §§ 2704-2706.  NIGC has no authority to acquire trust lands for Indian gaming and no role in the Secretary's trust acquisition process.

In any event, as detailed in plaintiff's opening brief, construction on the casino development is proceeding at speed and the casino is scheduled to open in just four months, on July 4th.  *See* Pl. Mem. at 5.  That will be unlawful unless preceded by defendants' required review and approval decisions – reviews and decisions they have failed to make or even promise to make before allowing gaming to proceed.  Thus, there is absolutely no basis for defendants' effort to avoid an injunction here – absent an injunction, gaming operations are planned within a few months and as matters now stand they will be illegal.  That is just the situation that preliminary injunctive relief was designed to address – imminent unlawful acts.

### E.     The Department's 25 C.F.R. Part 151 Regulations Apply.

Defendants' last argument is to contest the applicability of the land acquisition regulations found in 25 C.F.R. Part 151 to defendants' acquisition of the interests in the Meh-No-Bah allotment.  *See* Opp. at 11-12.  On this score, defendants misconstrue Cherokee County's argument and the applicable law.

Contrary to defendants' argument, Cherokee County does not argue that a statute must expressly contain an exemption from the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, or Part 151, or that Section 465 governs all land acquisitions for Indians. *Compare* Opp. at 11 to Pl. Mem. at 26-38.  The Secretary purportedly effected the acquisitions at issue under the Indian Land Consolidation Act ("ILCA").  *See* Opp. at 11. The Secretary has not promulgated any specific regulations to govern acquisitions of fractional interests under ILCA.  Instead, ILCA expressly provides that Section 465

13

applies to ILCA acquisitions, for which Part 151 provides a specified procedure, including public notice and NEPA compliance.  *See* Pl. Mem. at 26.  Part 151 in turn is not limited to acquisitions under Section 465, but applies broadly to land acquisitions unless excepted:  "These regulations set forth the authorities, policy and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes."  25 C.F.R. § 151.1.  The regulations contain three specific exceptions, none applicable here:  (1) acquisition of lands in fee by individual Indians or tribes; (2) acquisition of land in trust by inheritance or escheat; and (3) "acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members."  *Id.*

       Thus, the plain meaning of ILCA's § 2202 calls for the application of Part 151.  Instead, defendants offer a contorted interpretation of that statute.  Congress included Section 2202 in ILCA to provide that "[t]he provisions of [25 U.S.C. § 465] shall apply to all tribes[.]" 25 U.S.C. § 2202.  Defendants contend that this provision was intended merely to amend Section 465, which by reference to other provisions of the IRA limited the Secretary's acquisition authority to tribes that chose to reorganize under the IRA.  Without stating so explicitly, defendants suggest that because Section 2202 merely amended Section 465, there is no import to attach to its inclusion in ILCA.  But that is flatly contrary to the proviso of Section 2202 that makes clear it does not "supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to *any specific tribe, reservation, or states(s).*"  25 U.S.C. § 2202 (emphasis added).  In other words, Section 465 applies to all tribes except to the extent Congress has enacted law concerning the acquisition of land for specific tribes or

in specific areas.  ILCA, which applies to all tribes and across the country, is not such a law.  Thus, defendants have offered no defense for failing to follow the procedure set forth in Part 151 before acquiring the Meh-No-Bah interests in trust for the Quapaw.

The bottom line is that defendants admit they conducted no NEPA review of the Quapaw tribe's casino development, *see* Def. Ex. 1, and they offer absolutely no argument or excuse for their failure to do so.  Moreover, they have failed to offer *any argument at all* to refute Cherokee County's arguments that NEPA review was required under the NEPA statute itself and the Department's own NEPA guidelines, even if defendants could lawfully avoid compliance with Part 151.

##     II.     Cherokee County Has Demonstrated Irreparable Harm.

In an effort to undercut Cherokee County's showing of irreparable harm, defendants suggest that the only harms that the Court should look at now are those caused by construction, which by their lights an injunction would not remediate.  *See* Opp. at 5-6, 12.  They entirely discount the imminent and irreparable harms Cherokee County undoubtedly will incur from gaming operations, and unreasonably accuse Cherokee County of delay in bringing suit.  *See* Opp. at 12-14.  Defendants are wrong on all points.

