## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-00317-RWR |
| KEMPTHORNE, et al., | ) ) | Judge Richard W. Roberts |
| Defendants. | ) ) ) | |

## <u>MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants, the United States Department of the Interior and Dirk Kempthorne, in his official

capacity as Secretary of the Interior (collectively, "United States"), move to dismiss this action

on the grounds that this Court lacks jurisdiction over the Complaint and that Plaintiff fails to

state any claim upon which relief can be granted.  Submitted herewith is Defendants' Statement

of Points and Authorities in Support of their Motion to Dismiss.


Dated: May 28, 2008                     Respectfully submitted,



                                        /s/
                                        _____

                                        AMY S. TRYON
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division

Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
(202) 353-8596
amy.tryon@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF | ) | |
| CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THE UNITED STATES'S MOTION TO DISMISS**

RONALD J. TENPAS
Assistant Attorney General

AMY S. TRYON
GINA L. ALLERY
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
(202) 353-8596
amy.tryon@usdoj.gov

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL AND STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    The Meh-No-Bah Allotment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    The Indian Land Consolidation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    The Indian Gaming Regulatory Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. APPLICABLE STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Standard for Dismissal under Rules 12(b)(1) and 12(b)(6) . . . . . . . . . . . . . . 10

    B.    Review of Agency Action Under the APA . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Plaintiff lacks standing to challenge the ILCA transfer. . . . . . . . . . . . . . . . . 14

        1.    Plaintiff's alleged injuries bear no causal connection to the
            federal conduct Plaintiff challenges. . . . . . . . . . . . . . . . . . . . . . . . . . 15

            a.    Plaintiff has alleged only gaming-related injuries. . . . . . . . . . . . 16

            b.    The ILCA transfer of the Meh-No-Bah Allotment into trust
               for the Quapaw Tribe did not authorize gaming on the land. . . . 17

            c.    The ILCA transfer had no effect on the lawfulness of
               gaming on the Meh-No-Bah Allotment because the land
               was "Indian lands" both before and after the transfer. . . . . . . . . 19

        2.    The relief Plaintiff seeks would not redress its alleged injuries. . . . . . . 21

    B.    Plaintiff's claim that the land transfers are invalid is barred by
        the Quiet Title Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    The ILCA transfer of the Meh-No-Bah Allotment did not require NEPA
        documentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D.    The Secretary was not required to refer the Meh-No-Bah transfer to
the Office of Indian Gaming Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.    The Checklist is irrelevant to the ILCA transfer of the Meh-No-Bah
Allotment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.    The Checklist is not binding on the Secretary. . . . . . . . . . . . . . . . . . . 28

E.    The United States has not violated IGRA. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

F.    The Section 151 regulations are irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

G.    The United States has no power to halt construction activity on the
Meh-No-Bah Allotment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.  <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Attached:
Exhibits 1(A) – 1(E), Deeds to Restricted Indian Land

## I.  INTRODUCTION

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants, the United States Department of the Interior and the Secretary of the Interior ("the Secretary" or "the United States"), by undersigned counsel, hereby respectfully submit this Statement of Points and Authorities in support of their Motion to Dismiss.  For the reasons described below, Plaintiff lacks standing to bring the claims raised in the Complaint, and this Court accordingly lacks jurisdiction to hear the claims.  In addition, the Complaint fails to state any claim against the United States upon which relief can be granted.  The United States therefore respectfully requests that the Court dismiss the Complaint.

On February 25, 2008, Plaintiff filed a Complaint alleging that the United States violated the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, when it transferred a parcel of land known as the Meh-No-Bah Allotment from a trust status benefitting individual Indians into trust on behalf of the Quapaw Tribe of Oklahoma ("Tribe").  Compl. at 11-12.  Plaintiff does not contest that the United States held fee title to the land at issue both before and after the transfer of beneficial ownership from the individual Indians to the Tribe.  Plaintiff contends that the transfer of beneficial interest in the Meh-No-Bah Allotment "will permit" the construction of a casino resort on the Allotment without the proper environmental review.  Id. at 2.  In particular, Plaintiff alleges that the Secretary failed to prepare an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") before effecting the transfer; failed to abide by an internal guidance document for gaming-related land acquisitions, and neglected to apply the regulations found in 25 C.F.R. Part 151.  Id. at 11-12.  For relief, Plaintiff asks this Court to

1

declare the United States's transfer of the Meh-No-Bah Allotment invalid; to require the Secretary to reopen the Meh-No-Bah conveyance and conduct certain NEPA review; to enjoin the Secretary from proceeding with any additional land transfers on behalf of the Quapaw Tribe related to the development of the casino; and to enjoin the Secretary and those acting in concert with him from conducting any further construction activity on the property and from operating the casino.  Id. at 13.[1]

The Complaint should be dismissed because Plaintiff lacks standing to challenge the transfer of the Meh-No-Bah Allotment.  The transfer of beneficial interest took place pursuant to the Indian Land Consolidation Act ("ILCA"), 25 U.S.C. §§ 2201-2221, which was enacted to encourage and facilitate the consolidation of fractionated Indian land interests resulting from the failed historical policy of allotting lands to individual Indians and discouraging tribal ownership. The Meh-No-Bah Allotment had been held by the United States in trust or restricted status for various individual Indians for more than a century.  To complete the ILCA transfer of the Allotment, the Secretary simply shifted the beneficiary of the fractionated interests in the property from individual Indians to the Quapaw Tribe; the United States remained the trustee. The individuals were paid compensation for their interest in the land.  Nothing about this transfer had any effect on Plaintiff whatsoever, let alone resulted in an injury that would confer standing on Plaintiff to challenge the transaction.

Plaintiff appears to be under the impression that the ILCA transfer of beneficial interest in the Meh-No-Bah Allotment from individual Indians to the Tribe allowed or authorized gaming to

---

[1]On the same day it filed its complaint, Plaintiff filed a motion seeking a preliminary injunction. The United States submitted a response in opposition on March 3, 2008, and Plaintiff filed a reply on March 10, 2008.

occur on the land. This is entirely incorrect. ILCA was designed exclusively to benefit Indians and Indian tribes by helping eliminate pernicious fractionated interests and consolidate land for tribal governance. In keeping with these goals, the transfer was a simple change in beneficial owner that had no bearing on any issues related to gaming. The transfer of the land into trust for the Tribe was neither sufficient nor necessary for gaming to lawfully occur there. It was not sufficient because there is an entire statutory scheme – IGRA – that regulates the circumstances under which an Indian tribe may engage in gaming. There are many restrictions on Indian gaming that have nothing to do with ownership of the land. Moreover, pursuant to IGRA, both allotments and land held in trust for tribes constitute "Indian lands" on which Indian gaming may occur. As a result, the status of the Meh-No-Bah Allotment as Indian lands was unchanged by the ILCA transfer Plaintiff challenges, and so the Allotment's potential as a site for lawful gaming by the Quapaw Tribe was also unchanged by the transfer. Even if the transfer had been a necessary precondition for lawful gaming to occur, moreover, nothing about the transfer itself authorized, permitted, or otherwise caused gaming to occur on the Allotment. Because Plaintiff's only claimed injuries relate to the prospective operation of a casino on the transferred parcel, Plaintiff has alleged no injury resulting from or attributable to the transfer of beneficial interest itself – the only federal action Plaintiff challenges. Without such an injury, Plaintiff lacks standing to challenge the ILCA transfer.

Further, the Complaint should be dismissed because even if Plaintiff had standing to challenge the transfer of beneficial interest in the Meh-No-Bah Allotment, it cannot prevail on any of its claims. First, Plaintiff seeks to invalidate a land acquisition that placed title in the United States in trust for the Quapaw Tribe. This action is barred by the Quiet Title Act

3

("QTA"), 28 U.S.C. § 2409a, which leaves intact federal sovereign immunity from suits seeking to divest the United States of title to Indian lands.  Second, Plaintiff's claim that the United States did not properly comply with NEPA cannot prevail because agency actions that clearly maintain the regulatory status quo, such as the ILCA transfer here, do not require the agency to prepare NEPA documents or to formally determine whether a categorical exclusion is applicable. In any event, Plaintiff's NEPA challenge is moot because the casino is virtually complete.  Third, Plaintiff's contention that the Secretary failed to abide by a certain internal guidance document is misplaced because that document is both non-binding and inapplicable to the ILCA transfer of beneficial interest in the Meh-No-Bah Allotment.  Fourth, Plaintiff's claims of an IGRA violation are unripe because IGRA regulates gaming and no gaming has taken place on the property.  Fifth, Plaintiff wrongly suggests that the Secretary violated the law by not applying the implementing regulations of another, separate land acquisition statute to the transfer that was done pursuant to ILCA.  This claim, like the others, is without merit.  Finally, the injunctive relief Plaintiff seeks is unavailable.  The Defendants are not in control of the construction activity Plaintiff seeks to halt; no gaming is yet taking place on the property; and even if gaming were taking place and were unlawful, the exclusive authority to bring an enforcement action against the Tribe would lie in the discretion of the National Indian Gaming Commission ("NIGC").[2]

For these reasons and the other reasons set forth below, Plaintiff's Complaint should be

---

[2]As indicated above, Plaintiff also seeks to enjoin the United States from "proceeding with any pending land conveyances relating to the Quapaw casino development."  Compl. at 13.  The Quapaw Tribe currently has a pending request to have land transferred to it under § 2204 of ILCA.  The Secretary of the Interior has agreed to take no action on this request during the pendency of the present litigation. Ex. 3 to U.S.'s Opp. to Mot. for Prelim. Inj., Decl. of Majel Russell.

4

dismissed.

## II.  FACTUAL AND STATUTORY BACKGROUND

**A.      The Meh-No-Bah Allotment**

Plaintiff's Complaint centers around the construction and development of a casino/hotel complex by the Quapaw Tribe in the northeastern corner of Oklahoma, where the State borders Kansas and Missouri.  Compl. at 3.  The project consists of the construction of the casino/hotel complex, infrastructure, and amenities on 85 acres of land in Oklahoma; surface vehicle parking and a driveway on approximately 63 acres in Kansas; and an extension of the driveway on approximately 30 acres in Missouri.[3/]  Ex. 1(C) to Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., ¶ 2.  The development is largely complete, and the Tribe has announced plans to open the casino for business on July 4, 2008.  See Compl. at 3.  Plaintiff is planning its own privately managed casino nearby.  Id. at 10.

