**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS**,

Case No.  1:08-cv-00317-RWR
Judge Richard W. Roberts

Plaintiff,

v.

**DIRK KEMPTHORNE, in his official
capacity as the SECRETARY OF THE
INTERIOR,
the UNITED STATES DEPARTMENT OF
THE INTERIOR**, and
**the NATIONAL INDIAN GAMING
COMMISSION**,

Defendants.

_____

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Introduction**

1.     This is an action for declaratory and injunctive relief brought under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Declaratory Judgment Act

("DJA"), 28 U.S.C. §§ 2201 and 2202, the National Environmental Policy Act ("NEPA"), 42

U.S.C. § 4321 *et seq.*, and the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, to

challenge actions of the defendants that, unless enjoined, will permit the construction and

operation of a large casino development on lands in the tri-state corner where Ottawa County,

Oklahoma, Jasper County, Missouri, and Cherokee County, Kansas, meet in violation of the

Indian Gaming Regulatory Act and without any review of the significant environmental impacts of the construction or the imminent casino operations on the human environment in violation of the National Environmental Policy Act.

2.      In the time following plaintiff's initiation of this action by its original complaint, plaintiff's counsel has been contacted by different third parties with an interest in the events surrounding the development of the Quapaw casino resort.  As a result of these contacts, plaintiff has become aware of additional facts and circumstances surrounding the land acquisitions at the heart of this action, which has led to the amendment of its pleading, including the addition of defendant the National Indian Gaming Commission.

### Parties

3.      Plaintiff Board of Commissioners of Cherokee County, Kansas, is the body politic and corporate for Cherokee County and is empowered under Kansas law to, among other powers, sue and be sued and to exercise the powers of home rule.  See K.S.A. §§  K.S.A. 19-101, 19-101a.

4.      Defendant Dirk Kempthorne is the appointed Secretary of the Department of the Interior ("DOI"), the agency of the United States that is responsible for and has administrative authority over matters involving Indian affairs by and through its bureaus and agencies, including the Bureau of Indian Affairs ("BIA").

5.      Defendant United States Department of the Interior is the agency of the federal government that is responsible for and has administrative authority over Indian affairs by and through its bureaus and agencies, including the Bureau of Indian Affairs ("BIA").

\\\DC - 023312/000002 - 2738452 v1

6.     Defendant National Indian Gaming Commission is an agency of the federal government that is responsible for the oversight and regulation of Indian gaming activities under the Indian Gaming Regulatory Act..

## Jurisdiction and Venue

7.     This Court has jurisdiction pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-06, because this action seeks review of administrative decisions.  This Court also has jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202.

8.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e), pertaining to civil actions against officers and employees of the United States sued in their official capacities, because the defendants reside in this district and because a substantial part of the events or omissions giving rise to this complaint occurred in this district.

## Facts Entitling Plaintiff to Relief

Quapaw Tribe's development and construction of a casino resort.

9.     On or about May 14, 2007, the Quapaw Tribe of Oklahoma held a press conference at which it announced its plans for a large scale $200 million casino resort in the northeast corner of Ottawa County, Oklahoma, where the borders of Oklahoma, Kansas and Missouri meet.  According to the Tribe's spokesman, the casino is scheduled to open on or about July 4, 2008, and to operate 24 hours a day, seven days a week and 365 days a year, attracting two million visitors per year to a development with more than 70,000 square feet of casino floor space, and more than 2,000 slot machines, 30 table games and 15 poker tables.

10.     The Quapaw also stated that the tribe has been planning the project since 1990, and disclosed that it had acquired more than 235 acres in Oklahoma, Kansas and Missouri to build the resort, including 85 acres in Oklahoma, 120 acres in Cherokee County, Kansas, and 30

3

acres in Missouri.  The Tribe's casino project manager, G. Michael Brown, disclosed in news articles that he became involved in the casino resort development in 2006, when three Quapaw officials, including the tribe's Chairman, described their plan for a full-service casino resort where Oklahoma, Kansas, and Missouri meet.

