**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-00317-RWR |
| KEMPTHORNE, et al., | ) ) | Judge Richard W. Roberts |
| Defendants. | ) ) ) | |

## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, Defendants, the United States Department of the Interior, Dirk Kempthorne, in his official capacity as Secretary of the Interior, and the National Indian Gaming Commission (collectively, "United States"), move to dismiss the First Amended Complaint on the grounds that this Court lacks jurisdiction over the Complaint and that Plaintiff fails to state any claim upon which relief can be granted, or in the alternative for summary judgment. Submitted herewith is Defendants' Statement of Points and Authorities in Support of their Motion.

Dated: June 23, 2008                    Respectfully submitted,

/s/
_____

AMY S. TRYON

Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
(202) 353-8596
amy.tryon@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-00317-RWR |
| KEMPTHORNE, et al., | ) ) | Judge Richard W. Roberts |
| Defendants. | ) ) ) | |

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THE UNITED STATES'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General

AMY S. TRYON
GINA L. ALLERY
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
(202) 353-8596
amy.tryon@usdoj.gov

# TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  FACTUAL AND STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     The Meh-No-Bah Allotment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.     The Indian Land Consolidation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     The Indian Gaming Regulatory Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.     The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  APPLICABLE STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.     Standard for Dismissal under Rules 12(b)(1) and 12(b)(6) . . . . . . . . . . . . . . . . 8

      B.     Conversion of Motion for Dismissal to Motion for Summary Judgment . . . . . . . 9

      C.     Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      D.     Review of Agency Action Under the Administrative Procedure Act . . . . . . . . . 11

V.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.     Plaintiff lacks standing to challenge the ILCA transfer. . . . . . . . . . . . . . . . . 16

            1.     Plaintiff's alleged injuries bear no causal connection to the
                   federal conduct Plaintiff challenges. . . . . . . . . . . . . . . . . . . . . . . 17

                  a.     Plaintiff has alleged only gaming-related injuries. . . . . . . . . . . 18

                  b.     The ILCA transfer of the Meh-No-Bah Allotment into
                      trust for the Quapaw Tribe did not authorize gaming
                      on the land. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                  c.     The ILCA transfer had no effect on the lawfulness of
                      gaming on the Meh-No-Bah Allotment because the land
                      was "Indian lands" both before and after the transfer. . . . . . . . . 21

            2.     The relief Plaintiff seeks would not redress its alleged injuries. . . . . . . 23

3.    Plaintiff lacks prudential standing because it falls
outside ILCA's "zone of interests." . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    Plaintiff's claim that the land transfer is invalid is barred
by the Quiet Title Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.    The ILCA transfer of the Meh-No-Bah Allotment did not require NEPA
documentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    The Secretary was not required to refer the Meh-No-Bah transfer
to the Office of Indian Gaming Management. . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.    The Checklist is irrelevant to the ILCA transfer of
the Meh-No-Bah Allotment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.    The Checklist is not binding on the Secretary. . . . . . . . . . . . . . . . . . . 31

E.    The Section 151 regulations are irrelevant to the ILCA transfer because they
implement an entirely different statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

F.    Under the APA, Plaintiff cannot challenge the lack of an "Indian lands"
determination because there has been no final agency action. . . . . . . . . . . . . . 35

VI.  <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Attached:**

Exhibit 1, <u>North County Cmty. Alliance, Inc. v. Kempthorne</u>, Case No. 2:07-cv-01098-JCC
(W.D. Wash. Nov. 16, 2007)

# I.  INTRODUCTION

Pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, Defendants, the United States Department of the Interior, the Secretary of the Interior, and the National Indian Gaming Commission ("NIGC") (collectively, "United States"), by undersigned counsel, hereby respectfully submit this Statement of Points and Authorities in support of their Motion to Dismiss Plaintiff's First Amended Complaint ("Complaint") or in the Alternative for Summary Judgment.  For the reasons described below, this Court lacks jurisdiction to hear the primary claim raised in the Complaint.  In addition, the Complaint fails to state any claim against the United States upon which relief can be granted.  The United States therefore respectfully requests that the Court dismiss the Complaint, or grant summary judgment in its favor.

# II.  PROCEDURAL HISTORY

On February 25, 2008, Plaintiff filed a complaint alleging that the United States had violated the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, when it transferred a parcel of land known as the Meh-No-Bah Allotment from a trust status benefitting individual Indians into trust on behalf of the Quapaw Tribe of Oklahoma ("Tribe").  The United States moved to dismiss the complaint on the ground that Plaintiff lacked standing to challenge the transfer of the Meh-No-Bah Allotment because the transfer had not caused Plaintiff any injury.

Plaintiff responded by filing its First Amended Complaint.  In the new Complaint, Plaintiff reiterates its challenge to the United States's transfer of beneficial interest in the Meh-No-Bah Allotment to the Quapaw Tribe.  Plaintiff has also added the NIGC as a defendant – even though there is no final agency action the NIGC took or could have taken relating to the

land at issue – and raised a new claim against the NIGC, claiming the NIGC failed to make a required determination that the Meh-No-Bah Allotment was "Indian lands." The Complaint also includes numerous new unsupported assertions and allegations, none of which states a claim against the United States. The United States now again moves for dismissal of the Complaint, or in the alternative for summary judgment.

### III.  FACTUAL AND STATUTORY BACKGROUND

**A.    The Meh-No-Bah Allotment**

Plaintiff's Complaint centers around the construction and development of a casino/hotel complex by the Quapaw Tribe in the northeastern corner of Oklahoma, where the State borders Kansas and Missouri. Am. Compl. at 1. The project consists of the construction of the casino/hotel complex, infrastructure, and amenities on 85 acres of land in Oklahoma; surface vehicle parking and a driveway on approximately 63 acres in Kansas; and an extension of the driveway on approximately 30 acres in Missouri.[1] Ex. 1(C) to Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., ¶ 2. The development is largely complete, and the Tribe has announced plans to open the casino for business on or about July 4, 2008. See Am. Compl. at 3. Plaintiff is planning its own privately managed casino nearby. Id. at 16.

The land on which the gaming establishment will be located is, in its entirety, a parcel of land in Oklahoma known as the Meh-No-Bah Allotment. Ex. 1(C) to Pl.'s Prelim. Inj. Mem., ¶ 3. The parcel is named for its original allottee, Meh-No-Bah Rabbit, a member of the Quapaw

---

[1]All 63 acres in Kansas, where Plaintiff is located, are owned by the Tribe in fee simple. As such, that parcel is subject to the State of Kansas's jurisdiction.

2

Tribe who was allotted the land in 1895.  Id. Ex. 2(C) at 4; AR 192; see AR 45.[2]  After Meh-No-Bah's death in 1905, the Allotment passed in fractionated trust or restricted interests to her heirs through several generations.  Ex. 2(C) to Pl.'s Prelim. Inj. Mem., at 5-6; AR 192.  At the beginning of April 2007, the entire Meh-No-Bah Allotment was held by the United States in trust for four individual Indians and one Indian estate in varying shares.[3]  In five separate transactions over the next three months, the United States transferred five-sixths of the Allotment from its individual Indian landowners in trust to the Quapaw Tribe; the remaining one-sixth of the land was transferred to the Tribe in restricted fee status.[4]  All five transactions took place pursuant to the Indian Land Consolidation Act ("ILCA"), 25 U.S.C. §§ 2201-2221.  See Deeds to Restricted Indian Land [AR 19, 63, 111, 132, 140].  The first two transactions each involved a one-quarter undivided beneficial interest in the Allotment, for a total of a one-half undivided interest.  These interests were transferred from their individual Indian owners into trust for the Tribe on April 27, 2007.  AR 19, 63.  Two additional one-sixth beneficial interests were transferred from their individual Indian owners into trust for the Tribe on May 18, 2007 and July 6, 2007, respectively.

---

[2]Citations to "AR" are to pages of the Certified Administrative Record.

[3]Contrary to Plaintiff's unsupported allegations, see Am. Compl. at 8-9, all five individuals (four living, one deceased) who owned beneficial interests in the Meh-No-Bah Allotment are Indians. George McWatters and Yannah Stephenson, who each held a one-quarter interest, are members of the Quapaw Tribe.  AR 22, 69.  Jan Killough, who held a one-sixth interest, is a member of the Comanche Nation.  AR 123.  Bobbie Rae Starr, who held a one-sixth interest, is a member of the Peoria Tribe of Indians of Oklahoma.  AR 139.  Billy Lewis Urquhart, whose estate held a one-sixth interest, was a member of the Creek Nation.  AR 140.

[4]The title of restricted fee land is held by the Indian tribe with specific federally-imposed restrictions on its use and/or disposition.  As the Supreme Court has noted, "[t]he power of Congress over 'trust' and 'restricted' lands is the same and in practice the terms have been used interchangeably."  Okla. Tax Comm'n v. United States, 319 U.S. 598, 618 (1943) (citation omitted).

3

AR 111, 132.  The final transaction, on July 10, 2007, involved the transfer of the remaining one-sixth undivided beneficial interest in the Allotment to the Tribe in restricted fee status.  AR 140.  Thus, after July 2007, the Meh-No-Bah Allotment was held by the United States in trust and restricted fee solely for the Quapaw Tribe.

Plaintiff alleges that the Meh-No-Bah Allotment lost its restricted status by 1921 because the names of Meh-No-Bah's heirs were not included in a 1921 Act of Congress extending restrictions on land belonging to certain named Quapaw allottees.  Am. Compl. at 6-7.  However, the deeds transferring the fractionated interests in the Allotment make clear that the land was restricted Indian land.  See AR 19, 63, 111, 132, 140.  Moreover, the Meh-No-Bah Allotment and other parcels of land were allotted to members of the Quapaw Tribe pursuant to an Act of the Quapaw National Council approved on March 23, 1893, and ratified and confirmed by Congress with the Act of March 2, 1895, 28 Stat. 876, 907.  At the time of allotment, the land became Indian country.  "'Indian country'. . . means . . . (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."  18 U.S.C. § 1151.  Although Congress enacted Section 1151 as a guide to federal criminal jurisdiction, the Supreme Court has applied its definition of Indian country to questions of federal civil jurisdiction and tribal jurisdiction.  California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208 (1987); DeCoteau v. Dist. County Court for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975).  Therefore, the Meh-No-Bah Allotment has always been Indian country.

**B.      The Indian Land Consolidation Act**

ILCA was adopted in 1983 "in part to reduce fractionated ownership of allotted lands" resulting from the unsuccessful historic federal allotment policy.  Babbitt v. Youpee, 519 U.S.

4

234, 238 (1997).  From the 1870s until 1934, the United States followed a policy, reflected in the

General Allotment Act, 24 Stat. 388, of dismantling Indian tribal governments, allotting parcels

of tribal land to individual members, and conveying "surplus" tribal land to non-Indians.  The

allotment policy ultimately resulted in a large-scale transfer of Indian lands out of Indian

ownership, which undermined tribal communities and impoverished the tribes and their

members.  See Hodel v. Irving, 481 U.S. 704, 707-08 (1987) (describing allotment policy as

"disastrous for the Indians"); see also Felix Cohen, Handbook of Federal Indian Law § 1.04

(1982 ed.).  Allotment also created the problem of "undivided fractionated interests."  As the

House Committee on Interior and Insular Affairs explained when recommending ILCA for

passage,

> If an Indian possessed of an allotment failed to make a will (and most Indians did
> not make wills), all heirs would inherit a fraction of this allotment.  The allotment
> would then be owned in "undivided" interests because the heirs would own all of
> the allotment together instead of each person having a specific part of the
> allotment. . . . [C]ourts have interpreted the law as to allow partition only if all the
> heirs agree to it. . . . [S]ome allotments have been passed on from generation to
> generation with the number of owners rapidly multiplying – in some cases owners
> have only 1/1000th share of the original 160 acre tract.

H.R. Rep. No. 97-908, at 10 (1982).

ILCA was designed to solve these problems.  In particular, the law aimed "to allow Indian

tribes: (1) to consolidate their tribal landholdings; (2) to eliminate certain undivided fractionated

interests in Indian trust or restricted lands; and (3) to keep trust or restricted lands in Indian

ownership by allowing tribes to adopt certain laws restricting inheritance of Indian lands to

Indians."  Id. at 9.  The statute provides several means of accomplishing the twin goals of tribal

land consolidation and elimination of fractionated interests.  It authorizes Indian tribes to adopt

land consolidation plans and submit them for approval by the Secretary.  25 U.S.C. § 2203.

ILCA also describes specific methods tribes can use to acquire and consolidate land holdings.

