# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS | ) | |
| OF CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| v. | ) | |
| | ) | |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S MOTION FOR SUMMARY JUDGMENT ON COUNTS II AND III OF THE FIRST AMENDED COMPLAINT

Plaintiff Board of Commissioners of Cherokee County, Kansas ("Cherokee County")

hereby moves for summary judgment on Count II and Count III of its First Amended Complaint.

Cherokee County's memorandum in support of its motion is included in its opposition to

defendants' Motion to Dismiss, or in the Alternative for Summary Judgment filed this date.

Dated:  July 28, 2008

Respectfully submitted,


s/Jonathan L. Abram
Jonathan L. Abram, D.C. Bar No. 389896
jlabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

*Counsel for Board of Commissioners of Cherokee County*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS | ) | |
| OF CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| v. | ) | |
| | ) | |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE
MOTION FOR SUMMARY JUDGMENT, AND BRIEF
IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT
ON COUNTS II AND III**

Plaintiff Board of Commissioners of Cherokee County, Kansas ("Cherokee County")

hereby responds to the defendants' Motion to Dismiss Plaintiff's First Amended Complaint or in

the Alternative for Summary Judgment and cross moves for summary judgment on Counts II and

III of its amended complaint.

**INTRODUCTION**

In this action, plaintiff Cherokee County challenges the government's violations of law

that have allowed the construction and operation of a large Indian casino resort without

compliance with the Indian Gaming Regulatory Act ("IGRA") and without any environmental

review of its effects on the surrounding human environment pursuant to the National

Environmental Policy Act ("NEPA"). The casino development follows from the government's

decision to take certain lands into trust and to convey other interests in land for the benefit of the Quapaw Tribe of Oklahoma, decisions that were taken without public notice and without regard to governing statutes, regulations, and policy.  As a result of the government's actions, the casino development has been largely constructed and is now open for business.  Over half the development footprint lies in Cherokee County, all access to the development passes through Cherokee County, and all parking for the development is located in Cherokee County.  The casino development imposes myriad environmental impacts and injuries on Cherokee County, which the government wholly failed to consider, as it is required to do, before taking lands into trust for the Quapaw for gaming.

This action involves a question of first impression:  whether the Secretary can side-step IGRA and its long-established IGRA policies addressing the acquisition of land for tribal gaming by the simple expedient of treating its acquisitions as mere paper transactions switching the beneficial ownership of land interests under the Indian Land Consolidation Act ("ILCA").  Now that the government has filed its Administrative Record and certified that it is complete, it is beyond doubt that the government knew full well that the acquisitions would be used to build a casino.  Nevertheless, the Record also makes clear that the government failed to follow its established and long-standing policy and procedure for acquiring lands for Indian gaming and failed to document any basis for its departure from established policy.  And it is clear that the government wholly failed to conduct any environmental review under NEPA and failed to document any rationale to support that failure.

Based on the Administrative Record, other undisputed facts of record, and the governing law, Cherokee County is entitled to summary judgment on its claims that the government

violated the Administrative Procedure Act ("APA") by side-stepping its established policies and procedures under IGRA and by failing to comply with NEPA.

## STATEMENT OF FACTS

Cherokee County first learned of the casino development at the center of this action in May 2007 when the Quapaw Tribe of Oklahoma announced plans for a large casino development in the tri-state corner of Oklahoma, Kansas and Missouri.  See Am. Compl. ¶ 9; Prelim. Inj. Exs. 1, Declaration of Rod Edmondson ¶ 7  ("Edmondson Decl.") & 1(A), W. Kennedy, "Tribe Announces Plans for Resort Casino," Joplin Globe, May 15, 2007 ("Tribe Announces Plans"). The development lies partly in Ottawa County, Oklahoma, where the casino and hotel structure are located, and partly in Cherokee County, where the development's access road and customer parking are located.  See Am. Compl. ¶¶  9, 13; Prelim. Inj. Ex.1(A), "Tribe Announces Plans" at 1.  Some two million people per year are expected, and even without the required environmental assessment, it is clear that much of the traffic and other environmental impacts will be felt in Cherokee County, in which every single casino customer will drive and park on his way to and from the casino just over the border.  See Am. Compl. ¶¶ 9, 50-54; Prelim. Inj. Ex. 1, Edmondson Decl.¶¶ 7, 10, 19-23.  As a result, Cherokee County will bear the brunt of the casino's direct and indirect environmental impacts.

### A.    The Quapaw Casino Development

Although no public announcement was made prior to May 2007, Quapaw officials stated at that time that "the tribe ha[d] been working on the project since 1990."  Am. Compl. ¶¶ 9-10; Prelim. Inj. Ex. 1(A), "Tribe Announces Plans" at 1.   "The [ ] project will consist of a casino/hotel complex, infrastructure and other amenities on approximately 85 acres in Oklahoma, surface vehicle parking and an access driveway on approximately 63 acres in Kansas, and an extension of the access driveway on approximately 30 acres in Missouri."  Prelim. Inj. Ex. 1(C),

C. Artman Letter to Sen. P. Roberts dated Dec. 20, 2007 at 1; <u>see also</u> Am. Compl. ¶ 10.  The entire 63 acres of parking area and access roadway in Kansas is located in Cherokee County. Am. Compl. ¶ 12.  "The [ ] project will consist of a casino/hotel complex, infrastructure and other amenities on approximately 85 acres in Oklahoma, surface vehicle parking and an access driveway on approximately 63 acres in Kansas, and an extension of the access driveway on approximately 30 acres in Missouri."  Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 10.  The Quapaw call the casino development the Downstream Casino Resort.  <u>See</u> Am. Compl. ¶ 11; Prelim Inj. Ex. 1(A) at 1.

The 40-acre Oklahoma parcel on which the casino-hotel structure is located is generally referred to as the Meh-No-Bah Allotment, named for the original Indian allottee of the parcel. Am. Compl. ¶ 13; Prelim. Inj. Ex. 1(C), Artman Letter to Sen. P. Roberts dated Dec. 20, 2007 at 1; M. Prelim. Inj. Ex. 1(B), Downing Letter to J. Nelson dated Oct. 25, 2007 at 1-2.  The Meh-No-Bah Allotment is located in an undeveloped area with no existing roads prior to the start of construction.  Am. Compl. ¶ 13; Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 11.  In order to bring casino resort customers to the development, the development plan calls for a new road to connect the development to Route 166 in Cherokee County and in nearby Missouri.  Am. Compl. ¶ 13; Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 11; <u>see also</u> Prelim. Inj. Ex. 1(E), Quapaw Casino Development Plan.  Interstate casino traffic moves from the interstate highway in Missouri onto Route 166 into Cherokee County, Kansas, and over the access road into the casino parking area, also located in Cherokee County, from which customers would make their way into the casino resort.  Am. Compl. ¶ 13; Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 11; <u>see also</u> Prelim. Inj. Ex. 1(E), Quapaw Casino Development Plan.

On or about May 14, 2007, the Quapaw Tribe held a press conference at which it announced its final plans for constructing a large-scale $200 million casino resort to operate 24 hours a day, seven days a week and 365 days a year, and to attract two million annual visitors. Am. Compl. ¶ 9; Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 6-7;  see also Prelim. Inj. Ex. 2(A), R. McKinney, "Area Officials Celebrate Quapaw Tribe's Planned $200 Million Casino, Hotel," Joplin Globe, July 31, 2007, at 1.  According to the Quapaw, its 12-story hotel will be visible for three miles in each direction from the interstate.  Am. Compl. ¶ 11; Prelim. Inj. Ex. 1(A), "Tribe Announces Plans" at 1.  The Quapaw also plan a second phase of development that includes a conference center, spa and salon, and have unspecified plans for further development.  Am. Compl. ¶ 11;  Prelim. Inj. Ex. 1(A), "Tribe Announces Plans" at 2 . 1/

The current phase of the Quapaw casino resort development includes a large parking area designed to hold over 2,200 cars, located in Cherokee County, Kansas.  Am. Compl. ¶ 12; Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 10, 12.  As planned, the Quapaw development contains no parking area to support its casino resort development except for the parking area in Cherokee County.  Am. Compl. ¶ 12; Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 10.

When the casino opened on July 5, 2008, it reportedly drew more than 10,000 visitors and caused traffic jams along Cherokee County's Route 166 and backed up traffic as far back as the interstate highway in neighboring Missouri.  See, e.g., G. Grislolano, "More Than 10,000 Pack Casino For Opening Day", Joplin Globe (attached as Ex. 1).  As described by the Quapaw, the casino contains more than 70,000 square feet of casino floor space, and more than 2,000 slot machines, 30 table games and 15 poker tables.  Am. Compl. ¶ 9; Prelim. Inj. Ex. 1, Edmondson

---

1/    The Quapaw maintain a website for the project at http://downstream-dashboard.com, on which a number of photographs of the current development can be viewed.  Other areas of the website are password-secured and not available to the public.

Decl. ¶ 8 & Ex. 1(A), "Tribe Announces Plans" at 1; Prelim, Inj. Ex. 2(B), R. McKinney, "Work

on Schedule," Joplin Globe, Dec. 17, 2007 ("Work on Schedule").

### B.      Defendant's Land Acquisitions for the Quapaw Casino Resort

In order to accumulate land interests in the Meh-No-Bah parcel to build its casino resort,

the Quapaw asked the Secretary to acquire by taking into trust certain fractional interests in the

parcel on which the casino is to be located, and to convey certain restricted fractional interests to

the tribe. Am. Compl. ¶¶ 22-24, 28, 30; AR 143-45, 150-54, 177-78.

In a series of four transactions between April and July 2007, the Secretary acquired a

five-sixths interest in the Meh-No-Bah allotment in trust for the tribe.  Am. Compl. ¶¶ 22-24, 28,;

AR 19, 63, 111, 132; see also Prelim. Inj. Ex. 1(C), Artman Letter dated Dec. 20, 2007;  Prelim.

Inj. Ex. 2(C), C. Ward Letter dated Aug. 6, 2007 at 6-7 (detailing transactions).  In July 2007, the

Secretary also conveyed title in the remaining one-sixth interest in the Meh-No-Bah parcel from

the estate of an individual Indian holding title under restrictions against alienation to the tribe

under restrictions against alienation.  Am. Compl. ¶ 30; AR 140; Prelim. Inj. Ex. 1(C), C.

Artman Letter dated Dec. 20, 2007.  All these Secretarial actions took place pursuant to the

Indian Land Consolidation Act, 25 U.S.C. § 2201 et seq.  Am. Compl. ¶ 33; Prelim. Inj. Ex. 1(C),

C. Artman Letter dated Dec. 20, 2007.

The Indian Land Consolidation Act ("ICLA"), 25 U.S.C. § 2201 et seq., was enacted to

address the problem of fractionated interests on allotment lands.  ILCA authorizes DOI, inter alia,

to acquire fractional interests in land in trust for the benefit of tribes.  Although ILCA expressly

provides that the general statute authorizing the Secretary to acquire land in trust for Indians, 25

U.S.C. § 465, applies to the Act, see 25 U.S.C. § 2202, the Secretary acquired the five-sixths

interests in the Meh-No-Bah allotment without applying the governing trust acquisition regulations codified in 25 C.F.R. Part 151.  See Am. Compl. 33-39; Prelim Inj. Ex. 1(C), C. Artman Letter dated Dec. 20, 2007.

The applicable federal regulations in Part 151 expressly provide that "these regulations set for the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes." 25 C.F.R § 151.1.  Therefore, the trust acquisition of the five-sixths interest in the parcel was subject to regulations requiring the Secretary to consider specific criteria and a specific process for trust acquisitions.  Section 151.10 expressly requires that "the Secretary will consider [the specified] criteria in evaluating requests for the acquisition of land in trust status," including among other requirements, the "purposes for which the lands will be used" and "the extent to which the applicant has provided information that allows the Secretary to comply with [the BIA's] National Environmental Policy Act Revised Implementing Procedures . . . ." 25 C.F.R. § 151.10(c),(h).  Part 151 expressly applies to the trust acquisition of fractional land interests.  25 C.F.R. § 151.7.

The Secretary has not promulgated any other regulations that specifically govern trust acquisitions or land conveyances under ILCA.  At present, the Department carries out ILCA transactions through its Indian Land Consolidation Center in the Bureau of Indian Affairs ("BIA").  See Prelim. Inj. Ex. 3, M. White Decl. ¶¶ 2-3.  Prior to approving trust acquisitions or land conveyances under ILCA, the ILCP requires the acquiring tribe to certify that it does not intend to change the use of the land to be acquired.  Id. ¶ 6.  According to the director of the ILCA program, ILCA has not previously been used to acquire lands for gaming.  Id. ¶ 4.  The Department later acknowledged that "[t]he BIA did not complete either an environmental assessment (EA) or environmental impact statement (EIS) for this project because it determined

that one is not required for the ILCA transactions."  Prelim. Inj. Ex. 1(C), C. Artman Letter dated Dec. 20, 2007 at 1.  The Administrative Record, however, contains no such determination, so the December 2007 letter – written some five months after the fifth and final acquisition of Meh-no-Bah interest – amounts to no more than a post hoc rationalization of the government's failure to comply with NEPA.  2/

Acquisitions of land in trust for gaming purposes are subject to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA").  Under IGRA, tribes may operate gaming only on "Indian lands," which consist of (1) "lands within the limits of any Indian reservation" and (2) "lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or . . . held by any Indian tribe . . . subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4).  IGRA also imposes a broad prohibition against gaming on land taken into trust after October 17, 1988 (the date of enactment), unless certain narrow exceptions apply.  25 U.S.C. § 2719.

