**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS | ) | |
| OF CHEROKEE COUNTY, KANSAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:08-cv-00317-RWR |
| | ) | Judge Richard W. Roberts |
| v. | ) | |
| | ) | |
| KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**Plaintiff Board of Commissioners of Cherokee County's Reply in Support of
Cross Motion for Summary Judgment on Counts II and III**

In its reply and opposition brief, 1/ the government focuses almost exclusively on

its jurisdictional arguments and offers no meaningful opposition to the merits of Cherokee

County's cross motion for summary judgment on Counts II and III.  Cherokee County has fully

rebutted the government's asserted jurisdictional defenses, see Pl. Br. at 16-25, 38-40, and

respectfully submits this short memorandum in support of its cross motion for summary

judgment on Counts II and III of the amended complaint.

Apart from unimportant quibbles, the government does not contest the salient

facts regarding the timing, location and scope of the Quapaw Tribe's casino development, the

---

1/      The government's brief, titled Reply in Support of the United States's Motion to Dismiss
and Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, is cited herein
as "Govt. Reply at \_\_" (D.E. 23).  Cherokee County's Opposition to Motion to Dismiss, or in the
Alternative for Summary Judgment and Cross Motion for Summary Judgment on Counts II and
III (D.E. 21) is cited herein as "Pl. Br. at \_\_."  The government's Statement of Points and
Authorities in Support of its Motion to Dismiss or, in the Alternative, for Summary Judgment
(D.E. 17), is cited herein as "Govt. Br. at \_\_."

injury that development causes Cherokee County, and the underlying land acquisitions and

conveyances the Department of the Interior defendants undertook on behalf of the Quapaw. 2/

Nor does the government dispute – and it could not, under the facts established by its

Administrative Record – that it was well aware that the Quapaw intended to use the very parcel

the government endeavored to convey to the Tribe for the purpose of building a casino.  The

government also does not dispute that it did not follow its own established policies for gaming

acquisitions by, among other things, referring the acquisitions to DOI's Office of Gaming in

Washington, D.C., for approval, and documenting its complete compliance with the National

Environmental Policy Act ("NEPA").

　　　　　Instead the government takes the position that none of this matters.  According to

the government, it took its actions under the Indian Land Consolidation Act ("ILCA"), and they

had no effect on the Tribe's development and operation of a casino on the Meh-No-Bah parcel.

See, e.g., Govt. Br. at 30, 34.  That position appears to rest primarily on two asserted legal

conclusions.  First, the government claims that the Indian Gaming Regulatory Act ("IGRA") and

the Department's IGRA policies have no bearing here because the challenged transactions did

---

2/ 　　 Compare Cherokee County's Statement of Undisputed Material Facts (included in D.E.
21) with the United States's Response to Plaintiff's Statement of Undisputed Material Facts at 3-
6 (D.E. 23-3).  The government argues that the Court should only consider matters in the
Administrative Record, and that resolution of extra-record factual disputes at a trial would be
inappropriate. See United States's Response to Plaintiff's Statement of Undisputed material
Facts at1-3.  Cherokee County agrees that the government's actions may be upheld, if at all, only
on the basis of the Administrative Record, but maintains that fair adjudication of the pending
motions requires consideration of facts concerning the location and scope of the casino
development and the effects and injury that development has and threatens to have on Cherokee
County.  Because, as the government agrees, there are no material facts in dispute, see id. at 3,
the Court is not called upon to resolve factual disputes among the parties.

　　　　In reviewing Plaintiff's Statement of Undisputed Facts, counsel identified an error in the
first citation in paragraph 9, which should refer to Exhibit E of the Edmondson Declaration (Ex.
1 to Cherokee County's Preliminary Injunction Memorandum) rather than to an attachment to
the Statement.

not "allow or authorize gaming to occur on the land."  Id. at 13; see also id. at 30, 34.  Second, it

asserts that the Meh-No-Bah interests were eligible for gaming under IGRA as "Indian lands"

both before and after the challenged transactions, so the interests acquired by the United States

for the tribe in trust or restricted status remained eligible for gaming.  Id. at 21-22.  Neither

assertion stands up to scrutiny.

      **First**, it makes no difference that ILCA acquisitions do not themselves

"authorize" gaming.  None of the Secretary's land acquisition statutes authorize gaming; they

authorize the acquisitions themselves.  See, e.g., 25 U.S.C. § 465.  Nonetheless, when the

Department knows a tribe intends to use lands at issue for gaming, the Department applies its

gaming-acquisition policies to the transaction to ensure that the acquired interests would satisfy

the requirements of IGRA and are in compliance with other federal laws, chiefly NEPA.  See Pl.

