UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BOARD OF COMMISSIONERS OF CHEROKEE COUNTY, KANSAS,<br><br>Plaintiff,<br><br>v.<br><br>SALLY JEWEL, in her official capacity as SECRETARY OF THE INTERIOR, *et al.*,<br><br>Defendants. | Civil Action 08-317 (RC) |

MEMORANDUM OPINION

In 2008, the Quapaw Tribe of Oklahoma ("the tribe") opened the Downstream Casino Resort, a large complex that straddles the borders of Kansas, Missouri, and Oklahoma. The actual casino is situated on a plot of land acquired by the Secretary of the Interior and the tribe by means of the Indian Land Consolidation Act. The Board of Commissioners of Cherokee County, Kansas, where another portion of the casino complex is located, brought this suit to invalidate the Secretary's land acquisition and to force the National Indian Gaming Commission to determine whether the Indian Gaming Regulatory Act permits the Quapaw to operate a casino on the land in question. The Secretary and the Gaming Commission have moved to dismiss the complaint or, in the alternative, for summary judgment; the Board of Commissioners has filed a cross-motion for partial summary judgment.

## I.  BACKGROUND

In 1895, a Quapaw woman named Meh-No-Bah was allotted forty acres of land in what is now the northeastern corner of Oklahoma.  AR 45.  The Quapaw Allotment Act provided that such allotments would "be inalienable for a period of twenty-five years" from the date on which a patent was issued to the allottee.  28 Stat. 907; *see also Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1170–71 (N.D. Okla. 2009) (discussing history of the Quapaw allotments).  In 1905, Meh-No-Bah died intestate with two heirs—Alexander Beaver (also known as Alexander Lewis, Alexander Lewis Beaver, and Ah-Sah-Ta) and Newakis Hampton (also known as Ta-Meh Quapaw and Temeh Quapaw)—each of whom received an undivided half-interest in the allotment.  AR 192–93.  In 1921, Congress amended the Quapaw Allotment Act so that "the restrictions which now exist against the alienation of the lands allotted to and allotted lands inherited by the Quapaw Indians" specifically named in the amendment were "extended for the further and additional period of twenty-five years from the date of this Act."  41 Stat. 1248–49.  Neither Meh-No-Bah nor her heirs were named.

Alexander Beaver died in the spring of 1956, passing his undivided half-interest to his widow, Matilda Stand Beaver.  AR 193.  She passed her undivided half-interest to three heirs.  *Id.*[1]  Newakis Beaver died in 1957, passing her undivided half-interest to a single heir, who in turn passed that interest to two heirs.  By 2004, four people and one estate held undivided

---

[1] Ms. Beaver was a member of the Peoria tribe.  AR 193.  On August 2, 1956, Congress passed the Peoria Termination Act, which provided that "[a]ll restrictions on the sale or encumbrance of trust or restricted land owned by members of the Peoria Tribe of Indians of Oklahoma . . . regardless of where the land is located, are hereby removed three years after the date of this Act, and the patents or deeds under which titles are then held shall pass the titles in fee simple . . . ."  70 Stat. 937.  Ms. Beaver died on July 30, 1959, three days before the Peoria Termination Act took effect.  AR 193.  One of her heirs was also a member of the Peoria Tribe.  AR 139.

interests in the original Meh-No-Bah allotment; two of these were one-quarter interests, while the other three were one-sixth interests. *Id.*

The creation of undivided but ever-smaller fractional interests in allotted land was one of many troubling features of the allotment policy. *See Babbitt v. Youpee*, 519 U.S. 234, 237 (1997) ("The allotment policy 'quickly proved disastrous for the Indians.'" (quoting *Hodel v. Irving*, 481 U.S. 704, 707 (1987))). "The fractionation problem proliferated with each succeeding generation as multiple heirs took undivided interests in allotments. . . . As most owners had more than one heir, interests in lands already allotted continued to splinter with each generation." *Id.* at 238. In 1983, Congress passed the Indian Land Consolidation Act, Pub. L. No. 97-459, tit. II, 96 Stat. 2517 (codified as amended at 25 U.S.C. § 2201 *et seq.*), "in part to reduce fractionated ownership of allotted lands," *Babbitt*, 519 U.S. at 238. The Act allowed an Indian tribe that owned at least half of the undivided interest in a tract of land subject to that tribe's jurisdiction to purchase the remaining interests in the tract for their fair market value. 25 U.S.C. § 2204(a). In 2000, Congress gave the Secretary discretionary authority to acquire "any fractional interests in trust or restricted lands," at fair market value and with the consent of the owner, and to hold those interests in trust for the relevant tribe. Indian Land Consolidation Act Amendments of 2000, Pub. L. No. 106-462, tit. I, § 103, 114 Stat. 1999 (codified as amended at 25 U.S.C. § 2212(a)). In doing so, the Secretary was instructed to "promote the policies provided for in section 102 of the Indian Land Consolidation Act Amendments of 2000," 25 U.S.C. § 2212(b)(1), which include "promot[ing] tribal self-sufficiency and self-determination," Pub. L. No. 106-462, tit. I, § 102(4), 114 Stat. 1992.