First of all, defendants may make light of it, but Cherokee County has been and continues to be harmed from the construction activity that causes otherwise irremediable injury to it.  *See* Pl. Mem. at 10-12, 36-38.  The greatest harms, however, will shortly begin when absent an injunction the casino opens for business on July 4.  Defendants suggest that such harms are speculative because "IGRA imposes a variety of regulations and requirements that must be complied with before gaming may occur," citing 25 U.S.C. §§ 2710 and 2719.  Opp. at 13.  Would that it were so.  Instead, all the Section 2710

15

requirements, concerning the need for an approved gaming ordinance, were satisfied some time ago, and it is Cherokee County's understanding of the administrative record that NIGC made the determination that the Quapaw development fell within the strictures of section 2719. (Defendants have offered no facts or evidence to indicate otherwise.) Make no mistake: the Quapaw casino development will open for business and Cherokee County will begin to bear the substantial, irremediable burden of providing the majority of the public safety cost of the Quapaw casino impacts (among other impacts) in just a few months absent an injunction. As described in detail in its opening brief, Cherokee County's injury is plainly irreparable. *See* Pl. Mem. at 36-38; *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

      Defendants also are wrong to suggest that Cherokee County slept on its rights and therefore does not meet the irreparable injury requirement. Opp. at 13-14. It is certainly so that Cherokee County became aware of construction activity in the Spring 2007. But the legal basis for that activity was not disclosed in a public process, as would have been the case if defendants had followed NEPA and other required procedures. Our opening brief and the Declaration of June DeHart (Pl. Mem. Ex. 4) recount the significant efforts made to learn whether and how the Quapaw Tribe had obtained the right to construct and operate a casino development by at least July 2007. *See* Pl. Mem. at 15 & Ex. 4. Thereafter, we attempted to resolve the problems posed by defendants' failure to comply with the law through discussions with Department officials. Defendants may complain we were too patient in that effort; if so, our patience was founded on assurances from defendants themselves. *See* Pl. Mem. Ex. 4 ¶¶ 11-16. Through plaintiff's efforts, the Assistant Secretary for Indian Lands recognized that the trust acquisitions for the Quapaw

16

casino had not proceeded in accordance with department policy and that no NEPA review had been done, and by December 2007 and January 2008, he indicated that the Secretary would undertake NEPA compliance of the Quapaw casino development. *See id.* ¶¶ 12-16. By the end of January 2008, Cherokee County learned that the Secretary would not take action to review the Quapaw development pursuant to NEPA, *see id.* ¶ 17, and determined that litigation was necessary.

### III.     Defendants' Remaining Arguments Are Without Merit.

Defendants offer essentially no argument that an injunction would impair the government's interests or the public interest. *See* Opp. at 14.  As Cherokee County set out in its opening brief, defendants have no legitimate interest in engaging in action that is contrary to law and they cannot claim to be harmed by an injunction that requires them to carry out their lawful obligations under NEPA.  *See* Pl. Mem. at 38-39.  For similar reasons, an injunction is in the public interest, because the public has a strong interest in seeing that public officials faithfully execute the law, particularly laws like NEPA that embody a public policy to examine the environmental effects of federal actions.  *See id.* at 39.  No harm will befall the defendants if federal law is followed here.

### CONCLUSION

For these reasons, and the reasons set forth in plaintiff's opening brief, Cherokee County requests that the Court issue the requested preliminary injunction to enjoin the defendants from permitting any further construction activity on the property and from permitting operation of the casino until the Secretary has complied with applicable law by, among other things, completing an environmental assessment and, if necessary, an environmental impact statement as required by NEPA.

\\\DC - 023312/000002 - 2694608 v1

Dated: March 10, 2008

Respectfully submitted,

_s/Jonathan L. Abram_
Jonathan L. Abram, D.C. Bar No. 389896
jlabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

C. Dean McGrath, Jr., D.C. Bar No. 453574
dmcgrath@manatt.com
June DeHart, D.C. Bar No. 362871
jdehart@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
700 Twelfth St. NW
Suite 1100
Washington, DC 20005
(202) 585-6500
(202) 585-6600

David R. Cooper
dcooper@fisherpatterson.com
FISHER, PATTERSON, SAYLOR & SMITH, LLP
3550 SW 5th Street
Topeka, KS 66601
(785) 232-7761 (Telephone)
(785) 232-6604 (Facsimile)


Counsel for Board of Commissioners of Cherokee County