The land on which the gaming establishment will be located is, in its entirety, a parcel of land in Oklahoma known as the Meh-No-Bah Allotment.  Ex. 1(C) to Pl.'s Prelim. Inj. Mem., ¶ 3.  The parcel is named for its original allottee, Meh-No-Bah Rabbit, a member of the Quapaw Tribe who was allotted the land in 1895.  Id. Ex. 2(C) at 4.  After Meh-No-Bah's death in 1905, the Allotment passed in fractionated trust or restricted interests to her heirs through several generations.  Id. at 5-6.[4/]  At the beginning of April 2007, the entire Meh-No-Bah Allotment was

---

[3/]All 63 acres in Kansas, where Plaintiff is located, are owned by the Tribe in fee simple.  As such, that parcel is subject to the State of Kansas's jurisdiction.

[4/]Notably, the Meh-No-Bah Allotment and other parcels of land were allotted to members of the Quapaw Tribe pursuant to an Act of the Quapaw National Council approved on March 23, 1893, and ratified and confirmed by Congress with the Act of March 2, 1895, 28 Stat. 876, 907.  "'Indian country'. . . means . . . (c) all Indian allotments, the Indian titles to which have not been

held by the United States in trust for four individual Indians and one Indian estate in varying

shares.  In five separate transactions over the next three months, the United States transferred

five-sixths of the Allotment from its individual Indian landowners in trust to the Quapaw Tribe;

the remaining one-sixth of the land was transferred to the Tribe in restricted fee status.[5/]  All five

transactions took place pursuant to ILCA.  See Deeds to Restricted Indian Land (attached as Exs.

1(A)-(E)).  The first two transactions each involved a one-quarter undivided beneficial interest in

the Allotment, for a total of a one-half undivided interest.  These interests were transferred from

their individual Indian owners into trust for the Tribe on April 27, 2007.  Exs. 1(A), (B).  Two

additional one-sixth beneficial interests were transferred from their individual Indian owners into

trust for the Tribe on May 18, 2007 and July 6, 2007, respectively.  Exs. 1(C), (D).  The final

transaction, on July 10, 2007, involved the transfer of the remaining one-sixth undivided

beneficial interest in the Allotment to the Tribe in restricted fee status.  Ex. 1(E).  Thus, after July

2007, the Meh-No-Bah Allotment was held by the United States in trust and restricted fee solely

for the Quapaw Tribe.

## B.    The Indian Land Consolidation Act

---

extinguished, including rights-of-way running through the same."  18 U.S.C. § 1151.  Although
Congress enacted Section 1151 as a guide to federal criminal jurisdiction, the Supreme Court has
applied this definition to questions of federal civil jurisdiction and tribal jurisdiction.  California
v. Cabazon Band of Mission Indians, 480 U.S. 202, 208 (1987); DeCoteau v. Dist. County Court
for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975).  Therefore, the Meh-No-Bah Allotment
has always been Indian land and Indian country.

[5/]The title of restricted fee land is held by the Indian tribe with specific federally-imposed
restrictions on its use and/or disposition.  As the Supreme Court has noted, "[t]he power of
Congress over 'trust' and 'restricted' lands is the same and in practice the terms have been used
interchangeably."  Okla. Tax Comm'n v. United States, 319 U.S. 598, 618 (1943) (citation
omitted).

ILCA was adopted in 1983 "in part to reduce fractionated ownership of allotted lands" resulting from the unsuccessful historic federal allotment policy.  Babbitt v. Youpee, 519 U.S. 234, 238 (1997).  From the 1870s until 1934, the United States followed a policy, reflected in the General Allotment Act, 24 Stat. 388, of dismantling Indian tribal governments, allotting parcels of tribal land to individual members, and conveying "surplus" tribal land to non-Indians.  The allotment policy ultimately resulted in a large-scale transfer of Indian lands out of Indian ownership, which undermined tribal communities and impoverished the tribes and their members.  See Hodel v. Irving, 481 U.S. 704, 707-08 (1987) (describing allotment policy as "disastrous for the Indians"); see also Felix Cohen, Handbook of Federal Indian Law § 1.04 (1982 ed.).  Allotment also created the problem of "undivided fractionated interests."  As the House Committee on Interior and Insular Affairs explained when recommending ILCA for passage,

> If an Indian possessed of an allotment failed to make a will (and most Indians did not make wills), all heirs would inherit a fraction of this allotment.  The allotment would then be owned in "undivided" interests because the heirs would own all of the allotment together instead of each person having a specific part of the allotment. . . . [C]ourts have interpreted the law as to allow partition only if all the heirs agree to it. . . . [S]ome allotments have been passed on from generation to generation with the number of owners rapidly multiplying – in some cases owners have only 1/1000th share of the original 160 acre tract.

H.R. Rep. No. 97-908, at 10 (1982).

ILCA was designed to solve these problems.  In particular, the law aimed "to allow Indian tribes: (1) to consolidate their tribal landholdings; (2) to eliminate certain undivided fractionated interests in Indian trust or restricted lands; and (3) to keep trust or restricted lands in Indian ownership by allowing tribes to adopt certain laws restricting inheritance of Indian lands to

Indians." <u>Id.</u> at 9.  The statute provides several means of accomplishing the twin goals of tribal land consolidation and elimination of fractionated interests.  It authorizes Indian tribes to adopt land consolidation plans and submit them for approval by the Secretary.  25 U.S.C. § 2203. ILCA also describes specific methods tribes can use to acquire and consolidate land holdings. For example, if an Indian tribe owns more than 50 percent of a tract of trust or restricted land within the tribe's reservation, or has the consent of the owners of more than 50 percent of such land, the tribe may purchase the remainder of the tract for its fair market value.  <u>Id.</u> § 2204.  An amendment to the statute in 2000 created a pilot land consolidation program, giving the Secretary discretionary authority to acquire certain fractional interests in trust or restricted lands, at fair market value and with the consent of the owner, to be held in trust for the relevant tribe.  <u>Id.</u> § 2212(a).  In 2004, Congress appropriated nearly $22 million for Indian land consolidation, noting that the pilot program "has been successful in slowing the problem [of fractionated interests] on those few reservations where it has been implemented" but that "more needs to be done."  S. Rep. No. 108-89 (2003).  Of that $22 million appropriation, $1 million was earmarked for land consolidation efforts by the Quapaw Tribe.  H.R. Rep. No. 108-330 (2003).

Consistent with these statutory goals, and using funds from the $1 million earmark, the land at issue in this case, the Meh-No-Bah Allotment, was transferred to the Quapaw Tribe.  The transfer took place in pieces under different sections of ILCA.  Four of the five individual Indian owners of the allotment consented to the transfer of their shares of beneficial interest to the Tribe in exchange for a payment of assessed fair market value.  Exs. 1(A)-(D).  Their shares of the beneficial interest were transferred to the Tribe under 25 U.S.C. § 2212.  <u>Id.</u>  The fifth owner was deceased and thus unable to consent to the transfer of his share, so the Tribe purchased the share

8

from the owner's estate for its fair market value under 25 U.S.C. § 2204.  Ex. 1(E).

## C.    The Indian Gaming Regulatory Act

IGRA was enacted in 1988, designed "in large part to 'provide a statutory basis for the

operation of gaming by Indian tribes as a means of promoting tribal economic development,

self-sufficiency, and strong tribal governments.'"  Citizens Exposing Truth About Casinos v.

Kempthorne, 492 F.3d 460, 462 (D.C. Cir. 2007) ("CETAC") (quoting Taxpayers of Mich.

Against Casinos v. Norton, 433 F.3d 852, 865 (D.C. Cir. 2006) ("TOMAC"); 25 U.S.C. §

2702(1)).  IGRA recognizes that "Indian tribes have the exclusive right to regulate gaming

activity on Indian lands" as long as the gaming complies with federal law and takes place in a

state where gaming is not prohibited.  25 U.S.C. § 2701(5).  The statute regulates various aspects

of Indian gaming, such as tribal gaming ordinances, see 25 U.S.C. § 2710, and management

contracts, see id. § 2711.  In addition, with certain important exceptions, IGRA generally

prohibits gaming activities on land acquired into trust by the United States after October 17,

1988.  Id. § 2719(a).

## D.    The National Environmental Policy Act

NEPA sets forth "a broad national commitment to protecting and promoting

environmental quality."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348

(1989).  However, NEPA is a procedural statute; it requires federal agencies to follow certain

procedures when making decisions, but "does not mandate particular consequences."  Citizens

Against Burlington, Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991).  NEPA requires

federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal

actions significantly affecting the quality of the human environment."  Duncan's Point Lot

9

Owners Ass'n v. Fed. Energy Reg. Comm., 522 F.3d 371, 376 (D.C. Cir. 2008) (citing 42 U.S.C.

§ 4332(C)).  NEPA applies only when an agency contemplates a major federal action and that

action would significantly affect the quality of the human environment.  See Found. on Econ.

Trends v. Lyng, 817 F.2d 882, 885 (D.C. Cir. 1987) (major federal action is "a *sine qua non* of

NEPA's applicability (in addition to the requirement of 'significantly affecting' the

environment)"). The Supreme Court has emphasized that federal agency determinations

regarding the scope of NEPA documents are entitled to deference.  See Kleppe v. Sierra Club,

427 U.S. 390, 412-14 (1976).  "[A]s long as the agency's decision is 'fully informed' and

'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute

its own policy judgment."  Natural Res. Def. Council v. Hodel, 865 F.2d 288, 294 (D.C. Cir.

1988) (quoting North Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980)).

### III.  APPLICABLE STANDARDS

**A.**     **Standard for Dismissal under Rules 12(b)(1) and 12(b)(6)**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may dismiss a

complaint for lack of subject matter jurisdiction.  If a plaintiff lacks standing to bring a claim,

that is a defect in the court's subject matter jurisdiction over the claim.  See Haase v. Sessions,

835 F.2d 902, 906 (D.C. Cir. 1987) (citing Bender v. Williamsport Area School Dist., 475 U.S.

534, 541 (1986)).  "Although the District Court may in appropriate cases dispose of a motion to

dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint

standing alone, where necessary, the court may consider the complaint supplemented by

undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts."  Coal. for Underground Expansion v. Mineta, 333 F.3d

10

193, 198 (D.C. Cir. 2003) (internal quotation marks omitted) (citation omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the Court to dismiss a complaint when it fails "to state a claim upon which relief can be granted." "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Generally, under this standard, the Court accepts the allegations within the complaint as true and resolves ambiguities in favor of the pleader. See Harbury v. Deutch, 244 F.3d 956, 958 (D.C. Cir. 2001); Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 234 (D.D.C. 2002). However, the Court "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." Guam Indus. Servs., Inc. v. Rumsfeld, 405 F. Supp. 2d 16, 19 (D.D.C. 2005) (citing Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004); Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)); see also Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## B.     Review of Agency Action Under the APA

Plaintiff's claims are brought via the Administrative Procedure Act ("APA"), which provides for judicial review of certain administrative actions. See 5 U.S.C. § 704. Section 706(2)(A) of the APA provides that a court may set aside agency action where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This standard encompasses a presumption in favor of the validity of agency action. Thus, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S.