11.     The Quapaw held a groundbreaking ceremony for the development, which the Quapaw call the Downstream Casino Resort, in July 2007.  Current construction includes the casino, a hotel, restaurants, shopping areas and a 10,000-square-foot meeting center.  According to the Quapaw, the 12-story hotel will be visible for three miles in each direction from the interstate.  The Quapaw also plan a second phase of development that includes an additional 400-room hotel and other plans.  The project's contractor recently described the current development as "the largest construction project in the state of Oklahoma right now."

12.     Cherokee County is the site of all customer parking for the casino development, and all construction traffic and customer traffic passes or will pass through Cherokee County. The current development of the Quapaw casino resort includes a large parking area designed to hold over 2200 cars in Cherokee County.  As planned, the Quapaw development contains no other parking area to support its casino resort development except for the parking area in Cherokee County.  The Quapaw Tribe purchased the land in Cherokee County on which the parking facilities have been built in or around 2006 and, on information and belief, the Quapaw hold title to it in the Tribe's own name in fee simple.

13.     The casino-hotel structure is located on a 40-acre parcel of land in Ottawa County, Oklahoma, known as the Meh-No-Bah parcel.  The Meh-No-Bah parcel, which is approximately 100 feet from Cherokee County,  is located in an undeveloped area that had  no existing roads prior to the start of construction.  In order to bring casino resort customers to the development,

the Quapaw had to build a road to connect the development to Route 166, which runs through Cherokee County, Kansas, and into Missouri.

14.     As described more fully below, federal law imposes strict requirements on the development of Indian gaming facilities, including requirements relating to ownership of the land on which such facilities may lawfully be operated.   Under the Indian Gaming Regulatory Act ("IGRA"), the site of Indian gaming – here, the Meh-No-Bah parcel – must qualify as "Indian lands" as defined by that statute in order for gaming to take place.   IGRA also contains a broad prohibition on Indian gaming on Indian lands acquired after the date of its enactment in 1988, and places an obligation on defendants to ensure that post-1988 land acquisitions qualify for one of the limited exceptions to that prohibition.

Status of the Meh-No-Bah Parcel

15.      Prior to 2007, the Quapaw held no interest in the Meh-No-Bah parcel, but in a series of acquisitions by the Secretary between April 2007 and July 2007, the Quapaw purportedly acquired all interests in the parcel.

16.     The Meh-No-Bah parcel is a 40-acre parcel that was originally allotted to a Quapaw Tribe member of that name.  Following enactment of the Dawes Act, also known as the General Allotment Act of 1887, the Quapaw Tribe allotted all of its reservation lands to its members, including Meh-No-Bah, pursuant to an 1983 Act of the Quapaw National Council. According to historians, unlike other tribes which opposed the federal allotment policy, the Quapaw affirmatively embraced allotment, and sent a delegation to Congress seeking allotment of its reservation lands.  The Tribe's allotments were "ratified and confirmed" by an act of Congress, which placed the allotments under a 25-year period of restriction upon alienation.  Act

5

of March 2, 1985, 28 Stat. 876, at 907.  At the time of ratification, the Quapaw had 236 tribe members, each of whom received allotments.

17.     Meh-No-Bah died in February 1905.  Her interests were inherited by her niece, Ta-Meh-Quapaw (also known as Newakis Hampton) and her nephew, Alexander Lewis (also known as Alexander Beaver), each of whom inherited a one-half undivided interest in the parcel.

18.     During the period following the 1895 Act of Congress ratifying the Quapaw allotments, many of the allotments to Quapaw tribe members became unrestricted interests owned in fee simple.  The restriction on alienation simply meant that during the period of restriction an allottee had to obtain the Secretary's approval in order to sell it.  An allottee, however, could request that the restriction be removed, as the majority of Quapaw members did.

19.      By March of 1921, only 62 Quapaw members held their allotments in restricted status.  That year, the Quapaw Tribe asked Congress to extend then-existing restrictions on allotments for a further 25 years.  Congress did so in the Act of March 3, 1921, 41 Stat. 1225, at 1248-49, but in doing so it identified by name each allottee or heir of an allottee for whom the extension of the restriction period applied.  It provided that the period of restriction on Quapaw allotted lands imposed by the Act of March 2, 1895 "be, and is hereby, amended so as to provide that the restrictions which now exist against the alienation of the lands allotted to and to allotted lands inherited by the Quapaw Indians named in the letter of January 15, 1921, of the Secretary of the Interior" be extended a further 25 years.  41 Stat. at 1248-49 (emphasis added).