For example, if an Indian tribe owns more than 50 percent of a tract of trust or restricted land

within the tribe's reservation, or has the consent of the owners of more than 50 percent of such

land, the tribe may purchase the remainder of the tract for its fair market value.  Id. § 2204.  An

amendment to the statute in 2000 created a pilot land consolidation program, giving the Secretary

discretionary authority to acquire certain fractional interests in trust or restricted lands, at fair

market value and with the consent of the owner, to be held in trust for the relevant tribe.  Id. §

2212(a).  In 2004, Congress appropriated nearly $22 million for Indian land consolidation, noting

that the pilot program "has been successful in slowing the problem [of fractionated interests] on

those few reservations where it has been implemented" but that "more needs to be done."  S.

Rep. No. 108-89 (2003).  Of that $22 million appropriation, $1 million was earmarked for land

consolidation efforts by the Quapaw Tribe.  H.R. Rep. No. 108-330 (2003).

Consistent with these statutory goals, and using funds from the $1 million earmark, the

land at issue in this case, the Meh-No-Bah Allotment, was transferred to the Quapaw Tribe.  The

transfer took place in pieces under different sections of ILCA.  Four of the five individual Indian

owners of the allotment consented to the transfer of their shares of beneficial interest to the Tribe

in exchange for a payment of assessed fair market value.  See AR 19, 63, 111, 132.  Their shares

of the beneficial interest were transferred to the Tribe under 25 U.S.C. § 2212.  Id.  The fifth

owner was deceased and thus unable to consent to the transfer of his share, so the Tribe

purchased the share from the owner's estate for its fair market value under 25 U.S.C. § 2204.

See AR 140.

C.    **The Indian Gaming Regulatory Act**

IGRA was enacted in 1988, designed "in large part to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'" Citizens Exposing Truth About Casinos v. Kempthorne, 492 F.3d 460, 462 (D.C. Cir. 2007) ("CETAC") (quoting Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852, 865 (D.C. Cir. 2006) ("TOMAC"); 25 U.S.C. § 2702(1)). IGRA recognizes that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands" as long as the gaming complies with federal law and takes place in a state where gaming is not prohibited. 25 U.S.C. § 2701(5). The statute regulates various aspects of Indian gaming. For example, a tribe that wishes to conduct gaming under IGRA must adopt a tribal gaming ordinance that meets certain requirements. See id. § 2710. A tribe wishing to contract with an outside manager for the management of a gaming facility must first obtain approval of the management contract. See id. § 2711. In addition, with certain important exceptions, IGRA generally prohibits gaming activities on land acquired into trust by the United States after October 17, 1988. Id. § 2719(a).

IGRA established the NIGC, id. § 2704, granting it specific authority over certain aspects of Indian gaming, while granting specific authority for other aspects of Indian gaming to the Secretary, Indian tribes, and the States. IGRA authorizes the NIGC Chairman to bring enforcement actions and collect civil fines for substantial violations of IGRA, NIGC regulations, and approved tribal gaming ordinances. Id. § 2713(a). The Chairman has the authority to temporarily close Indian gaming, and the full Commission has the authority to halt gaming permanently if it finds a substantial violation. Id. § 2713(b).

7

**D.    The National Environmental Policy Act**

NEPA sets forth "a broad national commitment to protecting and promoting environmental quality." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989).  However, NEPA is a procedural statute; it requires federal agencies to follow certain procedures when making decisions, but "does not mandate particular consequences." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991).  NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." Duncan's Point Lot Owners Ass'n v. Fed. Energy Reg. Comm., 522 F.3d 371, 376 (D.C. Cir. 2008) (citing 42 U.S.C. § 4332(C)).  NEPA applies, however, only when an agency contemplates a major federal action and that action would significantly affect the quality of the human environment. See Found. on Econ. Trends v. Lyng, 817 F.2d 882, 885 (D.C. Cir. 1987) (major federal action is "a *sine qua non* of NEPA's applicability (in addition to the requirement of 'significantly affecting' the environment)").

## IV.    APPLICABLE STANDARDS

**A.    Standard for Dismissal under Rules 12(b)(1) and 12(b)(6)**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint for lack of subject matter jurisdiction.  If a plaintiff lacks standing to bring a claim, that is a defect in the court's subject matter jurisdiction over the claim. See Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (citing Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986)).  "Although the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint

standing alone, where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted) (citation omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the Court to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Generally, under this standard, the Court accepts the allegations within the complaint as true and resolves ambiguities in favor of the pleader.  See Harbury v. Deutch, 244 F.3d 956, 958 (D.C. Cir. 2001); Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 234 (D.D.C. 2002).  However, the Court "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." Guam Indus. Servs., Inc. v. Rumsfeld, 405 F. Supp. 2d 16, 19 (D.D.C. 2005) (citing Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004); Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).

**B.      Conversion of Motion for Dismissal to Motion for Summary Judgment**

Rule 12(d) of the Federal Rules of Civil Procedure provides for the conversion of a Rule 12(b)(6) motion to dismiss to a motion for summary judgment where "matters outside the pleadings are presented to and not excluded by the court" after there has been a "reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d). However, a court may take judicial notice of matters in the general public record, including

records and reports of administrative agencies, without converting a motion to dismiss into a

motion for summary judgment.  <u>See</u> <u>Am. Farm Bureau v. EPA</u>, 121 F. Supp. 2d 84, 106 (D.D.C.

2000) (citing <u>Black v. Arthur</u>, 18 F. Supp. 2d 1127, 1131 (D. Or. 1998)).  Further, where a

challenge to an agency decision presents only legal questions concerning, for example, "whether

the agency adhered to the standards of decisionmaking required [by law]," the court may "consult

the record to answer the legal question before the court" without converting a 12(b)(6) motion

into one for summary judgment.  <u>Marshall County Health Care Auth. v Shalala</u>, 988 F.2d 1221,

1226 (D.C. Cir. 1993); <u>see also</u> <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C.

Cir. 2001) ("As we have repeatedly recognized, however, when a party seeks review of agency

action under the APA . . . [t]he 'entire case' on review is a question of law.").  Finally,

conversion of a motion to dismiss to one for summary judgment does not entitle a plaintiff to

discovery: "Challengers to agency action are not . . . ordinarily entitled to augment the agency's

record with either discovery or testimony presented in the district court."  <u>Marshall County</u>

<u>Health Care Authority</u>, 988 F.2d at 1226; <u>see also</u> <u>Am. Bioscience, Inc.</u>, 269 F.3d at 1083

("Absent very unusual circumstances the district court does not take testimony.").

## C.    Standard for Summary Judgment

In the event the Court finds it necessary to convert the United States's motion to a

summary judgment motion, Rule 56 of the Federal Rules of Civil Procedure provides that

summary judgment shall be rendered if there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law.  Rule 56 is "an integral part of the

Federal Rules as a whole" insofar as it allows for the dismissal of "factually insufficient claims"

before trial, and thereby prevents the "unwarranted consumption of public and private resources"

required by a trial of such meritless claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

**D.    Review of Agency Action Under the Administrative Procedure Act**

Plaintiff's claims are brought via the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which provides for judicial review of certain administrative actions: namely, "agency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court."  Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005) (quoting 5 U.S.C. § 704).  Section 706(2)(A) of the APA provides that a court may set aside agency action where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  This standard encompasses a presumption in favor of the validity of agency action.  Thus, "the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 753 (D.C. Cir. 2007).  The reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).

Review is based on an examination of the administrative record.  5 U.S.C. § 706; Am. Bioscience, Inc., 269 F.3d at1084 (citing Overton Park, 401 U.S. 402).  The APA "standard of review is a highly deferential one, which presumes the agency's actions to be valid" and "requires affirmance if a rational basis exists for the agency's decision."   Am. Fin. Servs. Ass'n v. Fed. Trade Comm'n, 767 F.2d 957, 985 (D.C. Cir. 1985) (citations omitted).

The APA's definition of "agency action" includes an agency's failure to act.  See

11

Kaufman v. Mukasey, 524 F.3d 1334, 1337-38 (D.C. Cir. 2008) (citing 5 U.S.C. § 551(13)). Under the statute, a court is authorized to "compel agency action unlawfully withheld or unreasonably delayed." Id. (quoting 5 U.S.C. § 706(1)).  However, a plaintiff may challenge an agency's failure to act under the APA "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Id. (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61, 64 (2004)).

## V.  ARGUMENT

Plaintiff challenges the Secretary's transfer under ILCA of beneficial interest in the Meh-No-Bah Allotment from individual Indians to the Quapaw Tribe.  First, Plaintiff contends that the ILCA transfer will permit the construction of a casino resort on the Allotment without the proper environmental review.  Am. Compl. at 1-2.  In particular, Plaintiff alleges that the Secretary failed to comply with NEPA before effecting the transfer; failed to abide by an internal guidance document for gaming-related land acquisitions; and neglected to apply the regulations found in 25 C.F.R. Part 151.  Id. at 18-19.  Second, Plaintiff suggests that the beneficial interests in the Meh-No-Bah Allotment were not eligible for transfer under ILCA in the first place because the Allotment had fallen out of restricted status by 1921.  For relief, Plaintiff asks this Court to declare the United States's transfer of the Meh-No-Bah Allotment invalid and to require the Secretary to reopen the Meh-No-Bah conveyance and conduct certain NEPA review.  Id. at 20-21.[5]

---

[5]In its original complaint, Plaintiff also requested this Court (1) to enjoin the United States from acting on any pending land conveyances relating to the Quapaw Tribe's casino development and (2) to enjoin the Secretary and those acting in concert with him from conducting any further construction activity on the property and from operating the casino.  These claims were not included in the First Amended Complaint and are therefore waived.  See, e.g., Armstrong v.

These claims should be dismissed because Plaintiff lacks standing to challenge the transfer of the Meh-No-Bah Allotment. The transfer of beneficial interest took place pursuant to ILCA, which, as described above, was designed exclusively to benefit Indians and Indian tribes by helping eliminate pernicious fractionated interests and consolidate land for tribal governance. The Meh-No-Bah Allotment had been held by the United States in trust or restricted status for various individual Indians for more than a century. To complete the ILCA transfer of the Allotment, the Secretary simply shifted the beneficiary of the fractionated interests in the property from individual Indians to the Quapaw Tribe; the United States remained the trustee. The individuals were paid compensation for their interest in the land. Nothing about this transfer had any effect on Plaintiff whatsoever, let alone resulted in an injury that would confer standing on Plaintiff to challenge the transaction.

All of Plaintiff's alleged injuries are gaming-related. However, the ILCA transfer of beneficial interest in no way allowed or authorized gaming to occur on the land. The transfer was a simple change in beneficial owner that had no bearing on any issues related to gaming. Transferring beneficial interest in the land to the Tribe was neither sufficient nor necessary for gaming to lawfully occur there. Because Plaintiff's only claimed injuries relate to the prospective operation of a casino on the transferred parcel, Plaintiff has alleged no injury resulting from or attributable to the transfer of beneficial interest itself – the only federal action Plaintiff challenges. Likewise, the remedy Plaintiff ultimately seeks, a re-do of the ILCA transfer

Executive Office of the President, 810 F. Supp. 335, 337 n.1 (D.D.C. 1993), rev'd on other grounds, 90 F.3d 553 (D.C. Cir. 1996). For the same reason, Plaintiff's motion for a preliminary injunction ordering the Secretary to halt construction, filed on the same day as Plaintiff's original complaint, is now moot.

accompanied by NEPA review, would not redress Plaintiff's injuries: those injuries all relate to the prospective operation of a casino, and the ILCA transfer – whether accompanied by NEPA documents or not – has no bearing on whether a casino may lawfully be operated on the site. Without an injury fairly traceable to the challenged federal conduct, and redressable by the relief sought, Plaintiff lacks constitutional standing to sue. Plaintiff also lacks prudential standing because it is not within the zone of interests that ILCA was designed to protect. As a result, Plaintiff's challenge to the ILCA transfer should be dismissed for lack of standing.

Moreover, as described above, Plaintiff has attempted to establish that the Meh-No-Bah Allotment had fallen out of restricted status by 1921, and, presumably, that the land was therefore not eligible for gaming before the ILCA transfer at issue here. See Am. Compl. at 11. If this theory is correct, however, Plaintiff's challenge to the ILCA transfer is barred by the sovereign immunity of the United States, which Congress expressly declined to waive in the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a. The QTA preserves sovereign immunity in cases challenging title to trust or restricted Indian lands. If Plaintiff is correct that the Meh-No-Bah Allotment lost restricted status decades ago, then to invalidate the ILCA transfer would return the land to its former fee simple owners and wholly divest the United States of title to the land. Such a claim is barred by sovereign immunity.