To carry out its obligations under IGRA, the Department has developed and published specific policies.  In accordance with official DOI policy, all gaming-related trust acquisition

_____

2/    Indeed, even defendants appear to agree that NEPA must be followed in this context.  After acquiring the one-sixth interest under restrictions against alienation in the Meh-no-Bah allotment, the Quapaw submitted an application to the Eastern Oklahoma Regional Director of the BIA pursuant to Part 151 to have that one-sixth interest taken into trust.  Prelim. Inj. Mem. Ex. 1(C). at 1.  On December 20, 2007, Assistant Secretary Artman indicated that BIA did intend to "comply with NEPA requirements for the pending acquisition of the [one-sixth] interest in the Meh-no-Bah allotment."  Id.  Within days, the Quapaw withdrew its application to have the one-sixth interest taken into trust.  See Prelim. Inj. Mem. Ex. 4, J. DeHart Decl. ¶ 17.

Thus, as matters stand, the Secretary has acknowledged that taking lands into trust for gaming requires compliance with NEPA, but it has conveyed all the interests in the Meh-no-Bah allotment, either in trust or with restrictions against alienation, to the Quapaw without conducting any environmental review of the tribe's casino development under NEPA.  Id. ¶ 12.  "The bottom line is that the Tribe now owns 100 percent of the Meh-no-Bah allotment and BIA records reflect that it is held in trust for the Tribe."  Prelim Inj. Mem. Ex. 2(D), W. Nordwall Letter dated Aug. 6, 2007 at 2 (providing "a summary of the acquisition of the Meh-no-Bah Quapaw allotment, [ ] on which [Nordwall] advised the Quapaw Tribe").

applications must be referred to the Office of Indian Gaming in the Assistant Secretary for Indian Affairs' Office of Policy and Economic Development in Washington, D.C.  See Prelim. Inj. Mem. Ex. 2(E), Checklist for Gaming-Related Acquisitions at 1 ("Gaming Acquisition Policy"); Am. Compl. ¶ 44.  No trust acquisitions for purposes of gaming may take place until the Office of Indian Gaming has approved the acquisition. Prelim. Inj. Mem. Ex. 2(E),  Gaming Acquisition Policy at 1; Am. Compl. ¶ 44.

Here, no such approval occurred.  The BIA did not even refer the trust applications to the Office of Indian Gaming for approval, even though it is clear that no later than May 10, 2007, the government knew that the Quapaw planned to build a casino on the parcel.  AR 201.  See also AR 145 (Quapaw letter to BIA describing the tribe's need to conclude the acquisitions as "urgent"); Prelim. Inj. Ex. 3, M. White Decl. ¶ 8 (it was "common knowledge" within BIA that the Quapaw were building a casino development); Prelim. Inj. Mem. Ex 1(A), "Tribe Announces Plans" at 1 (reporting Quapaw's May 15, 2007 press conference describing the location, size, scope, and timing of their planned gaming development and stating that the tribe has been working on the project since 1990).

### C.    Injury to Cherokee County Caused by Defendant's Actions

The government's failure to review the Quapaw casino development under NEPA prior to taking land into trust for and conveying interests in land to the Quapaw has caused and will continue to cause substantial injuries to Cherokee County.

The County has a small, declining population of approximately 21,000 living in its 590 square miles (on average, 39 people per square mile), with a per capita annual income of approximately $14,710.  Prelim. Inj. Ex. 1, Edmondson Decl.  ¶ 5.  Under state law, the County is responsible for the cost of police services and the cost of fire and other public safety services in unincorporated areas, and for maintaining County roads.  Id. ¶ 16.

Because of the passage of time, we need not speculate about injury in this case.  For example, the Quapaw development has already damaged Cherokee County roads.  Construction contractors for the Quapaw development have been using State Line Road, a Cherokee County road, to bring heavy equipment and materials onto the construction site for over a year.  Id. ¶ 18.  Part of the construction has involved cutting the existing "chip and seal" hard surface road to extend a sewer line from the project site into Missouri.  Id.  Construction traffic already has interfered with use of the County road and shortened its expected life. Id.  See also Am. Compl. ¶¶ 50, 52. 3/

As planned by the Quapaw, all casino traffic will travel through Cherokee County on County roads, and all or virtually all casino customers will park in Cherokee County.   Prelim. Inj. Ex. 1, Edmondson Decl.  ¶ 15.  With over two million annual visitors expected at the Quapaw casino, all of whom will drive on Cherokee County roads and park in Cherokee County, it is certain that casino traffic will have a significant, adverse and continuing impact on County roads.  Id. ¶ 19.  The dramatic increase in traffic will have a significant impact on the cost of maintaining the roads and on traffic safety, as the expected traffic volume will far exceed the traffic volume for which the county roads were designed to bear.  Id.

Based on the experience of another Kansas jurisdiction with a smaller Indian casino, Cherokee County expects the casino traffic to cause a significant increase in  automobile accidents and law enforcement service calls in the vicinity of the development.  Id. ¶ 20.  Even leaving aside the impact on Cherokee County residents, the increase in vehicle accidents and dramatic increase in the County's transient population will require increased police service

---

3/      Construction work on the parking lot and road in Cherokee County also has destroyed critical wildlife habitat in the county.  The habitat was destroyed without the permit required by Kansas law. Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 14 & Ex. 1(D) at 6-7 (J. Larson, Kansas Department of Wildlife and Parks e-mail dated Dec. 27, 2007).

calls – a burden the County has estimated will require five new law enforcement personnel to patrol the roads and respond to traffic accidents and fatalities. Id. ¶¶ 19-23. The County also will need to fund a new public safety substation in the vicinity of the casino to provide adequate fire and ambulance services to the casino area. Id. ¶ 23; Am. Compl. ¶ 53. All of these impacts are felt in and by Cherokee County as a direct result of the government's actions, yet none have been considered by the Secretary as required by NEPA and other federal law and none has been mitigated by alterations in the project. 4/

Other environmental impacts exist as well. Starting shortly after the Civil War, Cherokee County and surrounding counties in Kansas, Missouri and Oklahoma – including Ottawa County where the Quapaw casino development is centered – were the site of over a century of intensive coal, lead, and zinc mining. Am. Compl. ¶ 51; Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 24. Cherokee County and other parts of what is known as the Tri-State mining district have been left scarred by this history. Id. Today, the U.S. Environmental Protection Agency broadly monitors this region and continues to engage in reclamation efforts. Id. To this day, communities in the Tri-State mining district continue to be vulnerable to danger from lead, zinc, cadmium, and other mining-related contaminants in soil and waters. Id. ¶ 25. Without an environmental study, it is unknown whether construction and surface disturbance for the Quapaw casino development has

---

4/    Cherokee County is not opposed to casino development *per se*; but it is opposed to casino development that threatens it and its citizens with a significant uncompensated burden without any review by responsible officials. As set forth in greater detail in its preliminary injunction memorandum, it is possible that Cherokee County will become the location for one of the four State Lottery-owned gaming facilities authorized by the 2007 Kansas Expanded Lottery Act. If so, Cherokee County will receive a percentage of revenues to ameliorate the negative impacts of the development, and under an agreement between the County and Kansas Penn Gaming, Kansas Penn Gaming will provide additional direct reimbursement to the County for the infrastructural and public safety costs incurred due to the Kansas Lottery casino, *see id.* ¶ 36, and will remain fully responsible for complying with Kansas environmental laws and standards and with any applicable federal environmental laws.

caused or will lead to exposure of contaminants in soils or surface or groundwater in Cherokee County or in other nearby areas.

Likewise, because there has been no environmental review, the Secretary has not evaluated whether the construction and operation of the casino development violate or otherwise implicate any substantive environmental laws. Based on the initial review of an environmental consultant, Cherokee County determined that the project involved likely violations of the Clean Water Act. See Am. Compl. ¶¶ 54-55; Prelim. Inj. Mem. Ex. 2(F) (Notice of Violation, detailing suspected violations).

**STANDARD OF REVIEW**

**A.     Legal Standard for Dismissing a Complaint Under Rules 12(b)(1) and 12(b)(6)**

In evaluating a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a court accepts all of the factual allegations contained in the complaint as true. Artis v. Greenspan, 158 F.3d 1301, 1306 (D.C. Cir. 1998). The court may also consider undisputed facts presented in the record. Tootle v. Sec'y of the Navy, 446 F.3d 167, 174 (D.C. Cir. 2006) (a court may look beyond the pleadings to resolve disputed jurisdictional facts when considering a 12(b)(1) motion). Although the burden is on the plaintiff to establish subject matter jurisdiction, Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), the "nonmoving party is entitled to all reasonable inferences that can be drawn in [its] favor," Artis, 158 F.3d at 1306.

A 12(b)(6) motion should be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "On review of a 12(b)(6) motion a court 'must treat the complaint's factual allegations as true ... and must grant plaintiff the benefit of all inferences that can be

derived from the facts alleged.'" <u>Holy Land Found. for Relief & Dev. v. Ashcroft</u>, 333 F.3d 156,

165 (D.C. Cir. 2003) (quoting <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir.

2000)).  This is true even if the plaintiff's allegations are doubtful.  <u>Bell Atl. Corp. v. Twombly</u>,

127 S. Ct. 1955, 1965 (2007).  Rule 8(a)'s notice pleading standard does not require the plaintiff

to plead a prima facie case.  <u>See</u> <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 511 (2002).  Indeed,

even though the plaintiff must provide "more than labels and conclusions," the complaint "does

not need detailed factual allegations." <u>Twombly</u>, 127 S. Ct. at 1965.  Rule 8(a) simply requires

"a short and plain statement of the claim that will give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests." <u>Sparrow</u>, 216 F.3d at 1114 (internal

quotation marks omitted).

### B.      Legal Standard for Summary Judgment Motion in APA Cases

In determining whether the agency's action was arbitrary or capricious or in violation of

the APA, the district court sits as an appellate tribunal.  <u>Marshall County Health Care Auth. v</u>

<u>Shalala</u>, 988 F.2d 1221, 1225 (D.C. Cir. 1993).  Therefore, it is generally appropriate for the

court to grant summary judgment in such cases, either on the defendant's motion to dismiss or

the plaintiff's motion for summary judgment.  <u>See</u> <u>Am. Bioscience, Inc. v. Thompson</u>,  269 F.3d

1077, 1083-1084 (D.C. Cir. 2001) (cataloging examples of summary judgment in administrative

review cases).

Summary judgment may be granted only where the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under

the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The party

seeking summary judgment bears the initial burden of demonstrating the absence of a genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If the moving party

demonstrates such an absence, the nonmoving party may present "specific facts showing that

there is a genuine issue for trial." Taylor v. Blakey, 490 F.3d 965, 972 (D.C. Cir. 2007) (internal

quotations and citation omitted) (emphasis in original).  In determining whether genuine issues

of material fact exist, the court must draw all reasonable inferences in favor of the non-moving

party.  Anderson, 477 U.S. at 255.

## ARGUMENT

### I.    The Court Has Subject Matter Jurisdiction Over Cherokee County's Claims

#### A.    Cherokee County Has Standing to Maintain its Claims

Cherokee clearly has standing to pursue its claims under IGRA and under NEPA, and the

government has not offered any argument to the contrary.  Instead, concentrating on ILCA 5/and

an ipse dixit assertion that the ILCA transactions merely switched beneficial owners of the Meh-

No-Bah interests, the government disclaims any responsibility for Cherokee County's injuries.

The government argues that Cherokee County lacks standing to maintain its claims because (a)

its injuries were not caused by the transfers at issue; (b) because relief would not redress

Cherokee's injuries; and (c) because Cherokee is not "within the zone of interests ILCA was

designed to protect."  Govt. Br. at 25.  The government is wrong on all scores.

The doctrine of standing derives from Article III's case or controversy requirement and

ensures that a plaintiff has a real stake in the issue being litigated.  To have standing, a plaintiff

must show that it is injured in fact; that there is a causal relationship between the injury and the

challenged action; and that the plaintiff's injury is redressable. See Idaho v. Interstate Commerce

_____

5/        Cherokee County asserts only one, alternative argument concerning NEPA that implicates the
provisions of ILCA.  See infra Part II.B.2.   It has made no direct claims under ILCA.

Commission, 35 F.3d 585, 590 (D.C. Cir. 1994)(citing Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)).  In NEPA and APA cases that challenge the defendant's compliance with procedural aspects of the statutes, the plaintiff need not meet the normal redressability requirement.  Id. at 591. A plaintiff must also demonstrate that he meets the prudential standing requirement – that its interest in redressing its injury falls within the "zone of interests" protected by the statutes at issue.  Idaho, 35 F.3d at 590-91.

      **1.**      **Injury.**  The government does not dispute Cherokee County's allegations and declaration testimony concerning its injury.  See Govt. Br. at 18-19; Am. Compl. ¶¶ 50-55; Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 19-23.  Nor could it.  Over half of the current development footprint, and all the casino parking areas, are located within Cherokee County, and all of the employee and customer traffic to and from the casino travels over Cherokee County roads on its way to and from the development.  See Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 15, 19 & Ex. 1(E), Quapaw Casino Development Map.  In recent weeks, the casino opened for business, reportedly receiving over 10,000 visitors in its first hour of business and over 100,000 over the first week of business.  Ex. 1, G. Grisolano, "More Than 10,000 Pack Casino For Opening Day," Joplin Globe (July 5, 2008); R. McKinney, "Decision To Affect Cherokee County Casino," Joplin Globe (July 20, 2008) (attached as Ex. 2).  This influx of people and vehicles into a county with a population of merely 21,000 over 590 square miles constitutes a gigantic change in the local human environment.  Injuries that were imminent a couple of months ago are now beginning, although the full picture of the direct, indirect, and cumulative adverse impacts of the Quapaw casino development are not yet known because of the government's failure to conduct an environmental review pursuant to NEPA.

Now that the casino is open for business, Cherokee County bears the burden of not only the dramatic increase in traffic on its roads, but also the burden of the public safety impacts from the huge numbers of people and vehicles traveling to and from the casino. Prelim. Inj. Ex. 1, Edmondson Decl. ¶¶ 16-23. Cherokee County's injuries are described in greater detail in the Declaration of Rod Edmondson, submitted with Cherokee County's Motion for Preliminary Injunction. Among the most significant of Cherokee County's injuries is the significant impact on public safety and costs. Casino traffic necessarily leads to an increased need for police to patrol the roads and respond to traffic accidents and other law enforcement service calls, as well a need for additional fire and ambulance services in the area near the casino. Id. at 20-23.