Br. at 25-26; see also id. at 30-32.

      Four of the five challenged transactions involve the Secretary's direct acquisition

of interests in the Meh-No-Bah parcel, using federal funds, for the benefit of the Quapaw

pursuant to 25 U.S.C. § 2212.  See Govt. Br. at 6. 3/  By its very terms, Section 2212 is a statute

that authorizes the Secretary to acquire land interests in trust for tribal governments.  Id.  The

government seems to believe that because it could and did acquire the Meh-No-Bah interests

under ILCA, it could ignore its knowledge that the parcel would be used for gaming, execute a

handful of deeds and be done with the matter.  Not so.  There is nothing in the language of ILCA

that exempts the government's acquisitions under that statute from the law and department

policies that come into force when a tribe asks the government to acquire trust lands for a casino.

---

3/     The fifth and final transaction involved the Tribe's acquisition of the purported restricted
interest of a decedent's estate.  In that instance, the tribe utilized its own funds.  See Govt. Br. at
6.

On the contrary, the government's gaming-acquisition policy expressly applies to "all

acquisitions for gaming[,]" including "acquisitions of restricted to restricted/trust lands."  That

command plainly applied to the Meh-No-Bah acquisitions, which according to the government,

involved the acquisition of restricted interests in trust for the tribe.  Govt. Br. at 22-23. 4/

        Despite its knowledge that the acquired lands would be used for gaming and the

plain applicability of the government's gaming-acquisition policy, the government treated the

transactions as run-of-the-mill ILCA transactions and completely ignored its obligations under

the Department's gaming acquisition policy, IGRA, and NEPA.  The Administrative Record is

devoid of any consideration of whether the tribe's intended use of the parcel implicated any

requirements under IGRA or NEPA.  Thus, this is not a case where responsible officials made a

reasoned decision to depart from existing policy on an articulated basis.  To the contrary, the

government was so derelict in it haste to do the tribe's bidding that local and regional officials

did not even consult with the Office of Gaming in the Secretary's executive offices to determine

whether the designated superior officers would recognize some sort of exemption or departure

from policy for the Meh-No-Bah acquisitions.

        **Second**, the government offers absolutely no support for its claim that the Meh-

No-Bah interests were eligible for gaming under IGRA before the transactions at issue.  Govt. Br.

at 18; Govt. Reply at 21-23.  The government offers nothing more than bare assertions by

---

4/    For that reason, the government relies on a distinction without a difference in its attempt
to distinguish this case from  Michigan Gambling Opposition v. Norton, 477 F. Supp. 2d 1, 9-20
(D.D.C. 2007) ("MichGO"), TOMAC v. Norton, 240 F. Supp. 2d 45, 52-53 (D.D.C. 2003) and
City of Roseville v. Norton, 219 F. Supp. 2d 130, 165-70 (D.D.C. 2002), aff'd, 348 F.3d 1020
(D.C. Cir. 2003) . See Govt. Reply at 7.  In all those cases, as in this case, the government took
land into trust under one of its acquisition statutes.  Likewise, the government's citation to Indian
Land Opinions in which no acquisition of land was involved is plainly unavailing here where the
government in fact did acquire lands for the benefit of the tribe.

litigation counsel on this question and points to no record evidence that, prior to the transactions

at issue, the interests were held to be gaming-eligible, much less that any responsible Department

official made that determination.  As Cherokee County explained in its prior brief, whether lands

qualify as "Indian lands" under IGRA is a distinct question governed by that statute's terms and

definitions.  See Pl. Br. at 22, 41. 5/  To plaintiff's knowledge, the government never had

occasion to make an "Indian lands" determination prior to the acquisitions at issue, and there is

nothing in the Administrative Record that purports to apply the definitions or statutory

interpretation of IGRA's requirements to the Meh-No-Bah interests.  The Administrative Record

submitted by the government is thin, and it contains no relevant source materials addressing the

question, nor any analysis of this point.  There is simply no record on which the government can

base any assertion that, before or after the challenged acquisitions, the parcel had been

determined to be "Indian lands" under IGRA.

In its amended complaint, Cherokee County outlined the sequence of

Congressional enactments regarding the status of the Quapaw allotments, which indicate that the

parcel fell out of restricted status decades ago, and therefore would not have been eligible for

gaming prior to the challenged acquisitions.  See Am. Compl. ¶¶ 16-20.  As explained in

Cherokee County's brief, the Court need not decide any questions concerning the status of the

land interests.  See Pl. Br. at 22.  It is enough to observe that, having offered no analysis of the

issue in its Administrative Record, the government cannot establish that "the Meh-No-Bah

Allotment was eligible for gaming before and after the ILCA transfer."  Govt. Br. at 22.