In 2007, using that mechanism, the Secretary purchased four of the five undivided interests in the Meh-No-Bah allotment. AR 19, 63, 111, 132. She did not perform any environmental review of the acquisition. The tribe purchased the remaining one-sixth interest

using the mechanism set out in 25 U.S.C. § 2204. AR 140. In 2008, the Downstream Casino Resort opened on the forty-acre plot allotted to Meh-No-Bah more than a hundred years before. It has been in continuous operation ever since.

The Board of Commissioners of Cherokee County, Kansas, filed suit several months before the casino opened. The Board of Commissioners alleges, first, that the Secretary violated the Indian Gaming Regulatory Act by failing to determine whether the Meh-No-Bah allotment was eligible for gaming before acquiring it, and that the National Indian Gaming Commission was obligated to make that determination before allowing the casino to open. The Board also alleges that the Secretary failed to comply with the National Environmental Policy Act, the land-into-trust regulations and her own internal policies when she acquired the fractional interests in the Meh-No-Bah allotment. The Secretary has moved to dismiss the complaint or, in the alternative, for summary judgment; the Board has filed a cross-motion for partial summary judgment.

## II. LEGAL STANDARD

### A. Standing

A petitioner seeking judicial review of agency action "must either identify in th[e] record evidence sufficient to support its standing to seek review or, if there is none . . . submit additional evidence." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citing *Amfac Resorts, L.L.C. v. Dep't of Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002)); *see also id.* at 900 ("When the petitioner's standing is not self-evident, . . . the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review."). To meet its burden of production, the petitioner "must support each element of its claim to standing 'by affidavit or other evidence,'" *id.* at 899 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), "and must thereby 'show a "substantial probability" that it has been injured,

that the defendant caused its injury, and that the court could redress that injury,'" *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1134 (D.C. Cir. 2005) (quoting *Sierra Club*, 292 F.3d at 899 (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000))).[2]

### B. Merits

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, or in violation of another standard set out in 5 U.S.C. § 706(2).

When a plaintiff seeks to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the "claim . . . can proceed only where [the] plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004)) (emphases in *Norton*). "[W]hen an agency is compelled by law to act, but the manner of its action is left to the agency's discretion, the 'court can compel the agency to act, [although it] has no power to specify what th[at] action must be.'" *Id.* (quoting *Norton*, 542 U.S.

---

[2] Although these cases discuss standing to challenge agency action in the court of appeals, "that requirement is the same, of course, as it would be if such review were conducted in the first instance by the district court." *Sierra Club*, 292 F.3d at 899; *accord Teamsters*, 429 F.3d at 1134.

at 65) (last two alterations in original); *accord Enterprise Nat'l Bank v. Vilsack*, 568 F.3d 229, 234 (D.C. Cir. 2009).

The defendants have moved to dismiss or, in the alternative, for summary judgment. Although, in the context of challenges to agency action, "there is no real distinction . . . between the question presented on a 12(b)(6) motion and a motion for summary judgment," *Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226, the D.C. Circuit has suggested that "[i]t is probably the better practice for a district court always to convert to summary judgment" in such cases. *Id.* at 1226 n.5. This court therefore treats the defendants' motion as one brought for summary judgment, and evaluates both it and the plaintiff's cross-motion for partial summary judgment under the standards discussed above.