11

402, 416 (1971); see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 753 (D.C.

Cir. 2007).  The reviewing court's task is to determine "whether the [agency's] decision was

based on a consideration of the relevant factors and whether there has been a clear error of

judgment."  Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S.

360, 378 (1989).  Review is based on an examination of the administrative record.  5 U.S.C.

§ 706; Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (citing Overton

Park, 401 U.S. 402).

        The Secretary's interpretation of ILCA upon which the transfer of beneficial interest in

the Meh-No-Bah Allotment rested is entitled to the deference normally accorded agencies.  See

Am. Fin. Servs. Ass'n v. Fed. Trade Comm'n, 767 F.2d 957, 985 (D.C. Cir. 1985) (APA

"standard of review is a highly deferential one, which presumes the agency's actions to be valid"

and "requires affirmance if a rational basis exists for the agency's decision") (citations omitted).

The courts will grant an agency's interpretation of its own regulations considerable legal leeway.

See Auer v. Robbins, 519 U.S. 452, 461 (1997) (Secretary's interpretation of own regulations is

controlling unless "plainly erroneous or inconsistent with the regulation.").

## IV.  ARGUMENT

        Plaintiff cannot prevail on any of its claims.  First, Plaintiff lacks standing to challenge

the Secretary's transfer of the Meh-No-Bah Allotment under ILCA because Plaintiff has suffered

no injury as a result of that transaction.  None of Plaintiff's alleged injuries can be fairly traced to

the ILCA transfer.  Plaintiff appears to be under the impression that the ILCA transfer somehow

authorized or allowed the construction of the Tribe's casino, but in fact the transfer simply

consisted of changing names on a deed.  The transfer of the land from trust status for individual

Indians to trust status for the Tribe did not change the land's eligibility for gaming, and had no effect whatsoever on Plaintiff, let alone caused Plaintiff any injury. Likewise, the remedy Plaintiff ultimately seeks, a re-do of the ILCA transfer accompanied by NEPA review, would not redress Plaintiff's injuries: those injuries all relate to the prospective operation of a casino, and the ILCA transfer – whether accompanied by NEPA documents or not – has no bearing on whether a casino may lawfully be operated on the site. Without an injury fairly traceable to the challenged federal conduct, and redressable by the relief sought, Plaintiff lacks constitutional standing to sue. The Complaint, as a result, should be dismissed for lack of standing.

Second, under the Quiet Title Act, this Court has no jurisdiction to hear Plaintiff's challenge to the ILCA transfer, because the United States retains sovereign immunity in cases seeking to disrupt federal title to trust or restricted Indian lands. Third, even if Plaintiff had standing, its claim under NEPA fails because no NEPA documentation is required for actions that do nothing but preserve the regulatory status quo, such as the land transfer here, and in any event the NEPA claim is moot because the casino construction is virtually complete. Fourth, Plaintiff's contention that the Secretary violated an internal guidance document when transferring the land is incorrect because the document was both non-binding and inapplicable to the Meh-No-Bah transfer. Likewise, Plaintiff wrongly alleges that the Secretary was required to abide by the regulations found in 25 C.F.R. Part 151, because those regulations apply to the initial acquisition of land in trust by the United States under a separate statute and have no application to ILCA transfers of beneficial interests in trust land. Plaintiff's claims under IGRA fail because no gaming has occurred on the property and no decision has been made to authorize gaming, and therefore there is no federal action for Plaintiff to challenge. Finally, Plaintiff's request for

13

injunctive relief is misdirected; the relief it seeks is unavailable.  Accordingly, Plaintiff's

Complaint should be dismissed.

**A.    Plaintiff lacks standing to challenge the ILCA transfer.**

The only federal action Plaintiff targets in its Complaint is the transfer of the beneficial

interests in the Meh-No-Bah Allotment, under ILCA, from trust status for individual Indians into

trust status for the Quapaw Tribe.  Plaintiff asks this Court to invalidate that conveyance as well

as to require the United States to re-conduct the transfer while preparing an EA and/or an EIS.

Compl. at 13.  However, Plaintiff quite simply lacks standing to challenge the ILCA transfer of

the Meh-No-Bah Allotment.  The only effect of the transfer was to change the beneficiary of the

trust land from four individual Indians and one Indian estate to the Quapaw Tribe.  Plaintiff

suffered no injury as a result of this land transfer – in fact, the transaction had no effect on

Plaintiff whatsoever.

"The 'irreducible constitutional minimum of standing contains three elements': (1) the

plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected,

concrete and particularized interest; (2) there must be a causal connection between the alleged

injury and the defendant's conduct at issue; and (3) it must be 'likely,' not 'speculative,' that the

court can redress the injury."  Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C.

Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  It is a

plaintiff's burden to establish standing to sue.  See KERM, Inc. v. FCC, 353 F.3d 57, 59 (D.C.

Cir. 2004).  In this case, even assuming that Plaintiff's feared future injuries qualify as

"imminent," the second and third required elements of standing are absent because Plaintiff's

injuries bear no causal connection to the challenged federal action, and because the relief

14

Plaintiff seeks would not redress its injuries.

   **1. Plaintiff's alleged injuries bear no causal connection to the federal conduct Plaintiff challenges.**

   "No more fundamental component of standing doctrine exists than the requirement of a presently demonstrable injury in fact directly traceable to the defendant's supposedly unlawful actions." Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 54 (D.C. Cir. 1991). Here, all of the injuries Plaintiff alleges in its Complaint either stem from the Tribe's current construction activities or are anticipated by Plaintiff as a future result of the Tribe's prospective operation of its casino. See, e.g., Compl. at 8 (alleging Plaintiff "will bear the cost of repairing its roads that have already been damaged by Quapaw construction equipment" and "the cost imposed by the dramatic increase in vehicle traffic caused by the Quapaw's 24-hour a day, 365-day a year casino resort"). These injuries have no causal link to the ILCA transfer of beneficial interests, which is the only federal action Plaintiff challenges. Plaintiff appears to believe that the Secretary's act of approving the ILCA transfer somehow authorized the Tribe to build a casino and conduct gaming on the parcel. This is just not true. Facially, the ILCA transfer was done for the Congressionally-approved purposes of tribal land consolidation, not gaming. But there are no hidden gaming-related consequences of the transaction. The transfer of the Meh-No-Bah Allotment into trust for the Tribe was neither sufficient nor necessary for Indian gaming to lawfully occur there. Whether and under what circumstances an Indian tribe may engage in gaming activities is determined by IGRA. There are many restrictions on Indian gaming that have nothing to do with ownership of the land, so the mere fact that the Quapaw Tribe is now the trust beneficiary of the Meh-No-Bah Allotment does not mean that gaming is suddenly allowed

on the land.  In addition, when lawful gaming *is* permitted, it is permitted on "Indian lands," a

term which includes individual as well as tribal trust or restricted land.  See 25 U.S.C. § 2703(4).

The Meh-No-Bah Allotment was "Indian lands" both before and after the transfer at issue here.

In short, the ILCA transfer did not allow or authorize the Tribe to construct a casino or to engage

in gaming on the land.  Because none of Plaintiff's alleged injuries actually result from the

federal action Plaintiff seeks to set aside, it has no standing to challenge the ILCA transfer.[6]

### a. Plaintiff has alleged only gaming-related injuries.

In its Complaint, Plaintiff alleges the following injuries: (1) the cost of repairing roads

damaged by the Quapaw Tribe's construction equipment; (2) the cost that will be imposed by

increased vehicle traffic caused by operation of a 24-hours-a-day, 365-days-a-year casino; (3)

"the public safety burden caused by Quapaw casino customers' vehicular accidents, and of any

crime or disorderly behavior that spill into the parking lot or further into the county," (4) funding

of five new law enforcement personnel "to patrol the vicinity of the casino parking area and

respond to service calls in the area"; and (5) the cost of "a new public safety facility in the

vicinity of the Quapaw casino to provide timely and adequate fire and ambulance services."

---

[6]This causation analysis does not change even if Plaintiff frames its injuries as resulting from the United States's failure to comply with NEPA when effecting the transfer of the Meh-No-Bah Allotment.  "Where plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax – while not wholly eliminating – the issues of imminence and redressability, but not the issues of injury in fact or causation."  Ctr. for Law & Educ., 396 F.3d at 1157 (emphasis omitted). Causation is lacking here from every angle.  Whether or not the United States properly complied with NEPA's procedural requirements when transferring the Allotment, the fact remains that the Plaintiff's injuries stem from the Tribe's prospective *gaming activity* on the land, and the ILCA transfer did not authorize, allow, enable, or otherwise cause that gaming activity.

Compl. at 8.[7]  All of these injuries plainly relate either to the Tribe's current lawful construction

activity on its land or to the Tribe's anticipated future operation of a casino on that land.  As

shown below, however, none of the injuries bears a causal relationship to the federal action

Plaintiff challenges in this case.  The ILCA transfer is neither a direct cause nor even a but-for

cause of Plaintiff's alleged injuries.

> **b.  The ILCA transfer of the Meh-No-Bah Allotment into trust for the Quapaw Tribe did not authorize gaming on the land.**

The legal and practical effect of the ILCA transfer was simply to change the trust

beneficiaries of the Meh-No-Bah Allotment from several individual Indians to the Quapaw Tribe.

In other words, the fractional interests owned by the individual Indians were consolidated in the

Tribe.  The United States was trustee of the land before the transfer, and it remained trustee after

the transfer.  ILCA is "primarily directed to exchanges of Indian tribal lands for individual Indian

trust lands (e.g., allotments) in an effort to consolidate tribal land holdings."  Ute Indian Tribe v.

Utah, 935 F. Supp. 1473, 1504 (D. Utah 1996).  Congress favored consolidation so that tribes

could eliminate checkerboard patterns of ownership, which in turn would "reduce instances of

fractionated heirship in trust lands and provide land for tribal programs designed to improve the

economy of the tribe and its members."  Id. (quoting H. Rep. No. 97-908, at 5).  The actual land

transfers themselves, however, do not authorize any programs or projects, especially not gaming,

which is subject to its entire own statutory scheme.  Plaintiff's alleged injuries, which all pertain

to gaming on the Allotment, have no causal connection to the ILCA transfer.

---

[7]Plaintiff also describes its suspicions that the Quapaw Tribe has violated the Clean Water Act, which are patently irrelevant to the present lawsuit, where the Tribe is not even a party.  Compl. at 9.  Plaintiff then devotes three paragraphs to describing its own plans to build a casino in Cherokee County, "just across its border" from the Quapaw construction site.  Id. at 9-10.