20.     The 1921 Act named the 62 individuals to whom it applied.  Later the same year, the 1921 Act was amended on November 18, 1921 to add three additional names.  None of the identified tribe members in the 1921 Act or its amendment were Meh-No-Bah (who had died in 1905) or her heirs, Ta-Meh-Quapaw and Alexander Lewis.  Thus, the parcel known as Meh-No-

Bah fell out of restriction sometime between 1895 and 1921, and was thereafter owned by individuals in fee.

21.     Congress twice acted to extend the remaining Quapaw allotment restrictions, first in 1939, extending then-existing restrictions for a further 25 years from 1946 to 1971 (Act of July 27, 1939, 53 Stat. 1127), and again in 1970, extending then-existing restrictions from 1971 to 1996.  Pub. L. 91-290, 84 Stat. 325 (June 25, 1970).  Congress did not subsequently pass any act further extending then-existing restrictions on Quapaw allotted lands, which would have expired in 1996.

Land Acquisition for the Quapaw Casino Resort

22.     By early 2007, five descendants of Meh-No-Bah held undivided interests in the parcel.  At the instigation of the Quapaw Tribe, over the course of several months and in five separate conveyances, the Secretary of the Interior took the significant step of (purportedly) accepting into trust for the benefit of the Quapaw Tribe land interests totaling a five-sixths interest in the Meh-No-Bah parcel, and of conveying a one-sixth interest in the Meh-No-Bah parcel from the estate of an individual to the Quapaw.  All of the acquisitions purported to be pursuant to the Indian Land Consolidation Act.

23.     The two acquisitions were effected through BIA deeds executed on April 27, 2007.  The Secretary acquired the one-quarter interest of Yannah Stephenson "in trust for the Quapaw Tribe" for consideration of $9,500 and the one-quarter interest of George McWatters "in trust for the Quapaw Tribe" for the $9,500.  Stephenson and McWatters are descendants of Ta-Meh-Quapaw.  McWatters is a member of the Quapaw Tribe's governing body, and has been a paid consultant to the Tribe in connection with the development of the casino resort since 2006, receiving over $6,500 a month to serve as Cultural/Spiritual Manager of the development.

\\\DC - 023312/000002 - 2738452 v1

24.     The third acquisition was effected by a BIA deed dated May 18, 2007.  The

Secretary acquired the one-sixth interest of Jan Killough "in trust for the Quapaw Tribe" for

$6,333.33.   Killough is an heir on the Alexander Lewis line of descendants.  He is not a member

of the Quapaw Tribe, and the Bureau of Indian Affairs identifies him as a "non-Indian."

25.     Prior to May 18, 2007, Killough was approached several times by Quapaw Tribe

officials or their designees with offers to purchase his interest in the Meh-No-Bah parcel.  After

refusing prior offers, in early May 2007, he agreed to sell his one-sixth interest in the Meh-No-

Bah parcel and the Quapaw Tribe agreed to purchase it for $250,000.  Upon signing the

agreement, the Tribe gave Killough a $10,000 deposit on the purchase price.  In discussions with

Quapaw officials in connection with the tribe's offer to purchase his interest, Killough expressly

asked whether the tribe would use the land for a casino, and he was told that it would not be used

for a casino and that the Tribe intended to build a motel or hotel in the neighboring parcel.

26.     On May 18, 2007, Killough, a tribal officer, and a BIA representative met at the

local BIA office in Miami, Oklahoma.  There Killough signed an amended agreement with the

Tribe and signed the BIA deed.  During the meeting, the tribal officer gave Killough a check for

$150,000.

27.     Thereafter, the BIA notified Killough that the agency had overpaid him for his

one-sixth interest, and reduced the BIA's purchase price to approximately $6,000.