Even if Plaintiff had standing to challenge the ILCA transfer and the challenge was not barred by the QTA, its claim under NEPA fails because no NEPA documentation is required for actions that do nothing but preserve the regulatory status quo, such as the land transfer here, and in any event the NEPA claim is moot because the casino construction is virtually complete. Plaintiff's contention that the Secretary violated an internal guidance document when transferring

14

the land is incorrect because the document was both non-binding and inapplicable to the Meh-No-Bah transfer.  Likewise, Plaintiff wrongly alleges that the Secretary was required to abide by the regulations found in 25 C.F.R. Part 151, because those regulations apply to the initial acquisition of land in trust by the United States under a separate statute and have no application to ILCA transfers of beneficial interests in trust land.[6]

Finally, Plaintiff newly alleges that the Defendants were required, and failed, to conduct an "Indian lands" inquiry and render an "Indian lands" determination about the Meh-No-Bah Allotment, as well as a determination that gaming is not prohibited by Section 20 of IGRA, 25 U.S.C. § 2719.[7]  Am. Compl. at 17.  Plaintiff asks this Court to declare that the Allotment is not "Indian lands" and is not eligible for gaming under Section 20 of IGRA.  Id. at 21.  Plaintiff further seeks an injunction requiring the NIGC to notify the Tribe that the parcel is ineligible for gaming and issue a notice of violation and closure order if the Tribe begins gaming on the parcel. Id.  This allegation fails to state a claim under the APA, because the APA allows a plaintiff to challenge an agency's failure to act only where the agency has neglected to take an action it was required by law to take.  Here, neither the NIGC nor the Secretary had a statutory or regulatory

---

[6]The Amended Complaint also includes an assortment of unsupported factual assertions about the Tribe's role in the five transfers of beneficial interest in the Meh-No-Bah Allotment and the amount of compensation paid to the former beneficial owners.  Am. Compl. at 7-9.  Plaintiff also mentions that the reason it amended its original complaint is that Plaintiff "has become aware of additional facts and circumstances" after being "contacted by different third parties with an interest in the events surrounding the development of the Quapaw casino resort."  Id. at 2. Although Plaintiff does not appear to marshal these unsupported assertions behind any actual legal claim, the United States notes that Plaintiff does not have standing to raise complaints of third parties.

[7]Under IGRA, Indian gaming may take place only on "Indian lands."  25 U.S.C. § 2710(b)(1) & (d)(3).

obligation to formally determine whether the Meh-No-Bah Allotment qualifies as "Indian lands." In addition, no gaming is yet taking place on the property; and even if gaming were taking place and were unlawful, the exclusive authority to bring an enforcement action against the Tribe would lie in the NIGC's discretion. Accordingly, Plaintiff's "Indian lands" determination claim should be dismissed.

## A.    Plaintiff lacks standing to challenge the ILCA transfer.

The only completed federal action Plaintiff targets in its Complaint is the transfer of the beneficial interests in the Meh-No-Bah Allotment, under ILCA, from trust status for individual Indians into trust status for the Quapaw Tribe. Plaintiff asks this Court to invalidate that conveyance as well as to require the United States to re-conduct the transfer while preparing NEPA documentation. Am. Compl. at 20-21. However, Plaintiff lacks standing to challenge the ILCA transfer of the Meh-No-Bah Allotment. The only effect of the transfer was to change the beneficiary of the trust land from four individual Indians and one Indian estate to the Quapaw Tribe. Plaintiff suffered no injury as a result of this land transfer – in fact, the transaction had no effect on Plaintiff whatsoever.

"The 'irreducible constitutional minimum of standing contains three elements': (1) the plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be 'likely,' not 'speculative,' that the court can redress the injury." Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). It is a plaintiff's burden to establish standing to sue. See KERM, Inc. v. FCC, 353 F.3d 57, 59 (D.C.

16

Cir. 2004).  In this case, even assuming that Plaintiff's feared future injuries qualify as

"imminent," the second and third elements of standing are absent because Plaintiff's injuries bear

no causal connection to the challenged federal action, and because the relief Plaintiff seeks would

not redress its injuries.

### 1. Plaintiff's alleged injuries bear no causal connection to the federal conduct Plaintiff challenges.

"No more fundamental component of standing doctrine exists than the requirement of a

presently demonstrable injury in fact directly traceable to the defendant's supposedly unlawful

actions." Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 54 (D.C. Cir. 1991).  Here, all of the

injuries Plaintiff alleges either stem from the Tribe's current construction activities or are

anticipated by Plaintiff as a future result of the Tribe's prospective operation of its casino.  See,

e.g., Am. Compl. at 14 (alleging Plaintiff "will bear the cost of repairing its roads that have

already been damaged by Quapaw construction equipment" and "the cost imposed by the

dramatic increase in vehicle traffic caused by the Quapaw's 24-hour a day, 365-day a year casino

resort").  These injuries have no causal link to the ILCA transfer of beneficial interests, which is

the only federal action Plaintiff challenges.  The Secretary's act of approving the ILCA transfer

in no way authorized or enabled the Tribe to build a casino and conduct gaming on the parcel.

Facially, the ILCA transfer was done for the Congressionally-approved purposes of tribal land

consolidation, not gaming.  But there are no hidden gaming-related consequences of the

transaction.  The transfer of the Meh-No-Bah Allotment into trust for the Tribe was neither

sufficient nor necessary for Indian gaming to lawfully occur there.  Whether and under what

circumstances an Indian tribe may engage in gaming activities is determined by IGRA.  In

17

addition, when lawful gaming *is* permitted, it is permitted on "Indian lands," a term which

includes individual as well as tribal trust or restricted land.  See 25 U.S.C. § 2703(4).  The Meh-

No-Bah Allotment was "Indian lands" both before and after the transfer at issue here.  In short,

the ILCA transfer did not allow or authorize the Tribe to construct a casino or to engage in

gaming on the land.  Because none of Plaintiff's alleged injuries actually result from the federal

action Plaintiff seeks to set aside, it has no standing to challenge the ILCA transfer.[8]

### a.  Plaintiff has alleged only gaming-related injuries.

In its Amended Complaint, Plaintiff alleges the following injuries: (1) the cost of

repairing roads damaged by the Quapaw Tribe's construction equipment; (2) the cost that will be

imposed by increased vehicle traffic caused by operation of a 24-hours-a-day, 365-days-a-year

casino; (3) "the public safety burden caused by Quapaw casino customers' vehicular accidents

and fatalities, and of any crime or disorderly behavior that spill into the parking lot or further into

the county," (4) funding of five new law enforcement personnel "to patrol the vicinity of the

casino parking area and respond to service calls in the area"; and (5) the cost of "a new public

safety facility in the vicinity of the Quapaw casino to provide timely and adequate fire and

---

[8]This causation analysis does not change even if Plaintiff frames its injuries as resulting from the
United States's failure to comply with NEPA when effecting the transfer of the Meh-No-Bah
Allotment.  "Where plaintiffs allege injury resulting from violation of a procedural right afforded
to them by statute and designed to protect their threatened concrete interest, the courts relax –
while not wholly eliminating – the issues of imminence and redressability, but not the issues of
injury in fact or causation."  Ctr. for Law & Educ., 396 F.3d at 1157 (emphasis omitted).
Causation is lacking here from every angle.  Whether or not the United States properly complied
with NEPA's procedural requirements when transferring the Allotment, the fact remains that the
Plaintiff's injuries stem from the Tribe's prospective *gaming activity* on the land, and the ILCA
transfer did not authorize, allow, enable, or otherwise cause that gaming activity.

ambulance services." Am. Compl. at 14-15.[9]  All of these injuries plainly relate either to the Tribe's current construction activity on its land or to the Tribe's anticipated future operation of a casino on that land.  As shown below, however, none of the injuries bears a causal relationship to the federal action Plaintiff challenges in this case.  The ILCA transfer is neither a direct cause nor even a but-for cause of Plaintiff's alleged injuries.

### b.  The ILCA transfer of the Meh-No-Bah Allotment into trust for the Quapaw Tribe did not authorize gaming on the land.

The legal and practical effect of the ILCA transfer was simply to change the trust beneficiaries of the Meh-No-Bah Allotment from several individual Indians to the Quapaw Tribe. In other words, the fractional interests owned by the individual Indians were consolidated in the Tribe.  The United States was trustee of the land before the transfer, and it remained trustee after the transfer.  ILCA is "primarily directed to exchanges of Indian tribal lands for individual Indian trust lands (e.g., allotments) in an effort to consolidate tribal land holdings."  Ute Indian Tribe v. Utah, 935 F. Supp. 1473, 1504 (D. Utah 1996).  Congress favored consolidation so that tribes could eliminate checkerboard patterns of ownership, which in turn would "reduce instances of fractionated heirship in trust lands and provide land for tribal programs designed to improve the economy of the tribe and its members."  Id. (quoting H. Rep. No. 97-908, at 5).  The actual land transfers themselves, however, do not authorize any programs or projects, especially not gaming,

---

[9]Plaintiff also describes its suspicions that the Quapaw Tribe has violated the Clean Water Act. Am. Compl. at 15-16.  These suspicions are patently irrelevant to the present lawsuit, where the Tribe is not even a party.  If Plaintiff has been adversely affected by a person's alleged violations of the Clean Water Act, Plaintiff may initiate a citizen suit against that person after providing 60 days' notice.  See 33 U.S.C. § 1365; Citizens Coordinating Comm. on Friendship Heights, Inc. v. Wash. Metro. Area Transit Auth., 765 F.2d 1169, 1172 (D.C. Cir. 1985) (describing Clean Water Act citizen suit process).

which is subject to its entire own statutory scheme. Plaintiff's alleged injuries, which all pertain

to gaming on the Allotment, have no causal connection to the ILCA transfer.

The circumstances under which an Indian tribe may engage in gaming activity are

specified by IGRA. There are many restrictions on Indian gaming that have nothing to do with

ownership of the land, so the mere fact that the Quapaw Tribe is now the trust beneficiary of the

Meh-No-Bah Allotment does not mean that gaming is suddenly allowed on the land. For

example, "IGRA requires tribes that engage or intend to engage in 'class III gaming' . . . to

negotiate, enter into, and comply with a compact between the tribe and the state in which the

gaming will occur." San Manuel Indian Bingo & Casino v. Nat'l Labor Relations Bd., 475 F.3d

1306, 1317 (D.C. Cir. 2007) (citing 25 U.S.C. § 2710(d)(1)(C), (3)(A)).[10] In addition, Class III

Indian gaming can be lawful "only if authorized by a tribal ordinance or resolution approved by

the Chairman of the National Indian Gaming Commission." Id. at 1318 (citing 25 U.S.C. §

2710(d)(1)(A). To suggest that the mere transfer of the Allotment from one trust status to

another authorized or caused the Quapaw Tribe's gaming to go forward is to ignore the entire

statutory scheme that was designed to regulate Indian gaming.

Plaintiff's misapprehension of the cause and effect at work in this case is embodied in its

statement, "As a result of defendants' failure to comply with the law, the Quapaw casino resort

---

[10]IGRA divides gaming activities into three classes. Class I gaming includes social games for
minimal prizes and traditional forms of gaming in connection with tribal ceremonies or
celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive jurisdiction of the
tribe and not regulated under IGRA. Id. § 2710(a)(1). Class II gaming includes games of chance
commonly known as bingo, including pull-tabs, lotto, punch boards, tip jars, and instant bingo,
and card games which are not banked. Id. § 2703(7). Class III gaming is all forms of gaming
that are not Class I or II, including banked card games (such as blackjack) and slot machines. Id.
§ 2703(8). Class II and Class III gaming are subject to IGRA.

has been under construction for many months." Am. Compl. at 19. This statement displays

Plaintiff's failure to understand ILCA, IGRA, and the relationship between the United States and

the Tribe. So far, the only role played by the United States has been that of facilitating the

transfer of the beneficial interest in the Meh-No-Bah Allotment from individuals to the Tribe.

The United States did not endorse, authorize, allow, or cause any construction for the proposed

casino. The Tribe has engaged in construction activities on its own – activities which, to date,

involve no violation of law of which the United States is aware. The United States has taken no

action to allow or authorize gaming by the Tribe on the Allotment. Certainly the ILCA transfer

did not have that effect. Accordingly, Plaintiff's injuries, which are all related to prospective

gaming by the Tribe, simply were not caused by the federal action Plaintiff seeks to overturn –

the ILCA transfer.[11]/

> **c. The ILCA transfer had no effect on the lawfulness of gaming on the Meh-No-Bah Allotment because the land was "Indian lands" both before and after the transfer.**

Finally, the ILCA transfer did not cause Plaintiff's gaming-related injuries because the

Allotment's eligibility for use as lawful gaming land was identical both before and after the

transfer occurred. When lawful gaming is permitted, it is permitted on "Indian lands," a term

which includes individual as well as tribal trust or restricted land. 25 U.S.C. § 2703(4). Under

IGRA's statutory definition, the Meh-No-Bah Allotment was "Indian lands" both before the

transfer, when the trust beneficiaries were individual Indians, and after the transfer, when the

---

[11]/The only injury Plaintiff alleges to have already occurred is damage to its roads by the Tribe's construction equipment. Am. Compl. at 14. It is hard to imagine how the transfer of beneficial interest under ILCA from individual Indians to the Tribe, which spoke not at all to whether the Tribe could operate heavy equipment, could be deemed the cause of damage to Plaintiff's roads.

trust beneficiary became the Tribe.  Accordingly, the Allotment's eligibility for gaming remained the same after the ILCA transfer as it was before the transfer.  Plaintiff's claimed injuries, which will stem from future gaming on the parcel, thus will not have been caused by the ILCA transfer. Without an injury caused by that land transfer – the only federal action at issue – Plaintiff lacks constitutional standing to seek to invalidate the transfer.