    **2.**    **Causation.** The government entirely misses the point when it claims that its decisions did not cause these impacts and injuries. According to the government, all these injuries "relate to either . . .construction activity . . . or the Tribe's . . . operation of a casino on that land," and "none of the injuries bears a causal relationship to the federal action challenged in this case." Govt. Br. at 19. That is so, argues the government, because the decisions at issue were without substance. They effected no change in the use of the property, but merely transferred beneficial interests in the Meh-No-Bah tract from individual Indians to the Tribe. Id. at 19. See also id. at 21 ("[s]o far, the only role played by the United States has been that of facilitating the transfer of the beneficial interest in the Meh-No-Bah Allotment[.]"

But that is sophistry. As the Administrative Record confirms, the government actively undertook to address the Tribe's need to acquire beneficial interest in the Meh-No-Bah parcel, knowing those acquisitions were intended to be put to use as the location of a casino. AR 143-45 (July 3, 2007 Letter from Tribe to BIA, stating "it is becoming very urgent that the Tribe be able to conclude these conveyances[.]"); AR 201 (BIA officials knew no later than May 10, 2007 that

"the Tribe wants to build a casino on" the Meh-No-Bah parcel); <u>see also</u> AR 177-78 (May 1, 2007 letter from Quapaw counsel to BIA officials, thanking them "for assisting with the pending real estate transactions" and for going "well beyond the call of duty by providing assistance last night after regular business hours").

This was not a case of bare property transfer.  It was a reconfiguration of ownership for the avowed purpose of a gaming development, and there is no fair dispute both that both the Quapaw and the government knew it.  As a result, IGRA and the Department's IGRA policies were unquestionably implicated by the proposed acquisitions, and the government was not free to ignore the known the consequences of its actions.  <u>See</u> <u>infra</u> Part II.A.

The government's also attempts to disconnect its decisions from the gaming that has ensued by supposing that the individual Indian owners might have conducted gaming on the parcel even without the government action sought by the tribe.  <u>See</u> Govt. Br. at 21-23.  First, even assuming the individuals could have conducted gaming under IGRA and the tribe's governing law, it is wild speculation that any large-sized casino project could be pulled together and financed by a few individuals.  We are unaware of any large-scale  Indian gaming facility owned and operated by individual tribe members, and the government points to none.  Second, and in any event, those individuals never sought to game, and are not at issue.  Third, and most importantly, the Government cannot defend noncompliance with NEPA and related statutes by claiming there were ways for the development to take place without the government action at issue.  <u>See</u> <u>S.W. Neighborhood Assembly v. Eckard</u>, 445 F. Supp. 1195, 1202 (in NEPA action challenging Government Services Administration's failure to conduct an adequate environmental review in connection with lease, standing remained even though builder might have leased building to another party, leading to the same environmental effects).  The indisputable fact is

that the Tribe sought the federal actions at issue for purposes of a gaming development, and the government acted with that purpose fully in mind.

3.      **Redressability.**  The government goes furthest afield when it claims that nothing this Court can do now would redress the injury caused by the government's violations of IGRA and NEPA.  See Govt. Br. at 23-24.  The relief Cherokee County seeks would redress its injuries, particularly its NEPA-related injuries.  First, an injunction requiring the government to reopen the ILCA acquisitions and conduct any acquisition in accordance with law, including NEPA, would result in a new decision about whether the parcel can be acquired by the Tribe under applicable standards and whether the parcel would qualify as Indian lands eligible for gaming under IGRA's Section 20.  Second, an injunction precluding gaming during the pendency of environmental review under NEPA would certainly redress the County's present injuries arising from operation of the behemoth development.  And NEPA exists for a reason – it is entirely possible that an EIS would uncover environmental impacts significant enough to preclude further gaming operations.  In any event, the NEPA process, which is designed to make federal decision-makers take a hard look at the environmental consequences of their decisions, necessarily provides valuable information to Cherokee County and other affected parties and creates opportunities for decision makers to incorporate mitigation measures into the development's physical structure, operation, and financial relationship with nearby jurisdictions.  See, e.g., West v. Sec'y of Dep't Transp., 206 F.3d 920, 929 (9th Cir. 2000) (NEPA review of completed state of highway interchange may identify ways to modify operation of interchange or mitigate its effects).

4.      **Zone of Interests.**  Cherokee County's interests fall within the zone of interests of NEPA and IGRA.  Plainly, its environmental injuries "fall[ ] squarely within the zone of

interests protected by [NEPA]." Idaho, 35 F.3d at 590. Likewise, in City of Roseville v. Norton, 219 F. Supp.2d 130 (D.D.C. 2002), aff'd 348 F.3d 1020 (D.C. Cir. 2003), on motions for summary judgment, the court held that local municipalities had standing to maintain a NEPA claim arising in connection with the environmental review of an Indian casino development where the cities cited evidence of particular injury.

Cherokee County's interests also fall within the zone of interests under IGRA.   As enacted, IGRA reflects Congress' desire to promote tribal economic development through Indian gaming on one hand, but also to place limitations on such activity by carefully defining where such gaming could take place and by placing strict limitations on the expansion of  eligible gaming lands through new land transactions.  Local governments and communities injured by nearby gaming facilities fit easily within the type of plaintiffs Congress would expect to enforce the Act's limitations.  See, e.g., TOMAC v. Norton, 193 F. Supp.2d 182, 190 (D.D.C. 2002), aff'd 433 F.3d 852 (D.C. Cir. 2006); City of Roseville, 219 F. Supp.2d at 157-58.

The Government's zone of interests argument is that because ILCA "does not require considerations of environmental concerns, NEPA cannot serve to further a plaintiff's environmental interests relating to a federal action taken under that substantive law[,]" relying on Grand Council of the Crees v. Fed. Energy Reg. Comm'n, 198 F.3d 950, 959 (D.C. Cir. 2000). Govt. Br. at 24. But in Grand Council, the agency defendant did not have authority to consider environmental interests   There, the federal action at issue had to do with the agency's rate-setting authority, in connection with which the "Commission ha[d] affirmatively forsworn environmental considerations."  Id. (emphasis added).  Indeed, that agency had no authority to consider environmental matters in carrying out its statutory functions.  See id. (agency previously had held that environmental factors were "beyond the Commission's authority to

consider under sections 205 and 206 of the Federal Power Act" and that "the Commission's authority is limited to review of the rates, terms and conditions of jurisdictional agreements to ensure that they are just and reasonable and not unduly discriminatory or preferential.")  The D.C. Circuit also cited the agency's prior holding that "Congress has not granted the Commission authority to reject rate filings on environmental grounds."  Id.

Here, just the opposite is so.  First, the obvious:  There is no similar body of law that immunizes federal actions pursuant to either ILCA or IGRA from consideration of environmental impacts, and there is nothing in the statutes themselves that provides any basis for exempting agency decisions from the requirements of NEPA.  Second, the Department's own view:  The Department of the Interior, and its agency the Bureau of Indian Affairs, not only have authority but have promulgated express policies to carry out environmental reviews under NEPA and regularly conduct environmental reviews of actions concerning Indian gaming.  See infra Part II.B.1.  Indeed, this is conceded even in the government's litigation position.  Although it (wrongly) claims that by incanting "ILCA" it can avoid the need for NEPA review, even the government concedes that it has authority to engage in such review.   See Govt. Br. at 29 n.13 ("[I]t would be within the Secretary's discretion to prepare appropriate NEPA documents for other ILCA transfers."). 6/

Cherokee County plainly has standing to assert its NEPA and IGRA claims under the APA, and the government's motion to dismiss the complaint on that basis should be denied.

**B.      The Quiet Title Act Does Not Bar Cherokee County's Claims**

---

6/      The government is wrong to the extent it suggests that compliance with NEPA is within  the Secretary's unreviewable discretion.  As discussed infra in Part II.B.1, where NEPA applies, federal officers are required to comply with its mandates.  Likewise, under the Administrative Procedure Act, the only federal actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), are "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (internal quotation marks omitted).

The government also attempts to avoid judicial scrutiny by claiming that it slipped one by. According to the government, now that the transfers have occurred, any review is barred by the Quiet Title Act. That is so, it claims, because Cherokee County calls into question the government's title resulting from the Meh-No-Bah transactions. See Govt. Br. at 25-26. But the Quiet Title Act is not implicated here.

The Quiet Title Act waives the United States' sovereign immunity for actions to quiet title involving property held by the United States but maintains the United States' immunity with respect to challenges to the United States' title to trust or restricted Indian lands. 28 U.S.C. § 2409a(a); Block v. N. D. ex rel. Bd. Of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983) ("Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property.") (emphasis added). But the Act does not apply where, as here, the Court's ruling would not disturb the United States' title. Under "the plain language of the statute, for the QTA to apply to an action: "'(1) the United States must claim an interest [other than a security interest or water rights] in the property at issue, and (2) there must be a disputed title to real property. If either condition is absent, the [QTA] [by its] terms does not apply[.]'" Citizens Against Casino Gambling in Erie County v. Kempthorne, 2007 WL 1200473, at *6 (W.D.N.Y. Apr. 20, 2007) (quoting Leisnoi, Inc. v. United States, 170 F.3d 1188, 1191 (9th Cir. 1999).

Courts determining the applicability of the Act to actions arising under other statutes recognize that the central question is whether "the plaintiff's suit could impact the United States' title" to the land at issue. Neighbors For Rational Dev., Inc. v. Norton, 379 F.3d 956, 965 (10th Cir. 2004) (emphasis added) ("Neighbors"); see also Comanche Nation, Okla. v. United States, 393 F. Supp. 2d 1196, 1207 (W.D. Okla. 2005). Indeed, in each of the cases the government

discusses, a ruling in favor the plaintiff would have affected the United States' title to Indian lands, by removing trust status or by altering boundaries of trust lands. See Govt. Br. at 25-26. That is not the case here.

Defendants assert that Meh-No-Bah interests were trust or restricted lands before the transactions at issue and remained so afterwards, pointing to the language of the deeds recorded by the Bureau of Indian Affairs. See Govt. Br. at 21-22. 7/ For the purposes of adjudicating Cherokee County's claims, the Court can accept that assertion, because a ruling in favor of Cherokee County does not require any finding by the Court concerning the trust status of the Meh-No-Bah interests at the time of the Secretary's transactions. In other words, the Court can issue the declaratory relief sought – that the interests were invalidly acquired for gaming purposes without adherence to the law and proper procedure – without affecting the United States' title to the land interest.

While Cherokee County takes issue with the Defendants' failure to conduct any "Indian lands" inquiry in connection with the Quapaw casino development, see infra Part III, and have alleged facts that raise questions about the status of the land as of the early twentieth century, see Am. Compl. ¶¶ 16-20, neither raises a sovereign immunity bar under the Quiet Title Act. As discussed infra in Part III, the "Indian lands" inquiry is a requirement of IGRA that employs the specific definition of "Indian lands" provided in that Act; it is not a determination about title to lands, it is a determination about the eligibility of specific lands for lawful Indian gaming. 8/ Cherokee County's factual allegations concerning the history of the Meh-No-Bah parcel may be relevant to an appropriate "Indian lands" determination conducted by defendants, and serve in

---

7/       As the government agrees, for purposes of the Quiet Title Act and in general, "trust' lands and "restricted' lands are treated identically under the law. See Govt. Br. at 3 n.4.

8/       It is certainly the case that the Court can grant Cherokee County summary judgment on Counts II and III  and order the relief requested in Prayer for Relief ¶¶ 1 and 4 without in any way adjudicating a question concerning the United States' title to Indian lands.

the complaint to identify some of the facts and legal questions one would expect to find

addressed in an appropriate administrative record of an IGRA-compliant acquisition for Indian

gaming (and which are absent from the Administrative Record presented here).

Furthermore, there is no reason to apply the Quiet Title Act's sovereign immunity

provisions to NEPA claims.  In <u>Neighbors</u>, the Tenth Circuit addressed the plaintiff's NEPA

claim and observed:

> We do not think this request for relief is precluded by the Quiet Title Act.
> Furthermore, considering various development proposals after the trust
> acquisition would not be simply an exercise in futility.  We, nevertheless,
> conclude this request for relief is moot <u>because the Secretary complied
> with [NEPA] when approving a lease of the [ ] property</u>.  We do not think
> it would be wise to require the Secretary to plow the same ground
> twice . . . .  Neighbors never argues the completed environmental
> assessment does not adequately consider the environmental impacts and
> alternatives to development of the property.

<u>Id.</u> at 965-66 (emphasis added).  The Tenth Circuit plainly was correct that NEPA compliance

does not involve any disturbance of the United States' title to Indian land. 9/

## II.  Cherokee County Is Entitled To Summary Judgment On Counts II And III Of Its Amended Complaint.

Counts II and III of Cherokee County's amended complaint are brought pursuant to the

Administrative Procedure ("APA"), 5 U.S.C. §§ 701-706.  The APA provides for judicial review

of "[a]gency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court."  5 U.S.C. § 704.  Section 706(2)(A) of the APA provides that

a court "shall . . . hold unlawful and set aside" agency action where it finds the action "arbitrary,

---

9/        Moreover, APA claims challenging the agency's decision to *acquire* Indian lands should be
regarded as falling outside the Quiet Title Act.  In <u>South Dakota v. U.S. Dep't of Interior</u>, the Eighth
Circuit observed that "[w]e doubt whether the Quiet Title Act precludes APA review of agency action by
which the United States *acquires* title [for the beneficial use of an Indian tribe]."  69 F.3d 878 (8th Cir.
1995), <u>cert. granted, judgment vacated, case remanded with instructions to vacate District Court judgment
and remand to Secretary for reconsideration</u>, 519 U.S. 919 (1996) (APA review of the Secretary's
decision to take land into trust).  The Eighth Circuit did not reach the question because it had determined
that 25 U.S.C. § 465 was an unconstitutional delegation of power.  69 F.3d at 881, n.1.

capricious, an abuse of discretion, or otherwise not in accordance with law."  A court should also

set aside an agency action that is "manifestly contrary to the statute" the agency is implementing.

Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844 (1984).  Although review

of administrative action is generally deferential, the court retains an obligation "to engage in a

substantial inquiry" and the presumption of regularity does not shield the agency's action "from

a thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S.

402, 415 (1971).

        In exercising such thorough review, courts have articulated several ways in which agency

action runs afoul of the APA.  First, the D.C. Circuit has repeatedly recognized that agency

action is arbitrary and capricious when the agency fails to "adequately explain its result."

Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting Public Citizen, Inc. v.

Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993); Fed. Election Comm'n v. Rose, 806

F.2d 1081, 1088 (D.C. Cir. 1986)).  Second, agency action that departs from established agency

policy, without reasoned explanation, is arbitrary and capricious and contrary to law.  See, e.g.,

Morton v. Ruiz, 415 U.S. 199, 232 (1974); D&F Afonso Realty Trust v. Garvey, 216 F.3d 1191,

1196-97 (D.C. Cir. 2000).   Third, an agency's action is also arbitrary and capricious where it

departs from the agency's established and routine course of action because the "settled course of

behavior embodies the agency's informed judgment that, by pursing that course, it will carry out

the policies committed to it by Congress."  Atchison, Topeka, & Santa Fe Ry. Co. v. Wichita Bd.

of Trade, 412 U.S. 800, 807-808 (1973); Greyhound Corp. v. Interstate Commerce

Comm'n,  551 F.2d 414, 416 (D.C. Cir. 1977) (holding that the court "emphatically requires"

agencies explain all deviations from precedent).  The agency is bound by its prior, settled course

of action even though its discretion was "unfettered at the outset," and "irrational departures

from that policy" are, therefore, arbitrary and capricious.  <u>I.N.S. v. Yueh-Shaio Yang</u>, 519 U.S.

26, 32 (1996).  Agency action cannot be upheld on the basis of post hoc rationalizations offered

after the administrative decision is made or action is taken, but must be upheld, if at all, on the

basis of the Administrative Record.  <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.</u>

<u>Co.</u>, 463 U.S. 29, 50 (1983).

> A.    **The Department Violated the APA By Its Utter Departure, Without Any Explanation or Rationale, From Its Long-Standing Policies and Procedures In Carrying Out IGRA.**

Under IGRA, Indian gaming may occur only on "Indian lands."  *See* 25 U.S.C. § 2701.

For tribes, like the Quapaw, which do not have a reservation, "Indian lands" are "any lands title

to which is either held in trust by the United States for the benefit of any Indian tribe or

individual or held by any Indian tribe or individual subject to restriction by the United States

against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C.

§ 2703(4)(B).  Section 20 of IGRA further provides that "gaming . . . shall not be conducted on

<u>lands acquired by the Secretary in trust for the benefit of an Indian tribe</u> after October 17, 1998"

unless certain exceptions apply.  25 U.S.C. § 2719(a) (emphasis added).  Because IGRA places

stringent statutory requirements on Indian gaming if it would occur on post-October 1988 land

acquisitions, the Department has promulgated specific procedural steps that must be followed

with respect to land acquisitions that are gaming-related.

The key requirements of the policy are contained in the Department's "Checklist for

Gaming Acquisitions, Gaming-Related Acquisitions, and IGRA Section 20 Determinations,"

Office of Indian Gaming Management (March 2005) ("Gaming Acquisition Policy").  Under this

policy, "<u>[a]ll requests for the acquisition of land for gaming</u> must be transmitted to [Office of

Indian Gaming Management] regardless of whether the land is located on, contiguous to, or off

the applicant's reservation."  Prelim. Inj. Ex. 2(E), Gaming Acquisition Policy at 1.  This directive expressly applies to "trust-to-trust, restricted-to-restricted/trust, and fee-to-trust land acquisitions."  Id.  Thus, the Secretary has adopted a policy that required all of the Quapaw's Meh-No-Bah acquisitions to follow the procedures outlined in the Gaming Acquisition Policy, including the transactions for the five-sixths interests that were acquired in trust and the one-sixth interest that was acquired by the tribe under restrictions against alienation.  See id.  The policy further provides that "[t]he authority to approve or disapprove land acquisitions for gaming and gaming-related purposes is vested with the Assistant Secretary-Indian Affairs[.]"  Id.

The Secretary's Gaming Acquisition Policy also requires that BIA follow the acquisition regulations of 25 C.F.R. Part 151.  Id. (BIA Regional Director must provide "a complete file . . . which clearly indicates compliance with 25 C.F.R. Part 151").  It mandates that regional offices of the BIA transmit complete acquisition "packages" to the Office of Gaming Management in Washington for approval before acquiring lands into trust for gaming-related purposes.  Id.  The acquisition package "must contain a complete file of information and documents which clearly indicates [BIA's] compliance with 25 C.F.R. Part 151, IGRA, the National Environmental Policy Act (NEPA) and other applicable Federal laws, regulations and Executive Orders."  Id. (emphasis added).  The policy further provides that "[a] tribe's contention that gaming on newly acquired lands is not prohibited because one or more exceptions [to Section 20] apply will require a conclusive factual and legal finding that the particular exception does apply to the trust acquisition."  Id. at 6.

In this case, the BIA was required to follow the Gaming Acquisition Policy in order to take into trust, or transfer title to the tribe under restrictions against alienation, the interests in the Meh-No-Bah allotment on which the Quapaw are constructing the gaming/hotel structure.  It

failed to do so, instead processing the transactions through the ILCP, as if gaming were nowhere

n the horizon.  Thus, the Secretary permitted the acquisition of the Meh-No-Bah interests to

occur without complying with 25 C.F.R. Part 151, without conducting an inquiry under IGRA to

determine if the acquisition fell within 25 U.S.C. § 2719's exceptions on the prohibition on

gaming in post-1988 land acquisitions, without complying with NEPA, and without obtaining the

approval of the Secretary or his specified delegee, the Assistant Secretary-Indian Affairs.

As acknowledged by the Director of the Indian Land Consolidation Program, ILCA has

never before been used to acquire land for gaming.  Prelim Inj. Mem. Ex. 3, White Decl. ¶ 4.

Indeed, that policy has been enforced by exacting requirements in the ILCA process.  According

to the ILCP Director, when the ILCP is asked to acquire an interest in land for a tribe under

ILCA, the ILCP requires that the tribe certify that it will not change the manner in which the land

is being used.  Id. ¶ 6.  With no planned change in land use, no substantial risk arises of

environmental or other impacts of the decision to take land into trust.

Here, just the opposite occurred.  The Department went forward despite the fact that it

knew that the Quapaw planned to use the Meh-No-Bah acquisitions to build a casino.  AR 201.

Clearly, the Secretary was on notice by May 2007 that the tribe intended a radical change in land

use, and that ILCA was being used to circumvent IGRA and Department's Gaming Acquisition

Policy.

It is a basic tenet of administrative law that agencies must follow their established

policies and procedures.  See, e.g., Morton v. Ruiz, 415 U.S. 199, 232 (1974); D&F Afonso

Realty Trust v. Garvey, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (vacating agency decision

where "the FAA's abandonment of its own established procedure and its lack of reasoned

analysis on the record constitute[d] arbitrary and capricious agency action in violation of the

law.").  The Secretary's failure to do so here – a direct cause of the Secretary's failure to comply with NEPA – was arbitrary and capricious.  The appropriate remedy is declaratory relief that the Secretary's decisions to acquire the Meh-No-Bah interests are invalid and injunctive relief requiring the Secretary to reopen the decisions in order to conduct the transactions in compliance with law.

Indeed, the government has agreed with just that approach in prior cases by itself requesting that courts vacate and remand trust decisions in order to enable the Department to reconsider ab initio a decision to take land into trust for a tribe.  See Dep't of Interior v. South Dakota, 519 U.S. 919, 922 (1996) ("the Government asks this Court [to grant certiorari, vacate and remand decision of the Eighth Circuit and] do so with 'instructions that [the district court's decision] also be vacated and that the matter, in turn, be remanded to the Secretary of the Interior for reconsideration and issuance of a new administrative decision"); Notice, Dep't of the Interior, Bureau of Indian Affairs, Land Status: Lower Brule Sioux Tribe, 62 Fed. Reg. 26,551, 26,552 (May 14, 1997) (stating that court's remand of trust acquisition "operates to take the land out of trust" for tribe).  10/

---

10/     An injunction requiring the Secretary to reconsider or reopen his trust decisions on the Meh-No-Bah Allotment in order to comply with the law is in line with the Secretary's inherent authority to reconsider his decisions.  See, e.g., Belville Mining Co. v. United States., 999 F.2d 989, 997 (6th Cir.1993).  For example, in King v. Norton, a decision dealing with an amendment to the Chippewa's tribal constitution, the court found that the "Agency [BIA] did not act beyond the scope of its authority when it reconsidered and reversed its earlier decision [approving the sufficiency of petition signatures to call an election to amend the constitution of the Saginaw Chippewa Indian Tribe of Michigan]." 160 F. Supp. 2d 755, 762 (E.D. Mich. 2001).  Furthermore, "detrimental reliance by a party will not prevent an agency's reconsideration of a decision if the initial decision is in fact erroneous." Id. at 761 (quoting Belville, 999 F. 2d at 999).

**B.    The Department Violated the APA By Conducting Absolutely No Environmental Review In Connection With Its Acquistion of Land For Indian Gaming.**

It is abundantly clear from the Administrative Record that the Secretary made no decision concerning the applicability of NEPA, and conducted absolutely no environmental review in connection with, the Meh-No-Bah acquisitions.  The entire Record contains only <u>one</u> mention of the word "NEPA" and that is on an e-mail whose contents were redacted on the basis of the deliberative process privilege–meaning that the only document in the AR that even mentions NEPA was "pre-decisional" and does not reflect the purported basis for the failure to conduct an environmental review in connection with the acquisitions.  <u>See</u> AR 202; Declaration of Privilege.

**1.    NEPA Review of Indian Land Acquisitions for Gaming**

The Secretary of the Interior ("Secretary") must comply with the National Environmental Policy Act ("NEPA"), which requires that every Federal agency take a "hard look" at the environmental consequences of its actions.  <u>Balt. Gas & Electric Co. v. Nat'l Res. Defense Council, Inc.</u>, 462 U.S. 87, 97 (1983)).  Pursuant to NEPA, the Council on Environmental Quality ("CEQ") promulgated regulations implementing the Act, which, as the Department recognizes, "are binding on all Federal agencies, address the procedural requirements of NEPA and the proper methods for the administration of the NEPA process."  Prelim. Inj. Ex. 2(E), Gaming Acquisition Policy at 9.

NEPA review is triggered by "major federal action," including "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area[,] . . . actions approved by permit or other regulatory decision, [and] federal and federally assisted activities."  40 C.F.R. § 1508.18(b)(4).  NEPA prohibits federal agencies from ignoring connected and/or interrelated actions to avoid application of NEPA or to avoid a more detailed

assessment of environmental effects.  40 C.F.R. § 1508.25(a).  The NEPA review process must be completed "without delay."  40 C.F.R. § 1500.5. 11/

There are two levels of environmental review under NEPA, an Environmental Assessment ("EA") and Environmental Impact Statement ("EIS").  The EA process is used when the agency must determine whether a federal action or federal project would significantly affect the environment.  40 C.F.R. § 1508.27.  If the EA ultimately concludes that the action or project would not significantly effect the environment, the agency issues a Finding of No Significant Impact ("FONSI") and the NEPA review is complete.  If the EA concludes that the action or project would significantly effect the environment, the agency must prepare an EIS in accordance with the requisite process.  40 C.F.R. § 1502.  If it appears likely that an EIS will be required, the agency may directly proceed with an EIS without first preparing an EA.  According to the Department, "[p]roposals for large and/or controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts."  Prelim. Inj. Ex. 2(E), Gaming Acquisition Policy at 10.

Taking land into trust for the Tribe for gaming is a federal action requiring compliance with NEPA.  As this Court noted in another case involving NEPA review of an Indian casino project, "[i]t seems self-evident that a massive complex devoted entirely to around-the-clock commercial gambling and complementary diversions for a host of transient visitors is a unique species of 'development' bearing little resemblance to [other types of commercial

---

11/    CEQ's NEPA regulations expressly require federal agencies to consider whether the cumulative impact of a series of actions will require the preparation of an environmental impact statement or an environmental assessment.  CEQ has defined cumulative impact to cover exactly the kind of structured transaction at issue here:

> 'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  40 C.F.R. § 1508.7.

development].” <u>Citizens Exposing Truth About Casinos v. Norton</u>, 2004 WL 523811, at *8

(D.D.C. Apr. 23, 2004), <u>aff'd</u>, 492 F.3d 460 (D.C. Cir. 2007) (“<u>CETAC</u>”) (enjoining trust

acquisition, finding casino EA inadequate and remanding to agency to address deficiencies).

Indeed, the Department of the Interior regularly prepares Environmental Assessments and

Environmental Impact Statements in connection with trust acquisitions or other Indian-gaming

related federal actions to address how a planned casino project (including its thousands of new

employees, daily visitors, and changes in physical development and natural resource use) will

affect the environment.  For example, the Bureau of Indian Affairs recently issued a Draft EIS in

connection with a trust acquisition for the Confederated Tribes of the Warm Springs Reservation

of Oregon's proposal to develop a resort and casino in the City of Cascade Locks, Hood River

County, Oregon.  <u>See</u> http://www.gorgecasinoeis.com/index.html. 12/

        In recent years, there have been a number of legal disputes about the adequacy of

environmental reviews of Indian casino projects.  <u>See</u>, <u>e.g.</u>, <u>Mich. Gambling Opposition v.