---

5/    "Indian lands" as defined by IGRA is not equivalent to "Indian country," a term used in
other federal statutes.  Compare 25 U.S.C. § 2703(4) with Govt. Br. at 4 (providing definition of
"Indian Country").

**Third**, even if the government could show a determination that the Meh-No-Bah interests would have qualified as gaming-eligible under IGRA prior to the government's actions, there is no question that as a direct result of the government's actions, the tribe acquired control over the parcel on which, as the government knew, the tribe intended to and did construct a casino. It is beyond fair debate that the government's action facilitated and enabled the tribe's announced plans to build a casino, and even used federal funds for four of the five acquisitions necessary to make that happen. That is more than sufficient to trigger an obligation to comply with IGRA and NEPA. See, e.g., Anacostia Watershed Soc'y v. Babbitt, 871 F. Supp. 475, 481-82 (D.D.C. 1994) (federal agency's transfer of jurisdiction is not "mere paper transaction" where it facilitated "potentially intrusive development"); S. W. Neighborhood Assembly v. Eckard, 445 F. Supp. 1195, 1199-1200 (D.D.C. 1978).

In an effort to distance its actions from their consequences, however, the government speculates that if the government had not taken the challenged actions, maybe the tribe might have operated its casino under a lease agreement. Govt. Reply at 6. But that is nothing but speculation, and it is at odds with the Administrative Record, which makes clear that the tribe very actively orchestrated the government's acquisitions, strongly suggesting that the tribe viewed the government's actions as critical. See AR 143-45, 150-54, 169-72, 173-75, 176-78, 201. Indeed, the tribe told the government its actions were critical to the development plan. The tribe broke ground on its casino development in July 2007. On July 3, two of the five transaction had yet to be completed, and the tribe made clear to the government that "it is becoming very urgent that the Tribe be able to conclude these conveyances[.]" AR 145. Now, the government claims the parcel was already eligible for gaming or could have been secured by lease. But obviously, the tribe believed the transactions were urgently required prior to its

planned groundbreaking.  Perhaps the tribe could not obtain required financing otherwise, or

perhaps individual interest holders would not agree to a leasing arrangement (or, if given a

choice, would demand too high a price).  Perhaps the tribe could not devise a workable way to

hold leases from five fractional interest holders, including a decedent's estate.  The

Administrative Record contains no basis for the government's supposition that its action were

mere surplusage.  What is plain is that the tribe urgently needed the government to effect the

acquisitions, and that the government knowingly did so in order to enable the tribe to move

forward with the casino.

Under the facts and law set out in Cherokee County's submissions, it is clear that

the federal actions at issue triggered the government's obligation to comply with IGRA, the

Department's long-standing IGRA policies, and NEPA.   Because it is undisputed that the

government never even considered the application of IGRA to its actions (let alone complied

with it) and never conducted any environmental review under NEPA, the government violated

the APA by taking its actions arbitrarily and capriciously and in a manner contrary to law.

**Conclusion**

For the foregoing reasons, and for the reasons presented in Cherokee County's

Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss, or in the

Alternative Motion for Summary Judgment, and Brief in Support of Cross Motion for Summary

Judgment on Counts II and III, Cherokee County respectfully requests that the Court grant

Cherokee County summary judgment on Counts II and III of the amended complaint.

Dated:  August 21, 2008

                                        Respectfully submitted,


                                        s/Jonathan L. Abram
                                        Jonathan L. Abram, D.C. Bar No. 389896
                                        jlabram@hhlaw.com
                                        Audrey E. Moog, D.C. Bar No. 468600
                                        amoog@hhlaw.com
                                        HOGAN & HARTSON LLP
                                        555 Thirteenth Street, NW
                                        Washington, DC  20004–1109
                                        (202) 637-5600 (Telephone)
                                        (202) 659-5910 (Facsimile)

                                        *Counsel for Board of Commissioners of Cherokee
                                        County*

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiff Board of Commissioners of Cherokee County, Kansas, hereby certifies that on August 21, 2008, the foregoing Plaintiff Board of Commissioners of Cherokee County's Reply in Support of Cross Motion for Summary Judgment on Counts II and III was filed with the Court using the CM/ECF system, which automatically serves notice of the filing on counsel for the defendants.

s/Audrey E. Moog
Audrey E. Moog