### III.  ANALYSIS

#### A.  Indian Gaming and Indian Lands

Under the Indian Gaming Regulatory Act ("IGRA"), "[a] tribe may conduct gaming only on 'Indian lands' within its jurisdiction." *Citizens Exposing Truth About Casinos v. Kempthorne* ("*CETAC*"), 492 F.3d 460, 462 (D.C. Cir. 2007) (quoting 25 U.S.C. §§ 2710(b)(1), (d)(1)(A)(I)). The statute defines "Indian lands" to include:

> (A) all lands within the limits of any Indian reservation; and,
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). But the statute prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless" one of several statutory exceptions applies. *Id.* § 2719(a). Among those exceptions, gaming is permitted on more-recently-acquired trust or restricted lands if "the Indian tribe ha[d] no reservation on October 17,

1988, and (A) such lands are located in Oklahoma, and (i) are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary, or (ii) are contiguous to other land held in trust or restricted status by the United States for the Indian tribe in Oklahoma." *Id.* § 2719(a)(2).

IGRA defines several classes of gaming, subjecting each to a different regulatory scheme. Class I gaming is not at issue here. "Class II gaming includes bingo and card games except for 'banking' card games like baccarat, chemin de fer, and blackjack." *North Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009) (citing 25 U.S.C. § 2703(7)). In order to conduct class II gaming, a tribe must adopt a gaming ordinance or resolution and have it approved by the National Indian Gaming Commission ("NIGC"), "a regulatory body created by IGRA with rulemaking and enforcement authority." *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011); *see* 25 U.S.C. § 2710(b)(1)(B) (requiring NIGC approval of gaming ordinance or resolution). The NIGC must give its approval "if the proposed ordinance meets certain specified conditions." *North Cnty. Cmty. Alliance*, 573 F.3d at 744 (citing 25 U.S.C. § 2710(b)(2)). "There is no explicit requirement in IGRA that, as a precondition to the NIGC's approval, a proposed ordinance identify the specific sites on which the proposed gaming is to take place." *Id.* at 744–45. The Ninth Circuit has concluded that no such implicit requirement exists, either. *Id.* at 747. Nonetheless, some tribal gaming ordinances do specify the sites on which gaming will take place—and, when they do, the NIGC concedes that it has an obligation to determine whether those sites are eligible for gaming under IGRA. *Id.* at 746 ("The NIGC states in its brief to us that when a site-specific ordinance is presented for approval it has an obligation to make an Indian lands determination for the specifically identified site or sites."); *Neighbors of Casino San Pablo v. Salazar*, 773 F. Supp. 2d 141, 146 n.10 (D.D.C. 2011) ("Defendants acknowledge that the NIGC should make an Indian lands determination if a tribe

submits a site-specific gaming ordinance . . . that indicates the proposed location of the gaming." (internal quotation marks omitted)); Defs.' Br. at 38. And, under its regulations as amended in 2008, "the NIGC is authorized to require that a tribe submit Indian lands information when submitting a proposed ordinance for approval." *North Cnty. Cmty. Alliance*, 573 F.3d at 747 (citing 25 C.F.R. § 522.2 ("A tribe shall submit to the Chairman [of the NIGC] . . . with a request for approval of a class II. . . ordinance or resolution . . . . (i) . . . Indian lands . . . documentation that the Chairman may in his or her discretion request as needed.")).

A tribe must also issue "[a] separate license . . . for each place, facility, or location on Indian lands at which class II gaming is conducted." 25 U.S.C. § 2710(b)(1). The NIGC does not approve those licenses but, as of 2008, a tribe must "submit to the Chair [of the NIGC] a notice that a facility license is under consideration for issuance at least 120 days before opening any new place, facility, or location on Indian lands where class II . . . gaming will occur." 25 C.F.R. § 559.2(a). "That notice must contain specified information about the location and status of the property on which the facility is to be located, so that the NIGC may determine whether the property is Indian lands eligible for gaming." *North Cnty. Cmty. Alliance*, 573 F.3d at 748; *see also* 25 C.F.R. § 559.1(a) (describing regulations as intended "to ensure that each place, facility, or location where class II . . . gaming will occur is located on Indian lands eligible for gaming").