The circumstances under which an Indian tribe may engage in gaming activity are specified by IGRA. There are many restrictions on Indian gaming that have nothing to do with ownership of the land, so the mere fact that the Quapaw Tribe is now the trust beneficiary of the Meh-No-Bah Allotment does not mean that gaming is suddenly allowed on the land. For example, "IGRA requires tribes that engage or intend to engage in 'class III gaming' . . . to negotiate, enter into, and comply with a compact between the tribe and the state in which the gaming will occur." San Manuel Indian Bingo & Casino v. Nat'l Labor Relations Bd., 475 F.3d 1306, 1317 (D.C. Cir. 2007) (citing 25 U.S.C. § 2710(d)(1)(C), (3)(A)).[8] In addition, Class III Indian gaming can be lawful "only if authorized by a tribal ordinance or resolution approved by the Chairman of the National Indian Gaming Commission." Id. at 1318 (citing 25 U.S.C. § 2710(d)(1)(A)). To suggest, as Plaintiff does, that the mere transfer of the Allotment from one trust status to another authorized or caused the Quapaw Tribe's gaming to go forward is to ignore the entire statutory scheme that was designed to regulate gaming.

Plaintiff's misapprehension of the cause and effect at work in this case is embodied in its statement, "As a result of defendants' failure to comply with the law, the Quapaw casino resort has been under construction for many months." Compl. at 11. This statement displays Plaintiff's failure to understand ILCA, IGRA, and the relationship between the United States and the Tribe.

---

[8] IGRA divides gaming activities into three classes. Class I gaming includes social games for minimal prizes and traditional forms of gaming in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive jurisdiction of the tribe and not regulated under IGRA. Id. § 2710(a). Class II gaming includes games of chance commonly known as bingo, including pull-tabs, lotto, punch boards, tip jars, and instant bingo, and card games which are not banked. Id. § 2703(7). Class III gaming is all forms of gaming that are not Class I or II, including banked card games (such as blackjack) and slot machines. Id. § 2703(8). Class II and Class III gaming are subject to IGRA.

So far, the only role played by the United States has been that of facilitating the transfer of the beneficial interest in the Meh-No-Bah Allotment from individuals to the Tribe. The United States did not endorse, authorize, allow, or cause any construction for the proposed casino. The Tribe has engaged in construction activities on its own – activities which, to date, involve no violation of law of which the United States is aware. Nor did the ILCA transfer make potential gaming lawful where it was not lawful before. The United States has taken no action to allow or authorize gaming by the Tribe on the Allotment. Certainly the ILCA transfer did not have that effect. Accordingly, Plaintiff's injuries, which are all related to prospective gaming by the Tribe, simply were not caused by the federal action Plaintiff seeks to overturn – the ILCA transfer.[9]

### c. The ILCA transfer had no effect on the lawfulness of gaming on the Meh-No-Bah Allotment because the land was "Indian lands" both before and after the transfer.

Finally, the ILCA transfer did not cause Plaintiff's gaming-related injuries because the Allotment's eligibility for use as lawful gaming land was identical both before and after the transfer occurred. When lawful gaming is permitted, it is permitted on "Indian lands," a term which includes individual as well as tribal trust or restricted land. 25 U.S.C. § 2703(4). Under IGRA's statutory definition, the Meh-No-Bah Allotment was "Indian lands" both before the transfer, when the trust beneficiaries were individual Indians, and after the transfer, when the trust beneficiary became the Tribe. Accordingly, the Allotment's eligibility for gaming remained the same after the ILCA transfer as it was before the transfer. Plaintiff's claimed injuries, which

---

[9]The only injury Plaintiff alleges to have already occurred is damage to its roads by the Tribe's construction equipment. Compl. at 8. It is hard to imagine how the transfer of beneficial interest under ILCA from individual Indians to the Tribe, which spoke not at all to whether the Tribe could operate heavy equipment, could be deemed the cause of damage to Plaintiff's roads.

will stem from future gaming on the parcel, thus will not have been caused by the ILCA transfer.

Without an injury caused by that land transfer – the only federal action at issue – Plaintiff lacks

constitutional standing to seek to invalidate the transfer.

IGRA "provide[s] a statutory basis for the operation of gaming by Indian tribes as a

means of promoting tribal economic development, self-sufficiency, and strong tribal

governments.'" TOMAC, 433 F.3d at 865 (quoting 25 U.S.C. § 2702(1)). As noted above, the

statute places many restrictions on Indian gaming. One of these restrictions is that "[a] tribe may

conduct gaming only on 'Indian lands' within its jurisdiction." CETAC, 492 F.3d at 462 (citing

25 U.S.C. § 2710(b)(1), (d)(1)(A)(I)). IGRA includes a definition of "Indian lands":

> (A) all lands within the limits of any Indian reservation; and

> (B) any lands title to which is either held in trust by the United States for the
> benefit of any Indian tribe or individual or held by any Indian tribe or individual
> subject to restriction by the United States against alienation and over which an
> Indian tribe exercises governmental power.

Id. (citing 25 U.S.C. § 2703(4)).

The definition includes trust or restricted land held by or for "*any Indian tribe or*

*individual*." 25 U.S.C. § 2703(4)(B) (emphasis added). Thus, the Meh-No-Bah Allotment was

eligible for gaming before and after the ILCA transfer.[10] The Tribe must, of course, comply with

the other restrictions and procedures laid out in IGRA in order to game lawfully, but the simple

change in trust beneficiary from the individual Indians to the Tribe did not affect the Allotment's

---

[10]The Meh-No-Bah Allotment consists of "lands located within the Quapaw Tribe of
Oklahoma's jurisdictional boundary." Exs. 1(A)-(E). See also Ex. 1(B) to Pl.'s Prelim. Inj.
Mem., Bureau of Indian Affairs Letter to NIGC (confirming that the Meh-No-Bah Allotment lies
within the former historic territory of the Tribe and is tantamount to "former reservation lands"
under IGRA); id. Ex. 2(C) at 9-11, Ward Letter to NIGC (describing Tribe's exercise of
jurisdictional and governmental powers over the Allotment).

status as "Indian lands" and, therefore, had no effect one way or the other on the land's eligibility to host gaming. Accordingly, Plaintiff's alleged gaming-related injuries cannot be causally linked to the ILCA transfer.

**2.  The relief Plaintiff seeks would not redress its alleged injuries.**

For the same reasons that causation is absent in this case, the third requirement for constitutional standing, redressability, is also lacking. If this Court were to grant the relief Plaintiff requests and invalidate the Secretary's transfer of the beneficial interests in the Allotment, that judgment would not necessarily affect the Tribe's construction activity or the lawfulness or unlawfulness of any future gaming that takes place on the Allotment, and thus would have no effect on Plaintiff's injuries. Nor would the NEPA review Plaintiff seeks resolve its injuries. Plaintiff wants the United States to redo the ILCA transfer but this time prepare an EA and/or an EIS. Even were the United States to do this, it would not necessarily preclude the Tribe from lawful operation of a casino. Because all of Plaintiff's alleged injuries could occur if the beneficial interest in the Allotment remained with the individual allottees, these injuries cannot be redressed by the relief requested. Plaintiff therefore lacks standing not only because it has no injury that was caused by the United States but also because redressability is absent. See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 936-37 (D.C. Cir. 2004) (lack of redressability alone defeats plaintiffs' standing to sue).

For these reasons, Plaintiff lacks standing to challenge the ILCA transfer of the Meh-No-Bah Allotment.[11]

---

[11]Even if Plaintiff were somehow able to allege an injury directly traceable to the ILCA transfer, it can hardly be said that Plaintiff is "within the zone of interests" ILCA was designed to protect, a requirement for prudential standing. See Role Models Am., Inc. v. Geren, 514 F.3d 1308,

**B.**    **Plaintiff's claim that the land transfers are invalid is barred by the Quiet Title Act.**

In addition, Plaintiff's challenge to the Secretary's decision to transfer the Meh-No-Bah

Allotment is barred by sovereign immunity.  Plaintiff challenges the land transfer directly, asking

this Court to declare the conveyances of the beneficial interests in the Meh-No-Bah Allotment

invalid, as well as indirectly, by claiming that the Secretary violated NEPA in the transfer

process.  Compl. at 13.   By both of these routes, Plaintiff seeks to nullify the Secretary's

decision to transfer the beneficial interest in the allotment to the Tribe.  However, the QTA

prohibits suits challenging the United States's title in trust or restricted fee Indian lands.  See

Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d 956, 961-62 (10th Cir. 2004) (citing

United States v. Mottaz, 476 U.S. 834, 843 (1986)).  The QTA waives the United States's

sovereign immunity for suits to adjudicate disputed title to lands, but explicitly states that the

waiver does not apply to trust or restricted Indian lands.  28 U.S.C. § 2409a(a).  For a suit to be

prohibited under the QTA, a plaintiff need not explicitly characterize its action as one seeking to

---

1311-12 (D.C. Cir. 2008).  ILCA was designed to help Indians and Indian tribes.  Counties and
other municipal organizations have no interest in whether the United States shifts beneficial
interests in Indian land from one trust beneficiary to another, and ILCA does not contain a
provision for community protection.  Nor can Plaintiff rely on NEPA's zone of interests to assert
prudential standing here.  Because NEPA does not impose any substantive requirements on an
agency, but simply prescribes procedures whereby agencies can make informed decisions, "the
zone-of-interests of the EIS requirement can be examined only in conjunction with the relevant
substantive provision" – in this case, ILCA.  Grand Council of the Crees v. Fed. Energy Reg.
Comm., 198 F.3d 950, 959 (D.C. Cir. 2000).  Where the substantive law at issue does not require
consideration of environmental concerns, NEPA cannot serve to further a plaintiff's
environmental interests relating to a federal action taken under that substantive law.  See id.
(holding that petitioner lacked prudential standing to bring NEPA challenge to federal
ratemaking decision under Federal Power Act ("FPA") because FPA does not require
consideration of environmental concerns).  Here, even assuming Plaintiff's injuries qualify as
environmental, ILCA does not require the Secretary to consider environmental concerns or
community impacts, and so Plaintiff's injuries do not fall within "NEPA's zone-of-interests as
applied to" ILCA.  Id.

quiet title in Indian lands. As long as the relief sought would interfere with the United States's title to the land, the Indian lands exception to the QTA bars the suit. See Neighbors, 379 F.3d at 961-62 (action seeking declaratory judgment that trust acquisition of Indian lands was null and void barred by the QTA); Metro. Water Dist. of S. Cal. v. United States, 830 F.2d 139, 143 (9th Cir. 1987) (action barred by QTA where plaintiff sought "a determination of the boundaries of the Reservation [and the] effect of a successful challenge would be to quiet title in others than the Tribe").