28.     The fourth acquisition was effected by a BIA deed dated July 6, 2007.  The

Secretary acquired the one-sixth interest of Bobbie Rae Starr "in trust for the Quapaw Tribe" for

$6,333.33.  Like her sibling Killough, Starr is an heir on the Alexander Lewis line of descendants.

She is not a member of the Quapaw Tribe, and the Bureau of Indian Affairs identifies her as a

"non-Indian."

8

29.     Several months prior, however, in May 2007, Bobbie Rae Starr had executed a warranty deed conveying the same one-sixth interest to the Quapaw Tribe for $10.00, which was recorded in the office of the Clerk of Ottawa County, Oklahoma.

30.     The fifth and final conveyance of interests in the Meh-No-Bah parcel took place on July 10, 2007, when "the Secretary of the Interior on behalf of the Estate of Billy Lewis Urquhart, . . .an Indian of the Creek Nation" conveyed to the Quapaw Tribe the final one-sixth interest in the parcel for $6,333.33.  Like his siblings Killough and Starr, Urquhart, who died in approximately 1959, was an heir on the Alexander Lewis line of descendants.  He was not a member of the Quapaw Tribe, and is alternately identified by BIA as a Creek Indian and as a "non-Indian."

31.     Unlike the other acquisitions, in which the Secretary purchased the land interests with monies Congress allocated for the Quapaw, in the Urquhart transaction, the Quapaw Tribe purchased the land interest, and the Secretary served both as the seller, on behalf of the Urquhart Estate, and as the federal authority providing the required approval of the transaction.

32.     Notably, the Secretary valued the three one-sixth interests in the Meh-No-Bah parcel in each instance at the purported "fair market value" of no more than $6,333.33 but the Quapaw Tribe purchased the identical interests at highly divergent values of $250,000, $10.00, and $6,333.33.

The Indian Land Consolidation Act

33.     All five conveyances were purportedly effected pursuant to the Indian Land Consolidation Act ("ILCA"),  25 U.S.C. § 2201 et seq.  Enacted to address the problem of fractionated land interests on allotment lands, ILCA authorizes DOI to acquire fractional

interests in land in trust for the benefit of tribes. No provision of ILCA authorizes the acquisition of lands for the purpose of gaming.

34.    Four of the acquisitions of the interests in the Meh-No-Bah parcel were purportedly carried out pursuant to 25 U.S.C. § 2212. Section 2212 permits the Secretary to acquire "with the consent of the owner, . . . and at fair market value, any fractional interest in trust or restricted lands." 25 U.S.C. § 2212(a).

35.    The fifth transaction, involving the Estate of Billy Urquhart, was purportedly carried out pursuant to 25 U.S.C. § 2204. Section 2204(a) permits a tribe to purchase part or all of the interests in a parcel "(A) of trust or restricted land within the boundaries of the reservation of the tribe; or (B) land that is otherwise subject to the jurisdiction of the tribe" if the tribe obtains the consent of the owners of undivided interests totaling 50% of the undivided interest in the land. The consent requirement may be met by including the tribe's own interest in the calculation,

36.    ILCA expressly provides that the general statute authorizing the Secretary to acquire land in trust for Indians, 25 U.S.C. 465, applies to acquisitions under ILCA. 25 U.S.C. § 2202.

37.    Trust land acquisitions under Section 465 are governed by regulations promulgated by the Secretary and codified in 25 C.F.R. Part 151. Although Section 465 conferred substantial discretion on the Secretary respecting trust acquisitions, the Secretary's discretion is circumscribed by the requirements set out in 25 C.F.R. Part 151. Part 151 expressly applies to acquisition of fractional interests.

38.    Defendants' acquisition of the five-sixths interest in the Meh-No-Bah parcel for the Quapaw in 2007 falls within 25 C.F.R. Part 151, and the tribe's applications were subject to

10

25 C.F.R. § 151.10. Section 151.10 expressly requires that "the Secretary will consider [the specified] criteria in evaluating requests for the acquisition of land in trust status[,]" including among other requirements, the "purposes for which the lands will be used" and "the extent to which the applicant has provided information that allows the Secretary to comply with [the BIA's] National Environmental Policy Act Revised Implementing Procedures[.]"