IGRA "provide[s] a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'" TOMAC, 433 F.3d at 865 (quoting 25 U.S.C. § 2702(1)).  As noted above, the statute places many restrictions on Indian gaming.  One of these restrictions is that "[a] tribe may conduct gaming only on 'Indian lands' within its jurisdiction."  CETAC, 492 F.3d at 462 (citing 25 U.S.C. § 2710(b)(1), (d)(1)(A)(I)).  IGRA includes a definition of "Indian lands":

> (A) all lands within the limits of any Indian reservation; and

> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

Id. (citing 25 U.S.C. § 2703(4)).

The definition includes trust or restricted land held by or for "*any Indian tribe or individual.*"  25 U.S.C. § 2703(4)(B) (emphasis added).  Thus, the Meh-No-Bah Allotment was eligible for gaming before and after the ILCA transfer.[12]  The Tribe must, of course, comply with

---

[12]/The Meh-No-Bah Allotment consists of "lands located within the Quapaw Tribe of Oklahoma's jurisdictional boundary." AR 19, 63, 111, 132.  See also Ex. 1(B) to Pl.'s Prelim. Inj. Mem., Bureau of Indian Affairs Letter to NIGC (confirming that the Meh-No-Bah Allotment lies within the former historic territory of the Tribe and is tantamount to "former reservation lands" under IGRA); id. Ex. 2(C) at 9-11, Ward Letter to NIGC (describing Tribe's exercise of jurisdictional and governmental powers over the Allotment).

the other restrictions and procedures laid out in IGRA in order to game lawfully, but the simple change in trust beneficiary from the individual Indians to the Tribe did not affect the Allotment's status as "Indian lands" and, therefore, had no effect one way or the other on the land's eligibility to host gaming.

Plaintiff contends that the Meh-No-Bah Allotment lost its restricted status sometime before 1921, and thus would not have satisfied the "Indian lands" definition before being transferred to the Tribe. Am. Compl. at 11. However, contrary to Plaintiff's allegation, the Meh-No-Bah Allotment has continuously been treated as restricted Indian lands. The deeds transferring the interests in the Allotment clearly indicate those interests' restricted status. See AR 19, 63, 111, 132, 140. Accordingly, Plaintiff's alleged gaming-related injuries cannot be causally linked to the ILCA transfer.

### 2. The relief Plaintiff seeks would not redress its alleged injuries.

For the same reasons that causation is absent in this case, the third requirement for constitutional standing, redressability, is also lacking. If this Court were to grant the relief Plaintiff requests and invalidate the Secretary's transfer of the beneficial interests in the Allotment, that judgment would not necessarily affect the Tribe's construction activity or the lawfulness or unlawfulness of any future gaming that takes place on the Allotment, and thus would have no effect on Plaintiff's injuries. Nor would the NEPA review Plaintiff seeks resolve its injuries. Even were the United States to prepare an EIS, it would not necessarily preclude the Tribe from lawful operation of a casino. Because all of Plaintiff's alleged injuries could occur if the beneficial interest in the Allotment remained with the individual allottees, these injuries cannot be redressed by the relief requested. Plaintiff therefore lacks standing not only because it

23

has no injury that was caused by the United States but also because redressability is absent.  See

Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 936-37 (D.C. Cir. 2004) (lack of

redressability alone defeats plaintiffs' standing to sue).

### 3.  Plaintiff lacks prudential standing because it falls outside ILCA's "zone of interests."

Even if Plaintiff were somehow able to allege an injury directly traceable to the ILCA

transfer, Plaintiff lacks prudential standing because it is not "within the zone of interests" ILCA

was designed to protect.  See Role Models Am., Inc. v. Geren, 514 F.3d 1308, 1311-12 (D.C.

Cir. 2008).  ILCA was designed to help Indians and Indian tribes.  Counties and other municipal

organizations have no interest in whether the United States shifts beneficial interests in Indian

land from one trust beneficiary to another, and ILCA does not contain a provision for community

protection.  Nor can Plaintiff rely on NEPA's zone of interests to assert prudential standing here.

Because NEPA does not impose any substantive requirements on an agency, but simply

prescribes procedures whereby agencies can make informed decisions, "the zone-of-interests of

the EIS requirement can be examined only in conjunction with the relevant substantive

provision" – in this case, ILCA.  Grand Council of the Crees v. Fed. Energy Reg. Comm., 198

F.3d 950, 959 (D.C. Cir. 2000).  Where the substantive law at issue does not require

consideration of environmental concerns, NEPA cannot serve to further a plaintiff's

environmental interests relating to a federal action taken under that substantive law.  See id.

(holding that petitioner lacked prudential standing to bring NEPA challenge to federal

ratemaking decision under Federal Power Act ("FPA") because FPA does not require

consideration of environmental concerns).  Here, even assuming Plaintiff's injuries qualify as

24

environmental, ILCA does not require the Secretary to consider environmental concerns or community impacts, and so Plaintiff's injuries do not fall within "NEPA's zone-of-interests as applied to" ILCA.  Id.

For these reasons, Plaintiff lacks standing to challenge the ILCA transfer of the Meh-No-Bah Allotment.

**B.    Plaintiff's claim that the land transfer is invalid is barred by the Quiet Title Act.**

As described above, Plaintiff's Amended Complaint attempts to establish that the Meh-No-Bah Allotment lost its restricted status sometime before 1921 and became fee simple, unrestricted land.  If this is true, Plaintiff's challenge to the Secretary's transfer of the Meh-No-Bah Allotment is barred by sovereign immunity of the United States.  Plaintiff challenges the land transfer in two ways: directly, by asking this Court to declare the conveyances of the beneficial interests in the Meh-No-Bah Allotment invalid, and indirectly, by claiming that the Secretary violated NEPA in the transfer process.  By both of these routes, Plaintiff seeks to nullify the Secretary's transfer of beneficial interest in the Allotment to the Tribe.  However, federal sovereign immunity bars suits challenging the United States's title in trust or restricted fee Indian lands.  See Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d 956, 961-62 (10th Cir. 2004) (citing United States v. Mottaz, 476 U.S. 834, 843 (1986)).  The QTA waives the United States's sovereign immunity for suits to adjudicate disputed title to lands, but explicitly states that the waiver does not apply to trust or restricted Indian lands.  28 U.S.C. § 2409a(a).  By expressly retaining federal sovereign immunity in suits challenging title to reserved or trust Indian land, "Congress sought to prohibit third parties from interfering with the responsibility of the United States to hold lands in trust for Indian tribes."  Florida v. U.S. Dep't of Interior, 768

F.2d 1248, 1254 (11th Cir. 1985).

For a suit to be prohibited under the QTA, a plaintiff need not explicitly characterize its action as one seeking to quiet title in Indian lands. As long as the relief sought would interfere with the United States's title to the land, the Indian lands exception to the QTA bars the suit. See Neighbors, 379 F.3d at 961-62 (action seeking declaratory judgment that trust acquisition of Indian lands was null and void barred by the QTA); Metro. Water Dist. of S. Cal. v. United States, 830 F.2d 139, 143 (9th Cir. 1987) (action barred by QTA where plaintiff sought "a determination of the boundaries of the Reservation [and the] effect of a successful challenge would be to quiet title in others than the Tribe"); Shivwits Band of Paiute Indians v. Utah, 185 F. Supp. 2d 1245, 1249-52 (D. Utah 2002) (QTA prohibited plaintiffs from challenging a trust acquisition), aff'd, 428 F.3d 966 (10th Cir. 2005).

The Meh-No-Bah Allotment is currently Indian lands, held in trust by the United States for the Quapaw Tribe. If Plaintiff were correct that the Meh-No-Bah Allotment fell out of restriction decades ago and could not be considered trust or restricted land after that time, then invalidating the ILCA transfer of the Allotment would completely divest the United States of title to the land and vest fee title in the previous owners (four individual Indians and one Indian estate). This is precisely the type of result that the QTA prohibits. Accordingly, whether or not Plaintiff has standing to challenge the ILCA transfer, sovereign immunity bars Plaintiff's attempt to invalidate the Secretary's transfer of the Meh-No-Bah Allotment into trust for the Quapaw Tribe.

**C.** **The ILCA transfer of the Meh-No-Bah Allotment did not require NEPA documentation.**

Even if Plaintiff had standing to challenge any aspect of the ILCA transfer and the suit were not barred by sovereign immunity under the QTA, Plaintiff's contention that the Secretary did not comply with NEPA in conjunction with the transfer is incorrect. Under NEPA, the Secretary need not prepare an EIS for the transfer under ILCA of the Meh-No-Bah Allotment because the only effect of the transfer was a change in the holder of the beneficial interest in the land. "Discretionary agency action that does not alter the status quo does not require an EIS." Nat'l Wildife Fed'n v. Espy, 45 F.3d 1337, 1344 (9th Cir. 1995) (citing Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 235 (9th Cir. 1990)). In Espy, the court held that an EIS was not required where the plaintiff alleged no additional injury or change that would result from the agency action. Id. at 1343-44. Likewise, here, Plaintiff's claimed injuries – harms from the prospective future operation of the casino – bear no relation to the agency action Plaintiff challenges – the ILCA transfer of the land from individual to tribal trust status.

"[D]etermining whether an action perpetuates the 'regulatory status quo' is the proper measure of whether NEPA analysis should apply." Humane Soc'y v. Johanns, 520 F. Supp. 2d 8, 31 (D.D.C. 2007). Where, as here, the agency action did not trigger or create any change in the regulatory scheme, the action merely preserved the status quo and did not require an EIS. See Fund for Animals, Inc. v. Thomas, 127 F.3d 80, 83-84 (D.C. Cir. 1997) (holding that Forest Service's issuance of policy that merely confirmed the existing policy of leaving bear baiting regulation to states was not major federal action and did not require an EIS). Compare Anacostia Watershed Soc'y v. Babbitt, 871 F. Supp. 475, 481-82 (D.D.C. 1994) (National Park Service's decision to transfer jurisdiction over portions of national park to District of Columbia for construction of a children's theme park was not "mere paper transaction that did not change the

status quo" where transfer "facilitated and authorized potentially intrusive development"; Park
Service accordingly erred by not preparing NEPA documents).

As described above, the transfer had no regulatory consequences; it merely effected a
change in beneficiary from the individual allottees to the Tribe while maintaining the existing
federal trusteeship of the land.  "[W]here [ILCA] land exchanges take place within the existing
boundaries of a reservation, the transition of a particular parcel into or out of tribal ownership or
trust status has no impact on the existing jurisdictional limits." Ute Indian Tribe, 935 F. Supp. at
1505.  In contrast to the situation in Anacostia Watershed Society, here the transfer did not
facilitate, allow, or authorize gaming to occur on the property.  In short, with no regulatory or
other consequences resulting, the ILCA transfer of the Meh-No-Bah Allotment was not a "major
federal action significantly affecting the quality of the human environment."  42 U.S.C. §
4332(c).