Norton</u>, 477 F. Supp. 2d 1, 9-20 (D.D.C. 2007) (“<u>MichGO</u>”); <u>CETAC</u>, 2004 WL 523811, at *5-9

(D.D.C. Apr. 23, 2004)(“CETAC”); <u>TOMAC v. Norton</u>, 240 F. Supp. 2d 45, 52-53 (D.D.C.

2003); <u>City of Roseville v. Norton</u>, 219 F. Supp. 2d 130, 165-70 (D.D.C. 2002), <u>aff'd</u>, 348 F.3d

1020 (D.C. Cir. 2003).  In those, the issue was the adequacy of the Government's NEPA review.

What makes this case unusual is the Secretary's complete failure to conduct *any* environmental

review whatsoever.

        Typically, environmental review of planned Indian casino projects involves detailed

analysis of various environmental effects, including the traffic, public safety and law

enforcement effects that Cherokee County is or will be injured by, and other socioeconomic

---

12/      The National Indian Gaming Commission also frequently conducts NEPA reviews of Indian
casino-related federal actions that fall within its domain.  <u>See</u>, <u>e.g.</u>, www.gratoneis.com (website for
NIGC's current NEPA review of a Sonoma County, California tribal casino project).

impacts.  See, e.g., CETAC, 2004 WL 5238116, at *7 ("EA . . . replete with discussion of . . .

traffic, noise, cultural resources, socioeconomic conditions" among others; "the project will

exponentially increase traffic" with 10,600 to 13,000 vehicle trips per day); TOMAC, 240 F.

Supp. 2d at 51-52 (discussing direct and indirect impacts on traffic); Cascade Locks Draft EIS,

Chapter 4 at 88-89, 133-40 (assessing the impacts on police, fire and ambulance service needs

under the proposed alternative; assessing traffic and transportation impacts of the proposed

action, including impacts due to construction) (available at

http://www.gorgecasinoeis.com/draft_eis.html). 13/

     The government contends that compliance with NEPA was not required because it

proceeded under ILCA and so its actions did not constitute "major federal action."  Govt. Br. at

27-29.  The core problem with the government's position is that it presumes that, once it was

aware that the immediate purpose for acquiring the Meh-No-Bah parcel was to construct a casino,

it was still permissible for it to blithely proceed with its ILCA procedures without applying its

long-established policies governing acquisitions for gaming, which always involve an

environmental review under NEPA.  The government relies on its claim that the mere transfer of

beneficial owners under ILCA "had no regulatory consequences[,]" Govt. Br. at 28, but it does

not even address the government's knowledge that the transfers had critical practical

consequences.  IGRA and NEPA apply whenever the subject property is to be used for gaming.

That was plainly so here.

---

13/     Casino environmental reviews also typically addresses issues relating to substantive federal
environmental laws like the Clean Air Act and the Clean Water Act.  See, e.g., MichGo, 477 F. Supp. 2d
at 11-12 (discussing Clean Air Act and air pollution impacts); Cascade Locks Draft EIS, Chapter 4 at 27-
30 (assessing direct and indirect impacts of proposed project on water quality).  Here, a prominent
international environmental consultant identified potentially significant issues with the Quapaw project
that implicate the Clean Water Act.   See Prelim. Inj.  Ex. 2(F), Notice Letter at 6-10.

The government's claimed right to circumvent IGRA and NEPA flies in the face of past cases, in which courts have issued injunctive relief to force adequate environmental review in connection with a federal action that would enable the development of an Indian casino. That was the case in TOMAC, in which BIA was initially enjoined from taking 79 acres into trust so an Indian tribe could construct and operate a casino until BIA had considered the impact of growth-induced development on the environment. 240 F. Supp. 2d at 52-53. Similarly, in CETAC, the district court enjoined the Secretary and "remanded for further elaboration of the Environmental Assessment on the particular[ ] [issues] noted [by the court] or, in the alternative, for preparation of an Environmental Impact Statement." CETAC, 2004 WL 5238116, at *10. The same result should obtain here, where the Secretary has entirely failed to assess the environmental impacts of its decisions respecting the Meh-No-Bah parcel.

### 2. The Secretary's Failure To Follow The Land Acquisition Regulations, 25 C.F.R. Part 151, Was Arbitrary And Capricious And Contrary To Law.

Defendants failed to consider their NEPA obligations because they permitted the land acquisitions to proceed under the Indian Land Consolidation Act without following the procedures set forth in the land acquisition regulations, 25 C.F.R. Part 151. See Prelim. Inj. Ex. 1(C), C. Artman Letter dated Dec. 20, 2007 to Sen. P. Roberts. Then-Assistant Secretary for Indian Affairs stated in December 2007 that "[t]he BIA did not complete either an environmental assessment (EA) or an environmental impact statement (EIS) because it determined that one is not required for the ILCA acquisitions." Id. ILCA, however, contains no exemption from NEPA or other federal environmental laws, nor does it contain an exemption from the regulations at 25 C.F.R. Part 151. Furthermore, the Gaming Acquisition Policy clearly calls for all acquisitions for gaming – even of land interests already held in restricted or trust status – to take place under Part 151. See Prelim. Inj. Ex. 2(E), Gaming Acquisition Policy at 1.

ILCA was enacted in order to address the problem of fractionated land interests on allotment lands.  ICLA authorizes DOI, inter alia,  to acquire fractional interests in land in trust for the benefit of tribes.  Although ILCA provides for funding trust acquisitions of fractional interests, it does not provide a specific procedure for such transactions.  On the contrary, ILCA expressly provides that the general statute authorizing the Secretary to acquire land in trust for Indians, 25 U.S.C. § 465, applies to the Act.  25 U.S.C. § 2202. 14/  Trust land acquisitions under Section 465 are governed by regulations promulgated by the Secretary and codified in 25 C.F.R. Part 151, which expressly includes acquisition of fractional interests.  See 25 C.F.R. § 151.7.

Defendants' acquisition of the five-sixths interest in the Meh-No-Bah allotment for the Quapaw in 2007 falls within 25 C.F.R. Part 151, either under ILCA or under the Gaming Acquisition Policy.  Under this part, "an individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary[,]" providing the required information.  25 C.F.R. § 151.9.  The Quapaw acquisitions were subject to 25 C.F.R. § 151.10. 15/  Section 151.10 expressly requires that "the Secretary will consider [the specified] criteria in evaluating requests for the acquisition of land in trust status[,]" including among other requirements, the "purposes for which the lands will be used" and "[t]he extent to which the applicant has provided information that allows the Secretary to comply with

---

14/       The government argues that Section 2202 was intended to amend Section 465 and has no direct relationship to ILCA,  Govt. Br. at 34, but the words of the statute are plain and its placement as a provision within ILCA strongly suggests that Congress intended the provision to have application to ILCA acquisitions.

15/       Section 151.10 relates to "on-reservation" acquisitions.  Although the Quapaw Tribe does not have a reservation, its trust acquisitions fall within the on-reservation regulation under the definition of "reservation" in 25 C.F.R. 151.2(f) because the Meh-No-Bah allotment is within the tribe's former reservation in Oklahoma.

[the BIA's] National Environmental Policy Act Revised Implementing Procedures[.]"  25 C.F.R. 151.10 (c), (h).

The Secretary's land acquisition regulations also require that the Secretary provide public notice of his intention to acquire land into trust for an Indian or Tribe by placing a notice in the Federal Register or "in a newspaper of general circulation serving the affected area" prior to transferring title.  25 C.F.R. 151.12(b).  Critically, the Secretary failed to provide <u>any</u> public notice of the Meh-No-Bah acquisitions, depriving plaintiff and other affected parties from seeking judicial review prior to the transfer of title.

In taking into trust the Meh-No-Bah interests, the Secretary did not follow the procedure under Part 151 or consider any of the criteria under Section 151.10 in acquiring land in trust for the Quapaw casino development.  "It is well settled that an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide them."  <u>Esch v. Yeutter</u>, 876 F.2d 976, 991 (D.C. Cir. 1989) (citing <u>Service v. Dulles</u>, 354 U.S. 363 (1957)).  <u>See</u> <u>also</u> <u>Cntr. for Auto Safety v. Dole</u>, 828 F.2d 799, 808 (D.C. Cir. 1987) ("a court will require an agency to adhere to its own regulations 'even when the administrative action under review is discretionary in nature'"); <u>Doe v. Rumsfeld</u>, 341 F. Supp. 2d 1, 13 (D.D.C. 2004) (granting plaintiff's motion for summary judgment where agency failed to follow its own regulatory procedures; "[a]lthough . . . the courts may not compel an agency to employ 'extra procedural devices,' this Court shall compel an agency to follow the procedures set forth in its own regulations."). Defendants' failure to conduct the required trust acquisition procedures, including compliance with NEPA, in connection with taking the five-sixths interest in the Meh-No-Bah Allotment into trust was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law.

3.     **Even If The Department's Trust Acquisitions Were Not Subject To Part 151, They Were Still Subject to The Department's NEPA Policies.**

Even if it were proper to acquire trust lands under ILCA without complying with Part 151, the Secretary violated the Administrative Procedure Act by failing to comply with the Department's and BIA's NEPA policies (as well as NEPA itself) in connection with the Meh-No-Bah acquisitions.

The Department's NEPA policies are set out in Part 516 of the Department Manual. 16/ With respect to externally initiated proposals such as tribal land acquisition, it is Department policy that "[o]fficials responsible for the development or conduct of loan, grant, contract, lease, license, permit, or other externally initiated activities shall require applicants, to the extent necessary and practicable, to provide environmental information, analyses, and reports as an integral part of their applications." 516 DM 1.4(C).

Each agency within the Department has promulgated its own NEPA policies. The BIA's NEPA policy, titled "Managing the NEPA Process-Bureau of Indian Affairs," is published in the Department Manual as Chapter 10 of Part 516. The BIA's NEPA policy clearly provides that NEPA compliance is required when BIA action is required on an application by a tribe:

> Guidance to Applicants and Tribal Governments.
>       A.     Relationship with Applicants and Tribal Governments.
>             (1)     Guidance to Applicants.
>             (a)     An "applicant" is an entity which proposes to undertake any activity which will at some point require BIA action. These may include tribal governments, private entities, state and local governments or other Federal agencies. BIA compliance with NEPA is Congressionally mandated. Compliance is initiated when a BIA action is necessary in order to implement a proposal.
>
>       * * *

---

16/     The Department Manual is available on the Department's website at http://elips.doi.gov/app_home/index.cfm?fuseaction=home

(2)     Guidance to Tribal Governments.
(a)     Tribal governments may be applicants, and/or be affected by a proposed action of BIA or another Federal agency . . .  [T]he BIA retains sole responsibility and discretion in all NEPA compliance matters.
(b)     Any proposed tribal actions that do not require BIA or other Federal approval, funding or "actions" are not subject to the NEPA process.

516 DM 10.3 (emphasis added).

In accordance with this policy, compliance with NEPA is required when a tribe seeks BIA's action on trust land acquisitions – and receives federal funding for its acquisition.  See Govt. Br. at 6.   As discussed above, although it failed to do so here, BIA typically recognizes that trust land acquisitions for gaming purposes call for environmental review under NEPA.  BIA also conducts NEPA review on trust acquisitions for other, non-gaming purposes.  See, e.g., Notice of Intent to Prepare an Environmental Impact Statement for the White River Amphitheater, Muckleshoot Indian Reservation, King County, WA, 63 Fed. Reg. 35939-03 (July 1, 1998) (EIS to be prepared in connection with proposed trust acquisition for construction of amphitheater).

Agencies must follow their established policies and procedures.  See Morton v. Ruiz, 415 U.S. 199, 235 (1974) (providing that "[b]efore the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures."); D&F Afonso Realty Trust v. Garvey, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (vacating agency decision where "the FAA's abandonment of its own established procedure and its lack of reasoned analysis on the record constitute[d] arbitrary and capricious agency action in

violation of the law.").  Defendant's failure to follow its own NEPA policies in its decision-making process for the Meh-No-Bah acquisitions constitutes a violation of the APA. 17/

For all these reasons, defendant's complete failure to conduct any environmental review under NEPA cannot survive even deferential review and Cherokee County is entitled to summary judgment for the government's failure to comply with NEPA.

### 4.    Cherokee County's NEPA Claim Is Not Moot

As a tag-along to its argument that NEPA compliance was not required, the government argues that Cherokee County's NEPA claim is moot "because the casino is virtually complete." Govt. Br. at 29.  It is true that construction of the casino structure is complete and open for business, causing current, continuing injury to Cherokee County.  Although Cherokee County's preliminary injunction motion was focused on enjoining continued construction, its NEPA-related injuries are not solely or even largely caused by construction but by the operation of the casino with its umpteen thousands of daily visitors – reportedly over 100,000 over the first week of business. See, e.g., Ex. 1, G. Grisolano, "More Than 10,000 Pack Casino For Opening Day," Joplin Globe (July 5, 2008); Ex. 2, R. McKinney, "Decision To Affect Cherokee County Casino," Joplin Globe (July 20, 2008).

"The law is clear that a suit is moot only when it can be shown that a court cannot even theoretically grant relief."  Vieux Carre Property Owners, Residents, & Assocs., Inc. v. Brown, 948 F.2d 1436, 1446 (5th Cir. 1991) (quotation and citation omitted); see also Ellis v.

---

17/        Nor do the acquisitions here qualify for a categorical exclusion from NEPA's requirements.  The Council on Environmental Quality's NEPA regulations define a categorical exclusion as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.  40 C.F.R. § 1508.4.  The BIA's categorical exclusions are set forth in the Departmental Manual and none of the listed categorical exclusions could conceivably cover the acquisition of land in trust for gaming or other development purpose.  See 516 DM 10.5.