For a tribe to engage in class III gaming, which "includes banking card games and slot machines," *North Cnty. Cmty. Alliance*, 573 F.3d at 741 (citing 25 U.S.C. § 2703(8)), both a tribal gaming ordinance or resolution approved by the Gaming Commission and a tribal-state compact approved by the Secretary must be in place. *Amador Cnty.*, 640 F.3d at 376 (citing 25 U.S.C. § 2710(d)(1)(A), (2)(C) (gaming ordinance or resolution); *id.* § 2710(d)(1)(C) (tribal-state compact)). There is no statutory requirement that the compact identify gaming sites. Most

statutory and regulatory provisions governing gaming ordinances and licenses apply equally to class III gaming facilities.  *See* 25 U.S.C. § 2710(d)(1)(A)(ii) (class III gaming ordinance must "meet[] the requirements of subsection (b) of this section"); 25 C.F.R. §§ 522.2, 559.1–2.

The Board of Commissioners contends that the National Indian Gaming Commission has a nondiscretionary duty to determine whether, given this statutory scheme, the tribe can legally conduct gaming on the Meh-No-Bah allotment.  Two courts have held that the NIGC need not make a site-specific determination of gaming eligibility before approving a gaming ordinance that does not specify sites.  *See North Cnty. Cmty. Alliance*, 573 F.3d at 746–47; *Neighbors of Casino San Pablo*, 773 F. Supp. 2d at 146 ("[T]he plain language of the IGRA did not require the NIGC to perform an independent 'Indian lands' determination in conjunction with the . . . submission of non-site-specific gaming ordinances." (footnote omitted)); *but see Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 322–27 (W.D.N.Y. 2007).  The Board of Commissioners does not make the argument raised and rejected in those cases: that the NIGC should have made an eligibility determination before approving the tribe's gaming ordinance or tribal-state compact, neither of which specify gaming sites.  Instead, the Board argues that the Secretary was required to determine the gaming eligibility of the Meh-No-Bah allotment before acquiring interests in it under the Indian Land Consolidation Act, and that the NIGC was required to do so when the tribe gave notice that it planned to license gaming on that parcel.  The defendants take the position that although the NIGC has discretionary authority to bring an enforcement action against any Indian gaming operation that violates IGRA, NIGC regulations, or a tribal gaming ordinance, neither the Secretary nor the NIGC is required to determine the gaming eligibility of a particular parcel unless it is named as a gaming site in an ordinance or tribal-state compact.

Both the Ninth Circuit and one judge in this district have rejected the argument that the NIGC has an enforceable duty to determine whether a site is gaming-eligible when it learns that a tribe intends to construct a gaming facility there.  The Ninth Circuit could not "find anything in the text of IGRA, or in the regulations in effect in 2006" that would require "the NIGC to make an Indian lands determination when a tribe licensed or began construction of a class II gaming facility already authorized by a non-site-specific ordinance." *North Cnty. Cmty. Alliance*, 573 F.3d at 747.  It therefore concluded "that NIGC was under no judicially enforceable obligation to make an Indian lands determination in 2006." *Id.*  The Ninth Circuit limited its holding to the state of the law in 2006 because, in 2008, the NIGC promulgated the regulations discussed above, which require tribes to provide the Commission with information about gaming eligibility before licensing a gaming site, and which empower the Commission to request information about gaming eligibility before approving an ordinance.  25 C.F.R. §§ 522.2, 559.1–2.  The Ninth Circuit noted that "[t]he validity and proper interpretation of these new regulations" was not before it, because the regulations were not in place "at the times relevant to [that] suit." *North Cnty. Cmty. Alliance*, 573 F.3d at 747.  In 2011, however, after those regulations had come into force, a judge in this district similarly concluded that "knowledge of gaming activities . . . does not create an additional legal duty (such as an Indian lands determination) not imposed by statute." *Neighbors of Casino San Pablo*, 773 F. Supp. 2d at 147.

In its briefing here, the Board of Commissioners has not identified any statutory or regulatory basis for the alleged requirement that the NIGC determine the gaming eligibility of parcels on which it knows that gaming is planned, nor that the Secretary make a similar determination when she acquires land that she knows will be used for gaming.  Instead, the Board insists that because eligibility for gaming "is the predicate question under IGRA," "fundamental to the statute," and "fundamental to [the NIGC's] jurisdiction under IGRA," Pltf.'s

10

Br. at 41, Congress has "implicitly required," *id.* at 44, that the Secretary and the NIGC make an eligibility determination. But, having examined the text and the structure of IGRA and its implementing regulations, the court cannot discern any such "*discrete* agency action that [the agency] is *required to take*." *Kaufman*, 524 F.3d at 1338 (quoting *Norton*, 542 U.S. at 63) (emphases in *Norton*).