The QTA's jurisdictional bar applies in this case even though, prior to the Secretary's transfer of the Meh-No-Bah Allotment to the Tribe, the land was held by the United States in trust or restricted status for individual Indians. The standard for determining whether there is a waiver of sovereign immunity in an Indian lands challenge is not whether the result of the suit, if successful, would divest the United States of all title whatsoever. Instead, the United States has not waived its sovereign immunity for *any* third-party challenges regarding title to Indian land. "[W]hen the United States claims an interest in real property based upon that property's status as trust or restricted Indian lands, the Government is immune from suit under the QTA." Metro. Water Dist., 830 F.2d at 143 (citing Mottaz, 476 U.S. at 834). By expressly retaining federal sovereign immunity in suits challenging title to reserved or trust Indian land, "Congress sought to prohibit third parties from interfering with the responsibility of the United States to hold lands in trust for Indian tribes." Florida v. U.S. Dep't of Interior, 768 F.2d 1248, 1254 (11th Cir. 1985). For that reason, here the QTA forbids a non-Indian third-party plaintiff from interfering with the United States's trust responsibilities and decisions regarding Indian lands. Accordingly, sovereign immunity bars Plaintiff's attempt to invalidate the Secretary's transfer of the Meh-No-

23

Bah Allotment into trust for the Quapaw Tribe.

**C.    The ILCA transfer of the Meh-No-Bah Allotment did not require NEPA documentation.**

Even if Plaintiff had standing to challenge any aspect of the ILCA transfer, its contention

that the Secretary violated the law by not preparing an EA or EIS in conjunction with the transfer

is incorrect.  Under NEPA, the Secretary need not prepare an EA or EIS for the transfer under

ILCA of the Meh-No-Bah Allotment because the only effect of the transfer was a change in the

holder of the beneficial interest in the land.  "Discretionary agency action that does not alter the

status quo does not require an EIS."  Nat'l Wildife Fed'n v. Espy, 45 F.3d 1337, 1344 (9th Cir.

1995) (citing Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 235 (9th

Cir. 1990)).  In Espy, the court held that an EIS was not required where the plaintiff alleged no

additional injury or change that would result from the agency action.  Id. at 1343-44.  Likewise,

here, Plaintiff's claimed injuries – harms from the prospective future operation of the casino –

bear no relation to the agency action Plaintiff challenges – the ILCA transfer of the land from

individual to tribal trust status.

"[D]etermining whether an action perpetuates the 'regulatory status quo' is the proper

measure of whether NEPA analysis should apply."  Humane Soc'y v. Johanns, 520 F. Supp. 2d 8,

31 (D.D.C. 2007).  Where, as here, the agency action maintained the existing federal trusteeship

of the land and did not trigger or create any change in the regulatory scheme, the action merely

preserved the status quo and did not require an EA or EIS.  See Fund for Animals, Inc. v.

Thomas, 127 F.3d 80, 83-84 (D.C. Cir. 1997) (holding that Forest Service's issuance of policy

that merely confirmed the existing policy of leaving bear baiting regulation to states was not

major federal action and did not require an EIS).  Compare Anacostia Watershed Soc'y v.

Babbitt, 871 F. Supp. 475, 481-82 (D.D.C. 1994) (National Park Service's decision to transfer

jurisdiction over portions of national park to District of Columbia for construction of a children's

theme park was not "mere paper transaction that did not change the status quo" where transfer

"facilitated and authorized potentially intrusive development"; Park Service accordingly erred by

not preparing NEPA documents).

  Plaintiff's entire Complaint rests on the premise that the ILCA transfer of the Meh-No-

Bah Allotment allowed for a change in land use, see Compl. at 7, but that premise is false.  As

described above, the transfer had no regulatory consequences; it merely effected a change in

beneficiary from the individual allottees to the Tribe.  "[W]here [ILCA] land exchanges take

place within the existing boundaries of a reservation, the transition of a particular parcel into or

out of tribal ownership or trust status has no impact on the existing jurisdictional limits."  Ute

Indian Tribe, 935 F. Supp. at 1505.  In contrast to the situation in Anacostia Watershed Society,

here the transfer did not facilitate, allow, or authorize gaming to occur on the property.  Congress

designed ILCA to achieve a specific, narrow goal: facilitating the expeditious consolidation of

fractionated interests into tribal trust status.  ILCA transfers were not intended to have any

consequences or effects other than to eliminate disastrous fractionated interests and consolidate

ownership in tribal governments.  In short, with no regulatory or other consequences resulting,

the ILCA transfer of the Meh-No-Bah Allotment was not a "major federal action significantly

affecting the quality of the human environment."  42 U.S.C. § 4332(c).

  Deciding what level of NEPA review is required is the responsibility of the agency taking

the action.  "An initial agency determination on this matter is judicially vulnerable only when the

agency has abused its discretion or has acted arbitrarily." Comm. for Auto Responsibility v.
Solomon, 603 F.2d 992, 1002 (D.C. Cir. 1979). Here, the agency action was a simple transfer
under ILCA of the Meh-No-Bah Allotment from a holding in trust for individual Indians into a
holding in trust for the Tribe. In keeping with Congress's goal in enacting ILCA, the transfer's
purpose and effect were to consolidate land title to stem the pernicious repercussions of the
historical allotment policy. No change in regulatory status occurred as a result of the transfer; the
land's status as Indian country and its eligibility (or lack thereof) for gaming remained the same
before and after the transfer. It was therefore neither arbitrary and capricious nor an abuse of
discretion for the Secretary to approve the ILCA transfer without preparing a NEPA analysis.[12]

In any event, even if Plaintiff were correct that the ILCA transfer authorized the Tribe to
build a casino, Plaintiff's NEPA claim would be moot because the casino is virtually complete.
As Plaintiff itself notes, the casino complex is scheduled to open July 4, 2008. See Compl. at 3.
Courts have routinely found NEPA challenges moot where the project in question is complete or
nearly complete. See, e.g., Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs, 217 F.3d
393, 396 (5th Cir. 2000) (where plaintiff sought NEPA review for federal decision granting
construction permit for retail complex, claim was moot because the "construction authorized by
the permit has been substantially completed"); Neighbors Org. to Insure a Sound Env't, Inc. v.
McArtor, 878 F.2d 174, 178 (6th Cir. 1989) (in suit filed after construction, but before opening,
of new airport terminal, finding NEPA claim moot because terminal was finished); Fla. Wildlife
Fed'n v. Goldschmidt, 611 F.2d 547, 549 (5th Cir. 1980) (affirming denial on mootness grounds

---

[12]/Although it was within the Secretary's discretion to approve the transfers of beneficial interests
in the Meh-No-Bah Allotment without conducting a NEPA analysis, it would likewise be within
the Secretary's discretion to prepare appropriate NEPA documents for other ILCA transfers.

of motion for permanent injunction under NEPA of an almost-complete highway because the

challenged activities "have already substantially occurred").  Here too, this Court can provide

Plaintiff no meaningful relief by requiring NEPA review of a project that is essentially complete.

At this "point in the life" of the project, it "make[s] sense to hold NEPA inapplicable" because

"the agency would no longer have a meaningful opportunity to weigh the benefits of the project

versus the detrimental effects on the environment." Tenn. Valley Auth. v. Hill, 437 U.S. 153,

188 n.34 (1978) (emphasis omitted).

**D.    The Secretary was not required to refer the Meh-No-Bah transfer to the Office of Indian Gaming Management.**

Plaintiff also claims that the Secretary's approval of the ILCA transfer of beneficial

interest in the Meh-No-Bah Allotment violated the law because the Secretary did not refer the

transfer to the Office of Indian Gaming Management ("OIGM").  Compl. at 6-7, 13.  In

particular, Plaintiff alleges that the Secretary failed to abide by an internal Interior Department

guidance document dated March 2005 and entitled "Checklist for Gaming Acquisitions, Gaming-

Related Acquisitions, and IGRA Section 20 determinations" ("Checklist") that calls for "[a]ll

requests for the acquisition of land for gaming" to be sent to OIGM.  See Compl. Ex. 2(E) at 1.

Again, even if Plaintiff had standing to challenge the ILCA transaction, it has failed to state a

claim for relief here.  The ILCA transfer of the Meh-No-Bah Allotment was not made for

purposes of gaming, so the Checklist does not apply.  And, in any event, the Checklist constitutes

internal guidance that is not binding on the agency.

**1.  The Checklist is irrelevant to the ILCA transfer of the Meh-No-Bah Allotment.**

The Checklist is wholly irrelevant to the transactions at issue in this case because it lists

steps for processing the application packages of "requests for the acquisition of land for gaming." The transfer under ILCA of the Meh-No-Bah Allotment from individual to tribal trust status was plainly not "for gaming." Rather, it was done for the Congressionally-voiced purpose of eliminating pernicious fractionated interests in Indian trust land and consolidating those interests in tribal government.

Plaintiff contends that the United States "knew or should have known that the Meh-No-Bah transactions were undertaken in order to build a casino development." Compl. at 11. However, as explained above, the transfer of the Allotment had no effect on whether the Quapaw Tribe could lawfully build a casino or engage in gaming on the land. Thus, the land was not acquired or transferred "for" gaming. Rather, the land was transferred for land consolidation purposes. As the Senate Appropriations Committee stated when allocating money for tribal land consolidation efforts, "consolidating these fractionated interests is one of the most effective means of ameliorating a problem that grows worse every year." S. Rep. No. 108-89 (2003). The Committee specifically identified the Quapaw as an example of "where tribal leadership has taken an active role" in slowing fractionation, and the final appropriations bill contained $1 million for use in the Quapaw's own land consolidation efforts. H.R. Rep. No. 108-330 (2003). Given this clear Congressional endorsement of land consolidation by the Tribe, along with the purposes of ILCA and the fact that the transfer of title to the Tribe did not authorize or allow gaming, it was not arbitrary and capricious or an abuse of discretion for the Secretary to determine that the ILCA transfer of the Meh-No-Bah Allotment was not "for gaming" and thus did not need to be referred to OIGM.

**2. The Checklist is not binding on the Secretary.**

Plaintiff incorrectly characterizes the Checklist as "official DOI policy." Compl. at 6. In fact, the Checklist is not a policy statement, but rather a purely internal agency document intended "to assist [Bureau of Indian Affairs Regional Directors] in preparing a complete land acquisition package for review and final action." Compl. Ex. 2(E) at 1. Even if it could be characterized as a policy statement, the Checklist does not constitute a rule or regulation, and hence cannot be said to be binding upon the Department. Policy statements are designed merely to inform, not to serve as mandatory rules. Because the Checklist does not qualify as a rule under any of the standards used by the D.C. Circuit to distinguish between rules and policy statements, it should not be construed as having any binding effect upon the Department.