39.    The Secretary or his designees acquired the five-sixths interest in the Meh-No-Bah parcel in trust for the Quapaw without considering the use to which the Tribe planned to the trust lands, and without complying with the BIA's guidelines for NEPA compliance or with NEPA itself.

The Indian Gaming Regulatory Act

40.    Acquisitions of land in trust and other conveyances of land to tribes for gaming purposes are subject to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. 2701 *et seq.* IGRA sets forth the requirements that must be met for each of three classes of gaming. For the Class III gaming the Quapaw casino resort seeks to offer, IGRA requires, <u>inter</u> <u>alia</u>, that the tribe have a gaming ordinance approved by the NIGC, a gaming compact with the state approved by the Secretary, and that the gaming occur only on "Indian lands" as defined by the statute.

41.    Under IGRA, "Indian lands" are defined as  (1) "lands within the limits of any Indian reservation" and (2) "lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or . . . held by any Indian tribe . . . subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." Thus, unrestricted land interests do not qualify as "Indian lands" under IGRA.

42.    Contrary to the requirements of IGRA, none of the defendants have made an "Indian lands" determination with respect to the Quapaw casino resort development.

11

43.    In Section 20 of IGRA, Congress imposed a broad prohibition against gaming on land taken into trust after October 17, 1988, unless certain exceptions apply.  One exception applies to Oklahoma tribes, if the trust lands in question are within the boundaries of the tribe's former reservation.

44.    In accordance with official DOI policy, published in the Department's Checklist of Gaming Acquisitions, Gaming-Related Acquisitions and IGRA Section 20 Determinations ("Checklist"), all gaming-related trust acquisitions and land conveyances must follow the regulations in 25 C.F.R. Part 151 and also must be referred to the Office of Indian Gaming in the Assistant Secretary for Indian Affairs' Office in Washington, D.C.  No trust acquisitions or land conveyances for purposes of gaming may take place until the Office of Indian Gaming has approved the acquisition.

45.    The Checklist expressly requires that "[a]ll requests for acquisition of land for gaming must be transmitted to [the Office of Indian Gaming] regardless of whether the land is located on, contiguous to, or off the applicant's reservation [and that] [t]his directive applies to trust-to-trust, restricted-to-restricted/trust, and fee-to-trust land acquisitions."  It further provides that "[t]he authority to approve or disapprove land acquisitions for gaming and gaming-related purposes is vested with the [Assistant Secretary-Indian Affairs.]"  The Checklist requires the BIA regional office to transmit complete documentation "which clearly indicates compliance with 25 C.F.R. Part 151, IGRA, the National Environment  Policy Act (NEPA) and other applicable Federal laws, regulations, and Executive Orders."  It also requires the regional office to provide complete documentation that the proposed acquisition complies with Section 20 of IGRA.  In that regard, the Checklist provides that "[a] tribe's contention that gaming on newly acquired lands is not prohibited because one or more exceptions [to Section 20] apply will

12

require a conclusive factual and legal finding that the particular exception does apply to the trust acquisition."

46.    BIA personnel did not prepare the required documentation and analysis and did not refer the Quapaw trust acquisition of the five-sixths interest or the conveyance of the one-sixth interest to the Office of Indian Gaming, in contravention of the DOI policy.

47.    All land-into-trust acquisitions and land conveyances are also subject to NEPA and BIA's NEPA guidelines.  BIA's NEPA guidelines create an exemption from environmental review for certain land conveyances, but not surprisingly, that exemption from environmental review applies only to those land acquisitions and conveyances in which no change in land use is planned.  The exemption does not apply to the property actions at issue here, because the tribe indisputably planned to use some or all of the Meh-No-Bah parcel lands to build and operate its planned casino development.

48.    The BIA and the Department of Interior knew at the time that it effected all or some of the Meh-No-Bah acquisitions that the Quapaw Tribe intended to use the Meh-No-Bah parcel for gaming and that construction of the intended casino was underway.  Defendant NIGC knew since at least July 2007 that the Quapaw intended to use the Meh-No-Bah parcel for gaming and that construction of the intended casino was underway.