Deciding what level of NEPA review is required is the responsibility of the agency taking
the action.  "An initial agency determination on this matter is judicially vulnerable only when the
agency has abused its discretion or has acted arbitrarily." Comm. for Auto Responsibility v.
Solomon, 603 F.2d 992, 1002 (D.C. Cir. 1979).  Here, the agency action was a simple transfer
under ILCA of the Meh-No-Bah Allotment from a holding in trust for individual Indians into a
holding in trust for the Tribe.  In keeping with Congress's goal in enacting ILCA, the transfer's
purpose and effect were to consolidate land title to stem the pernicious repercussions of the
historical allotment policy.  No change in regulatory status occurred as a result of the transfer; the
land's status as Indian lands and its eligibility for gaming remained the same before and after the
transfer.  It was therefore neither arbitrary and capricious nor an abuse of discretion for the

28

Secretary to approve the ILCA transfer without preparing a NEPA analysis.[13]

In any event, even if Plaintiff were correct that the ILCA transfer authorized the Tribe to build a casino, Plaintiff's NEPA claim would be moot because the casino is virtually complete. As Plaintiff itself notes, the casino complex is scheduled to open on or about July 4, 2008.  See Am. Compl. at 3.  Courts have routinely found NEPA challenges moot where the project in question is complete or nearly complete.  See, e.g., Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs, 217 F.3d 393, 396 (5th Cir. 2000) (where plaintiff sought NEPA review for federal decision granting construction permit for retail complex, claim was moot because the "construction authorized by the permit has been substantially completed"); Neighbors Org. to Insure a Sound Env't, Inc. v. McArtor, 878 F.2d 174, 178 (6th Cir. 1989) (in suit filed after construction, but before opening, of new airport terminal, finding NEPA claim moot because terminal was finished); Fla. Wildlife Fed'n v. Goldschmidt, 611 F.2d 547, 549 (5th Cir. 1980) (affirming denial on mootness grounds of motion for permanent injunction under NEPA of an almost-complete highway because the challenged activities "have already substantially occurred").  Here too, this Court can provide Plaintiff no meaningful relief by requiring NEPA review of a project that is essentially complete.  At this "point in the life" of the project, it "make[s] sense to hold NEPA inapplicable" because "the agency would no longer have a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 n.34 (1978) (emphasis omitted).

---

[13]Although it was within the Secretary's discretion to approve the transfers of beneficial interests in the Meh-No-Bah Allotment without conducting a NEPA analysis, it would likewise be within the Secretary's discretion to prepare appropriate NEPA documents for other ILCA transfers.

**D.    The Secretary was not required to refer the Meh-No-Bah transfer to the Office of Indian Gaming Management.**

Plaintiff also claims that the Secretary's approval of the ILCA transfer of beneficial interest in the Meh-No-Bah Allotment violated the law because the Secretary did not refer the transfer to the Office of Indian Gaming Management ("OIGM"). Am. Compl. at 19. In particular, Plaintiff alleges that the Secretary failed to abide by an internal Interior Department guidance document dated March 2005 and entitled "Checklist for Gaming Acquisitions, Gaming-Related Acquisitions, and IGRA Section 20 determinations" ("Checklist") that calls for "[a]ll requests for the acquisition of land for gaming" to be sent to OIGM. See Compl. Ex. 2(E) at 1. Again, even if Plaintiff had standing to challenge the ILCA transaction and its claim were not barred by sovereign immunity under the QTA, it has failed to state a claim for relief here. The ILCA transfer of the Meh-No-Bah Allotment was not made for purposes of gaming, so the Checklist does not apply. And, in any event, the Checklist constitutes internal guidance that is not binding on the agency.

**1.    The Checklist is irrelevant to the ILCA transfer of the Meh-No-Bah Allotment.**

The Checklist is wholly irrelevant to the transactions at issue in this case because it lists steps for processing the application packages of "requests for the acquisition of land for gaming." The transfer under ILCA of the Meh-No-Bah Allotment from individual to tribal trust status was plainly not "for gaming." Rather, it was done for the Congressionally-voiced purpose of eliminating pernicious fractionated interests in Indian trust land and consolidating those interests in tribal government.

Plaintiff claims, with no factual support, that the United States "knew at the time that it

effected all or some of the Meh-No-Bah acquisitions that the Quapaw Tribe intended to use the

Meh-No-Bah parcel for gaming." Am. Compl. at 13. However, as explained above, the transfer

of the Allotment had no effect on whether the Quapaw Tribe could lawfully build a casino or

engage in gaming on the land. Thus, the land was not acquired or transferred "for" gaming.

Rather, the land was transferred for consolidation purposes. As the Senate Appropriations

Committee stated when allocating money for tribal land consolidation efforts, "consolidating

these fractionated interests is one of the most effective means of ameliorating a problem that

grows worse every year." S. Rep. No. 108-89 (2003). The Committee specifically identified the

Quapaw as an example of "where tribal leadership has taken an active role" in slowing

fractionation, and the final appropriations bill contained $1 million for use in the Quapaw's own

land consolidation efforts. H.R. Rep. No. 108-330 (2003). Given this clear Congressional

endorsement of land consolidation by the Tribe, along with the purposes of ILCA and the fact

that the transfer of title to the Tribe did not authorize or allow gaming, it was not arbitrary and

capricious or an abuse of discretion for the Secretary to determine that the ILCA transfer of the

Meh-No-Bah Allotment was not "for gaming" and thus did not need to be referred to OIGM.

### 2. The Checklist is not binding on the Secretary.

Plaintiff incorrectly characterizes the Checklist as "official DOI policy." Am. Compl. at

12. In fact, the Checklist is not a policy statement, but rather a purely internal agency document

intended "to assist [Bureau of Indian Affairs Regional Directors] in preparing a complete land

acquisition package for review and final action." Compl. Ex. 2(E) at 1. Even if it could be

characterized as a policy statement, the Checklist does not constitute a rule or regulation, and

hence cannot be said to be binding upon the Department. Policy statements are designed merely

to inform, not to serve as mandatory rules.   Because the Checklist does not qualify as a rule under any of the standards used by the D.C. Circuit to distinguish between rules and policy statements, it should not be construed as having any binding effect upon the Department.

"[I]n cases where we have attempted to draw the line between legislative rules and statements of policy, we have considered whether the agency action (1) 'impose[s] any rights and obligations' or (2) 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" Gen. Elec. Co. v. EPA, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987)).   The Court has also considered "(1) the Agency's own characterization of its action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." Id. (quoting Molycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999)).   Finally, the D.C. Circuit has characterized the essence of those tests as a determination of whether the document in question binds private parties or the agency itself with the force of law.   Id. (finding the guidance document to have the force of law).   The Checklist does not qualify as a rule under any of these standards.   It is merely an informal internal document provided to assist BIA Regional Directors in preparing gaming and gaming-related acquisition packages for review by OIGM.   It imposes no rights or obligations on any party, has no binding effects, and has not been published in the Federal Register or the Code of Federal Regulations.   Nor does it restrict in any way the Secretary's discretion.   Cf. Mich. Gambling Opposition v. Norton, 477 F. Supp. 2d 1, 10 n.14 (D.D.C. 2007) (noting that where Department regulations do not require preparation of an EIS, the Checklist cannot bind the agency to produce one).   Accordingly, the Checklist cannot be deemed binding upon the Department.

32

**E.    The Section 151 regulations are irrelevant to the ILCA transfer because they implement an entirely different statute.**

Plaintiff's final challenge to the ILCA transfer is an allegation that the Secretary was required to follow the regulations contained in 25 C.F.R. Part 151 when transferring the beneficial interest in the Meh-No-Bah Allotment.  Once again, even if Plaintiff had standing to challenge the transfer and its claim were not barred by sovereign immunity under the QTA, this claim would fail.  The Part 151 regulations were promulgated by the Secretary to implement an entirely different statute from ILCA – namely, the initial land acquisition provision of the Indian Reorganization Act, 25 U.S.C. § 465.[14]  All of the land at issue in this case was already in trust or restricted status, and the beneficial interest in the land was transferred pursuant to ILCA, not

---

[14]The IRA was enacted in 1934 as part of the federal government's return to a policy supporting "principles of tribal self-determination and self-governance."  Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior, 228 F.3d 82, 85 (2d Cir. 2000) (quoting County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 255 (1992)).  The law was specifically intended to stop the alienation of Indian land and "to support Indians, and to provide for acquisition of additional acreage for tribes.  This comprehensive legislation sought to offset the unintended and devastating effects of prior federal Indian policies, including cultural destruction, poverty, and loss of land."  Cohen, Handbook of Federal Indian Law § 1.05.  To this end, Section 5 of the IRA authorizes the Secretary to take lands into trust "for the purpose of providing land for Indians."  25 U.S.C. § 465.  Section 5 provides the Secretary with "broad authority to acquire property in trust for Indian tribes."  Sokaogon Chippewa Cmty. v. Babbitt, 214 F.3d 941, 943 (7th Cir. 2000).

Regulations implementing Section 5, set forth in 25 C.F.R. Part 151, govern the fee-to-trust process.  A tribe wishing to have land taken into trust must file a written request with the Secretary.  25 C.F.R. § 151.9.  The Secretary must then notify the state and local governments having regulatory jurisdiction over the proposed trust land so that they can provide written comments about potential impacts on regulatory jurisdiction, property taxes, and special assessments.  Id. at § 151.10.  The regulations oblige the Secretary, in deciding whether to approve a tribe's request, to consider several factors, including the tribe's need for the land; the use to which the land will be put; the impact on the state and its political subdivisions of removing the land from the tax rolls; jurisdictional problems and potential conflicts of land use; whether the BIA is equipped to discharge any additional responsibilities resulting from the trust status; and compliance with NEPA.  See id. at § 151.10(b), (c), (e)-(h).

acquired under the IRA, so the Part 151 regulations do not apply.

Plaintiff argues that Section 2202 of ILCA requires the application of the IRA and its regulations to land transfers.[15/] Am. Compl. at 10. However, Plaintiff misunderstands that provision. The purpose of Section 2202 is to amend Section 5 of the IRA, 25 U.S.C. § 465, to extend Section 5's provisions to all tribes, regardless of whether those tribes had voted to become organized under the IRA. See H.R. Rep. No. 97-908, at 7 (1982). Before this amendment, it was unclear whether tribes that chose not to organize under the IRA could use the IRA's land acquisition authority. In passing ILCA, Congress amended the IRA to clarify this issue.

If Plaintiff's interpretation of Section 2202 and the Part 151 regulations were to prevail, and all ILCA transfers had to be done through the Part 151 procedures, that would defeat Congress's purpose in establishing a mechanism for expeditious and routine consolidation of fractionated interests in Indian land. The IRA fee-to-trust process is time-consuming, costly, and often controversial. It makes no sense to suggest that Congress would have created the trust land consolidation process in ILCA and then, in a provision of that very statute, stated that the separately-authorized procedures whereby a tribe may purchase fee land and apply to have it accepted into trust are always required here as well. Congress would have used much clearer language in Section 2202 had that been its intent.

Therefore, the Secretary did not abuse his discretion or act arbitrarily and capriciously by not following the Part 151 regulatory steps in this instance.

---

[15/]Section 2202 reads, "The provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 of this title: *Provided*, That nothing in this section is intended to supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to any specific tribe, reservation, or state(s)."

**F.    Under the APA, Plaintiff cannot challenge the lack of an "Indian lands" determination because there has been no final agency action.**

Plaintiff's new allegation is that the United States was required to make a determination that the Meh-No-Bah Allotment qualifies as "Indian lands" under IGRA and failed to do so.  Am. Compl. at 17.  Plaintiff asks this Court to declare that the Meh-No-Nah Allotment does not qualify as "Indian lands" and therefore is not eligible for gaming under IGRA.  Id. at 21.  However, this claim fails to challenge any final agency action or decision that can be subject to judicial review under the APA.  Accordingly, it should be dismissed.

In IGRA, Congress expressly addressed which decisions of the NIGC may be reviewed under the APA:

> **Judicial Review**
>
> Decisions by the Commission pursuant to sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5 [the APA].

25 U.S.C. § 2714.

The APA does not create an independent basis of jurisdiction.  Califano v. Sanders, 430 U.S. 99, 105-07 (1977).  Rather, it confers a general cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a relevant statue," 5 U.S.C. § 702, which is limited to the extent that a relevant statute "preclude[s] judicial review."  Id. § 701(a)(1); see also Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (determining whether and to what extent a statute precludes judicial review by considering express language of statute, legislative history, and nature of the administrative action).  Consequently, "the APA's presumption of judicial review may be overcome if congressional intent to preclude review can

35

be 'fairly discerned' from the statutory scheme underlying the agency action being challenged."

Lac Vieux Desert Band of Lake Superior Chippewa Indians of Mich. v. Ashcroft, 360 F. Supp.

2d 64, 67 (D.D.C. 2004) (citing United States v. Fausto, 484 U.S. 439, 452 (1988)).

The "relevant statute" here, IGRA, clearly demonstrates Congress's intent to limit judicial

review to very specific final agency actions. "The omission of a provision thereby shows

Congressional intent to prohibit judicial review over any other agency actions as opposed to the

few already granted express jurisdiction." Lac Vieux, 360 F. Supp. 2d at 67 (internal quotation

marks and citations omitted); see also Hartman v. Kickapoo Tribe Gaming Comm'n, 319 F.3d

1230, 1232 (10th Cir. 2003) ("Although Congress did provide that certain decisions by the NIGC

made under various provisions of IGRA are subject to federal court review under the [APA], the

district court correctly pointed out that nowhere does IGRA expressly authorize private

individuals to sue directly under the statute for failure of a tribe, a state, or the NIGC to comply

with its provisions.") (internal citation and footnote omitted). Further, the legislative history is

consistent with a congressional intent to limit judicial review to *certain* agency decisions. See S.