Brotherhood of Ry. Clerks, 466 U.S. 435, 442 (1984) ("[A]s long as the parties have a concrete

interest, however small, in the outcome of the litigation, the case is not moot.").  In cases like

this one, where the NEPA claim arises from the continuing, unassessed environmental harms

flowing from the federal action at issue, the court can grant effective relief and the claim is not

moot.  See, e.g., Montana Wilderness Ass'n v. Fry, 408 F. Supp. 2d 1032, 1034 (D. Mont. 2006)

(district court suspended Bureau of Land Management leases and ordered the shutdown of a

pipeline pending BLM's compliance with NEPA); see also Bob Marshall Alliance v. Hodel, 852

F.2d 1223, 1230 (9th Cir. 1988) ("The proper [judicial] remedy for substantial procedural

violations of NEPA . . . is an injunction.").  The Montana Wilderness court determined that its

> equitable powers are broad, and it is within the court's authority to fashion a
> remedy that fits the particular facts of the case before it.  Moreover, a district
> court has the power to fashion a remedy that ensures full compliance with the law.
> In this case there are two options with respect to the leases.  One is to
> permanently suspend the leases until the NEPA process is complete.  The other
> more drastic option is to void the leases[.]

Mont. Wilderness, 408 F. Supp. 2d at 1034 (citing Kettle Range Conservation Group v. U.S.

Bureau of Land Mgmt., 150 F.3d 1083 (9th Cir. 1998)).  The court decided to suspend the leases

and to shutdown the pipeline.

Likewise, in S.W. Neighborhood Assembly v. Eckard, 445 F. Supp. 1195, 1202-03

(D.D.C. 1978), this Court held that a NEPA claim was not moot and granted summary judgment

to plaintiffs based on the continuing environmental impacts from a daily influx of traffic and

employees to a building leased by the government.  Id. at 1199-1200.  There, the federal action

that necessitated review under NEPA was entering the lease, which caused the builder to erect a

nine-story office building according to the government's specifications.  Id.  Even though the

federal action (leasing the building) was completed and the building was constructed, the court

held that the NEPA claim was not moot and that the environmental impacts must be measured.

Id. at 1202-03.  Many cases reach similar conclusions.  See, e.g., Utah Environmental Congress v. Russell, 518 F.3d 817 (10th Cir. 2008) (where plaintiffs sought to enjoin the application of road salt in conjunction with a logging enterprise, court held that, because the application of the salt would be continuous, the fact that it had begun did not moot the controversy; "even where it is 'too late to ... provide a fully satisfactory remedy' the availability of 'a partial remedy' will prevent the case from being moot.")(quoting Church of Scientology v. United States, 506 U.S. 9, 13 (1992)); West v. Sec'y of Dep't of Transp., 206 F.3d 920, 925-26 & n.4-5 (9th Cir. 2000) (NEPA claim not moot even though stage one of highway project was completed and carrying traffic; upon finding that defendants violated NEPA, court's "remedial powers would include remanding for additional environmental review, and conceivably, ordering the interchange closed or taken down"); Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 428-29 (10th Cir. 1996) (where the key environmental issue is the new patterns of jet flights rather than the construction of the runway, NEPA is not moot; "if we find that the Respondents failed to comply with NEPA, we could order that the runway be closed or impose restrictions on its use until Respondents complied with NEPA."). [18]/

## III.        Defendants' Motion to Dismiss Count I Should Be Denied.

---

[18]/        The government relies on inapposite authorities in which claims are mooted during the pendency of an appeal, and in each case the defendants had at least facially complied with NEPA by preparing some assessment of the environmental impacts of its actions.  See Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs, 217 F.3d 393, 396 (5th Cir. 2000) (appeal moot because Court could not grant effective relief following construction of building pursuant to permit; Corps had conducted EA and issued FONSI); Neighbors Org. to Insure A Sound Env't, Inc. v. McArtor, 878 F.2d 174, 178 (6th Cir. 1989) (appeal moot because construction sought to be enjoined was complete; FAA had completed thorough review in EA);  Fla. Wildlfe Fed'n v. Goldschmidt, 611 F.2d 547, 549 (5th Cir. 1980)(appeal moot "where the activities sought to be enjoined have already substantially occurred" while the appeal was pending; defendants had prepared several environmental impact statements related to project).  The government also cites Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 n.34 (1978) (discussing distinction between NEPA claims and the Endangered Species Act).  There the Supreme Court noted that the district court had enjoined the project at issue for 21 months, after TVA had spent some $29 million on the project on land purchases, concrete work, and building a four-lane steel span bridge, while the defendant complied with NEPA.  Id. at 158 & n. 5.

Count I of the amended complaint alleges that the Secretary, Department of the Interior, and NIGC violated the APA by failing to conduct an Indian lands determination with respect to the casino located on the Meh-No-Bah parcel. Am. Compl. ¶¶ 59-67. 19/

There appears to be little question on the substance.  IGRA permits gaming only on lands that qualify as "Indian lands" as defined by that statute, and IGRA generally prohibits gaming on any Indian lands acquired after the date of its enactment in 1988 unless certain exceptions apply. On this point of law, plaintiff and defendants agree.  See Govt. Br. at 38.   IGRA is replete with language that plainly limits lawful Indian gaming to gaming on Indian lands.  See, e.g., 25 U.S.C. §§ 2703(4), 2710(b)(1) & (d)(3), 2719.  For that reason, whether land to be used for gaming is Indian lands is the predicate question under IGRA, to which both the Secretary and the NIGC have for years paid significant attention.  Whether lands qualify as Indian lands under IGRA is so fundamental to that statute that the Secretary and the NIGC have for years worked under a Memorandum of Agreement detailing how the agencies agree to share responsibility for and reach concurrence on this critical component of their mutual obligations.  See Memorandum of Agreement Between The National Indian Gaming Commission and the Department of the Interior (attached as Ex. 3). 20/  Moreover, the NIGC considers the "Indian lands" question fundamental to its jurisdiction under IGRA.  In regulations it recently published, for example, it stated, "the Commission has jurisdiction only over gaming on Indian lands and therefore must establish that it has jurisdiction as a prerequisite to its monitoring, enforcement, and oversight

---

19/     An "Indian lands" inquiry encompasses an inquiry as to whether lands acquired after IGRA's date of enactment in 1988 – like the Meh-No-Bah acquisitions – are eligible for gaming under one of the exceptions in Section 20 of the Act, 25 U.S.C. § 2719, because the issue is whether the lands in question qualify for gaming under the Act.

20/     The Memorandum of Agreement is also available on the NIGC website, at http://www.nigc.gov/ReadingRoom/IndianLandOpinions/tabid/120/Default.aspx.

duties." 73 Fed. Reg. 6019, National Indian Gaming Commission, Facility License Standards (Final Rule)(Feb. 1, 2008) (emphasis added).

In this case, the record demonstrates that the Department of Interior knew full well by early May 2007 (before three of the five transactions were effected) that the Quapaw sought to acquire the Meh-No-Bah interests in order to build a casino. AR 201 (May 10, 2007 e-mail from Jaeger to Hanna stating that the Quapaw chairman "called yesterday about the 40 acre tract that the Tribe wants to build a casino on"). As set forth supra in Part II.A, the Department of Interior was obligated to follow its established policies and procedures for gaming acquisitions, which would have included an appropriate "Indian lands" determination under IGRA. See Prelim. Inj. Mem. Ex. 2(E) at 6. The Administrative Record makes clear that Department of Interior wholly failed to do that. Once NIGC became aware that the Quapaw intended to game on the parcel and were actively pursuing that intent by constructing a casino, NIGC was not free to turn a blind eye to the duty to assess whether such gaming would be lawful. 21/ As defendants' brief points out, the NIGC-approved Quapaw gaming ordinance is not site-specific, see Govt. Br. at 38, so NIGC had not considered the question at the time it approved the Tribe's ordinance. The government appears to argue that because the Quapaw has a non-site-specific gaming ordinance and a non-site specific compact with the State of Oklahoma, and never submitted a management contract to NIGC for approval, NIGC had no duty to ensure that the newly acquired lands were eligible for gaming under the Act. See id. But that not only ignores the Indian-land strictures of IGRA, it also would create an incentive for tribes with dubious claims to IGRA-compliant lands to structure their regulatory submissions to develop gaming without any inquiry at all.

---

21/    Based on the NIGC's response to a FOIA request submitted by one of Cherokee County's counsel, we understand that NIGC received documentation from the Tribe providing the Tribe's position on the Indian lands and Section 20 question, but we have not seen any documentation indicating that NIGC made any determination or assessment of the merits of the Tribe's position or made its own assessment of the issue. NIGC has not filed an Administrative Record as of this date.

In any event, even if NIGC did not have a duty to undertake an Indian lands inquiry when it became aware of the Quapaw development, it should have done so earlier this year in connection with its review under its new regulations of the Quapaw's submission of its casino facility license. In February, NIGC published final rules it calls its "Facility License Standards." As described by NIGC in its summary, "the standards will help the Commission ensure that each place, facility or location where class II or class III gaming will occur is located on Indian lands eligible for gaming as required by [IGRA]." 73 Fed. Reg. 6019. The new regulations require a tribe opening a new gaming facility to submit documentation to enable NIGC to determine whether gaming in the facility would take place on "Indian lands" within the meaning if IGRA. See 73 Fed. Reg. 6019, 6024, 6029. 22/ Defendants' brief suggests that Cherokee County claims an Indian lands determination should be an "independent proceeding" and that it should be a "pre-construction," but these concepts are the creation of defense counsel's imagination. Cherokee County merely maintains that, at least as to post-1988 trust acquisitions on which gaming is proposed to take place, the defendants must make a reasoned determination that such gaming would meet the predicate requirement of IGRA that the lands in question are eligible for gaming.

The government's main basis for seeking dismissal of Cherokee County's challenge to its failure to make any Indian lands determination is that no judicial review is permissible, either because it is barred by IGRA or because an Indian lands decision is not "a discrete action that [defendants are] required to take." Govt. Br. at 35-37 (quotation and citation omitted). But defendants themselves acknowledge that whether particular lands are eligible for gaming under IGRA is a fundamental requirement of the statute, and in the case of NIGC, a fundamental

---

22/    The documentation that Tribes are required to submit is initially small, presumably to avoid burdening those Tribe's which plainly propose gaming on eligible lands, such as reservations lands, but NIGC requests additional documentation if the initial submission is insufficient. See 73 Fed. Reg. 6024.

prerequisite for its jurisdiction.  By defining "Indian lands" in a manner specific to IGRA and in providing a general prohibition on gaming on lands acquired after enactment in 1988, Congress implicitly required that defendants make this determination.  Because of that requirement, the judicial review provision of IGRA – which in any event only applies to actions of the NIGC and not to the Secretary or the Department – should not be read as a "clear and convincing" signal that Congress intended to preclude judicial review under the APA.  Abbot Laboratories v. Gardner, 387 U.S. 136, 141 & n.2 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (quotation and citation omitted) (also quoting H.R. Rep. No. 1980, 79th Cong., 2d Sess., at 41, U.S. Code Cong. Serv. 1946 at 1195 (1946): "To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it.  The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.").  Defendant's motion to dismiss Count I should be denied.

## CONCLUSION

For these reasons, Cherokee County requests that the Court deny the government's motion to dismiss (or in the alternative for summary judgment) and grant summary judgment to Cherokee County on Counts II and III of the amended complaint.

Dated:  July 28, 2008

Respectfully submitted,


s/Jonathan L. Abram
Jonathan L. Abram, D.C. Bar No. 389896
jlabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

*Counsel for Board of Commissioners of Cherokee County*

**CERTIFICATE OF SERVICE**

The undersigned counsel for plaintiff Board of Commissioners of Cherokee

County, Kansas, hereby certifies that on July 28, 2008, the foregoing Opposition to Motion to

Dismiss, or in the Alternative for Summary Judgment and Brief in Support of Cross-Motion for

Summary Judgment, attached exhibits, Statement of Undisputed Material Facts, and Proposed

Order were filed with the Court using the CM/ECF system, which automatically serves notice of

the filing on counsel for the defendants.

s/Audrey E. Moog_____
Audrey E. Moog

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | Case No.  1:08-cv-00317-RWR |
| v. | ) ) | Judge Richard W. Roberts |
| KEMPTHORNE, et al., | ) ) | |
| Defendants. | ) ) ) | |

**PLAINITFF BOARD OF COMMISSIONERS OF CHEROKEE COUNTY'S
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1.      Plaintiff Board of Commissioners of Cherokee County, Kansas, is the body politic and corporate for Cherokee County and is empowered under Kansas law to, among other powers, sue and be sued and to exercise the powers of home rule.  Edmondson Declaration ¶ 1 (Ex. 1 to Mem. in Support of Prelim. Injunction); see also K.S.A. §§  K.S.A. 19-101, 19-101a.

2.      Under Kansas law, Cherokee County is responsible for, inter alia, funding the County Sheriff's office and other public safety services, including fire and ambulance services, in unincorporated areas, and for maintaining County roads. Edmondson Declaration ¶¶ 2, 16; see also K.S.A. 19-212; K.S.A. 19-241; K.S.A. 19-805(c); K.S.A. 68-502.

3.      Cherokee County is Kansas' most southeastern county, bordering both Missouri and Oklahoma.  Cherokee County is bordered on the south by Ottawa County, Oklahoma and on the east by Jasper and Newton Counties, Missouri.  The County has a small and declining

population of approximately 21,000 residents in its 590 square miles (approximately 39 persons per square mile), with a per capita income of approximately $14,710.  Edmondson Declaration ¶ 5.

4.      The portion of the Quapaw development on which the casino building is reportedly being constructed is on 40 acres of land described as the SE1/4 of the NW1/2, Section 17, Township 29 north, Range 25 east in Ottawa County, Oklahoma.  Edmondson Decl. ¶ 9 & Ex. B (Letter from BIA Regional Director dated Oct. 25, 2007).  This tract of land, known as the Meh-No-Bah allotment, is in the far northeast corner of Oklahoma, located north of Interstate 44 and immediately south of the Kansas/Oklahoma border.  Edmondson Decl. ¶ 9.