The NIGC clearly has the authority to enforce civil penalties against those who violate IGRA. *See* 25 U.S.C. § 2713. And the Supreme Court has "held that 'an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion' and therefore is presumptively unreviewable." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1256–57 (D.C. Cir. 2005) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "This presumption of unreviewability may be overcome 'where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers,' or 'where the agency has conspicuously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001) (quoting *Chaney*, 470 U.S. at 833 & n. 4)) (internal quotation marks omitted). Neither exception applies here. IGRA did not require either the Secretary or the NIGC to determine the gaming eligibility of the Meh-No-Bah allotment; it simply authorized them to do so, and committed civil enforcement to the discretion of the NIGC.

### B. Acquisitions Under the Indian Land Consolidation Act

In its remaining claims, the Board of Commissioners contends that the Secretary violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, as well as her own regulations and policies, in acquiring the majority of the Meh-No-Bah allotment. The Secretary argues, first, that the Board of Commissioners lacks standing to maintain this portion of its suit.

To establish constitutional standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). Petitioners seeking judicial review of agency action must identify evidence, either in the record or outside of it, to demonstrate a substantial probability that they satisfy each element of standing. *Int'l Bhd. of Teamsters*, 429 F.3d at 1134; *Sierra Club*, 292 F.3d at 899.

There is no real doubt that the Board of Commissioners has suffered a concrete and actual injury: Cherokee County is responsible for repairing county roads and ensuring public safety, which has surely become more expensive as visitors have driven to and from the parking lot of the Downstream Casino Resort, which is located in the county.

Whether those alleged injuries are fairly traceable to the Secretary's decision to acquire most interests in the Meh-No-Bah allotment is a much closer question. The Secretary argues that there is no causal link between her acquisition of land under the Indian Land Consolidation Act and the Board of Commissioners' injuries, all of which have been caused by the tribe's operation of a casino. Citing the provisions of IGRA discussed above, the Secretary notes that her

12

acquisition on behalf of the tribe did not authorize gaming—which is true, but which does not in itself defeat standing.

In *Taxpayers of Michigan Against Casinos v. Norton* ("*TOMAC*"), an advocacy group challenged a decision by the Bureau of Indian Affairs to take land into trust under the Pokagon Restoration Act, 25 U.S.C. § 1300j-5, "so that the Pokagon Band of Potawatomi Indians c[ould] build a casino." *TOMAC*, 193 F. Supp. 2d 182, 185 (D.D.C. 2002). The organization argued that a casino would "hurt the quality of life in surrounding communities." *Id.* at 186. The Secretary moved to dismiss the complaint for lack of standing, and the district court acknowledged that "the injuries asserted by TOMAC members arise, not directly from the challenged act of placing the land in trust, but rather from the intended use of the land by the Pokagon, who are not before the court." *Id.* at 188. Yet the district court concluded that neighbors to the site had standing to challenge the Secretary's decision to take that land into trust.[3] As the court explained:

> The necessary linkage is easy to identify . . . . TOMAC members' injuries due to operation of the casino are traceable to the Bureau[ of Indian Affairs]'s actions, because the taking of the site in trust is a necessary prerequisite to both Class II and Class III gaming, 25 U.S.C. § 2710(b)(1), (d)(1), and because taking the land into trust would give the Pokagon authority to compel the State of Michigan to negotiate over Class III gaming. These factors not only establish that the individual TOMAC members' injuries would be "fairly traceable" to the defendant's actions, but they

---

[3] The Supreme Court implicitly reached the same conclusion in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199 (2012), in which a plaintiff challenged the Secretary's decision to take land into trust under the Indian Reorganization Act, 25 U.S.C. § 465, so that a tribe could build a casino. Although there was no discussion of constitutional standing in that case—only prudential standing—the Court could not have reached the merits of the case if the plaintiff lacked standing to sue. *See id.* at 2210 (discussing the argument that the "relationship between § 465 and Patchak's asserted interests is insufficient . . . because the statute focuses on land *acquisition*, whereas Patchak's interests relate to the land's *use* as a casino"); *id.* at 2212 (concluding that because "the Secretary will typically acquire land with the eventual use in mind, after assessing potential conflicts that use might create. . . . neighbors to the use (like Patchak) are reasonable—indeed, predictable—challengers of the Secretary's decisions").