"[I]n cases where we have attempted to draw the line between legislative rules and statements of policy, we have considered whether the agency action (1) 'impose[s] any rights and obligations' or (2) 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" Gen. Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987)). The Court has also considered "(1) the Agency's own characterization of its action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." Id. (quoting Molycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999)). Finally, the D.C. Circuit has characterized the essence of those tests as a determination of whether the document in question binds private parties or the agency itself with the force of law. Id. (finding the guidance document to have the force of law). The Checklist does not qualify as a rule under any of these standards. It is merely an informal internal document provided to assist BIA Regional Directors in preparing gaming and gaming-related

29

acquisition packages for review by OIGM.  It imposes no rights or obligations on any party, has no binding effects, and has not been published in the Federal Register or the Code of Federal Regulations.  Nor does it restrict in any way the Secretary's discretion.  Cf. Mich. Gambling Opposition v. Norton, 477 F. Supp. 2d 1, 10 n.14 (D.D.C. 2007) (noting that where Department regulations do not require preparation of an EIS, the Checklist cannot bind the agency to produce one).  Accordingly, the Checklist cannot be deemed binding upon the Department.

**E.    The United States has not violated IGRA.**

Plaintiff also contends generally that the United States has violated IGRA, stating that "conveyances of land to tribes for gaming purposes are also subject to the Indian Gaming Regulatory Act."  Compl. at 6.  However, Plaintiff misunderstands the purpose and role of that statute.  IGRA has nothing to do with land conveyances.  Rather, IGRA prescribes rules governing the operation of gaming by Indian tribes.  See CETAC, 492 F.3d at 462; City of Roseville v. Norton, 348 F.3d 1020, 1024 (D.C. Cir. 2003).  Together with 18 U.S.C. § 1166, IGRA creates a scheme of civil and criminal regulation that may be used to prevent and punish Indian gaming that does not conform to IGRA's prescriptions.  See United States v. Santa Ynez Band of Chumash Mission Indians, 983 F. Supp. 1317, 1320 (C.D. Cal. 1997).  Thus, the transfer under ILCA of the Meh-No-Bah Allotment was not in any way "subject to" IGRA.  Any gaming that may occur in the future on the property, like all gaming on Indian lands, will be subject to the requirements of IGRA.  The land transfer itself, however, does not implicate IGRA.  When no gaming has taken place, there can be no violation of IGRA.  Neither the act of transferring land pursuant to ILCA nor the mere construction of a casino building or facility violates the statute.  Any future violation of IGRA is appropriately probed in a future lawsuit, not this one.

Moreover, any claim based on an injury stemming from authorization of gaming activity is unripe because no gaming has been authorized by recent agency action and the casino is not cuurently operating. Plaintiff cannot challenge the Secretary's "decision" authorizing the Quapaw Tribe to operate a gaming facility on the Allotment because no such decision has been made by the Secretary or any other official at the Interior Department. Nor has Plaintiff pointed to any specific action taken by the United States – for example, approval of a gaming compact or of an outside management contract – that could be said to authorize the Quapaw to begin lawful gaming. Without any such action by the Secretary, there is no federal action allowing Plaintiff to sue under the APA.

Even if gaming were occurring on the property in violation of IGRA, the remedy for such a violation is an enforcement action brought by the National Indian Gaming Commission. The NIGC has the power to issue a closure order against an Indian gaming operation for substantial violations of IGRA, the NIGC's regulations, or a relevant tribal gaming ordinance. See 25 U.S.C. § 2713(b). Not only must enforcement wait until a gaming operation is actually open and operating, but the decision whether to commence an enforcement action is left to the discretion of the NIGC. The "decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985). Plaintiff's request for "an injunction requiring the Secretary . . . to prohibit gaming operations until the Secretary has complied with the applicable law," Compl. at 13, is therefore improper.

In short, there has been and is no violation of IGRA because gaming is not occurring on the property. To the extent Plaintiff seeks some sort of preemptive declaration about action the

United States may or may not take in the future, or an injunction prohibiting such possible future

action, such a claim is unripe.

**F.    The Section 151 regulations are irrelevant.**

Plaintiff's final claim is that the Secretary was required to follow the regulations

contained in 25 C.F.R. Part 151 when transferring the beneficial interest in the Meh-No-Bah

Allotment.  Once again, even if Plaintiff had standing to challenge the transfer, this claim would

fail on the merits.  The Part 151 regulations were promulgated by the Secretary to implement an

entirely different statute from ILCA – namely, the initial land acquisition provision of the Indian

Reorganization Act, 25 U.S.C. § 465.[13]  All of the land at issue in this case was already in trust or

restricted status, and the beneficial interest in the land was transferred pursuant to ILCA, not

---

[13]The IRA was enacted in 1934 as part of the federal government's return to a policy supporting "principles of tribal self-determination and self-governance."  Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior, 228 F.3d 82, 85 (2d Cir. 2000) (quoting County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 255 (1992)).  The law was specifically intended to stop the alienation of Indian land and "to support Indians, and to provide for acquisition of additional acreage for tribes.  This comprehensive legislation sought to offset the unintended and devastating effects of prior federal Indian policies, including cultural destruction, poverty, and loss of land."  Cohen, Handbook of Federal Indian Law, § 1.05.  To this end, Section 5 of the IRA authorizes the Secretary to take lands into trust "for the purpose of providing land for Indians."  25 U.S.C. § 465.  Section 5 provides the Secretary with "broad authority to acquire property in trust for Indian tribes."  Sokaogon Chippewa Cmty. v. Babbitt, 214 F.3d 941, 943 (7th Cir. 2000).

Regulations implementing Section 5, set forth in 25 C.F.R. Part 151, govern the fee-to-trust process.  A tribe wishing to have land taken into trust must file a written request with the Secretary.  25 C.F.R. § 151.9.  The Secretary must then notify the state and local governments having regulatory jurisdiction over the proposed trust land so that they can provide written comments about potential impacts on regulatory jurisdiction, property taxes, and special assessments.  Id. at § 151.10.  The regulations oblige the Secretary, in deciding whether to approve a tribe's request, to consider several factors, including the tribe's need for the land; the use to which the land will be put; the impact on the state and its political subdivisions of removing the land from the tax rolls; jurisdictional problems and potential conflicts of land use; whether the BIA is equipped to discharge any additional responsibilities resulting from the trust status; and compliance with NEPA.  See id. at § 151.10(b), (c), (e)-(h).

acquired under the IRA, so the Part 151 regulations do not apply.

Plaintiff argues that Section 2202 of ILCA requires the application of the IRA and its regulations to land transfers.[14/]  Compl. at 5.  However, Plaintiff misunderstands that provision. The purpose of Section 2202 is to amend Section 5 of the IRA, 25 U.S.C. § 465, to extend Section 5's provisions to all tribes, regardless of whether those tribes had voted to become organized under the IRA.  See H.R. Rep. No. 97-908, at 7 (1982).  Prior to this amendment, it was unclear whether tribes that chose not to organize under the IRA could use the IRA's land acquisition authority.  In passing ILCA, Congress amended the IRA to clarify this issue.

If Plaintiff's interpretation of Section 2202 and the Part 151 regulations were to prevail, and all ILCA transfers had to be done through the Part 151 procedures, that would defeat Congress's purpose in establishing a mechanism for expeditious and routine consolidation of fractionated interests in Indian land.  The IRA fee-to-trust process is time-consuming, costly, and often controversial.  It makes no sense to suggest that Congress would have created the trust land consolidation process in ILCA and then, in a provision of that very statute, stated that the separately-authorized process whereby a tribe may purchase fee land and apply to have it accepted into trust is always required here as well.  Congress would have used much clearer language in Section 2202 had that been its intent.

Therefore, the Secretary did not abuse his discretion or act arbitrarily and capriciously by not following the Part 151 regulatory steps in this instance.

---

[14/]Section 2202 reads, "The provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 of this title: *Provided*, That nothing in this section is intended to supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to any specific tribe, reservation, or state(s)."

**G.    The United States has no power to halt construction activity on the Meh-No-Bah Allotment.**

Finally, as a remedy for some or all of its substantive claims, Plaintiff asks this Court for an injunction requiring the Secretary, "and all those acting in concert with him, to stop all construction activity on the property . . . until the Secretary has complied with applicable law." Compl. at 13. This injunctive relief is unavailable because the United States is not engaging in any construction on the property; the Quapaw Tribe is doing so. Therefore, if the Court were going to enjoin construction activities on the Meh-No-Bah Allotment, it would have to enjoin the Tribe, not the United States. However, the Quapaw Tribe is not a party to this case and cannot be joined by the Plaintiff because it has sovereign immunity from suit. See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991) ("Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.") (citations omitted).

As described in Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, although the United States does hold the Meh-No-Bah Allotment in trust and restricted fee for the Quapaw Tribe, the Tribe is a domestic dependent nation with inherent sovereign authority over its members and territories. As such, once the beneficial interest in the Meh-No-Bah Allotment was transferred to the Tribe, the United States has no role in regulating construction activities on it, unless Congress establishes such a regulatory role. Plaintiff fails to identify legislation providing the United States with such a regulatory role. The United States has a role in transferring the land, pursuant to ILCA, and in regulating the gaming operation – once it

34

begins – through IGRA, but not in regulating construction.  Moreover, the United States has no

information suggesting the construction is illegal.  "In addition to broad authority over intramural

matters such as membership, tribes retain sovereign authority to regulate economic activity

within their own territory."  Nat'l Labor Relations Bd. v. Pueblo of San Juan, 276 F.3d 1186,

1192-93 (10th Cir. 2002) (citing Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137 (1982);

Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 152-53

(1980)).

## V.  **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint.


Dated: May 28, 2008              Respectfully submitted,

                                 RONALD J. TENPAS
                                 Assistant Attorney General
                                 United States Department of Justice
                                 Environment and Natural Resources Division

                                     /s/
                                 _____

                                 AMY S. TRYON
                                 GINA L. ALLERY
                                 Trial Attorneys
                                 United States Department of Justice
                                 Environment and Natural Resources Division
                                 Indian Resources Section
                                 P.O. Box 44378
                                 L'Enfant Plaza Station
                                 Washington, D.C.  20026-4378
                                 (202) 353-8596
                                 amy.tryon@usdoj.gov

<u>OF COUNSEL</u>:

MARIA WISEMAN
United States Department of the Interior
Office of the Solicitor
1849 C Street NW
Washington, D.C. 20240

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BOARD OF COMMISSIONERS OF )
CHEROKEE COUNTY, KANSAS, )
                           )
        Plaintiff, )
                           )
v. )      Case No. 1:08-cv-00317-RWR
                           )      Judge Richard W. Roberts
KEMPTHORNE, et al., )
                           )
        Defendants. )
                           )

### Declaration of Amy S. Tryon

I, Amy S. Tryon, declare as follows:

1.      I am a trial attorney with the United States Department of Justice, Environment and Natural Resources Division, Indian Resources Section. I am licensed to practice law in the State of New York and the Commonwealth of Massachusetts.