49.    Sometime between July 2007 and December 20, 2007, the Quapaw submitted a land-into-trust application to BIA for the one-sixth "restricted' interest in the Meh-No-Bah parcel. The Quapaw withdrew the trust application on or about January 2008 after the Secretary and/or the BIA indicated it would perform an environmental review under NEPA in connection with the acquisition process under 25 C.F.R. Part 151.

Injury to Cherokee County Caused by Defendants' Conduct

50.    Like the Ottawa County, Oklahoma, area where the Meh-No-Bah parcel is located, the southeast corner of Cherokee County is composed primarily of undeveloped woodlands and wetlands and agricultural lands.  The county's total population is approximately 21,000 located across 590 square miles.

51.    For over a century beginning after the Civil War, heavy coal, lead and zinc mining was conducted in Cherokee County and a number of surrounding counties in Kansas, Missouri and Oklahoma (including Ottawa County, where the Meh-No-Bah parcel is located). The topography and environment of Cherokee County, Ottawa County, and other surrounding counties in the tri-state mining area bear the legacy of this history.  The tri-state mining area contains at least one Superfund site and is broadly monitored by the U.S. Department of Environmental Protection.  The defendants took the property actions at issue in this case without considering their environmental impacts, including those associated with this history of intensive mining.

52.    Under Kansas law, Cherokee County is responsible for the maintenance and repair of its county roads.  It will bear the cost of repairing its roads that have already been damaged by Quapaw construction equipment, just as it will bear the cost imposed by the dramatic increase in vehicle traffic caused by the Quapaw's 24-hour a day, 365-day a year casino resort.

53.    Cherokee County also will the bear the full brunt of the public safety burden caused by Quapaw casino customers' vehicular accidents and fatalities, and of any crime or disorderly behavior that spill into the parking lot or further into the county.  Based on the limited information available, plaintiff estimates that it will need to fund five additional law enforcement

14

personnel to patrol the vicinity of the casino parking area and respond to service calls in the area. Plaintiff also estimates it will need to fund a new public safety facility in the vicinity of the Quapaw casino to provide timely and adequate fire and ambulance services to that area of the county.  Under Kansas law, the county bears the cost of all public safety services in unincorporated areas.  The defendants took the property actions at issue in this case without considering any of the resulting environmental impacts, including those associated with the flow of millions of casino customers into the sparsely populated areas in and near Cherokee County.

Suspected Clean Water Act Violations

54.    Because the defendants conducted no environmental assessment or environmental impact analysis before taking the property actions at issue, they have created no record on which to base any systematic review of the environmental impacts of the planned Quapaw casino development.  Nevertheless, a prominent international environmental consulting firm, Environ, recently conducted a review and analysis of publicly available information, including state and federal permits, concerning the Quapaw casino development.  Its personnel also conducted a site assessment, to the extent possible from public lands and roadways.

55.    Environ's analysis concluded that there were likely violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*.  Specifically, it appears likely that the Quapaw is (1) dredging and/or filling waters of the United States without a Clean Water Act Section 404 permit or Section 401 certification and (2) violating various terms of the Kansas Stormwater Runoff from Construction Activities General Permit and Oklahoma Storm Water General Permit for Construction Activities.  These violations constitute violations of the CWA and its regulations and are grounds for an enforcement action under 40 C.F.R. § 122.41(a)**.**  Plaintiff served a Notice

of Violations and Intent to File Suit under the Federal Clean Water Act on the Quapaw pursuant

to Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

Kansas Expanded Lottery Act

56.    Cherokee County may become the location for one of the four State Lottery-

owned gaming facilities authorized by the 2007 Kansas Expanded Lottery Act.  The Kansas

Expanded Lottery Act is currently the subject of a state constitutional challenge and is under

review by the Kansas Supreme Court.  It is uncertain whether Kansas Lottery casino located in

Cherokee County will come to pass.