Rep. No. 100-446, at 20 (1988) ("certain Commission decisions will be final agency provisions

for the purposes of court review").

Plaintiff's claims do not involve any final agency decisions subject to judicial review

under IGRA or the APA. As set forth above, IGRA only provides for judicial review for the

following final Commission decisions: 25 U.S.C. §§ 2710 (decisions on tribal gaming

ordinances), 2711 (decisions on management contracts), 2712 (review of existing ordinances and

contracts), and 2713 (final enforcement actions). See 25 U.S.C. § 2714. The "implied corollary

of section 2714 is that other agency actions are not final and thus not reviewable." Lac Vieux,

36

360 F. Supp. 2d at 67 (internal quotation marks and citations omitted). Here, Plaintiff's claims do not fall within any of these statutory categories. Plaintiff essentially claims that the United States failed to make a pre-construction Indian lands determination and that this failure somehow allowed the Quapaw Tribe to begin constructing a casino. This claim has absolutely nothing to do with Commission decisions regarding gaming ordinances, management contracts, or final enforcement actions. Consequently, under IGRA and the APA, Plaintiff has failed to challenge a reviewable final agency action and therefore has failed to state a claim upon which relief can be granted.

Even without the specific limitation provided under IGRA, Plaintiff's claim would fail under the general standards for APA review. Judicial review of agency action under the APA is "limited to 'final agency action for which there is no other adequate remedy in a court.'" <u>Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.</u>, 460 F.3d 13, 18 (D.C. Cir. 2006) (citing 5 U.S.C. § 704) (emphasis omitted). Here, Plaintiff has not challenged any final agency action, but rather is complaining of an agency's failure to act. The APA permits a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "The Supreme Court has confirmed that this provision 'sometimes' permits litigants to challenge an agency's inaction, but 'only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take*.'" <u>Long Term Care Pharm. Alliance v. Leavitt</u>, 530 F. Supp. 2d 173, 185 (D.D.C. 2008) (quoting <u>S. Utah Wilderness Alliance</u>, 542 U.S. at 61, 64) (emphasis in original). Here, Plaintiff cannot challenge the NIGC's failure to make an "Indian lands" determination about the Meh-No-Bah Allotment because the NIGC was not "required to" make such a determination.

37

Under IGRA, tribes may engage in gaming only on "Indian lands," 25 U.S.C. § 2703(4), 2710(b)(1) & (d)(3), and, unless certain exceptions apply, Indian gaming is prohibited on trust lands acquired after IGRA's enactment date of October 17, 1988.  Id. § 2719.  However, IGRA does not require the United States to resolve these "Indian lands" questions in an independent proceeding.  When a tribe submits for the Chairman's approval a *site-specific* gaming ordinance or management contract,[16] the NIGC must make a determination that the site in question qualifies as "Indian lands" and also is eligible for gaming under Section 20 of IGRA.  See Citizens Against Casino Gambling in Erie County v. Kempthorne, 471 F. Supp. 2d 295, 323-24 (W.D.N.Y. 2007).  However, where the tribe has not submitted a site-specific ordinance or management contract for NIGC approval, there is no obligation to make an independent "Indian lands" determination.  Here, the Quapaw Tribe did not submit a site-specific gaming ordinance or management contract for gaming on the Meh-No-Bah Allotment, and Plaintiff makes no allegation to the contrary.[17]  The statute imposes no obligation on the NIGC to make an independent, formal Indian lands determination when a tribe announces or begins a casino project.

In a recent case in the Western District of Washington, the plaintiff made the identical allegation that Plaintiff makes here: that the NIGC had a duty to make an "Indian lands"

---

[16]Management contracts are always site-specific and, therefore, require an Indian lands determination for the gaming sites at issue.  Management contracts are subject to the approval of the NIGC Chairman.  See 25 U.S.C. § 2711.  Tribal-state compacts are approved by the Secretary.  25 U.S.C. § 2710(d)(8).  Historically, the Secretary and the Commissioner of the NIGC have worked cooperatively to issue Indian lands opinions when necessary.

[17]The Tribe's non-site-specific gaming ordinance, as well as its non-site-specific compact with the State of Oklahoma, is publicly available on the NIGC's website, www.nigc.gov.

determination regarding land where gaming was expected to occur.  See North County Cmty.

Alliance, Inc. v. Kempthorne, Case No. 2:07-cv-01098-JCC (W.D. Wash. Nov. 16, 2007)

(attached as Ex. 1), at 9.[18]  The court held that no such duty exists, noting that IGRA "offers not

even a hint as to when or how the NIGC is to make an 'Indian lands' determination."  Id. at 11.

In addition, the presence of numerous express provisions in IGRA requiring the NIGC to take

certain actions refutes the argument "that the NIGC has an implicit procedural duty to make

formal 'Indian lands' determinations with respect to new gaming establishments developed

pursuant to a valid, non-site-specific gaming ordinance."  Id. at 12.  In short, there is nothing in

IGRA (or any other statute) that requires the NIGC to complete an "Indian lands" determination

for the Quapaw's in-development casino project.  Plaintiff cannot use the APA to force the NIGC

to make such a determination.

Because the United States does not have a statutory or regulatory duty to perform the

action that Plaintiff seeks to compel, the claim should be dismissed.

Finally, if gaming one day occurs on the property in violation of IGRA, the remedy for

such a violation is an enforcement action brought by the NIGC, which has the power to issue a

closure order against an Indian gaming operation for substantial violations of IGRA, the NIGC's

regulations, or an approved tribal gaming ordinance.  See 25 U.S.C. § 2713(b).  Not only must

enforcement wait until a gaming operation is actually open and operating, but the decision

whether to commence an enforcement action is left to the discretion of the NIGC.  The "decision

not to prosecute or enforce, whether through civil or criminal process, is a decision generally

committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).

---

[18]/An appeal from this decision is pending in the Ninth Circuit.

See also <u>Shoshone-Bannock Tribes v. Reno</u>, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (holding that

Indian tribe cannot force Attorney General to pursue water rights claims where duty was not

specifically imposed by treaty, statute, or agreement).  Plaintiff's request for "an injunction

requiring the NIGC . . . to issue a Notice of Violation and Closure Order" if the Tribe ever

conducts gaming on the Meh-No-Bah Allotment, Am. Compl. at 21, is therefore improper.[19]

## VI.  **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint, or in the

alternative grant summary judgment in favor of the United States.


Dated: June 23, 2008                    Respectfully submitted,

                                        RONALD J. TENPAS
                                        <u>Assistant Attorney General</u>
                                        United States Department of Justice
                                        Environment and Natural Resources Division


                                        /s/
                                        _____

                                        AMY S. TRYON
                                        GINA L. ALLERY

---

[19]In its Prayer for Relief, Plaintiff also asks this Court to declare that the Meh-No-Bah Allotment is ineligible for gaming under Section 20 of IGRA.  Am. Compl. at 21.  Section 20 generally prohibits Indian gaming on land acquired into trust by the United States after October 17, 1988, but includes several important exceptions to that prohibition.  25 U.S.C. § 2719.  Plaintiff has offered not a single argument as to why the Meh-No-Bah Allotment would be ineligible for gaming under Section 20.  All Plaintiff has done is briefly cite the statute.  Am. Compl. at 12.  In fact, Plaintiff even notes that one of Section 20's exceptions is for Oklahoma tribes whose post-1988 trust lands fall within the boundaries of the tribe's former reservation.  <u>Id.</u>; <u>see</u> 25 U.S.C. § 2719(a)(2)(A)(i).  Here, the Bureau of Indian Affairs has confirmed that the Meh-No-Bah Allotment lies within the former treaty lands of the Tribe and is tantamount to the Tribe's "former reservation" under Section 20 of IGRA.  <u>See</u> Ex. 1(B) to Pl.'s Prelim. Inj. Mem., Bureau of Indian Affairs Letter to NIGC.  Plaintiff's wholly unsupported request for a declaratory judgment to the contrary should be rejected.

Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C.  20026-4378
(202) 353-8596
amy.tryon@usdoj.gov

OF COUNSEL:

MARIA WISEMAN
United States Department of the Interior
Office of the Solicitor
1849 C Street NW
Washington, D.C.  20240

JEFFREY NELSON
National Indian Gaming Commission
Office of General Counsel
1441 L Street NW
Washington, D.C.  20005

# Exhibit 1

<u>North County Cmty. Alliance, Inc. v. Kempthorne</u>, Case No. 2:07-cv-01098-JCC
(W.D. Wash. Nov. 16, 2007)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTH COUNTY COMMUNITY ALLIANCE,
INC.,

                  Plaintiff,

      v.

DIRK KEMPTHORNE, Secretary of the United
States Department of the Interior;
DEPARTMENT OF THE INTERIOR; THE
NATIONAL INDIAN GAMING
COMMISSION; and PHILIP HOGEN, Chairman
of the National Indian Gaming Commission,

                  Defendants.

CASE NO. C07-1098-JCC

ORDER

This matter comes before the Court on Defendants' Motion to Dismiss (Dkt. No. 7), Plaintiff's Response (Dkt. No. 9), and Defendants' Reply (Dkt. No. 14). Having considered the parties' briefing and supporting documentation, and finding oral argument unnecessary, the Court hereby finds and rules as follows.

## I.  BACKGROUND

Plaintiff is a non-profit organization, organized under the laws of the State of Washington, which is dedicated to environmental issues in Whatcom County, Washington. (Compl. ¶ 2 (Dkt. No. 1).) Plaintiff's members include property owners in the area affected by a casino project currently under

ORDER – 1

development by the Nooksack Indian Tribe, as well as members of the tribe itself. *Id.* at ¶¶ 3–4.

Defendants are federal government officials and agencies with an interlocking set of responsibilities

related to the regulation of Indian gaming. *Id.* at ¶¶ 5–8. The Nooksack Tribe is a federally recognized

Indian tribe located in the State of Washington. *See* 72 Fed. Reg. 13,648 (March 22, 2007).

In 1993, the Nooksack submitted a tribal gaming ordinance to the National Indian Gaming

Commission ("NIGC") for approval pursuant to the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C.

§ 2710. Shortly thereafter, the NIGC issued a list of tribes with approved class III gaming ordinances in

the Federal Register that included the Nooksack Tribe. 58 Fed. Reg. 65406 (Dec. 14, 1993). In

subsequent years, the NIGC has issued such notice in an identical format, with an updated listing of the

tribes with approved class III gaming ordinances. *See, e.g.*, 67 Fed. Reg. 54823 (Aug. 26, 2002). The

Nooksack's approved tribal gaming ordinance did not specify any particular site or facility where gaming

was to take place; rather, it provided that the Nooksack Gaming Commission "shall issue a separate

license to each place, facility, or location on Indian lands where Class II gaming is conducted under this

ordinance." *See* Nooksack Tribal Code 56.04.030. The Nooksack Tribe is currently developing a gaming

facility in Whatcom County called the Northwood Casino. The project is not located within the Nooksack

reservation, but rather on a site approximately twenty miles away, on land held in trust for the Nooksack

Tribe. (Pl.'s Resp. 6 (Dkt. No. 9)); (Dept. of Interior Letter (Dkt. No. 7-4).) Defendants assert that

current plans limit this facility to Class II gaming. (Defs.' Mot. 3 (Dkt. No. 7).)

Plaintiff filed the present lawsuit on July 13, 2007, alleging violations of IGRA, the National

Environmental Policy Act[1] ("NEPA"), and the Administrative Procedures Act ("APA"). These claims all

concern alleged defects in the process by which the NIGC approved the Nooksack Tribe's tribal gaming

ordinance, as well as an alleged neglect of ongoing procedural obligations (Compl. ¶¶ 21–45 (Dkt. No.

---

[1]In the Complaint, Plaintiff bases its second cause of action on the "National Environmental
Protection Act." The Court assumes this refers to the National Environmental Policy Act.

ORDER – 2

1

2   1).) Plaintiff seeks declaratory and injunctive relief, or in the alternative, a writ of mandamus halting the

3   development of the casino until the alleged procedural deficiencies can be cured. (Prayer for Relief ¶¶ 1–7

4   (Dkt. No. 1).) The matter now before the Court is Defendants' motion to dismiss pursuant to Rules

5   12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

6   **II.    DISCUSSION**

7   **A.    Legal Standards**

8   Federal Rule of Civil Procedure 12(b)(1) provides a defense for "lack of jurisdiction over the

9   subject matter" of a claim. An assertion that a court lacks subject matter jurisdiction is a challenge to its

10   "statutory and constitutional power to adjudicate the case, and it may not be waived." 2 MOORE'S

11   FEDERAL PRACTICE, § 12.30[1] (Matthew Bender 3d ed.) ("MOORE'S"); *see also* FED. R. CIV. P.

12   12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction

13   of the subject matter, the court shall dismiss the action"). "The district court must determine questions of

14   subject matter jurisdiction first, before determining the merits of the case." 2 MOORE'S, § 12.30[1].