5.      Over 50% of the entire footprint of the current Quapaw casino development is located within Cherokee County, including all or virtually all of the development's customer parking areas.  Surface parking and the access roadway for the Quapaw development occupies approximately 63 acres in Cherokee County, Kansas. Edmondson Decl. ¶ 10 & Ex. C (Dept. of Interior Letter to Senator Roberts dated Dec. 20, 2007).

6.      The site of the Quapaw development is essentially landlocked.  Vehicle access to the property requires exiting Interstate 44 in Missouri at the Route 166 junction, traversing a few hundred feet to State Line Road in Cherokee County, Kansas and, then, south and west to the construction site.  Regardless of any path taken by the tribe in constructing an entry through tribally owned land in Missouri and Kansas, the entrance to the project will necessarily cross a county road in Cherokee County, Kansas. Edmondson Decl. ¶ 11.

7.      On or about May 15, 2007, the Board of Commissioners learned of the Quapaw's intention to build a casino resort from an article in a local newspaper, the Joplin *Globe.*  The article concerned the public announcement by the Quapaw of its plans to develop a $200 million

casino resort in northeast Oklahoma and attract two million visitors per year. Quapaw Tribal

Chairman John Berrey announced the tribe had been working on the project since 1990.

J.R. Matthews, Vice Chairman of the Tribe's Business Committee, stated that the tribe had

acquired more than 235 acres in Oklahoma, Kansas and Missouri around the Tri-State

Monument where the three State borders meet to build the resort. The tribe stated that the

opening date for the casino was scheduled for July 4, 2008. The tribe also announced plans for a

12-floor luxury hotel with 240 rooms to open 90 days after the casino. Edmondson Decl. ¶ 8 &

Ex. A (Joplin *Globe*, "Tribe Announces Plans for Casino," May 15, 2007).

       8.     The Board of Commissioners learned from this and other published reports that

the Quapaw's casino resort project included: (a) surface parking for 2,200 cars plus a dedicated

employee parking lot; (b) additional surface parking for buses and recreational vehicles with

utility hook-ups; (c) 70,000 square feet of gaming floor, including 2,000 slot machines, 30 table

games, 15-table poker room, and a high limit gaming area; (d) a 12 story hotel; (e) multiple

restaurants; and (f) 9,000 square feet of meeting space. Edmondson Decl. ¶ 9.

       9.     The access for the project is intended to turn from U.S. Highway 166 onto a new

access road crossing State Line Road, to the parking area in Cherokee County, Kansas. (See

Quapaw Casino Development Plan, attached as Exhibit E.) Thus, all Quapaw casino traffic will

travel through Cherokee County on county roads, and all or virtually all casino customers will

park in Cherokee County. Edmondson Decl. ¶ 11.

       10.    Press reports disclose that the casino opened on July 5, 2008. See Pl. Mem. Exs.

1& 2; see also http://www.downstreamcasino.com/home.php.

       11.    The Meh-No-Bah parcel, on which the casino sits, is a 40-acre parcel that was

originally allotted to a Quapaw Tribe member of that name. AR 45. In five transactions in 2007,

the government acquired all interests in the parcel for the benefit of the Quapaw Tribe on which to build the Tribe's casino. AR 19, AR 63, AR 111, AR 132, AR 140.

12.     The government knew no later than May 10, 2007, that the Meh-No-Bah parcel was "the 40 acre tract that the Tribe wants to build a casino on." AR 201.  <u>See also</u> AR 145 (Quapaw letter to BIA describing the tribe's need to conclude the acquisitions as "urgent"); Prelim. Inj. Ex. 3, M. White Decl. ¶ 8 (it was "common knowledge" within BIA that the Quapaw were building a casino development); Prelim. Inj. Mem. Ex 1(A), "Tribe Announces Plans" at 1 (reporting Quapaw's May 15, 2007 press conference describing the location, size, scope, and timing of their planned gaming development and stating that the tribe has been working on the project since 1990).

13.     Two of the acquisitions were effected through BIA deeds executed on April 27, 2007.  The Secretary acquired the one-quarter interest of Yannah Stephenson "in trust for the Quapaw Tribe" for consideration of $9,500 (AR 63) and the one-quarter interest of George McWatters "in trust for the Quapaw Tribe" for the $9,500. AR 19. As reflected on the deeds, these acquisitions were made using federal funds.  AR 19, AR 63; <u>see also</u> Govt. Br. at 6.

14.     The third acquisition was effected by a BIA deed dated May 18, 2007.  The Secretary acquired the one-sixth interest of Jan Killough "in trust for the Quapaw Tribe" for $6,333.33.   AR 111.  As reflected on the deed, this acquisition was made using federal funds. <u>Id.</u>; <u>see also</u> AR 201; Govt. Br. at 6.

15.     The fourth acquisition was effected by a BIA deed dated July 6, 2007.  The Secretary acquired the one-sixth interest of Bobbie Rae Starr "in trust for the Quapaw Tribe" for $6,333.33.  AR 132.  As reflected on the deed, this acquisition was made using federal funds.  <u>Id.</u>; <u>see also</u> AR 201; Govt. Br. at 6.

16.     The fifth and final conveyance of interests in the Meh-No-Bah parcel took place on July 10, 2007, when "the Secretary of the Interior on behalf of the Estate of Billy Lewis Urquhart, . . .an Indian of the Creek Nation" conveyed to the Quapaw Tribe the final one-sixth interest in the parcel for $6,333.33.  AR 140.

17.     All these acquisitions and conveyances took place under the Indian Land Consolidation Act.  Prelim. Injun. Ex. 1(C ), C. Artman Letter to Sen. Roberts dated Dec. 20, 2007.

18.     The Department carries out ILCA transactions through its Indian Land Consolidation Center in the Bureau of Indian Affairs ("BIA").  Prelim. Inj. Ex. 3, M. White Decl. ¶¶ 2-3.  Prior to approving trust acquisitions or land conveyances under ILCA, the ILCP requires the acquiring tribe to certify that it does not intend to change the use of the land to be acquired. Id. ¶ 6.

19.     According to the director of the ILCA program, ILCA has not previously been used to acquire lands for gaming.  Id. ¶ 4.

20.     The Department later acknowledged that "[t]he BIA did not complete either an environmental assessment (EA) or environmental impact statement (EIS) for this project[.]" Prelim. Inj. Ex. 1(C), C. Artman Letter dated Dec. 20, 2007 at 1.

21.     Since 1994, the Department of the Interior has published and distributed to Bureau of Indian Affairs Regional Directors its Checklist for Gaming Acquisitions, Gaming-Related Acquisitions and IGRA Section 20 Determinations ("Checklist"), setting forth the procedures to  be followed for all gaming-related trust acquisitions and land conveyances.  Dept. of Interior, Final Rule, Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354, 29354 (May 20, 2008).  See also Prelim. Inj. Ex. 2(E) at 1.  Among other requirements

stated in the policy, all gaming-related trust acquisition applications must be referred to the Office of Indian Gaming in the Assistant Secretary for Indian Affairs' Office of Policy and Economic Development in Washington, D.C.  Prelim. Inj. Ex. 2(E) at 1.

22.    The Administrative Record contains no reference of any kind to the Checklist and contains no decision or discussion concerning the Checklist or the Indian Gaming Regulatory Act.  See AR 1-204.

23.    The Administrative Record contains a single reference to the word "NEPA" (AR 202) but contains no reference to or documentation of any decision concerning the applicability of or compliance with NEPA.  See AR 1-204.

24.    Under state law, the County is responsible for the cost of police services and the cost of fire and other public safety services in unincorporated areas, and for maintaining County roads.   Prelim. Inj. Ex. 1, Edmondson Decl. ¶ 16.

25.    The Quapaw development has damaged Cherokee County roads.  Construction contractors for the Quapaw development have been using State Line Road, a Cherokee County road, to bring heavy equipment and materials onto the construction site for over a year.   Id. ¶ 18.

26.    Part of the construction has involved cutting the existing "chip and seal" hard surface road to extend a sewer line from the project site into Missouri.  Id.   Construction traffic already has interfered with use of the County road and shortened its expected life. Id.

27.    As planned by the Quapaw, all casino traffic will travel through Cherokee County on County roads, and all or virtually all casino customers will park in Cherokee County.   Id. ¶ 15.

28.    With over two million annual visitors expected at the Quapaw casino, all of whom will drive on Cherokee County roads and park in Cherokee County, it is certain that casino traffic will have a significant, adverse and continuing impact on County roads.  Id. ¶ 19.

29.    The dramatic increase in traffic will have a significant impact on the cost of maintaining the roads and on traffic safety, as the expected traffic volume will far exceed the traffic volume for which the county roads were designed to bear.  Id.

30.    Cherokee County expects the casino traffic to cause a significant increase in automobile accidents and law enforcement service calls in the vicinity of the development.  Id. ¶ 20.  The increase in vehicle accidents and dramatic increase in the County's transient population will require increased police service calls.  Id.  The County has estimated will require five new law enforcement personnel to patrol the roads and respond to traffic accidents and fatalities.  Id. ¶¶ 19-23.

31.    The County also will need to fund a new public safety substation in the vicinity of the casino to provide adequate fire and ambulance services to the casino area.  Id. ¶ 23.

32.    Starting shortly after the Civil War, Cherokee County and surrounding counties in Kansas, Missouri and Oklahoma – including Ottawa County where the Quapaw casino development is centered – were the site of over a century of intensive coal, lead, and zinc mining.  Id.  ¶ 24.

33.    Cherokee County and other parts of what is known as the Tri-State mining district have been left scarred by this history.  Id.  Today, the U.S. Environmental Protection Agency broadly monitors this region and continues to engage in reclamation efforts.  Id.  To this day, communities in the Tri-State mining district continue to be vulnerable to danger from lead, zinc, cadmium, and other mining-related contaminants in soil and waters.  Id. ¶ 25.

34.    Based on the initial review of an environmental consultant, Cherokee County also determined that the project involved likely violations of the Clean Water Act.  Prelim. Inj. Mem. Ex. 2(F) (Notice of Violation, detailing suspected violations).


Dated: July 28, 2008

Respectfully submitted,


s/Jonathan L. Abram
Jonathan L. Abram, D.C. Bar No. 389896
jlabram@hhlaw.com
Audrey E. Moog, D.C. Bar No. 468600
amoog@hhlaw.com

HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
(202) 637-5600 (Telephone)
(202) 659-5910 (Facsimile)

**EXHIBIT I**



# More than 10,000 pack casino for opening day

July 05, 2008 09:30 pm

— By Greg Grisolano
ggrisolano@joplinglobe.com

OTTAWA COUNTY, Okla. — It took about one minute for Carol Murphy to see a return on her investment at the penny slot machine at the Downstream Casino Resort Saturday.

"I just hit for $26," said Murphy, who along with her husband, left their home in Springfield and arrived about 8 a.m. in order to be among the first people at the casino's grand opening. "It's the bottom jackpot. I wish it could have been the $5,000 one, but it wasn't."

With long lines of cars and people, other gamblers wound up having to wait longer for a shot at prosperity. David Maugans and his mother, Phyllis, said they waited in traffic for more than an hour to get into the parking lot.

"I'm worried about what it's going to be like when we leave," said Phyllis, who drove from Independence, Kan. "If I have to wait like that to get out, I'm not going to have enough gas to get home."

Traffic was backed up along Interstate 44 and Kansas Highway 166. The casino is built on Oklahoma land near the junction of Missouri, Kansas and Oklahoma. The parking lot is in Kansas.

Officials with the Quapaw Tribe of Oklahoma said they hope the traffic is a sign they made a wise investment. Tribal officials said more than 10,000 people packed the gaming floor within the first hour of business.

"It's a completely full house," said Sean Harrison, a spokesman for the tribe. "Ten thousand people in the first hour pretty much speaks for itself."

While thousands rushed to play video poker, slot machines and blackjack, Harry Kelley headed for the Legends sports bar to cool off with a drink after waiting outside for more than an hour in the heat.

"With this building here, they're getting to be like Las Vegas casinos," said Kelley, a retired truck driver from Joplin. "The scenery outside reminds me of Tahoe more than anything."

Manhattan Construction Co. of Tulsa is doing some of the work on the $301 million project, which also includes the 13-story hotel that is to open later.

Construction of the casino took just 10 months and 26 days, something tribal leaders said was initially thought to be impossible.

"We built something faster, quicker and bigger than anybody in history has done," said J.R. Mathews, vice chairman of the Downstream Development Authority.

Tribal chairman John Berrey said the casino opening was dedicated to the memories of tribal members no longer living.

The tribe invited Missouri State Sen. Gary Nodler, R-Joplin, to speak at a ribbon-cutting ceremony. Nodler thanked the tribe for making a significant investment in Missouri by purchasing the former Loma Linda Country Club and for hiring hundreds of Missouri workers.

"A tremendous number of Missouri citizens are employed in this enterprise," he said. "For all of those reasons, we want to thank the Quapaw people for their investment here."

More than 1,200 people are expected to be employed once the resort hotel opens this fall.

Barry Switzer
Former Dallas Cowboys and Oklahoma Sooners head football coach Barry Switzer was on hand for the grand opening of the Downstream Casino Resort Saturday.

Switzer, who is the casino's official celebrity spokesman, offered words of encouragement for the tribe, which he compared to underdogs who accomplished the impossible by getting the casino built in record time.

**EXHIBIT 2**



# Decision to affect Cherokee County casino

July 20, 2008 09:00 pm

— By Roger McKinney
rmckinney@joplinglobe.com

COLUMBUS, Kan. — The decision for a contract for a state-owned casino in Sumner County has taken on additional importance for residents of Cherokee County who are hoping a casino in that county will result in economic benefits.