>also help to satisfy the redressability requirement—since a decision *not* to take the land in trust would prevent the Pokagon from building a casino on that site and from satisfying the requirements of IGRA for casino gambling.

*Id.* (citations omitted).  The D.C. Circuit affirmed this ruling without elaboration. *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006) ("We note at the outset that we agree with the District Court's finding that TOMAC has Article III . . . standing to challenge BIA's actions . . . .  There is no serious question about TOMAC's standing that warrants further discussion by this court." (citations omitted)).[4]

The Secretary argues that, unlike in *TOMAC*, taking the Meh-No-Bah allotment into trust was not "a necessary prerequisite" to the operation of a casino on the parcel because, she says, prior to their acquisition the fractionated interests were either "held in trust by the United States for the benefit of an[ ] Indian . . . individual or held by an[ ] Indian . . . individual subject to restriction by the United States against alienation," 25 U.S.C. § 2703(4)(B), and were therefore already eligible for gaming.  It is not clear from the record whether this is true.  On the one hand, the mechanism by which the Secretary acquired a five-sixths interest in the Meh-No-Bah allotment was statutorily limited to the acquisition of "fractional interest[s] in trust or restricted lands," 25 U.S.C. § 2212(a)(1), and each of the deeds effecting the acquisition is labeled as a "Deed to Restricted Indian Land," AR 19, 63, 111, 132.  The deed conveying the final one-sixth interest is similarly labeled and attests that the interest was "restricted or held in trust by the United States" before its transfer.  AR 140.  On the other hand, as the Board notes, the Meh-No-Bah allotment was made under the Act of March 2, 1895, which provided that allotments would "be inalienable for a period of twenty-five years."  28 Stat. 907.  The record does not contain any

---

[4] The D.C. Circuit also suggested that environmental review was required before the land could be taken into trust.  *See TOMAC*, 433 F.3d at 857 ("Before proceeding with the project, the Bureau [of Indian Affairs] was required under NEPA to assess the potential environmental impacts of the gaming resort.").

information about how or when that restriction was extended, if in fact it was, and the Secretary has provided no explanation.

Instead, the Secretary suggests that, at some point before 2007, she took the restricted interests into trust on behalf of Meh-No-Bah or her heirs. Defs. Br. at 3 ("At the beginning of April 2007, the entire Meh-No-Bah Allotment was held by the United States in trust for four individual Indians and one Indian estate in varying shares."); *id.* at 19 ("The United States was trustee of the land before the transfer, and it remained trustee after the transfer."); *id.* at 23 (describing the transfer as a "simple change in trust beneficiary from the individual Indians to the Tribe"). The Secretary does not explain how or when she took these interests into trust prior to the transactions at issue here, and there is no discussion of any such process in the administrative record. To the contrary, the record indicates that there was some uncertainty about the status of several of the interests acquired by the Secretary, and that others were restricted—although, again, there is no explanation of how the restriction against alienation survived until 2007. *See, e.g.*, Letter from John L. Berrey, Chairman, Quapaw Tribal Business Committee to Jeanette Hanna, Regional Director, U.S. Bureau of Indian Affairs, AR 151 ("It is our understanding that your office will shortly . . . make a determination concerning whether [certain] interests in [the] tract are fee or restricted interests, and that it is highly likely [that they] will be determined to be fee interests."); *id.* at 152 ("A two-thirds interest in the [Meh-No-Bah] tract has . . . remained in restricted status since the . . . allotment in 1895.").

On the record before it, the court cannot determine whether the Meh-No-Bah allotment was eligible for gaming before the Secretary acquired a five-sixths interest in trust for the tribe—that is, whether the acquisition was a "necessary prerequisite to . . . Class II and Class III gaming" on that tract. *Cf. TOMAC*, 193 F. Supp. 2d at 188. But the court need not make that determination to decide the issue of causation. It is perfectly clear that, before the land

acquisition challenged here, the tribe was not legally entitled to build and operate a casino on the Meh-No-Bah allotment. The reason for that is simple: the tribe had no legal rights to the land. After the acquisition, it did. And so, even if (as the Secretary argues) the tribe could have entered a long-term lease with the owners of the fractionated interests in the allotment instead of petitioning the Secretary to take those interests into trust on the tribe's behalf—and even if the allotment was already gaming eligible—the tribe still needed to do *something* to acquire the right to build a casino there. It could not just build on land that it did not control. The Secretary removed this roadblock, with the apparent knowledge that the tribe intended to construct a casino. *See* AR 201 ("Mr. Barry called yesterday about the 40 acre tract that the Tribe wants to build a casino on."). Injuries resulting from the construction and operation of the casino are therefore fairly traceable to the Secretary's decision to acquire interests in the Meh-No-Bah allotment, regardless of whether that land was eligible for gaming before the acquisition or whether the acquisition itself made the land gaming-eligible.