2.      Attached hereto as Exhibits 1(A)-(E) are true and correct copies of the deeds for the transfer of beneficial interests in the Meh-No-Bah Allotment from the individual Indian owners to the Quapaw Indian Tribe.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this 28th day of May, 2008.

*Amy S. Try*
AMY S. TRYON
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
(202) 353-8596

# EXHIBIT 1(A)

5-5448
modified
May 2005
ILCP

Allottee: See Exhibit 'A'
Tract No: See Exhibit 'A'
Tran. No. 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-07

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS**

### DEED TO RESTRICTED INDIAN LAND

THIS INDENTURE, Made and entered into this _27_ day of _April_, 2007, by and between:

Yannah F. Stephenson ID # 920U002967, heir of allottee, a married woman dealing with her own separate property on which she does not reside, residing at Broken Arrow, Oklahoma, party of the first part,

And the ____USA in Trust for the Quapaw Tribe of Indians of Oklahoma____ party of the second part:

WITNESSETH, That said party of the first part, for consideration of nine-thousand five-hundred dollars and no/100 ($9,500.00).

In hand paid, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey unto said party of the second part the following described real estate and premises situated on lands located within the Quapaw Tribe of Oklahoma's jurisdictional boundary, to-wit:

> See attached Exhibit 'A' for undivided interests,
> Legal descriptions and considerations
> All located within the Indian Meridian.

This conveyance is made pursuant to the provisions of the Indian Land Consolidation Act Amendments of 2000, Public Law 106-462 (114 Stat., 1992), as amended by the American Indian Probate Reform Act of 2004, Public Law 108-374 (118 Stat., 1773). All revenue from said land interest(s) is encumbered by the United States of America until the purchase price has been repaid or the encumbrance is released by the Secretary.

Together with all improvements thereon and the appurtenances thereunto belonging.

And the said party of the first part, for herself and her heirs, executors, and administrators, does hereby covenant, promise, and agree to and with the said party of the second part, its successors and assigns, that she will forever warrant and defend the said premises against the claims of all persons, claiming or to claim by, through, or under herself only.

To have and to hold said described premises unto the said party of the second part, its successors, executors, administrators, and assigns, forever.

IN WITNESSES WHEREOF, That said party of the first part has set her hand and seal the day and year first above written.

WITNESSES:

_____

_____

_____

_____

_____ [SEAL]
Yannah F. Stephenson

_____ [SEAL]

_____ [SEAL]

_____ [SEAL]

FILED

MAY 03 2007
07 0400011
DOCUMENT NO.
EASTERN OKLAHOMA

Acknowledgements must be in accordance with the forms presented by the State in which the land is situated.

STATE OF _____ Oklahoma _____ )
                                    ) ss.
COUNTY OF _ Ottawa _____ )

BE IT REMEMBERED, That on this __27th__ day of __April__, A.D. _2007_ before the undersigned, a __Notary Public__ in and for the County and State aforesaid, personally appeared __Yannah F. Stephenson__

to me personally known to be the identical person who executed the within instrument of writing, and such person duly acknowledge the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_Penny Sexton_
Notary Public
(title)

My Commission expires: __9-2-09__
My Commission number: __0101361 7__

**UNITED STATES
DEPARTMENT OF THE INTERIOR**
Bureau of Indian Affairs
Miami Agency
Miami, Oklahoma 74055

The within deed is hereby approved:  Pursuant with authority delegated by 209 DM 8, 230 DM 1,3 IAM 4.1, and the Muskogee Area Addendum 9901 2 3IAM 4 issued 6/24/1999.

Approval Date: __4/27/2007__          Actg.  Superintendent



FILED
MAY 03 2007
07 0400011
DOCUMENT NO._____
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

JUL. 9. 2007 10:05AM    BIA RES

NO. 869    P. 4

Exhibit A

Land Interests Owned by Yannah F. Stephenson ID # 920U002967, located within the jurisdictional boundary of the Quapaw Tribe of Indian of Oklahoma

Date Printec April 26, 2007

Page 1

| Tract Number | Legal Description | Undivided Interest | Consideration |
|---|---|---|---|
| 920 B 194 Mehnobah | SE 1/4 of NW 1/4, Section 17, Township 29 North, Range 25 East, Ottawa County, containing 40 acres, more or less. | 1/4 | $ 9,500.00 |

FILED
MAY 0 8 2007
DOCUMENT NO.
07 0400011
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

EXHIBIT 1(B)

5-5446
modified
May 2005
ILCP

Allottee: See Exhibit 'A'
Tract No: See Exhibit 'A'
Tran. No. 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-07

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS**

### DEED TO RESTRICTED INDIAN LAND

THIS INDENTURE, Made and entered into this ___27th___ day of ___April___, 2007, by and between:

George R. McWatters Jr. ID # 920U002968, heir of allottee, a married man dealing with his own separate property on which he does not reside, residing at Quapaw, Oklahoma, party of the first part,

And the ____ USA in Trust for the Quapaw Tribe of Indians of Oklahoma ____ party of the second part:

WITNESSETH, That said party of the first part, for consideration of nine-thousand five-hundred dollars and no/100 ($9,500.00).

In hand paid, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey unto said party of the second part the following described real estate and premises situated on lands located within the Quapaw Tribe of Oklahoma's jurisdictional boundary, to-wit:

> See attached Exhibit 'A' for undivided Interests,
> Legal descriptions and considerations
> All located within the Indian Meridian.

This conveyance is made pursuant to the provisions of the Indian Land Consolidation Act Amendments of 2000, Public Law 106-462 (114 Stat., 1992), as amended by the American Indian Probate Reform Act of 2004, Public Law 108-374 (118 Stat., 1773). All revenue from said land interest(s) is encumbered by the United States of America until the purchase price has been repaid or the encumbrance is released by the Secretary.

Together with all improvements thereon and the appurtenances thereunto belonging.

And the said party of the first part, for himself and his heirs, executors, and administrators, does hereby covenant, promise, and agree to and with the said party of the second part, its successors and assigns, that he will forever warrant and defend the said premises against the claims of all persons, claiming or to claim by, through, or under himself only.

To have and to hold said described premises unto the said party of the second part, its successors, executors, administrators, and assigns, forever.

IN WITNESSES WHEREOF, That said party of the first part has set his hand and seal the day and year first above written.

WITNESSES:

_____    _George R. McWatters, Jr._ [SEAL]
                             George R. McWatters Jr.

_____    _____ [SEAL]

_____    _____ [SEAL]

_____    _____ [SEAL]

**FILED**

MAY 03 2007
07 0400010
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

Acknowledgements must be in accordance with the forms presented by the State in which the land is situated.

STATE OF _OKlahoma_ )
                      ) ss.
COUNTY OF _Ottawa_ )

BE IT REMEMBERED, That on this _27th_ day of _April_, A.D. _2007_ before the undersigned, a _Notary Public_ in and for the County and State aforesaid, personally appeared _George R. McWatters Jr._ to me personally known to be the identical person who executed the within instrument of writing, and such person duly acknowledge the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_Penny Sexton_
Notary Public
(title)

My Commission expires: _9-2-09_
My Commission number: _01013617_

[Notary seal:
PENNY SEXTON
NOTARY
# 01013617
EXP. 08/02/09
PUBLIC
STATE OF OKLAHOMA]

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Miami Agency
Miami, Oklahoma 74055

The within deed is hereby approved: Pursuant with authority delegated by 209 DM 8, 230 DM 1,3 IAM 4.1, and the Muskogee Area Addendum 9901 2 3IAM 4 issued 6/24/1999.

Approval Date: _4/27/2007_     Acting _Mary Those_ Superintendent

FILED
MAY 0 3 2007
07 0400010
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

JUL. 6. 2007 11:35AM     BIA RES

NO. 859     P. 3

Exhibit A

Land Interests Owned by George R. McWatters Jr. ID # 920U002968, located within the jurisdictional boundary of the Quapaw Tribe of Indian of Oklahoma

Date Printed April 26, 2007

Page 1

| Tract Number | Legal Description | Undivided Interest | Consideration |
|---|---|---|---|
| 920 B 194 Mehnobah | SE 1/4 of NW 1/4, Section 17, Township 29 North, Range 25 East, Ottawa County, containing 40 acres, more or less. | 1/4 | $ 9,500.00 |



FILED

MAY 03 2007

0200410010
Document
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

# EXHIBIT 1(C)

JUL-19-2007 THU 11:40 AM BIA/MIAMI AGENCY          FAX NO. 9185427202          P. 02

5-5440
modified
May 2005
ILCP

Allottee: See Exhibit 'A'
Tract No: See Exhibit 'A'
Tran. No. 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-07

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF INDIAN AFFAIRS

### DEED TO RESTRICTED INDIAN LAND

THIS INDENTURE, Made and entered into this _18th_ day of _May_, 2007, by and between:

Jan Colbert Killough, ID # 608U016020, heir of allottee, a single man dealing with his own separate property on which he does not reside, residing at Bluejacket, Oklahoma, party of the first part,

And the ____USA in Trust for the Quapaw Tribe of Indians of Oklahoma____ party of the second part:

WITNESSETH, That said party of the first part, for consideration of six-thousand three-hundred thirty-three dollars and 33/100 ($6,333.33),

in hand paid, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey unto said party of the second part the following described real estate and premises situated on lands located within the Quapaw Tribe of Oklahoma's jurisdictional boundary, to-wit:

See attached Exhibit 'A' for undivided interests,
Legal descriptions and considerations
All located within the Indian Meridian.

This conveyance is made pursuant to the provisions of the Indian Land Consolidation Act Amendments of 2000, Public Law 106-462 (114 Stat., 1992), as amended by the American Indian Probate Reform Act of 2004, Public Law 108-374 (118 Stat., 1773). All revenue from said land interest(s) is encumbered by the United States of America until the purchase price has been repaid or the encumbrance is released by the Secretary.

Together with all improvements thereon and the appurtenances thereunto belonging.

And the said party of the first part, for himself and his heirs, executors, and administrators, does hereby covenant, promise, and agree to and with the said party of the second part, its successors and assigns, that he will forever warrant and defend the said premises against the claims of all persons, claiming or to claim by, through, or under himself only.

To have and to hold said described premises unto the said party of the second part, its successors, executors, administrators, and assigns, forever.

IN WITNESSES WHEREOF, That said party of the first part has set his hand and seal the day and year first above written.

WITNESSES:

_____

_____         _Jan Colbert Killough_
                                          Jan Colbert Killough

_____                              [SEAL]

_____                              [SEAL]

                                                             [SEAL]

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
MIAMI, OKLAHOMA
CERTIFIED TRUE COPY
_____   7/10/07
Certifying Officer        Date

# FILED

07 0400036
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

JUL 1 2 2007

Acknowledgements must be in accordance with the forms presented by the State in which the land is situated.