57.    Pursuant to this Act, and subject to the decision of the Kansas Supreme Court,

Cherokee County held an election in which county residents voted in favor of locating a Kansas

Lottery casino in the county.  Thereafter, the County solicited statements of qualifications from

parties wishing to be considered to serve as the casino developer and manager.  Following public

hearings, the County approved a resolution endorsing the application of Kansas Penn Gaming, an

affiliate of Penn National Gaming, Inc.

58.    Each step in this process was conducted in public, with full participation of the

people of Cherokee County.  In addition, unlike the Quapaw development, consideration of

siting a Kansas Lottery casino in Cherokee County has been conducted in a way that assures

comprehensive analysis and mitigation of its environmental, infrastructural, and public finance

impacts.  Kansas Penn Gaming is fully supporting Cherokee County's effort to assure that all

environmental, infrastructural, and public finance impacts associated with gaming in the area are

properly addressed.  With respect to the possible Kansas Lottery casino, Kansas Penn Gaming

has committed to full compliance with Kansas environmental laws and standards and with any

applicable federal environmental laws, and has committed to address infrastructural and public

finance impacts by guaranteeing the people of Cherokee County 2% of gaming revenue and

specific reimbursement for the infrastructural and public safety costs incurred due to the Kansas

Lottery casino if it is built and operated.  Kansas Penn Gaming is also supportive of this lawsuit,

aimed at assuring full analysis and mitigation of environmental and other impacts on Cherokee

County and its citizens arising from the planned Quapaw development in Cherokee County and

just across its border.

## COUNT 1
### *Against All Defendants*
Violation of the Administrative Procedure Act for failure to conduct a Section 20 and an Indian
lands inquiry pursuant to IGRA

59.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

60.    Pursuant to IGRA, Indian gaming may lawfully take place only on "Indian lands"

as defined by that statute.

61.    In order to ensure that Indian gaming is lawful, Defendants must conduct an

"Indians lands" inquiry and render an "Indian lands" determination.  None of the Defendants

have made an "Indian lands" determination.

62.    Under IGRA, when gaming is planned or proposed on lands acquired after 1988,

Defendants must determine that gaming on such lands meets one of the exceptions under Section

20 of IGRA.

63.    Defendants' failure to take required agency action and to comply with IGRA is

final agency action within the meaning of the APA.

64.    In enacting the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, the

Congress expressly limited Indian gaming to gaming on "Indian lands" as defined in that statute

and placed strict limitations on Indian gaming on lands acquired after the date of enactment,

17

October 17, 1988.  Likewise, the Quapaw Gaming Ordinance and the Quapaw-Oklahoma Compact allow gaming only on "Indian lands."

65.     The Meh-No-Bah parcel on which gaming is to occur was not Indian lands at the time of the Secretary's acquisitions and conveyances, and because they occurred pursuant to ILCA rather than 25 C.F.R. Part 151, the acquisitions and conveyances, if effective at all, conveyed only the then-existing unrestricted, undivided individual interests, which do not qualify before or after acquisition as "Indian lands" as defined by IGRA.

66.     As a result of defendants' failure to comply with the law, the Quapaw casino resort has been under construction for many months and is about to open for gaming. The construction and imminent operation of the casino resort have caused and will continue to cause known and unknown significant environmental and other impacts that injure plaintiff.

67.     Defendants' failure to make the "Indian lands" determination and to comply with Section 20 in connection with the trust acquisition and land conveyance in the Meh-No-Bah parcel or thereafter was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law.

COUNT 2
*Against Defendants Kempthorne and Department of the Interior*
Violation of the Administrative Procedure Act Through Approval of Trust Acquisition and Land
Conveyance in Violation of IGRA and Defendants' Policies

68.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

69.     Defendants' trust acquisition of the five-sixths interest for the benefit of the Quapaw and land conveyance of the one-sixth interest to the Quapaw under restrictions against alienation in the Meh-No-Bah parcel are final agency actions within the meaning of the APA.

18

70.    In enacting the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, the Congress placed strict limitations on Indian gaming on lands acquired after the date of enactment, October 17, 1988.  To carry out its duties under IGRA, the Department of Interior promulgated a policy concerning land acquisitions and conveyances for Indian gaming, published in the Checklist.