15   Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a

16   claim upon which relief can be granted." In deciding a Rule 12(b)(6) motion, the Court must accept as

17   true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to

18   Plaintiff. *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001). Dismissal is warranted only

19   if it "appear[s] to a certainty that the plaintiff would not be entitled to relief under any set of facts that

20   could be proved." *Plaine v. McCabe*, 797 F.2d 713, 723 (9th Cir. 1986).  However, "[c]onclusory

21   allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to

22   state a claim." *In re Verifone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993).

23   **B.    Statute of Limitations**

24   Defendants assert that the only agency action for the purposes of Plaintiff's claims is the NIGC's

25   approval of the Nooksack's gaming ordinance, and that such a challenge is statutorily time-barred.

26   ORDER – 3

(Defs.' Mot. 9–10 (Dkt. No. 7).) The parties agree on the applicable statutory limit, which states in relevant part that "[e]xcept as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). This is consistent with precedent in this Circuit, which has found that § 2401(a) "should apply to actions brought under the APA which challenge a regulation on the basis of procedural irregularity." *Wind River Mining Corp. v. United States*, 946 F.2d 710, 713 (9th Cir. 1991) (citing *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988) (applying § 2401(a) to bar the Sierra Club's APA challenge to regulations whose adoption purportedly did not comply with the procedural requirements of NEPA)).

The crux of the disagreement is when Plaintiff's cause of action first accrued. Defendants assert that the limitations period began to accrue when approval of the Nooksack's gaming ordinance was first published in the Federal Register in 1993. (Defs.' Mot. 10 (Dkt. No. 7).) Plaintiff, on the other hand, maintains that the limitations period for its cause of action began to accrue "upon announcement of the Northwood Crossing project," when it "had reason to know" of the individual injury serving as the basis of the action. (Pl.'s Resp. 9 (Dkt. No. 9).) In the alternative, Plaintiff argues that the limitations period began to accrue when the NIGC published notice of its approval of the Nooksack gaming ordinance in the Federal Register in 2002. *Id*.

As a threshold matter, Plaintiff's argument that the 2002 publication in the Federal Register should serve as the point of accrual is entirely without merit. In both its form and professed intention, the 2002 publication is identical to the 1993 notice in the Federal Register cited by Defendants. *See* 58 Fed. Reg. 65406 (Dec. 14, 1993); 67 Fed. Reg. 54823 (Aug. 26, 2002). The only difference between the two documents, both issued by the NIGC, is that the latter reflects a longer, updated list of the tribes with approved gaming ordinances authorizing class III gaming. For present purposes, the critical factor is that both documents listed the Nooksack Tribe. Accordingly, there is no basis for designating the 2002 notice,

ORDER – 4

rather than the 1993 notice, as the point of accrual. Plaintiff argues that rather than serving as the "consolidated and comprehensive" listing that Defendants describe, the 2002 notice entitled its readers to believe it was "an approval of and action upon the Nooksack ordinance as of that date." (Pl.'s Resp. 10 (Dkt. No. 9).) Plaintiff supports this conclusion with language in IGRA providing that publication in the Federal Register shall occur "[u]pon the approval" of an ordinance or resolution. *Id.* (quoting 25 U.S.C. § 2710(d)(2)(B)(ii)). Nothing in this language, however, precludes the NIGC from publishing its recent approvals in periodic, consolidated listings. Furthermore, courts have found under similar circumstances that the reissue of information does not reset the relevant statute of limitations. *See, e.g., Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 n.9 (D.C. Cir. 1983). The confusion Plaintiff describes could only occur if one had neglected to read earlier notices in the Federal Register, an excuse that is antithetical to the principle of constructive notice. In sum, approval of the Nooksack gaming ordinance was first published in the Federal Register in 1993 and subsequent notices issued by the NIGC could do nothing to revise this operative date.

Having decided that the 2002 publication in the Federal Register was not the point of accrual, the question becomes whether, under the circumstances of this case, the 1993 publication triggered the limitations period or whether an event other than publication in the Federal Register should mark the point at which Plaintiff's rights were perfected. Ordinarily, "[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Friends of Sierra R.R., Inc. v. ICC*, 881 F.2d 663, 667–68 (9th Cir. 1989). However, certain characteristics of the statutory scheme of IGRA cast doubt on how this baseline rule is to apply. Pursuant to IGRA's notice requirement, the NIGC issued the 1993 publication in the Federal Register to announce that the Commissioner had approved the Nooksack's gaming ordinance authorizing class III gaming. This publication did not specify the nature or location of any specific project. It was not until over a decade later, when a concrete project at the Northwood Casino site finally materialized, that

ORDER – 5

1

2   Plaintiff most probably realized its interest in the matter. This raises the question of whether publication in

3   the Federal Register, under IGRA's scheme of shared authority between the NIGC and Indian tribes, was

4   sufficient to provide even constructive notice of Plaintiff's claims.

5         The Court concludes that the circumstances of this case do not justify a departure from the

6   general rule. First, Plaintiff's theory is that the NIGC did not make a required determination, which is a

7   procedural claim that should have been apparent at the time the NIGC approved the Nooksack's gaming

8   ordinance. Second, while it would have required familiarity with the statutory scheme of IGRA in order

9   to contemporaneously appreciate the *consequences* of the 1993 gaming ordinance approval, all necessary

10  information for identifying the land potentially affected by the decision was part of the public domain at

11  the time the ordinance was approved. With an approved gaming ordinance authorizing class III gaming

12  under IGRA, the Nooksack Tribe needed to do nothing more, with respect to the NIGC, in order to

13  conduct class II gaming on its own "Indian lands." Therefore, any piece of property falling within the

14  definition of "Indian lands" was a potential site for a project such as the Northwood Casino.[2] In this

15  respect, this case is distinguishable from one in which "defendant has concealed its acts with the result

16  that plaintiff was unaware of their existence or . . . [plaintiff's] injury was 'inherently unknowable' at the

17  accrual date." *Japanese War Notes Claimants Assoc. of the Philippines, Inc. v. United States*, 373 F.2d

18  356, 359 (Cl. Ct. 1967) (quoting *Urie v. Thompson*, 337 U.S. 163, 169 (1949)). While it may be little

19  consolation to Plaintiff that all the information necessary to identify its particularized claim was available

20  in the public record, the theory of constructive notice that assumes familiarity with prevailing law is no

21  different in kind from that which assumes familiarity with the content of the Federal Register.

22

23  _____

24        [2]Defendants state that the Nooksack Tribe plans to restrict the Northwood Casino to class II
     gaming (Defs.' Mot. 3 (Dkt. No. 7)), while Plaintiff speculates that the tribe may really be laying the
25   groundwork for a class III casino. (Pl.'s Resp. 5 (Dkt. No. 9).) The Court does not have enough
     information to resolve this dispute, which is not material to the issues raised by Defendants' motion.

26  ORDER – 6

1

2      Furthermore, this result comports with a line of case law in this Circuit that specifically addresses

3  the issue of agency action and accrual of statutory limitations periods. In *Shiny Rock Mining Corp. v.*

4  *United States*, a 1964 public land order withdrew from appropriation, under the United States mining

5  laws, a section of land within the Williamette National Forest. 906 F.2d 1362, 1363 (9th Cir. 1990). The

6  plaintiff applied for a mineral patent more than fifteen years later, only to be denied on the basis of the

7  order. Plaintiff filed suit "arguing that there were errors and violations of statutes and regulations in the

8  formulation and publication" of the public land order. *Id*. After concluding that the six–year statute of

9  limitations of § 2401(a) applied to the case, the Ninth Circuit found that the statutory period began to

10 accrue upon publication of the public land order in the Federal Register, and therefore the plaintiff's claim

11 was time-barred. *Id*. at 1366. In so doing, the court affirmed the adequacy of the Federal Register as a

12 means of constructive notice, and dispensed with the plaintiff's arguments that it did not have standing

13 and had not suffered an injury during the limitations period. The court explicitly "decline[d] to accept the

14 suggestion that standing to sue is a prerequisite to the running of the limitations period," and

15 characterized the injury, for the purposes of triggering accrual, as "that incurred by all persons when, in

16 1964 and 1965, the amount of land available for mining claims was decreased." *Id*. at 1365–66.

17      In *Wind River Mining Corp. v. United States*, the Ninth Circuit saw reason to depart from the

18 result in *Shiny Rock*, while drawing a key distinction. 946 F.2d 710 (9th Cir. 1991). *Wind River*

19 concerned a 1979 Bureau of Land Management decision to establish 138 Wilderness Study Areas

20 ("WSA") on federal land pursuant to the Federal Land Policy and Management Act of 1976 ("FLPMA").

21 *Id*. at 711. The plaintiff staked certain mining claims within the affected areas but was barred from

22 pursuing ore-extraction activities, and therefore brought suit claiming that the land in question was

23 improperly classified as a WSA. After identifying § 2401(a) as the operative statute of limitations, the

24 Ninth Circuit found that the plaintiff's claim was not time-barred, even though it was filed more than six

25 years after the Bureau's land designation. The court held that "a substantive challenge to an agency

26 ORDER – 7

1

2   decision alleging lack of agency authority may be brought within six years of the agency's *application of*

3   *that decision to the specific challenger*." *Id*. at 716 (emphasis added). The court harmonized its holding

4   with *Shiny Rock* by drawing a distinction between procedural and substantive challenges: "If a person

5   wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the

6   challenge must be brought within six years *of the decision*." *Id*. a 715 (emphasis added). The rationale for

7   this distinction was predicated on a delicate balance "between the government's interest in finality and a

8   challenger's interest in contesting an agency's alleged overreaching." *Id*. Whereas "[t]he government

9   should not be permitted to avoid all challenges to its actions, even if *ultra vires*, simply because the

10   agency took the action long before anyone discovered the true state of affairs," "[t]he government's

11   interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of policy or

12   procedure." *Id*.

13          Taken together, these cases emphasize the nature of a plaintiff's claims in deciding when the

14   statute of limitations to challenge agency action begins to accrue. Recognizing that the line between

15   procedure and substance can be an analytical thicket, it is apparent in this case that Plaintiff's claims are

16   procedural. The Complaint repeatedly characterizes the problem as a failure to make required

17   determinations, rather than a failure to reach the right result. (*See*, *e.g.*, Compl. ¶¶ 24, 26, 31, 40, 45

18   (Dkt. No. 1).) Furthermore, responding in part to Defendants' argument that Plaintiff seeks to usurp their

19   enforcement prerogative, Plaintiff explicitly subordinates questions of substance: "Now, in the end, it may

20   be that the Northwood Crossing site does in fact qualify as "Indian lands" – though the Alliance doubts

21   this. Either way, it is Defendants' duty under IGRA to make this determination, and to make it sooner

22   rather than later." (Pl.'s Resp. 6 (Dkt. No. 9).)

23          Therefore, to the extent that Plaintiff challenges Defendants' approval of the Nooksack's gaming

24   ordinance based on § 2710(b)(1) ("Indian lands") and § 2710(b)(2)(E) ("environment . . . public health

25   and safety"), the claims are time-barred under 28 U.S.C. § 2401(a), with the six–year limitation period

26   ORDER – 8

having begun to accrue upon publication in the Federal Register in December 1993. Accordingly, the

Court lacks subject matter jurisdiction over these claims under Federal Rule of Civil Procedure 12(b)(1).

### C. "Indian Lands" Under IGRA

While the statute of limitations precludes any challenge to the sole agency action taken with

respect to this case, this by itself does not dispose of the matter. In addition to the claim that approval of

the Nooksack gaming ordinance was flawed at its inception, Plaintiff also advances the theory that IGRA

"require[s] Defendants to make an 'Indian lands' determination for each and every facility where tribal

gaming is to occur." (Pl.'s Resp. 4 (Dkt. No. 9).) If this is true, then regardless of whether the gaming

ordinance should have been approved in 1993, the NIGC still had an ongoing obligation to make a formal

"Indian lands" determination with respect to the Northwood Casino site, once it became known.[3]

However, in order for Plaintiff to pursue this theory of unlawful omission, there must first be a

corresponding right to judicial review.

### i. Judicial review under IGRA

Plaintiff argues that IGRA provides for judicial review of Defendants' failure to make an "Indian

lands" determination "for each and every facility where tribal gaming is to occur." (Pl.'s Resp. 4 (Dkt.