The Kansas Lottery Gaming Facility Review Board will make its decision on contracts in both counties when it meets Aug. 21 and 22. Penn National Gaming had the only proposal in Cherokee County. When the review board met July 9 in Cherokee County, Steve Snyder, Penn National's senior vice president for corporate development, said the company wouldn't commit to building a casino in Cherokee County unless it also gets the Sumner County contract.

"We are committed in a southern Kansas strategy" involving both counties, Snyder said.

But Penn National has competition for its contract in Sumner County, from casino giant Harrah's Entertainment and start-up Marvel Gaming.

Unexpected competition

The casino for the Quapaw Tribe's $301 million Downstream Casino Resort opened July 5 and had 109,000 visitors in its first week. It's located off Interstate 44 where Oklahoma, Kansas and Missouri meet. A 222-room hotel is scheduled to open in the fall.

Penn National has proposed building its Hollywood Casino in Cherokee County just north of the tribal casino. Competition from the casino project of the Quapaw Tribe is the reason Penn National officials give for scaling back and phasing in its Cherokee County project, and the reason for switching to a "southern strategy."

Penn National initially applied with the state to build a $295 million casino and hotel, but later decided to invest $125 million in a casino initially and phase in investments totaling $100 million over the next 12 years.

The Quapaw Tribe of Oklahoma announced its plan for a casino and hotel on May 14, 2007, a few weeks before Cherokee County conducted a required referendum election June 5 on a state-owned casino. At that time, the tribal project's price tag was $200 million.

Eric Schippers, public affairs vice president with Penn National, said that even after the tribe made the announcement, his company didn't think the tribe could obtain financing for its project. He said that in today's economic environment, the deal would not have been possible.

Schippers said legal questions about the tribe's project remain.

Cherokee County has filed an amended complaint in U.S. District Court in the District of Columbia against the U.S. Interior Department. It alleges that the federal agency failed to act to comply with the Indian Gaming Regulatory Act by requiring that Indian gambling take place only on Indian lands. It seeks an injunction requiring the National Indian Gaming Commission to notify the Quapaw Tribe that the land on which its casino was built is ineligible for gambling under federal law.

The fees for David Cooper, Cherokee County's attorney for casino issues, are being paid by Penn National. Cooper said at the review board meeting that if Penn National doesn't build a casino in Cherokee County, the county could take legal action against Penn National.

Competing proposals

In Sumner County, Penn National is proposing investing $340 million in a Hollywood Casino near Wellington. The project would include a casino, a 350-room resort hotel, restaurants, a conference center, and a health and beauty spa. It would hire 1,100 employees.

Marvel Gaming is proposing spending $368 million, also near Wellington. That project would include a casino, 16-story hotel with 304 rooms, restaurants, an entertainment and convention center, and a health club. Employment would total 1,765 part-time and full-time workers.

Harrah's Entertainment is proposing a $490 million investment at Mulvane. It would have a casino, a 175-room hotel, restaurants, an event center, an outdoor amphitheater and a retail store. It would hire 1,187 people.

The most recent study by Christiansen Capital Advisors found that a destination casino near Wellington could generate annual gross gambling revenues of $166.5 million, while a Mulvane location could generate annual gambling revenues of $213.5 million.

Representatives of Harrah's Entertainment and of Marvel Gaming were reluctant to publicly criticize Penn National's southern strategy.

"Although we cannot comment specifically on competitors' practices, we can tell you that Sumner Resorts Harrah's Kansas is excited about the opportunity in Sumner County," wrote Jacqueline Peterson, corporate spokeswoman for Harrah's, in an e-mail response to a question about Penn National's strategy. "We do not need two casinos in Kansas in order to be successful and offer more than half-a-billion dollar investment to the state. We have proven that we have the best plan by every measure."

Roger Wagner, president of Marvel Gaming, said he thinks Penn National's decision in Kansas was influenced by the company's new president and chief executive officer, Tim Wilmott.

"He's a very astute guy," Wagner said of Wilmott. "He decided with the Downstream Casino, the Cherokee County deal wasn't going to pencil out."

Wagner said he thinks Wilmott decided that tying the Cherokee and Sumner county casinos together was the only financially viable option.

"I don't see anybody out there who's in a conniving mode," Wagner said.

He said Marvel has the best proposal in Sumner County. Marvel Gaming was formed specifically for the project.

"We're a small, upstart company, and all of our focus is going to be on Kansas," Wagner said. "Our owners will be present almost 24/7, while our competitors would have corporate jets flying over."

He noted that the Marvel proposal projects the largest work force of any of the three.

Making the case

Schippers made his case for why he thinks Penn National is the best bet in Sumner County.

"We'll actually attract more patrons from out of state with our higher number of hotel rooms," he said. "It's a gateway to downtown Wellington and will serve as an economic engine for additional development."

Though Penn National's proposed investment in Sumner County is the smallest of the three, Schippers said its tentative contract would give more money back to the state and to Sumner and Sedgwick counties than would its competitors' proposals. Penn National's plan would provide 30 percent of annual gambling revenues up to $250 million to the state, Sumner and Sedgwick counties, and a problem-gambling fund. That would increase to 32 percent if gambling revenues are $250 million to $300 million. If gambling revenues exceed $300 million, the amount would increase to 37 percent.

Harrah's tentative contract would give the state, Sumner and Sedgwick counties, the city of Mulvane and the problem-gambling fund 27 percent of gambling revenues up to $300 million. Harrah's top rate of revenue sharing is 35 percent for revenues above $500 million.

Marvel Gaming's tentative contract would provide 27 percent of casino revenues up to $250 million to state and local entities; 32 percent of revenues of $250 million to $300 million; and 37 percent of revenues above $300 million

Schippers returned to the southern strategy when discussing the Sumner County proposal.

"Our proposal to operate casinos in both Sumner and Cherokee counties would result in an approximately $600 million investment in the state, and would maximize revenues for the state and local communities in which they're located," Schippers said. "If combined, the facilities would generate more revenue for the state than any competing proposal. The two facilities would be able to run coordinated proposals. Two Hollywood-themed facilities would create brand loyalty and a critical mass to compete against the tribal casinos."

Schippers said he realizes that the Lottery Gaming Facility Review Board must make its decision based on the merits of the individual proposals, but said he hopes the board also considers Penn's southern strategy idea.

Mike Deines, spokesman for the Kansas Racing and Gaming Commission, said members of the review board must remain neutral until they make a decision, and they cannot discuss individual proposals. He said it would be up to the board to determine if Penn National or one of the competing companies has the best proposal.

Privilege fee

Penn National Gaming, Marvel Gaming and Harrah's Entertainment each has paid the state a nonrefundable $25 million privilege fee to be considered for building and managing a state-owned casino in Sumner County. Penn National also paid a $25 million fee in connection with its Cherokee County proposal.

Copyright © 1999-2008 cnhi, inc.

**EXHIBIT 3**



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

MEMORANDUM OF AGREEMENT
BETWEEN
THE NATIONAL INDIAN GAMING COMMISSION
AND
THE DEPARTMENT OF THE INTERIOR

WHEREAS, both parties agree that they are in need, from time to time, for legal advice on whether lands may be Indian lands on which a tribe may conduct gaming and that such advice must be provided in a timely fashion;

NOW, THEREFORE, the National Indian Gaming Commission ("NIGC") and Department of the Interior ("DOI") agree to the terms of this MEMORANDUM OF AGREEMENT ("MOA") as follows:

1. The NIGC agrees that whether a tribe meets one of the exceptions in 25 U.S.C. §2719 (i.e. settlement of a land claim, restored lands for a restored tribe, or an initial reservation of a tribe acknowledged through the Part 83 process) is a decision made by the Secretary when he or she decides to take land into trust for gaming.

2. The DOI agrees that deciding whether gaming is being conducted on Indian lands is a basic and essential jurisdictional requirement for the NIGC under the Indian Gaming Regulatory Act ("IGRA").

3. To the extent the Secretary or the Chairman seek legal advice for certain actions requiring action under IGRA dependant upon the determination of Indian lands, the NIGC Office of General Counsel ("OGC") and the DOI Office of the Solicitor ("Solicitor") agree on the following division of responsibilities:

   ▪ If the Secretary is considering a fee-to-trust acquisition, then the DOI's Division of Indian Affairs ("DIA") will draft the legal opinion to the Bureau of Indian Affairs ("BIA") whether it must complete a two-part determination as part of the fee-to-trust acquisition;

   ▪ If a tribe and a state submit a Class III Tribal-State Compact for gaming on existing Indian lands, then the DIA will draft the legal opinion whether the tribe has Indian lands;

Memorandum of Agreement
National Indian Gaming Commission/Department of the Interior – Office of the Solicitor

- If a tribe requests that the NIGC approve a management contract or ordinance for gaming on existing trust lands, then the OGC will draft the legal opinion to the Chairman on whether the tribe has Indian lands; and

- The OGC will draft the legal opinion to the Chairman whether existing or proposed tribal gaming operations will be on Indian land when the land is already held in trust by the United States.

4. Regardless of whether the DIA or the OGC are drafting the legal opinion, prior to a draft opinion being released to entities other than the DOI and the NIGC, and before any legal opinion is issued, the parties will make every attempt to reach concurrence on all written opinions that provide legal advice that interprets the definition of Indian lands, the exceptions in 25 U.S.C. §2719, a tribe's jurisdiction over proposed Indian lands or the boundaries of a tribe's reservation.

5. A request for concurrence of an Indian lands opinion will include a draft of the opinion and copies of all supporting documents. Within 30 working days of receiving the request, the receiving party will notify the requesting party of his or her intent to either concur or not concur.

6. Notwithstanding the 30 working day requirement in paragraph 5, either party may inform the other of exigent circumstances that require an expedited process. Upon agreement of the parties of the need for expedition, either the Solicitor or the OGC will notify the other party within 5 working days of its intent to concur or not concur.

7. If notified of the intent to not concur, then the parties will meet within 15 working days to discuss ways to resolve the issues of non-concurrence. The notice of the intent not to concur shall include in writing all factual and legal reasons for the non-concurrence.

8. If a legal opinion is re-submitted that addresses the issues of non-concurrence, either the Solicitor or the OGC will notify the parties of its intent to concur or not concur within 10 working days.

9. If the parties are still not able to resolve the issues of non-concurrence, the parties will meet to discuss the next step. The next step may include, with the mutual agreement of both parties, submission of the draft opinion and a summary of the issues of non-concurrence to the Office of Legal Counsel, Department of Justice for resolution.

10. Each party to the MOA will advise the other party within 15 working days of receiving a request to provide Indian lands determinations. The party receiving the request will inform the other party of the individual specifically assigned to work on the legal opinion. In addition, the parties shall periodically coordinate and update pending opinion requests and the OGC shall record and track all Indian lands opinions and decisions in the NIGC Indian lands database and provide periodic updated reports to DIA.

Memorandum of Agreement
National Indian Gaming Commission/Department of the Interior – Office of the Solicitor

11. If either party has a need for additional information or assistance from the other party in order to render a legal opinion, then the party requiring the information will request such information or assistance in writing to the other party. To the extent either party is able to comply with such a request, it will fully and promptly cooperate with the request. If unable to comply with such request, notice shall be promptly given to the requesting party.

12. The party responsible for the initial draft of the legal opinion shall provide the other party with reasonable time to review the draft and make written comments. The party making the comments will designate the individual responsible and notify the other party. All comments will be provided to the requesting party within 30 working days.

13. The DIA and the OGC will work cooperatively and with collegiality and make every attempt to reach agreement on all Indian lands opinions before submitting a draft legal opinion for concurrence.

14. The Solicitor may request in writing that the OGC draft an Indian lands opinion on pending trust acquisitions that address whether a tribe is a restored tribe and whether the lands are restored lands under IGRA. The OGC, at its discretion, will provide the Solicitor with a draft opinion or decline in writing.

15. It is the position of the Secretary not to approve compacts for gaming on lands that have not been acquired into trust.

16. It is the position of the Chairman not to approve tribal ordinances or management contracts that are site specific when they call for gaming on Indian lands that have not been acquired into trust. The Chairman may continue to approve or disapprove ordinances and management contracts that are otherwise site specific.

17. To meet the demands caused by the need for Indian lands opinions, the NIGC will fund an attorney position (one FTE) within the DIA for 2 years with additional years, if any, in the sole discretion of the NIGC. This attorney position and funding will remain in effect and unaltered by the termination provisions of paragraph 19.

18. This MEMORANDUM OF AGREEMENT supersedes the MEMORANDUM OF UNDERSTANDING previously entered into between the OGC and the Associate Solicitor of the DOI regarding Indian lands opinions.

Memorandum of Agreement
National Indian Gaming Commission/Department of the Interior – Office of the Solicitor

19. This MEMORANDUM OF AGREEMENT shall be effective upon signatures by both parties and will terminate six (6) months after the date of execution, unless extended by mutual agreement.

Dated this 26 day of Feb. , 2007

Dated this 18 day of January 2007

For the National Indian Gaming Commission:
Chairman

For the United States Department of the Interior:
Deputy Associate Secretary

Penny J. Coleman
Acting General Counsel

David L. Bernhardt
Solicitor

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**BOARD OF COMMISSIONERS OF
CHEROKEE COUNTY, KANSAS**,

Case No.  1:08-cv-00317-RWR
Judge Richard W. Roberts

Plaintiff,

v.

**DIRK KEMPTHORNE, et al.,**

Defendants.

───────────────────────────────

[PROPOSED] ORDER

On consideration of Defendants' Motion to Dismiss, or in the Alternative for

Summary Judgment, and of Plaintiff Board of Commissioners of Cherokee County's Opposition

to Defendants' Motion and Cross Motion for Summary Judgment, and the record herein, it is

hereby ORDERED that the defendants' motion to dismiss is DENIED and Plaintiff's Motion for

Summary Judgment is GRANTED as to Count II and Count III of its First Amended Complaint.

Dated: _____, 2008                   _____
                                        Hon. Richard W. Roberts
                                        United States District Judge
                                        District of Columbia