The question of redressability, however, does turn on the pre-acquisition gaming eligibility of the Meh-No-Bah allotment. The Board of Commissioners asks the court to reopen the acquisition process to allow for environmental review, returning the consolidated interests to their original owners until that review is complete.[5] That remedy would redress the Board's injuries if (and only if) it would be reasonably likely to cause the casino to shut down, because (as the Secretary repeatedly notes) all of the Board's injuries stem from the operation of the casino. If the Meh-No-Bah allotment was ineligible for gaming prior to the Secretary's acquisition on behalf of the tribe, then undoing that acquisition would render the land ineligible

---

[5] The Board of Commissioners also asks for an order that the NIGC enjoin the operation of the casino on the grounds that the land on which it sits is ineligible for gaming, but (as discussed above) the NIGC enjoys the discretionary authority to exercise its enforcement powers without judicial oversight.

once again—and it is reasonably likely that, if the land on which the casino sat became ineligible for gaming, the casino would indeed shut down, either out of prudence or as the result of an NIGC enforcement action. But if the Meh-No-Bah allotment was gaming eligible before the acquisition at issue here, because the fractionated interests were held in trust or restricted status by Indian individuals, then returning ownership of the land to those individuals would not be reasonably likely to cause the casino to cease operation. Obviously, some negotiations would be required between the tribe and the former owners of the land supporting its casino, and those negotiations might well deliver a windfall to the owners—but it is not reasonably likely that the parties would agree to shut down an apparently lucrative business rather than agreeing to share its proceeds. To demonstrate redressability, then, the Board of Commissioners must point to evidence sufficient to demonstrate a substantial probability the land on which the casino sits was ineligible for gaming before the acquisitions challenged here. *See Int'l Brotherhood of Teamsters*, 429 F.3d at 1134; *Sierra Club*, 292 F.3d at 899.

The Board of Commissioners has not done so. Instead, the Board argues that the court can find in its favor even if it accepts the Secretary's assertion that the interests in the Meh-No-Bah allotment were in trust or restricted status prior to the challenged acquisitions. Pl.'s Br. at 22. To support her argument, the Secretary points to the deeds by which the interests were acquired, all of which describe the land as being either held in trust or restricted, AR 19, 63, 111, 132, and the method of acquisition, which required as much, *see* 25 U.S.C. § 2212(a). Although it does not concede that point, the Board marshals very little evidence to the contrary, merely citing the Quapaw Allotment Act and arguing that, by the terms of that statute, any restriction against alienation terminated in the 1920s. *See* 28 Stat. 907 (providing that allotments would "be inalienable for a period of twenty-five years" from the date on which a patent was issued to the allottee). The Secretary has determined otherwise, but has not explained her determination. At

this stage of the analysis, however, it is not the Secretary's obligation to do so. Rather, it is the Board of Commissioners' burden to show a substantial probability that the determination was incorrect, and so establish the redressability of its injuries. The Board could have attempted to compel the Secretary to elaborate on her determination, but it believed that the issue would not be fatal to its case. That belief was incorrect.

The Board of Commissioners has not demonstrated a substantial probability that the injuries it has suffered as a result of the casino's operation would be redressed by the relief that it seeks here. It therefore lacks standing to challenge the Secretary's acquisition of interests in the Meh-No-Bah allotment on behalf of the tribe.

## IV.  CONCLUSION

For the reasons discussed above, the court concludes that the NIGC is not required to issue a determination as to the gaming eligibility of the Meh-No-Bah allotment, and that the Board of Commissioners has not established its standing to challenge the Secretary's decision to take that land into trust, because it has not shown a substantial probability that a judgment it its favor would redress its injuries.

Rudolph Contreras  
United States District Judge

Date: July 25, 2013