STATE OF _Oklahoma_ )
                                       ) ss.
COUNTY OF _Ottawa_ )

BE IT REMEMBERED, That on this _18th_ day of _May_____, A.D. _2007_ before the undersigned, a __Notary Public__ in and for the County and State aforesaid, personally appeared ___Jan Colbert K Hough_____ to me personally known to be the identical person who executed the within instrument of writing, and such person duly acknowledge the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_Penny Sexton_
Notary Public
(title)

My Commission expires: _9-2-09_
My Commission number: _01013617_

**UNITED STATES
DEPARTMENT OF THE INTERIOR**
Bureau of Indian Affairs
Miami Agency
Miami, Oklahoma 74055

The within deed is hereby approved: Pursuant with authority delegated by 209 DM 8, 230 DM 1,3 IAM 4.1, and the Muskogee Area Addendum 9901 2 3IAM 4 issued 6/24/1999.

Approval Date: _5-18-07_          _Paul Yates_
(ACTING)    Superintendent



FILED
07 0400036
JUL 1 8 2007
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

Exhibit A

Land Interests Owned by Jan Colbert Killough, ID # 808U016020, located within the jurisdictional boundary of the Quapaw Tribe of Indian of Oklahoma

Date Printed May 18, 2007

Page 1

| Tract Number | Legal Description | Undivided Interest | Consideration |
|---|---|---|---|
| 920 B 194 Mehnobah | SE_1/4 of NW_1/4, Section 17, Township 29 North, Range 25 East, Ottawa County, containing 40 acres, more or less. | 1/8 | $ 6,333.33 |



FILED
07 040 0036
JUL 1 2 2007
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

# EXHIBIT 1(D)

5-5448
modified
May 2005
ILCP

Allottee: See Exhibit 'A'
Tract No: See Exhibit 'A'
Tran. No. 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-07

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF INDIAN AFFAIRS

### DEED TO RESTRICTED INDIAN LAND

THIS INDENTURE, Made and entered into this ___6th___ day of ___July___, 2007, by and between:

Bobbie Rae Starr, ID # 926U001716, heir of allottee, a single woman dealing with her own separate property on which she does not reside, residing at Oklahoma City, Oklahoma, party of the first part,

And the _____ USA in Trust for the Quapaw Tribe of Indians of Oklahoma _____ party of the second part:

WITNESSETH, That said party of the first part, for consideration of six-thousand three-hundred thirty-three dollars and 33/100 ($6,333.33).

In hand paid, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, and convey unto said party of the second part the following described real estate and premises situated on lands located within the Quapaw Tribe of Oklahoma's jurisdictional boundary, to-wit:

> See attached Exhibit 'A' for undivided interests,
> Legal descriptions and considerations
> All located within the Indian Meridian.

This conveyance is made pursuant to the provisions of the Indian Land Consolidation Act Amendments of 2000, Public Law 106-462 (114 Stat., 1992), as amended by the American Indian Probate Reform Act of 2004, Public Law 108-374 (118 Stat., 1773). All revenue from said land interest(s) is encumbered by the United States of America until the purchase price has been repaid or the encumbrance is released by the Secretary.

Together with all improvements thereon and the appurtenances thereunto belonging.

And the said party of the first part, for herself and her heirs, executors, and administrators, does hereby covenant, promise, and agree to and with the said party of the second part, its successors and assigns, that she will forever warrant and defend the said premises against the claims of all persons, claiming or to claim by, through, or under herself only.

To have and to hold said described premises unto the said party of the second part, its successors, executors, administrators, and assigns, forever.

IN WITNESSES WHEREOF, That said party of the first part has set her hand and seal the day and year first above written.

WITNESSES:

_____          _____ [SEAL]
                                  Bobbie Rae Starr

_____          _____ [SEAL]

_____          _____ [SEAL]

                                  _____ [SEAL]



FILED
JUL 2 4 2007
07 0400038
DOCUMENT NO.____
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

Acknowledgements must be in accordance with the forms presented by the State in which the land is situated.

STATE OF _Oklahoma_ )
                                           ) ss.
COUNTY OF _Ottawa_ )

BE IT REMEMBERED, That on this _6th_ day of _July_, A.D. _2007_ before the undersigned, a _Notary Public_ in and for the County and State aforesaid, personally appeared ___Bobbie Rae Starr_____
to me personally known to be the identical person who executed the within instrument of writing, and such person duly acknowledge the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_Tamara R Summerfield_
Notary Public
(title)

My Commission expires: _6-29-08_
My Commission number: _04005813_

            UNITED STATES
    DEPARTMENT OF THE INTERIOR
        Bureau of Indian Affairs
            Miami Agency
        Miami, Oklahoma 74055

The within deed is hereby approved: Pursuant with authority delegated by 200 DM 1, 209 DM 8, 230 DM 1, 3 IAM 4.1, and Muskogee Area Addendum 9901 to 3 IAM 4 issued 6/22/1999.

Approval Date: _7/9/2007_        _Mary Thoss_
                                                        Superintendent
                                                   (ACTING)

FILED
JUL 2 4 2007
07 0400038
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

Exhibit A

Land Interests Owned by Bobbie Rae Starr, ID # 926U0017:6, located within the jurisdictional boundary of the Quapaw Tribe of Indians of Oklahoma.

Date Printed July 6, 2007                                                      Page 1

| Tract Number | Legal Description | Undivided Interest | Consideration |
|---|---|---|---|
| 920 B 194 Mehnobah | SE 1/4 of NW 1/4, Section 17, Township 29 North, Range 25 East, Ottawa County, containing 40 acres, more or less. | 1/6 | $ 8,333.33 |



FILED

JUL 24 2007
07 040 0038
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

# EXHIBIT 1(E)

JUL. 24. 2007  12:59PM    BIA  RES                                              NO. 106    P. 2



Land being conveyed was
Allotted to Meh-no-bah
Allottee No.Quapaw 178
Tract No. 194

JUL 11 2007
07 0400034
DOCUMENT NO.
EASTERN OKLAHOMA
TITLE SERVICES OFFICE

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

DEED TO RESTRICTED INDIAN LAND

THIS INDENTURE, Made and entered into this 10 day of July, 2007, by and between the Secretary of the Interior on behalf of the Estate of Billy Lewis Urquhart, aka Billy Louis Urquhart, an Indian of the Creek Nation in the State of Oklahoma, party of the first part, does hereby transfer and convey pursuant to 25 United States Code § 2204 (1) to the Quapaw Tribe of Indians of Oklahoma, P. O. Box 765, Quapaw, Oklahoma 74363, of said reservation, party of the second part:

WITNESSETH, That whereas the lands hereinafter described were allotted to or inherited by the said party of the first part under the provisions of legislation by Congress pursuant to which said lands are restricted or held in trust by the United States for the benefit of said grantor and are not subject to taxation; nor to alienation or encumbrance without the consent of the Secretary of the Interior, and whereas the said party of the second party being an Indian Tribe desires to acquire said herein described lands subject to the same conditions, restrictions, and limitations as to taxation, alienation, or encumbrance as now rest there against;

NOW, THEREFORE, for and in consideration of the sum of $6,333.33 (Six thousand three hundred thirty-three dollars and thirty-three cents); the receipt of which sum is hereby acknowledged, the said party of the first part does hereby transfer, set over, and convey to and unto the said party of the second part all right, title, and interest of said party of the first part in and to the lands and premises situated in the County of Ottawa, State of Oklahoma, described as:

1/6 interest in the SE¼NW¼ of Section 17, Township 29 North, Range 25 East of the
Indian Meridian, Ottawa County, Oklahoma, containing 40.0 acres, more or less.

together with all the improvements thereon and the appurtenances thereunto belonging, subject to the express condition that the execution of this deed by the party or parties hereto or its approval by the Secretary of the Interior shall not operate in any manner to remove any of the restrictions now resting against said lands, or to remove any trust or other conditions imposed upon said land as expressed in the original trust or any other patent issued therefore, or any part thereof; it being distinctly understood and agreed that the scope and intent of this deed is simply to transfer and convey such right, title, and interest as the party of the first part now has in such lands to the said party of the second part subject to the conditions, restrictions, and limitations as now rest there against in the hands of the party of the first part.

TO HAVE AND TO HOLD SAID above-described heirs, executors, administrators, and assigns unto the said party of the second part, its heirs, executors, administrators, and assigns forever.

IN WITNESSES WHEREOF, That said party of the first part has hereunto set her hand and seal the day and year first above written.

_Mary Moss_
Acting Superintendent, Miami Agency, on behalf of the Estate
of Billy Lewis Urquhart

STATE OF OKLAHOMA        )
                          ) ss.
COUNTY OF Muskogee       )

BE IT REMEMBERED, That on this 10 day of July, A.D. 2007 before the undersigned, a _Notary Public_ in and for the County and State aforesaid, personally appeared Mary Moss, Acting Superintendent, Miami Agency to me personally known to be the identical person who executed the within instrument of writing, and such person duly acknowledge the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_Mary L. Downing_
Notary Public

My Commission expires: _____

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Miami Agency
Miami, Oklahoma

OFFICIAL SEAL
MARY L. DOWNING
NOTARY PUBLIC OKLAHOMA
MUSKOGEE COUNTY
COMM. NO. 00005286 EXP. 04-20-08

Approved pursuant to authority delegated by 200 DM1, 209 DM 8, 230 DM 1, 3 IAM 4.1, and Muskogee Area Addendum 9901 to 3 IAM 4 issued 8/22/1999.

Date: 7/10/2007

_Mary Moss_
Acting Superintendent

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF | ) | |
| CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER
GRANTING THE UNITED STATES'S MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendants, the "United States," moved

this Court for an Order dismissing the Complaint in this action.  Upon consideration of all papers

in support of and opposition to the motion,

IT IS HEREBY ORDERED that the United States's Motion to Dismiss is GRANTED.

Dated:_____, 2008        _____

Hon. Richard W. Roberts
United States District Judge
District of Columbia

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF | ) | |
| CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

### **Certificate of Service**

  I hereby certify that on May 28, 2008, I electronically filed the foregoing **Motion to Dismiss** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participant in this case:

Jonathan Abram
HOGAN & HARTSON L.L.P.
555 13th Street, NW
Washington, DC 20004-1109
(202) 637-5600
Fax: (202) 637-5910
Email: jlabram@hhlaw.com

       /s/
      AMY S. TRYON
      <u>Trial Attorney</u>
      U.S. Department of Justice
      Environment and Natural Resources Division
      Indian Resources Section
      P.O. Box 44378
      L'Enfant Plaza Station
      Washington, DC 20026-4378
      (202) 353-8596
      amy.tryon@usdoj.gov