71.    Defendants failed to follow the Department's gaming and gaming-related acquisition Checklist that requires all trust acquisitions and conveyances that are gaming-related to be effected pursuant to the regulations in 25 C.F.R. Part 151 and submitted for approval to the Office of Indian Gaming, and to comply with NEPA, among other requirements.

72.    As a result of defendants' failure to comply with the law, the Quapaw casino resort has been under construction for many months.  The construction and imminent operation of the casino resort have caused and will continue to cause known and unknown significant environmental and other impacts that injure plaintiff.

73.    Defendants' failure to follow the Checklist and conduct the required procedures, including compliance with NEPA, in connection with the trust acquisition and land conveyance in the Meh-No-Bah parcel was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law.

COUNT 3

*Against Defendants Kempthorne and Department of the Interior*
Violation of the Administrative Procedures Act Through Approval of Trust Acquisition
in Violation of NEPA and 25 CFR Part 151

74.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

19

75.     Defendants' trust acquisition of five-sixths interest in the Meh-No-Bah parcel is a final agency action within the meaning of the APA.

76.     Defendants approved the trust acquisition without following the procedures mandated by 25 C.F.R. Part 151, which include the requirement of compliance with NEPA, and without complying with the NEPA statute itself.

77.     Defendants also failed to comply with the requirement that public notice of the trust acquisition be provided by notice in the Federal Register or in a local newspaper, thereby depriving plaintiffs and other interested parties from learning of the trust acquisition prior to the defendants' final decision.

78.     As a result of defendants' failure to comply with the law, the Quapaw casino resort has been under construction for many months.  The construction and imminent operation of the casino resort have caused and will continue to cause known and unknown significant environmental and other impacts that injure plaintiffs.

79.     Defendants' failure to conduct the required trust acquisition procedures, including compliance with NEPA, in connection with taking the five-sixths interest in the Meh-No-Bah parcel into trust was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law.

**Prayer for Relief**

WHEREFORE, Plaintiff prays:

1.     For judgment against the Secretary of the Interior and the Department of the Interior declaring that the defendants' acquisition of and conveyance of interests in land in the

\\\DC - 023312/000002 - 2738452 v1

Meh-No-Bah parcel are presently invalid because they were accomplished without observance of law;

2.      For judgment against the Secretary, the Department of the Interior, and the National Indian Gaming Commission declaring that the Meh-No-Bah parcel does not qualify as "Indian lands" as defined in the Indian Gaming Regulatory Act;

3.      For judgment against the Secretary, the Department of the Interior, and the National Indian Gaming Commission declaring that the Meh-No-Bah parcel is not eligible for gaming under Section 20 of IGRA;

4.      For an injunction requiring the Secretary of the Interior to reopen the trust acquisitions and conveyance of the intersts in the Meh-No-Bah parcel and to make determinations concerning these acquisitions and conveyances in compliance with 25 C.F.R. Part 151 and Defendants' Checklist for Gaming Acquisition, Gaming-Related Acquisitions and IGRA Section 20 Determinations, including review under NEPA;

5.      For an injunction requiring the NIGC to notify the Quapaw Tribe that the Meh-No-Bah parcel is ineligible for gaming pursuant to IGRA, and to issue a Notice of Violation and Closure Order if at the time of entry of the injunction, or at any time thereafter that the injunction is in effect, the Quapaw conduct gaming on the Meh-No-Bah parcel;

6.      For an award of attorney fees and expenses pursuant to Section 305 of the Equal Access to Justice Act; and

7.      Such other relief that the Court deems proper.

\\\DC - 023312/000002 - 2738452 v1

Dated: June 11, 2008

Respectfully submitted,


s/Jonathan L. Abram
Jonathan L. Abram, D.C. Bar No. 389896
jlabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com

HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

David Cooper
dcooper@fisherpatterson.com
FISHER, PATTERSON, SAYLOR & SMITH, LLP
3550 SW 5th Street
Topeka, KS 66601
(785) 232-7761 (Telephone)
(785) 232-6604 (Facsimile)

22