No. 9). The statute explicitly addresses the question of judicial review in § 2714, enumerating the

circumstances under which NIGC decisions can be appealed in federal court:

> Decisions made by the Commission pursuant to sections 2710 (Tribal gaming ordinances),
> 2711 (Management contracts), 2712 (Review of existing ordinances and contracts), and
> 2713 (Civil penalties) of this title shall be final agency decisions for purposes of appeal to
> the appropriate Federal district court pursuant to chapter 7 of Title 5.

25 U.S.C. § 2714. By what it specifically includes, and therefore excludes, this provision plainly does not

support a right to judicial review for an alleged failure to make a formal "Indian lands" determination

---

[3]Plaintiff must be asking for some kind of "formal" determination, since the NIGC's decision not
to exercise its enforcement authority with respect to the Northwood Casino necessarily implies that it
does not consider the tribe to be in violation of IGRA.

ORDER – 9

outside of the context of a gaming ordinance application. Even assuming that IGRA implicitly requires

such a determination, it still does not follow that § 2714 implicitly offers the right to judicial review, and

Plaintiff offers no support to the contrary.

### ii. Judicial review under the APA

Plaintiff also alleges a right to seek judicial review under the APA, which states in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide
> all relevant questions of law, interpret constitutional and statutory provisions, and
> determine the meaning or applicability of the terms of an agency action. The reviewing
> court shall--
>     (1) compel agency action unlawfully withheld or unreasonably delayed;

5 U.S.C. § 706; (Compl. ¶ 45 (Dkt. No. 1).) This provision rests on the premise that the agency has a

duty to act in the first place. *See San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 885–86 (9th Cir.

2002); *Friends of the Wild Swan, Inc. v. U.S. EPA*, 130 F.Supp.2d 1184, 1192 (D. Mont. 1999).

Plaintiff argues that IGRA implicitly imposes a duty on the NIGC to make ongoing "Indian lands"

determinations as individual gaming projects develop. The statutory basis for the duty, according to this

view, is IGRA's provision that "[a]n Indian tribe may engage in, or license and regulate, class II gaming

*on Indian lands* within such tribe's jurisdiction," subject to certain conditions. 25 U.S.C. § 2710(b)(1)

(emphasis added).[4] Furthermore, Plaintiff cites *Citizens Against Casino Gambling in Erie County v.

Kempthorne*, 471 F. Supp. 2d 295 (W.D.N.Y. 2007) for the proposition that IGRA's statutory scheme

contains this implicit requirement. (Pl.'s Resp. 7–8 (Dkt. No. 9).) Defendants argue that they "do not

have a statutory duty to make pre-construction determinations in the first place." (Defs.' Mot. 12–14

(Dkt. No. 7).) Defendants also distinguish *Citizens Against Casino Gambling* as a timely challenge of a

---

[4]The statute defines the term "Indian lands" as: "(A) all lands within the limits of any Indian
reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of
any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United
States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §
2703(4).

ORDER – 10

tribal gaming ordinance, and by the fact that the ordinance in that case was effectively "site-specific."

(Defs.' Reply 3 (Dkt. No. 14).)

There can be no doubt that IGRA limits an Indian tribe's right to conduct class II gaming to

"Indian lands," as this term is defined in the statute and implementing regulations. 25 U.S.C. §

2710(b)(1). Therefore, it cannot be the case that no mechanism exists for applying the definition of

"Indian lands" to a particular enterprise. The question here is when and how this mechanism is to operate.

Because any challenge to the NIGC's original approval of the Nooksack gaming ordinance is statutorily

time-barred for the reasons set forth above in subsection B, the precise issue that remains is whether the

NIGC must make a formal "Indian lands" determination for each class II gaming facility subsequently

developed under a validly approved, non-site-specific gaming ordinance.

The Court concludes that neither the provisions of IGRA, the underlying logic of IGRA's

statutory scheme, or the relevant case law, support Plaintiff's position that such a duty exists. The statute

offers not even a hint as to when or how the NIGC is to make an "Indian lands" determination, even at

the phase in which the NIGC reviews a tribal gaming ordinance. At that time, the statute provides certain

conditions for the conduct of class II gaming by an Indian tribe, including the adoption of an ordinance or

resolution by the tribal governing body, that is to be approved by the Commissioner. 25 U.S.C. §

2710(b)(1). This same provision also requires *a tribe* to issue a separate license for "each place, facility,

or location on Indian lands at which class II gaming is conducted." *Id*. The statute then sets forth the

criteria by which the Chairman must abide in granting approval of the tribal ordinance or resolution. *Id*. at

(b)(2). Taken together, these provisions require the NIGC to ensure that a tribal gaming ordinance or

resolution has certain institutional or systemic characteristics (i.e. limits on the use of net revenues,

provision of outside audits), while leaving specific siting decisions to the tribe. There is no corresponding

discussion of what the NIGC and a particular tribe must do as these siting decisions are made over time.

Furthermore, if it is some form of hearing that Plaintiff requests, such process is conspicuously

ORDER – 11

absent from IGRA, which states that the NIGC may hold such hearings "as the Commission deems appropriate," 25 U.S.C. § 2706(b)(8), and enumerates certain decisions for which hearings are required. *See*, *e.g.*, § 2710 (c)(2) (revocation of gaming licenses); § 2710 (c)(6) (removal of certificate of self-regulation); § 2711(f) (modification or voidance of a management contract). The presence of these express provisions tends to refute Plaintiff's theory that the NIGC has an implicit procedural duty to make formal "Indian lands" determinations with respect to new gaming establishments developed pursuant to a valid, non-site-specific gaming ordinance.

Plaintiff's reliance on *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295 (W.D.N.Y. 2007), is misplaced. That case involved a Tribal-State compact[5] that specifically authorized the tribe to establish gaming facilities at three separate sites, and identified how new land for gaming would be acquired. *Id*. at 307. Within three months after the Tribal-State compact was executed, the NIGC Chairman approved the tribe's class III gaming ordinance. *Id*. at 307, 309. Therefore, consideration of the gaming ordinance was made with particular sites having already been identified by the relevant Tribal-State compact. In rejecting the Government's argument that it was not required to make an "Indian lands" determination upon approving the gaming ordinance, the court found that IGRA implicitly required a determination, and therefore, "[p]rior to approving an ordinance, the NIGC Chairman must confirm that *the situs of proposed gaming is Indian lands*." *Id*. at 323–24.

There are at least a couple reasons why this case is distinguishable from the matter at hand. First, the plaintiffs there were challenging the final agency action of approving the tribe's gaming ordinance. For the reasons discussed above in subsection B, this avenue is closed to Plaintiff in this case, with the claim being brought well beyond the six–year statute of limitations. Furthermore, the implicit requirement to make an "Indian lands" determination found in that case was imposed in a context where specific sites

---

[5]As a prerequisite for conducting Class III gaming activities, IGRA requires that the tribe and relevant state enter into a Tribal-State compact. 25 U.S.C. § 2710(d)(1)(C).

had already been identified by the Tribal-State compact. Here, no such site was identified at the time the Nooksack Tribe sought approval of their gaming ordinance, and nothing in IGRA required them to go back to the NIGC before developing their class II facility. In *Citizens Against Casino Gambling*, the NIGC was simply faced with a different calculus at the time it approved the tribal gaming ordinance, and that court did not address whether there is any implicit obligation to initiate ongoing, formal "Indian lands" determinations as specific sites materialize.[6] Absent a statutory duty to make a formal "Indian lands" determination, Plaintiff has no right to judicial review under 5 U.S.C. § 706(1).

### D.   NEPA Claim

Plaintiff argues that a mandatory "Indian lands" determination also constitutes a "major federal action" triggering environmental review under NEPA. (Pl.'s Resp. 10 (Dkt. No. 9).) Therefore, Plaintiff's NEPA claim hinges on the theory that Defendants had an implicit obligation to make a formal "Indian lands" determination before construction on the Northwood Casino could commence. Since the Court has determined that no such formal, ongoing obligation exists, Plaintiff's NEPA claim fails on its own terms, as there is no "major federal action" that would require environmental review under that statute. 42 U.S.C. § 4332(2)(C).

### E.   Environmental Review Under IGRA

Plaintiff also argues that the NIGC had an ongoing obligation to make formal findings as to whether "the construction and maintenance of the gaming facility, and the operation of that gaming is

---

[6]While the immediate question here is when and how the NIGC must make "Indian lands" determinations, it is worth noting that the agency has not been evasive about its substantive position: "With all due respect to Plaintiff, the NIGC does not share this doubt [about whether the Northwood Casino site is on "Indian lands"]. NIGC staff has made appropriate inquires [sic] and has gathered appropriate documentation to inform the NIGC Chairman's enforcement discretion." (Defs.' Reply 4 (Dkt. No. 14).)

ORDER – 13

conducted in a manner which adequately protects the environment and the public health and safety." 25

U.S.C. § 2710(b)(2)(E). This claim fails for the same reason as the "Indian lands" theory in section C(ii).

Plaintiff offers no support for the assertion that a formal determination has to be made on an ongoing,

site-specific basis.

## III.    CONCLUSION

While it may be that Plaintiff raises legitimate policy concerns about the Northwood Casino

project, the position Plaintiff advances in this lawsuit is either statutorily time-barred or without a proper

legal home. Again, the question is not whether the NIGC must ensure compliance with IGRA, but rather

how it must do so.  IGRA delegates responsibility for Indian gaming to the NIGC, which exercises wide

discretion in overseeing the interplay of federal, state, and tribal authorities in this area. Since there

appears to be no requirement that tribal gaming ordinances be site-specific,[7] the statutory scheme is one

that necessarily relies upon the NIGC's enforcement authority to ensure compliance with the Act. The

NIGC's decision not to bring an enforcement action, displeasing as it might be to Plaintiff, is the

mechanism the statute sets forth under these circumstances for establishing the lawfulness of the project.

Plaintiff places great weight behind the notion that an "Indian lands" determination is necessary to

"preserve Defendants' ability to assert any sort of jurisdiction over the Northwood facility in the future."

(Pl.'s Resp. 7 (Dkt. No. 9).) However, Defendants have never denied making an "Indian lands"

determination, and regardless of how they make that determination, they have no such ability to influence

the sweep of their regulatory ambit. Rather than preserving NIGC jurisdiction, Plaintiff's position would

work an end-run around the NIGC's enforcement prerogative with procedural hurdles not set forth in the

statute. Simply put, while tribal gaming under IGRA must occur on "Indian lands" and the NIGC is the

agency charged with ensuring this happens, there is no support in the statute or the relevant case law for

---

[7]In fact, Defendants specifically aver that site-specific gaming ordinances are "not common."
(Defs.' Mot. 3 n.2 (Dkt. No. 7).)

ORDER – 14

1

2   the proposition that compliance must be enforced by the method of Plaintiff's choosing.

3        For the foregoing reasons, Defendants' Motion to Dismiss (Dkt. No. 7) is hereby GRANTED.

4        SO ORDERED on this 16th day of November, 2007.

5

6

7

8   _____

9   John C. Coughenour
    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER – 15

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-00317-RWR |
| KEMPTHORNE, et al., | ) ) | Judge Richard W. Roberts |
| Defendants. | ) ) | |
| ———————————————— | ) | |

**[PROPOSED] ORDER
GRANTING THE UNITED STATES'S MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, Defendants, the

"United States," moved this Court for an Order dismissing the First Amended Complaint in this

action or in the alternative for summary judgment.  Upon consideration of all papers in support of

and opposition to the motion,

IT IS HEREBY ORDERED that the First Amended Complaint is dismissed.

Dated:_____, 2008        _____

Hon. Richard W. Roberts
United States District Judge
District of Columbia

# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

BOARD OF COMMISSIONERS OF     )
CHEROKEE COUNTY, KANSAS,     )
    )
    Plaintiff,     )
    )
v.     )     Case No. 1:08-cv-00317-RWR
    )     Judge Richard W. Roberts
KEMPTHORNE, et al.,     )
    )
    Defendants.     )
_____)

## <u>Certificate of Service</u>

I hereby certify that on June 23, 2008, I electronically filed the foregoing **Motion to Dismiss Plaintiff's First Amended Complaint or in the Alternative for Summary Judgment** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participant in this case:

Jonathan Abram
HOGAN & HARTSON L.L.P.
555 13th Street, NW
Washington, DC 20004-1109
(202) 637-5600
Fax: (202) 637-5910
Email: jlabram@hhlaw.com


/s/
AMY S. TRYON
<u>Trial Attorney</u>
U.S. Department of Justice
Environment and Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, DC 20026-4378
(202) 353-8596
amy.tryon@usdoj.gov